UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

PATRICK GUILLORY,

                                        Plaintiff,
                                                            9:13-CV-1564
v.                                                          (MAD/TWD)

NANCY HAYWOOD, MAUREEN BOLL,
TIMOTHY MAHER, MICHAEL GRAZIANO,
J. DOBBS, ROWLAND POTTER, SERGEANT
DONOVAN, and CAPTAIN GOPPERT,

                                        Defendants,

_____

APPEARANCES:                            OF COUNSEL:

PATRICK GUILLORY
09-B-0714
Plaintiff *pro se*
Clinton Correctional Facility
P.O. Box 2002
Dannemora, New York 12929

HON. ERIC T. SCHNEIDERMAN              KEVIN M. HAYDEN, ESQ.
Attorney General for the State of New York
Attorney for Defendant
The Capitol
Albany, New York 12223

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

## <u>ORDER AND REPORT-RECOMMENDATION</u>

Plaintiff, Patrick Guillory, an inmate presently confined in Clinton Correctional Facility

("Clinton"), has commenced this *pro se* action civil rights action under 42 U.S.C. § 1983 against

Defendants Nancy Haywood (Haywood"), an attorney in the Department of Corrections and

Community Supervision ("DOCCS"); Maureen Boll ("Boll"), DOCCS Deputy Commissioner

and Counsel; Timothy Maher ("Maher"), Deputy Superintendent of Programs at Greene Correctional Facility ("Greene"); Michael Graziano ("Graziano"), Deputy Superintendent of Administration at Greene; J. Dobbs ("Dobbs"), a corrections counselor at Greene; Rowland Potter ("Potter"), incorrectly sued as "Roland Potter," a corrections officer at Greene; Sergeant Donovan ("Donovan"), a corrections sergeant at Greene; and Captain Goppert ("Goppert"), a corrections captain at Greene.  (Dkt. No. 24.)

Defendants have moved pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure to dismiss Plaintiff's Amended Complaint (Dkt. No. 24) for failure to state a claim, failure to exhaust, and on the grounds that two of Plaintiff's retaliation claims are duplicative of a claim pending in a separate action.  (Dkt. Nos. 37, 37-5.)  Plaintiff has opposed Defendants' motion (Dkt. No. 41), and Defendants have filed a reply (Dkt. No. 42.)  For reasons explained below, the Court recommends that Defendants' motion be granted in part and denied in part.

## I.      BACKGROUND[1]

### A.      May 6, 2013, Library Call-Out

On May 6, 2013, Plaintiff's name was on the law library call-out list for 1:00 p.m.  (Dkt. No. 24 at ¶¶ 6-7.)  Plaintiff had signed up for copying and notary service so that he could comply with the mailbox rule with regard to a May 7, 2013, court imposed deadline for filing a supplemental brief in an Article 78 proceeding entitled *Guillory v. Fischer*, Case No. 516282, that had been transferred to the New York State Supreme Court, Appellate Division Third

---

[1] The Background is taken from the allegations in Plaintiff's Amended Complaint, along with documents the Court may properly consider on a Rule 12(b)(6) motion to dismiss.

Department ("Third Department").[2]  *Id*. at ¶¶ 6, 9, 21 and p. 39.

At approximately 12:05 pm on May 6th, Defendant Potter sent Plaintiff to the package room to pick up kosher food from his parents, and Plaintiff reported back to his housing unit at 12:35 pm.  *Id*. at ¶ 8.  At approximately 1:03 pm, the phone in Plaintiff's housing unit rang and Plaintiff heard Potter tell Kim Ann Johnson ("Johnson"), the law library officer, "Guillory is in the package room." *Id*. at ¶ 9.  At the time, Plaintiff was standing twenty feet away from Potter and walked up to him and asked if the call was from the law library.  *Id.*  Potter denied Plaintiff's request for a pass to the law library despite his name being was on the library call-out list.  *Id*.  Potter denied the request even after Plaintiff showed him the filing deadline for the supplemental brief.  *Id*.

Defendant Graziano arrived to conduct an inspection of the housing unit to ensure compliance with DOCCS regulations at around 1:20 pm.  *Id*. at ¶ 10.  When Graziano and Potter passed near Plaintiff's cube, Plaintiff told Graziano that he was on the law library call-out list; that Johnson had called for him to report to the library; that he had a court imposed deadline; and that Potter had refused to permit him to report to the library.  *Id*.  Potter stood behind Graziano shaking his fist at Plaintiff while Plaintiff spoke with Graziano.  *Id*. at ¶ 11.  When Graziano asked Potter if what Plaintiff had told him was true, Potter responded that Plaintiff could go to the law library the next day.  *Id.* at ¶ 12.  Graziano told Plaintiff he would look into the matter but according to Plaintiff "did nothing but brush [him] off."  *Id*. at ¶¶ 12, 17.

Plaintiff claims he missed the court imposed deadline because he was not allowed to go

[2]  The sole respondent in the Article 78 proceeding was former DOCCS Commissioner, Brian Fischer.  *See Guillory v. Fischer*, 974 N.Y.S. 2d 196 (3d Dep't 2013); *see also* Dkt. No. 37-4.

to the law library on May 6, 2013. *Id.* at ¶ 17. He alleges in his Amended Complaint that Potter

did not want him to the go to the law library because Plaintiff had a lawsuit pending against him.

*Id.*

### B. Refusal to Send Out Plaintiff's Amended Complaint

Pursuant to an April 17, 2013, Order issued by the Hon. Randolph F. Treece, M.J., in

*Guillory v. Weber*, No. 9:12-CV-00280 (LEK/RFT) (N.D.N.Y.) ("*Weber*"), Plaintiff was given a

deadline of April 30, 2013, to file an amended complaint. (Dkt. No. 24 at ¶ 3 and p. 35.)

Plaintiff gave his very large amended complaint to the law library officer on April 25, 2013, so

that the officer could type a letter memorandum to the mail room indicating that the amended

complaint had to be sent out forthwith. *Id.* at ¶ 4. The letter memorandum was taped to the top

of the bulk legal mail and sent to the mail room by the law library officer. *Id.* at ¶ 4.

On May 7, 2013, Plaintiff's corrections counselor, Defendant Dobbs, called Plaintiff to

his office regarding Defendant Maher's refusal to send out the amended complaint in *Weber* that

was supposed to be mailed on April 25, 2013. *Id.* at ¶ 22. Plaintiff learned that the amended

complaint had sat in the Greene administrative office from April 25, 2013, to May 7, 2013,

despite the court imposed deadline, and that it had been opened and read by the security staff. *Id.*

at ¶ 23. Maher gave the opened amended complaint to Dobbs to be returned to Plaintiff when

they met on May 7, 2013. *Id.* at ¶¶ 23-24. The amended complaint was never received by the

court. *Id.* at ¶ 33.

Plaintiff sent a letter to Maher on May 7, 2013, demanding to know why his legal mail

had not been sent out. *Id.* at ¶ 24. Maher responded by letter memorandum of May 8, 2013,

informing Plaintiff his legal mail had been under investigation by security staff. *Id.* at ¶ 25 and p.

41.  According to Maher, the Business Office had received seven envelopes that were taped shut with "Legal" stamped on them and an authorized advance request form for $168.40 dated April 25, 2013, with Plaintiff's name and din number.  *Id*. at p. 43.  There was a second advance request for postage.  *Id*.  The format of the letter from the law library accompanying the envelopes and authorized advance request forms was different than those previously seen by Maher.  *Id*.  In addition, the letter was dated Sunday, April 25, 2013, although April 25th was a Thursday, the signature was not legible, and it did not match law library officer Johnson's signature.  *Id*.

Maher consulted with Superintendent Brandon Smith who recommended a security investigation.  *Id*.  The envelopes were forwarded to Defendant Goppert for investigation, and Maher contacted Library Services Central Office and was referred to Counsels Office.  *Id*.  Goppert returned the envelopes the following day, and they were given to Dobbs to return to Plaintiff.  *Id*.

Plaintiff filed a grievance against Maher, Dobbs, and the security staff regarding the opening and destruction of his legal mail.  *Id*. at ¶ 41 and pp. 53-59.

### C.  Retaliation by Donovan and Potter for Plaintiff's Parent's Complaint Call to Defendant Boll, and Plaintiff's Filing of Grievances Against Potter

The late afternoon of May 9, 2013, Plaintiff's parents called Defendant Boll to report that Plaintiff was being harassed by Potter and that the facility had sat on his legal mail for two weeks, knowing that he had a court imposed deadline.  (Dkt. No. 24 at ¶ 28.)  The next day, Plaintiff's cell was searched by Corrections Officer J. Manchester on the direct order of Defendant Donovan.  *Id*. at ¶ 29.  Donovan took half of Plaintiff's kosher food and half of his

legal mail.[3]  *Id*.  Plaintiff later received a contraband slip that said "no contraband found   no property damaged."  *Id*.  Donovan told Plaintiff if he received any complaints about the search and had to come back to Plaintiff's unit, "we will take a trip to the Special Housing Unit ("SHU")."  *Id*.  Plaintiff has alleged that Donovan took his legal mail and kosher food in retaliation for his parents contacting DOCCS and previous grievances filed against Potter.  *Id*.

On May 18, 2013, Potter intentionally destroyed the microwave in Plaintiff's housing unit.  *Id*. at ¶ 35.  While looking directly at Plaintiff and another inmate whose family had contacted Defendants Boll and Haywood, Potter said: "This is what inmates get when they call DOCCS on me!! Make another phone call and I will destroy the T.V. and Hot-Pot!"  *Id*.  A few minutes later, Potter called his supervisor and told him that the microwave had slipped out of his hands while he was doing a search.  *Id*. at ¶ 36.  Shortly thereafter, when he let Plaintiff out to report to the law library, Potter allegedly said "I have not forgot about what you did, you will be out of this jail soon when my buddies set your ass up, you bitch!"  *Id.* at ¶ 37.

### D.    Boll and Haywood

According to Plaintiff, after his parents called the DOCCS Office of Counsel and spoke to Boll, (Dkt. No. 24 at ¶ 28), Boll "apparently ordered more retaliation which is the custom, policy and procedure of [Boll and Defendant Haywood], resulting in Donovan's theft of his legal papers and kosher food and Potter's destruction of the microwave and threats to destroy the T.V. and hot-pot on May 18, 2013."  *Id*. at ¶¶ 29, 35.

---

[3]  In Paragraph 29 of his Amended Complaint, Plaintiff has alleged that Donovan took half of his legal mail and half of his kosher food on May 10, 2013.  (Dkt. No. 24. at ¶ 29.)  In Paragraph 32, Plaintiff has alleged that on May 10, 2013, Donovan took all of his legal mail and kosher food.  *Id*. at ¶ 32.

Plaintiff filed an Article 78 proceeding against Boll and Acting DOCCS Commissioner Anthony Annucci on or about May 18, 2013, in New York State Supreme Court, Greene County, regarding their refusal to address and investigate the withholding and confiscation and destruction of Plaintiff's legal mail and kosher food simply because his parents had contacted Boll. *Id*. at ¶ 38 and pp. 47-49. In his May 19, 2013, letter memorandum to Boll and Annucci regarding the Article 78 proceeding, Plaintiff accused Boll and Annucci of advising facilities to retaliate against inmates whose parents call DOCCS Office of Counsel to complain. *Id*. at p. 49.

In a July 2, 2013, letter from Boll to Plaintiff in response to his June 11, 2013, correspondence concerning his legal mail being destroyed, Boll informed Plaintiff that a letter written to Office of Counsel does not replace the formal or informal channels of problem resolution at Greene and recommended that Plaintiff use the grievance procedure set forth in DOCCS Directive 4040 for his complaints. *Id*. at pp. 68-69. Boll also informed Plaintiff that the Office of Counsel had investigated his complaints and found no evidence that his mail was being destroyed or that he had been denied access to the law library. Boll elaborated on the findings of the investigation. *Id*.

Plaintiff contends that DOCCS counsel Defendant Haywood conducted an investigation into the actions of Defendants Dobbs, Maher, and Goppert with regard to Plaintiff missing his court deadline. *Id*. at ¶ 42. According to Plaintiff, Haywood admitted to conducting an investigation regarding his letters to her office and responded in a May 22, 2013, letter memorandum asserting that she would not comment on his concerns. *Id*. at ¶ 56. It is unclear whether Haywood's investigation is the investigation referenced in Boll's July 2, 2013, letter.

Plaintiff claims that Boll and Haywood are in the habit of using threats and retaliation to

frighten inmates whose parents call the Office of Counsel to report prison staff misconduct. *Id*. at ¶ 67. Plaintiff likens Boll and Haywood to "high ranking gang-bangers who put out hits upon prisoners who piss them off," and claims "these reckless defendants have a 100 man 'hit squad' who can retaliated (sic) in a matter of hours." *Id*.

## II.    PROCEDURAL HISTORY

Plaintiff commenced this lawsuit in the United States District Court, Western District of New York on June 6, 2013. (Dkt. No. 1.) The action was transferred to the Northern District of New York by order of the Hon. William M. Skretny, Chief District Court Judge in the Western District of New York, on December 13, 2013. (Dkt. No. 8.)

Plaintiff's application to proceed *in forma pauperis* was granted on February 10, 2014, by the Hon. Mae A. D'Agostino, D.J. (Dkt. No. 11 at 2.) Upon initial review under 28 U.S.C. §§ 1915(e) and 1915A, Plaintiff's Complaint, liberally construed, was found to have asserted claims for: (1) denial of access to the courts in violation of his First Amendment rights and in retaliation for his litigation and complaints; (2) interference with Plaintiff's outgoing legal mail in violation of his First Amendment rights and in retaliation for his litigation and complaints; (3) search of his cell and confiscation of his property in retaliation for his litigation and complaints; and (4) denial of equal protection in violation of his Fourteenth Amendment rights. *Id*. at 6.

Plaintiff's claims for money damages against the Defendants in their official capacities were dismissed with prejudice on initial review by Judge D'Agostino. *Id*. at 8. Plaintiff's equal protection claim was dismissed without prejudice because the claim was entirely conclusory. *Id*. The remainder of Plaintiff's claims against Defendants in their individual capacities survived initial review and were found to require a response. *Id*. at 9.

Plaintiff thereafter moved for leave to file an amended complaint substituting Defendants Donovan and Goppert for Defendants John Doe Number 1 and John Doe Number 2. (Dkt. Nos. 17; 17-1 at 1.) Plaintiff's motion to amend was granted, and Donovan and Goppert were added as party defendants. (Dkt. No. 23 at 3.) Defendants thereafter filed the motion to dismiss now before the Court for review and recommendation. (Dkt. No. 37.)

## III.    LEGAL STANDARD GOVERNING RULE 12(b)(6) MOTIONS TO DISMISS

A defendant may move to dismiss a complaint "for failure to state a claim upon which relief can be granted" under Rule 12(b)(6). The motion tests the formal legal sufficiency of the complaint by determining whether it conforms to Federal Rule of Civil Procedure 8(a)(2), which requires that a complaint include "a short and plain statement of the claim showing that the pleader is entitled to relief." *Bush v. Masiello*, 55 F.R.D. 72, 74 (S.D.N.Y. 1972). Satisfaction of the requirement that a plaintiff "show" that he or she is entitled to relief requires that the complaint "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged    but it has not shown    that the pleader is entitled to relief." *Id.* at 679  (internal citation and punctuation omitted).

A complaint may be dismissed pursuant to Rule 12(b)(6) only where it appears that there are not "enough facts to state a claim that is plausible on its face." *Id.* at 570. While Rule 8(a)(2) "does not require detailed factual allegations, . . . it demands more than an unadorned,

the-defendant-harmed-me-accusation." *Iqbal,* 556 U.S. at 678 (citation and internal quotation marks omitted). A complaint which "tenders 'naked assertion[s]' devoid of 'further factual enhancement'" does not suffice. *Id.* (citation omitted)

"In reviewing a complaint for dismissal under Rule 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." *Hernandez v. Coughlin*, 18 F.3d 133, 136 (2d Cir. 1994) (citation omitted). However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678.

In considering a Rule 12(b)(6) motion, "the court considers the complaint, any written documents attached to them, and any matter of which the court can take judicial notice for the factual background of the case." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation and internal quotation marks omitted); *see also Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) (A court may consider "any written instrument attached [to the complaint] as an exhibit or documents incorporated in it by reference."). "The mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual allegations are consistent with the allegations of the Plaintiff's complaint." *Robles v. Bleau*, No. 07-CV-0464, 2008 WL 4693153, at *6 and n.41, 2008 U.S. Dist. LEXIS 110029, at *26-27 and n.41 (N.D.N.Y. Oct. 22,

2008)[4] (collecting cases); *Donhauser v. Goord*, 314 F. Supp. 2d 119, 121 (N.D.N.Y. 2004) (where a *pro se* is faced with a motion to dismiss, a court may consider materials outside of the complaint "to the extent they are consistent with the allegations in the complaint."), *vacated in part on other grounds*, 317 F. Supp. 2d 160 (N.D.N.Y. 2004); *see also Gil v. Mooney*, 824 F.2d 192, 195 (2d Cir. 1987) (in reviewing district court's dismissal of *pro se* plaintiff's claim, Second Circuit considered plaintiff's affidavit submitted in opposition to motion to dismiss). The Court has taken judicial notice of papers filed in other litigation involving Plaintiff and has considered documents in Plaintiff's submissions in opposition to the extent they are consistent with the allegations in Plaintiff's Amended Complaint.

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's] supporting papers liberally, and . . . interpret them to raise the strongest arguments that they suggest." *See Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994); *see also Harris v. Mills*, 572 F.3d 66, 72 (2d Cir. 2009) (courts remain obligated to construe *pro se* complaints liberally even after *Twombly*). Where a *pro se* complaint fails to state a cause of action, the court generally "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Cuoco v. Moritsugu*, 222 F.3d 99, 112 (2d Cir. 2000) (citation and internal quotation marks omitted). An opportunity to amend is not required where "the problem with [the plaintiff's] causes of action is substantive" such that "better pleading will not cure it." *Cuoco*, 222 F.3d at 112 (citation omitted).

---

[4] The Court will provide Plaintiff with copies of all unpublished decisions cited herein in accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

## IV.     ANALYSIS

### A.     Failure to Exhaust with Regard to Claims Against Defendants Maher, Dobbs, and Goppert

Plaintiff claims that Defendants Maher, Dobbs, and Goppert violated his First, Fifth, Sixth, and Fourteenth Amendment rights by: (1) refusing to send out his amended complaint in *Guillory v. Weber*, thereby denying him access to court; (2) interference with his outgoing legal mail; (3) improperly reading his legal mail; and (4) doing the foregoing in retaliation for grievances and lawsuits filed by him.  (Dkt. No. 24 at ¶¶ 48-53, 62.)  Defendants seek dismissal of the claims on the grounds that at the time this lawsuit was commenced, Plaintiff had not completed exhaustion of his administrative remedies.  (Dkt. No. 37-5 at 9-10.)  Plaintiff asserts that he had exhausted his administrative remedies before commencing the action because the Central Office Review Committee ("CORC") failed to decide his appeal in a timely manner. (Dkt. No. 41 at 12-15.)  Plaintiff further asserts that because his grievance had been administratively exhausted by the time he filed his Amended Complaint, his commencement of the lawsuit prior the exhaustion of his administrative remedies should be excused.  *Id*. at 12.

Under the Prison Litigation Reform Act ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted."  42 U.S.C. § 1997e(a).  "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong."  *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

A plaintiff's failure to exhaust administrative remedies is an affirmative defense. *Jones v. Bock*, 549 U.S. 199, 216 (2007). Thus, a prisoner has no independent duty to plead facts plausibly suggesting that he exhausted his available administrative remedies in order to state an actionable civil rights claim. *Jones*, 549 U.S. at 211-17. "[T]his is not to say that failure to exhaust cannot be a basis for dismissal for failure to state a claim." *Id*. at 216. If a prisoner chooses to plead facts regarding exhaustion, and those facts show that he failed to exhaust his available administrative remedies, then his complaint may be dismissed for failure to state a claim.[5] *Id*. at 215-16.

In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)). In New York state prisons, DOCCS has a well-established three-step inmate grievance program. N.Y. Comp. Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id.* at 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar

---

[5] "If nonexhaustion is clear from the face of the complaint (and incorporated documents) a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted." *Fuentes v. Furco*, No. 13-CV-6846, 2014 WL 4792110, at *1, 2014 U.S. Dist. LEXIS 136261, at *2 (S.D.N.Y. Sept. 25, 2014) (Nathan, D.J.) (quoting *McCoy v. Goord*, 255 F. Supp. 2d 233, 251 (S.D.N.Y. 2003)).

days of receipt of the grievance (*Id*. at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id*. at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. at 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id*. at 701.5(c)(3)(i).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id*. at 701.5(d)(1)(i). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id*. at 701.5(d)(3)(ii).

If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford*, 548 U.S. at 93. Receiving a decision from CORC *after* filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any claim not exhausted prior to commencement of the suit must be dismissed without prejudice. *Neal v. Goord*, 1267 F.3d 116, 122-23 (2d Cir. 2001), overruled on other grounds by *Porter v. Nussle*, 534 U.S. 516 (2002).

Here, Plaintiff filed his original Complaint on June 6, 2013. (Dkt. No. 1.) Plaintiff filed his Amended Complaint on March 27, 2014. (Dkt. No. 24.) Papers related to Plaintiff's grievance against Maher, Dobbs, and unnamed security personnel, are annexed as an exhibit to

Plaintiff's Amended Complaint. (Dkt. No. 24, Exh. G. at 53-59.) Plaintiff's Grievance No. GNE-7816-13 naming Maher, Dobbs and security staff involved in holding his legal mail is dated May 20, 2013. *Id*. at 53. The IGRC denied Plaintiff's grievance on June 10, 2013. *Id*. at 55. Plaintiff appealed to the Superintendent on June 11, 2013, *id*., and the appeal was denied on June 18, 2013.[6] *Id*. at 56. By the time Plaintiff appealed to CORC on June 19, 2013, he had already commenced this action. *Id.* In fact, according to the grievance papers annexed to Plaintiff's Amended Complaint, he commenced this action before the IGRC had denied the grievance. *Id*. at 55. Therefore, the fact that CORC did not decide the appeal until October 16, 2013, *id*. at 57, well beyond the thirty days provided for in § 701.5(d)(3)(ii), does not excuse Plaintiff's failure to exhaust prior to commencement of this action.

As noted above, Plaintiff has argued in his opposition that since CORC has now rendered a disposition unfavorable to him, he has properly exhausted. (Dkt. No. 41 at 12.) However, the Second Circuit has held that "[s]ubsequent exhaustion after suit is filed . . . is insufficient." *Neal v. Goord*, 267 F.3d 116,122 (2d Cir. 2001), overruled on other grounds, *Nussle* 534 U.S. at 523. While this may not be the most efficient outcome, as noted in *Mendez v. Artuz*:

> [T]he Court of Appeals has ruled that from the broader perspective of Congress and appellate judges, the greater good forbids allowing a case to proceed where administrative remedies have been exhausted while the complaint is pending, and requires in such a case dismissal of the complaint, to be re-filed, if the plaintiff wishes, with the addition of paragraphs explaining how administrative remedies have been exhausted.

No. 01 CIV. 4157 (GEL), 2002 WL 313796, at *2, 2002 U.S. Dist. LEXIS 3263, at *4-5

---

[6] The Superintendent's determination is erroneously dated June 18, 2014. (Dkt. No. 24 at 56.) It is clear given Plaintiff's June 19, 2013 appeal to CORC that the Superintendent's determination was made on June 18, 2013. *Id*.

(S.D.N.Y. Feb 27, 2002) (holding that prisoner failed to exhaust administrative remedies when he commenced civil rights action before receiving decision from CORC) (citing *Neal*, 267 F.3d at 123). Furthermore, a post-exhaustion amendment of the complaint cannot cure an exhaustion defect existing at the time the action was commenced. *See Kasiem v. Switz*, 756 F. Supp. 2d 570, 575 (S.D.N.Y. 2010) (citing *Neal*, 267 F.3d at 122).

Plaintiff's failure to exhaust does not end the review. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York*, 380 F.3d 680, 686, 691 (2d Cir. 2004).[7] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill*, 380 F.3d at 686 (citation omitted). Second, if those remedies were available, the court should "inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it . . . or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

As to the first question, New York's IGP is "recognized as an 'available' remedy for

---

[7] The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford*, 548 U.S. 81. *See Amador v. Andrews*, 655 F.3d 89, 102 (2d Cir. 2011).

purposes of the PLRA." *Taylor v. Chalom*, No. 9:10  CV  1494 (NAM/DEP), 2011 WL 6942891, at *4, 2011 U.S. Dist. LEXIS 150512, at *12 (N.D.N.Y. Dec. 13, 2011).  The grievance system was also clearly available to Plaintiff, who was in the process of utilizing the IGP at the time he filed his original Complaint.  (Dkt. No. 24 at 53-59.)

Second, Defendants are not estopped from asserting this defense, inasmuch as Plaintiff has pleaded no facts indicating Defendants interfered in any way with the grievance process that was ultimately completed.  (Dkt. No. 24.)

Third, there are no 'special circumstances' here to excuse Plaintiff's failure to exhaust, because:

> Justification "must be determined by looking at the circumstances which might understandably lead . . . uncounselled prisoners to fail to grieve in the normally required way."  Generally, the 'special circumstances' doctrine is applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterprets the statutory requirements of the appeals process.

*Ford v. Smith*, No. 9:12  CV  1109 (TJM/TWD), 2014 WL 652933, at *3, 2014 U.S. Dist. LEXIS 20581, at *8-9 (N.D.N.Y. Jan. 16, 2014) (citations omitted).  While Plaintiff has argued that his administrative remedies were exhausted because his CORC appeal was not decided for four months, that argument does not support a finding of special circumstances, particularly when Plaintiff commenced the action before CORC even received the appeal.  Furthermore, although regulations require CORC to respond within thirty days, its failure to do so is not a 'special circumstance' which might defeat an exhaustion defense.  *Id*.

In sum, Plaintiff had not yet exhausted all administrative remedies with regard to his claims against Maher, Dobbs, and Goppert at the time he filed this suit, and the Second Circuit's

three-part inquiry reveals no justification for his failure to exhaust.  Therefore, the Court

recommends that Plaintiff's claims against Defendants' Maher, Dobbs, and Goppert be dismissed

without prejudice for failure to exhaust administrative remedies.[8]

**B.      Plaintiff's First Amendment Claims for Denial of Access to Court Against Defendants Potter and Graziano**

Plaintiff claims that Defendants Potter and Graziano, prevented him from mailing a

supplemental brief in an Article 78 proceeding transferred to the Third Department in a timely

manner by refusing to allow him to go to the law library for necessary copying and notary

services.  (Dkt. No. 24 at ¶¶ 6, 9, 21 and p. 39.)

The Supreme Court has long held that inmates are guaranteed a right of access to the

courts under the First Amendment of the Constitution.  *See Lewis v. Casey*, 518 U.S. 343, 350

(1996); *Bounds v. Smith*, 430 U.S. 817, 828 (1977); *see also Washington v. James*, 782 F.2d

1134, 1138 (2d Cir. 1986) ("A prisoner has a constitutional right of access to the courts for the

purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and

that states have affirmative obligations to assure.").  In order to state a claim for denial of access

to the courts, a plaintiff must assert non-conclusory allegations demonstrating that the defendant

acted deliberately and maliciously.  *Lewis*, 518 U.S. at 349, 351; *Gonzales v. Carpenter* No.

---

[8] In addition to seeking dismissal for failure to exhaust, Goppert asks that the Amended
Complaint be dismissed as against him on the grounds that there are no factual allegations
suggesting his involvement in the decision to hold or investigate Plaintiff's mail and no
involvement by him in denying Plaintiff access to court.  (Dkt. No. 37-5 at 20.)  The same could
be said of Dobbs, who is alleged to have done nothing more than meet with Plaintiff to return his
legal mail after the investigation at Maher's direction.  Because the Court is recommending
dismissal for failure to exhaust, it makes no determination as to whether Plaintiff has stated a
claim against Goppert or Dobbs but does note that in the event Plaintiff amends to reassert his
claims against Goppert and Dobbs as they are alleged in the Amended Complaint, the Court will
almost certainly recommend dismissal for failure to state a claim.

9:08-CV-629 (LEK/ATB), 2011 WL 768990, at *7, 2011 U.S. Dist. LEXIS 18806, at *26 (N.D.N.Y. Jan. 3, 2011) (Baxter, M.J.). Plaintiff's Amended Complaint, liberally construed, satisfies that requirement.

However, Plaintiff must also assert non-conclusory allegations showing that the interference with his right of access to court resulted in actual injury. *Lewis,* 518 U.S. at 348-349. To do that, Plaintiff must describe the underlying claim allegedly frustrated by the interference well enough to establish that it is "nonfrivolous" and "arguable" in nature. *Christopher v. Harbury*, 536 U.S. 403, 415-16 (2002) (underlying cause of action "is an element that must be described in the complaint."); *Rosario v. Fischer*, No. 11 Civ 4717, 2012 WL 4044901, at *7, 2012 U.S. Dist. LEXIS 133502, at *19-20 (S.D.N.Y. Aug. 28, 2012) ("To satisfy the requirement that the underlying claim not be frivolous, a plaintiff must describe the claim well enough for the court to determine whether the claim had an arguable basis in either law or fact."). Plaintiff must set forth sufficient facts to suggest that success on the underlying claim is found on "more than hope." *Christopher*, 536 U.S. at 416.

The only "actual injury" alleged by Plaintiff as a result of Potter and Graziano's alleged refusal to allow him to go to the law library on May 6, 2013, is that he was unable to file his supplemental brief by the deadline imposed by the Third Department. (Dkt. No. 24 at ¶ 44.) Plaintiff's Amended Complaint includes no description of the claim(s) asserted in the Article 78 proceeding, and includes no facts suggesting that the claim(s) were found on "more than hope." *Christopher*, 536 U.S. at 416. Plaintiff has done nothing more than allege in conclusory fashion that his claim was non-frivolous and that it was frustrated by his inability to mail his supplemental brief in a timely manner. *Id.* A missed deadline, without showing the frustration

of a non-frivolous claim as a result, is insufficient to demonstrate actual injury. *See Cisnevas-Garcia v. Shipman*, No. 9:10-CV-179 (FJS/RFT), 2010 WL 5094637, at *1, 2010 U.S. Dist. LEXIS 129657, at *4 (N.D.N.Y. Dec. 8, 2010).

In light of the foregoing, the Court recommends that Plaintiff's claims for denial of access to court against Potter and Graziano be dismissed for failure to state a claim. The fact that Plaintiff had already submitted a lengthy legal brief to the Third Department in the Article 78 proceeding (Dkt. No. 39), and the Third Department's confirmation of the DOCCS administrative determination being challenged based upon the evidence in the Article 78 record, *see Guillory v. Fischer*, 974 N.Y.S. 2d 196, render it highly unlikely that given the opportunity to replead Plaintiff will be able to state a denial of access to court claim against Potter and Graziano. Nonetheless, in light of Plaintiff's *pro se* status, the Court recommends that the dismissal be without prejudice, and that Plaintiff be given the opportunity to amend.

## C. Argument for Dismissal of Plaintiff's Law Library Retaliation Claims Against Defendants Potter and Graziano as Duplicative

Defendants Potter and Graziano seek dismissal of Plaintiff's retaliation claim arising out of their refusal to allow him to go to the law library on May 6, 2013, on the grounds that the claim is identical to one asserted against Potter in *Guillory v. Morris, et al.*, 13-CV-0378 (NAM/TWD) ("*Morris*"), presently pending in the Northern District of New York. (Dkt. No. 37-5.)

On September 4, 2013, this Court issued a Text Order in *Morris* allowing Plaintiff to supplement his complaint with a document entitled "Supplemental Harassment by Correction Officer Potter," which asserted claims against Potter for denial of access to court and retaliation

arising out of Potter's refusal to allow Plaintiff to go to the law library on May 6, 2013. (*Morris*, Dkt. No. 6.) Pursuant to the Text Order the supplement was added to Plaintiff's complaint and the supplemented pleading was docketed as an amended complaint." (*Morris*, Dkt. No. 15.)

Plaintiff's supplemental claim against Potter was identified as one for denial of access to court and dismissed without prejudice for failure to state a claim in the September 13, 2013, Decision and Order of the Hon. Norman A. Mordue on initial review pursuant to 28 U.S.C. §§ 1915(e) and 1915A. (Dkt. No. 16.) Plaintiff has not filed an amended complaint since the issuance of that Decision and Order. Defendant Potter's Rule 12(b)(6) motion to dismiss Plaintiff's retaliation claims against him was denied by Judge Mordue based upon the recommendation of this Court. (Dkt. Nos. 68, 75.)

It is well-settled that a district court, as "part of its general power to administer its docket," has discretion to "stay or dismiss a suit that is duplicative of another federal court suit." *Curtis v. Citibank, N.A.*, 226 F.3d 133, 138 (2d Cir. 2000) (citing *Colorado River Water Conservation Dist. v. United States*, 424 U.S. 800, 817 (1976)). In *Colorado River*, the Supreme Court noted that since "[t]he complex problems that can arise from the multiple federal filings do not lend themselves to a rigid test," *id.*, "no precise rule has evolved" that governs the exercise of that discretion. *Colorado River*, 424 U.S. at 817. Rather, a district court must "consider the equities of the situation when exercising its discretion," *Curtis*, 226 F.3d at 138, "giving regard to conservation of judicial resources and comprehensive disposition of litigation . . . ." *Kerotest Mfg. Co. v. C-O-Two Fire Equipment Co.*, 342 U.S. 180, 183 (1952).

The Second Circuit has endorsed the principle "that [w]here there are two competing lawsuits, the first suit should have priority, absent the showing of balance of convenience . . . or

. . . special circumstances . . . giving priority to the second." *First City Nat'l Bank & Trust Co. v. Simmons*, 878 F.2d 76, 79 (2d Cir. 1989). The Court finds that at this point in the litigation, there are special circumstances that militate against dismissing the law library retaliation claims against Potter and Graziano in this case on the grounds that there are competing lawsuits.

The retaliation claim in *Morris* is asserted only against Potter. Graziano is not a defendant in *Morris* but is already before the Court as a party defendant in this action. Because the retaliation claims against Potter and Graziano arise out of the same facts and litigation of the claims would likely involve much of the same evidence, conservation of judicial resources and comprehensive disposition of litigation favors retaining Plaintiff's law library related retaliation claims against both Potter and Graziano in this action.[9]

Conservation of judicial resources and comprehensive disposition of litigation also favor litigation of Plaintiff's law library retaliation claims and denial of access to court claims against Potter and Graziano in the same lawsuit, since both claims arise out of a common nucleus of facts. There is no denial of access to court claim pending against Potter in *Morris* in light of the dismissal of the claim without prejudice on initial review (*Morris*, Dkt. No. 16), and Plaintiff's failure to amend his complaint in an attempt to state a claim. Although the Court is recommending dismissal of Plaintiff's denial of access to court claim against Potter and Graziano for failure to state a claim in this case, the recommendation is that the dismissal be without

---

[9] For reasons discussed below, the Court is recommending dismissal without prejudice of Plaintiff's retaliation claim against Graziano for failure to state a claim. If the recommendation is accepted by the District Court, the possibility that Plaintiff will be able successfully amend his claim against Graziano cannot be completely ruled out at present.

prejudice. Therefore, the possibility that Plaintiff will be able to amend his denial of access to court claim cannot be ruled out by the Court at this point.

For the foregoing reasons, the Court recommends that Potter and Graziano's motion to dismiss Plaintiff's law library related retaliation claims on the grounds that a duplicative action is pending be denied without prejudice.[10]

### D.    Plaintiff's Retaliation Claims Against Potter

Plaintiff claims that Potter refused to allow him to go to the law library on May 6, 2013, in retaliation for grievances and lawsuits filed by Plaintiff. (Dkt. No. 24 at ¶¶ 17, 60.) Plaintiff also claims that Potter destroyed the microwave in his housing unit in retaliation for his parents' call to Boll. *Id.* at ¶¶ 28, 35, 61. Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak*, 389 F.3d 379, 380-81 (2d Cir. 2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak*, 389 F.3d at 381-83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such claims with particular care. *See Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983).

As the Second Circuit has noted,

> [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison

---

[10] Presumably, Potter is free to move to dismiss Plaintiff's retaliation claim in *Morris* on the grounds that the same claim has been asserted in this action.

> official--even those otherwise not rising to the level of a constitutional
> violation--can be characterized as a constitutionally proscribed
> retaliatory act.

*Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001) (citations omitted), *overruled on other*

*grounds*, *Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002).

To prevail on a retaliation claim under § 1983, a plaintiff must prove that: (1) the speech

or conduct at issue was "protected;" (2) the defendants took "adverse action" against the

plaintiff; and (3) there was a causal connection between the protected speech and the adverse

action  in other words, that the protected conduct was a "substantial or motivating factor" in the

defendants' decision to take action against the plaintiff.  *Mt. Healthy City Sch. Dist. Bd. of Educ.*

*v. Doyle*, 429 U.S. 274, 287 (1977); *Pidlypchak*, 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Adverse action, used in the prison context, is defined objectively as "retaliatory conduct

that would deter a similarly situated individual of ordinary firmness from exercising . . .

constitutional rights." *Pidlypchak*, 389 F.3d at 381, 383 (quoting *Davis v. Goord*, 320 F.3d 346,

353 (2d Cir. 2003)).  "Otherwise the retaliatory act is simply *de minimis* and therefore outside the

ambit of constitutional protection." *Dawes*, 239 F.3d at 493.  In evaluating what constitutes

adverse action for purposes of a retaliation claim, a court should be mindful that "[p]risoners may

be required to tolerate more than public employees, who may be required to tolerate more than

average citizens, before a [retaliatory] action taken against them is considered adverse." *Id.*

Several factors may be considered in determining whether a causal connection exists

between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot*, 224

F. Supp. 2d 723, 732 (S.D.N.Y. 2002) (citing *Colon v. Coughlin*, 58 F.3d 865, 873 (2d Cir.

1995)).  Those factors include: (i) the temporal proximity between the protected activity and the

alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a

hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.*

(citing *Colon*, 58 F.3d at 872-73). "The causal connection must be sufficient to support an

inference that the protected conduct played a substantial part in the adverse action." *Id.*

### 1. The Law Library Incident

In paragraph 17 of his Amended Complaint, Plaintiff has alleged that "Defendant Potter

does not enjoy me going to the law library at all since he found out about the litigation that is

pending before this Court (which he is also a Defendant in *Guillory v. Cheryl Morris*, 9:13 cv

00378)." (Dkt. No. 24 at ¶ 17.) The original complaint in *Morris* was filed on April 4, 2013.

(*Morris*, Dkt. No. 1.) Although Potter was named as a John Doe in Plaintiff's original complaint,

it can be inferred from the allegations asserted against defendant Doe, *i.e.*, forcing Plaintiff to

have his side locks cut off, *id*. at ¶ 13, that Potter may very well have been recognized as Doe and

made aware that the suit had been commenced prior to May 15, 2013, when the complaint was

supplemented to substitute his name for John Doe.[11] (*Morris*, Dkt. No. 6.) Plaintiff has also

alleged that the retaliation was for his filing a grievance against Potter on April 10, 2013. *Id*. at ¶

32.

---

[11] Plaintiff has also alleged that Potter refused to allow him to go to the law library in
retaliation for informing Graziano about the refusal. *Id*. at 60. Since Plaintiff did not tell
Graziano until after Potter had refused to allow him to go to the law library, the facts do not
support a retaliation claim based upon Plaintiff's disclosure to Graziano. Furthermore, Plaintiff's
conclusory assertion that Potter was retaliating against him for bringing lawsuits against the
facility does not support a retaliation claim. *See Friedl v. City of New York*, 210 F.3d 79, 85 (2d
Cir. 2000) (Claims of retaliation must be "supported by specific and detailed factual allegations"
and not stated "in wholly conclusory terms.") (quoting *Flaherty*, 713 F.2d at 13).

The filing of lawsuits is protected conduct for purposes of First Amendment claims. *See Colon*, 58 F.3d at 872 ("Prisoners, like non-prisoners have a constitutional right of access to the courts and to petition the government for redress of grievances.") Furthermore, refusing to allow Plaintiff to go to the law library knowing that it would prevent an inmate from filing papers in a pending lawsuit in a timely manner would arguably deter "a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381, 383. In addition, the temporal connection between Plaintiff's pending lawsuit against Potter and the April 10, 2013, grievance against Potter, and Potter's refusal to allow Plaintiff to go to the law library, is "sufficient to support an inference that the protected conduct played a substantial part in the adverse action," *see Baskerville*, 224 F. Supp. 2d at 732, for purposes of surviving a Rule 12(b)(6) motion.

Therefore, the Court recommends that Potter's motion to dismiss Plaintiff's retaliation claim arising out of his refusal to allow Plaintiff to go to the law library be denied.

## 2.     The Microwave Incident

In addition to the specific arguments made by Defendants for dismissal of Plaintiff's retaliation claims against Potter and Graziano for not allowing him to go to the law library and the allegedly retaliatory cell search by Donovan, *id*. at 8-10, the Defendants have made a general argument for dismissal of all other retaliation claims that might be asserted in Plaintiff's Amended Complaint. (Dkt. No. 37-5 at 13-15.) Defendants have not identified the specific retaliation claims the argument is intended to address, the defendants involved in each retaliation claim, or specific facts relating to the retaliation claims they seek to have dismissed. *Id*. They have simply argued in conclusory terms that Plaintiff's Amended Complaint fails to include any

non-conclusory allegations supporting retaliation and does not allege facts establishing that the Defendants were aware of Plaintiff's grievances and lawsuits at the time of the claimed retaliation, thereby leaving the Court to guess as to particular retaliation claims on which dismissal is sought.[12]  *Id*. at 14-15.

Presumably, one of the claims intended to fall within the retaliation argument is Plaintiff's retaliation claim involving Potter's alleged destruction of the microwave in Plaintiff's housing unit, which occurred nine days after Plaintiff's parents called Boll to complain that Plaintiff was being harassed by Potter.  (Dkt. No. 24 at ¶¶ 28, 35, 61.)  Plaintiff claims that Potter destroyed the microwave while staring at Plaintiff and another inmate whose parents had called DOCCS Office of Counsel, and saying "this is what inmates get when they call DOCCS on me!!"  *Id*. at ¶¶ 35.  Plaintiff contends that the microwave destruction was in retaliation for the call to Boll and Plaintiff's grievances against Potter, one of which was filed on April 10, 2013. *Id*, at ¶ 32.

The filing of a grievance has been found to constitute protected First Amendment conduct for purposes of a retaliation claim.  *See Davis v. Goord*, 320 F.3d 346, 352-53 (2d Cir. 2003) (the right to file grievances is a constitutionally protected activity for retaliation purposes).  Inmate's verbal complaints to corrections officers and prison officials have also been found to constitute activity protected by the First Amendment.  *See, e.g., Monko v. Cusak*, No. 9:11-CV-1218 (GTS/TWD), 2013 WL 5441724, *10, 2013 U.S. Dist. LEXIS 142053, at *23  (N.D.N.Y. Sept. 27, 2013);  *Brewer v. Kamas*, 533 F. Supp. 2d 318, 329 (W.D.N.Y. 2008); *Smith v. Woods*, No.

---

[12]  Defendants' reliance upon a general argument for dismissal of Plaintiff's unspecified retaliation claims is to some degree understandable given the random, disorganized, and largely conclusory nature of much of Plaintiff's Amended Complaint.

9:03-CV-480, 2006 WL 1133247, at *10, 2006 U.S. Dist. LEXIS  at 29745 at *46 (N.D.N.Y. April 24, 2006), *aff'd*, 219 F. App'x 110 (2d Cir. 2007).

Plaintiff's parents' call to Boll might arguably be construed as Plaintiff's own conduct for First Amendment protection purposes, since the call was made on Plaintiff's behalf, and it can be inferred at his direction.  Defendants do not appear to have argued otherwise in seeking dismissal of Plaintiff's retaliation claims.  Moreover, for purposes of this motion, the temporal proximity of the call to Boll and the destruction of the microwave, and Potter's alleged comment connecting the destruction to the call makes a plausible showing of causal connection for purposes of this motion.  However, the Court finds that the destruction of the housing unit's microwave does not constitute adverse action    "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights"    for purposes of stating a retaliation claim.  *Pidlypchak*, 389 F.3d at 381, 383.  Rather, as pleaded by Plaintiff, the destruction of the microwave was *de minimis*.

Plaintiff has alleged that corrections officers like to destroy microwaves because inmates use them to heat chicken purchased from the commissary.  *Id.* at ¶ 38.  However, Plaintiff's Amended Complaint contains no factual allegations regarding his personal use of the housing unit microwave or the impact of its destruction on him that would suggest the impact was more than *de minimis*.  Furthermore, the Amended Complaint is devoid of allegations regarding the period of time the housing unit was without a microwave, although given Plaintiff's allegation that Potter contacted administration about the broken microwave and indicated he had dropped it, one could infer that it was likely replaced.  *Id*. at ¶ 36.

Given Plaintiff's failure to make a plausible showing that the destruction of the microwave constituted adverse action for purposes of his retaliation claim against Potter, the Court recommends that the claim be dismissed for failure to state a claim. The Court further recommends that Plaintiff be granted leave to amend his claim in the unlikely event he can plead facts showing the impact of the destruction of the microwave was sufficiently severe so as to deter a "similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Pidlypchak*, 389 F.3d at 381, 383.

### E.    Claims Against Graziano

#### 1.    Retaliation

According to Plaintiff, he made Graziano aware of his court imposed deadline and of Potter's refusal to allow him to go to the law library when he came to Plaintiff's housing unit in the early afternoon of May 6, 2013. (Dkt. No. 24 at ¶ 10.) Graziano did not intervene on Plaintiff's behalf but did tell him he would look into it. *Id.* at ¶ 11. Plaintiff claims that instead, Graziano brushed him off. *Id.* at ¶ 17.

Plaintiff has not identified any First Amendment protected conduct engaged in by him for which Graziano might retaliate. Nor are there any other allegations in the Amended Complaint that make a plausible showing that Graziano's failure to intervene on Plaintiff's behalf and alleged failure to look into the law library matter were in retaliation for Plaintiff's First Amendment protected conduct. Therefore, the Court recommends dismissal of Plaintiff's retaliation claim against Graziano for failure to state a claim and further recommends that in light of Plaintiff's *pro se* status he be granted leave to amend.

## 2. Supervisory Liability

Plaintiff has alleged that Graziano knew Potter was violating his constitutional rights and did nothing about it. *Id*. at ¶ 64. Plaintiff describes Graziano's conduct as "the same type of liability that is addressed when a supervisor knew of the subordinate's past misconduct (prior grievances against Defendant Potter, beat ups by Defendant Potter, Set-ups by Defendant Potter), [and] failed to set up policies that help guide subordinate's conduct so that the violations of constitutional rights does (sic) not continue to occur, failed to inform and train staff (Defendants Potter, Goppert, Donovan, Defendant Dobbs and Maher) on policies designed to avoid the deprivations of constitutional rights; and failed to supervise the said defendants to ensure that they follow policies that are created to protect the said constitutional rights." *Id*.

Those factual allegations suggest an attempt by Plaintiff to assert a claim against Graziano for supervisory liability. The law is clear that "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir. 1977). "Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each government-official defendant, through the official's own individual actions, has violated the Constitution." *Iqbal*, 556 U.S. at 676. ("Government officials may not be held liable for the unconstitutional conduct of their subordinates under a theory of *respondeat superior*."). "Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement." *Groves v. Davis*, No. 9:11-CV-1317 (GTS/RFT), 2012 WL 651919, at *6, 2012 U.S. Dist. LEXIS 25367, at *22-23 (N.D.N.Y. Feb. 28, 2012) (citing *McKinnon*, 568 F.2d at 934); *see also*

*Richardson v. Goord*, 347 F.3d 431, 435 (2d Cir. 2003) (a "mere 'linkage in the prison chain of command' is insufficient to implicate a state commissioner of corrections . . . in a § 1983 claim") (quoting *Ayers v. Coughlin*, 780 F.2d 205, 210 (2d Cir. 1985)). Therefore, "a plaintiff must . . . allege a tangible connection between the acts of a defendant and the injuries suffered." *Bass v. Jackson*, 790 F.2d 260, 263 (2d Cir. 1986).

The Second Circuit has held that personal involvement by a supervisor necessary to state a claim under § 1983 may be found where: "(1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Colon,* 58 F.3d at 873.[13]

The only factual allegations showing direct participation by Graziano in the violation of Plaintiff's constitutional rights are those related to Plaintiff's denial of access to court claim against him, which the Court has recommended be dismissed for failure to state a claim. Vague and conclusory claims that Graziano, as a supervisory official, has failed to provide proper training and supervision or created a policy, without facts showing personal involvement, are legally insufficient to state a claim under any of the categories identified in *Colon*. *See Bridgewater v. Taylor*, 832 F. Supp. 2d 337, 348 (S.D.N.Y. 2011); *White v. Fischer*, No. 9:09-

---

[13] The Second Circuit has expressly declined to determine whether *Iqbal* eliminated any of the *Colon* bases for liability. *See Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).

CV-240 (DNH/DEP), 2010 WL 624081, at *6, 2010 U.S. Dist. LEXIS 15492, at *19 (N.D.N.Y. Feb. 18, 2010) ("Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability."); *see also Pettus v. Morgenthau*, 554 F.3d 293, 300 (2d Cir. 2009) (same).

Given the conclusory nature of Plaintiff's supervisory liability claim against Graziano, the Court recommends dismissal for failure to state a claim, with leave to amend granted in deference to Plaintiff's *pro se* status.

### F.    Retaliation Claim Against Donovan

According to Plaintiff, the day after Plaintiffs' parents called Boll to complain about Potter and the holding of his legal mail, Defendant Donovan directed a corrections officer to conduct a search of Plaintiff's cell and took either half or all of Plaintiff's legal documents and food.  (Dkt. No. 24 at ¶¶ 29, 32.)  Plaintiff claims that the cell search and taking of his property were in retaliation for the call to Boll as well as Plaintiff's filing of grievances against Potter.  *Id.* at ¶ 32.  In his opposition to Defendants' motion to dismiss, Plaintiff has clarified that he is not asserting a property deprivation claim under the Fourth or Fourteenth Amendments, but rather is specifically asserting a retaliation claim, and the Court has taken Plaintiff at his word.[14]  (Dkt. No. 41 at 17.)

---

[14]   The Second Circuit has, in any event, held that "confiscation . . . [does] not constitute a Fourteenth Amendment violation for loss of property because of the availability of post-deprivation remedies" in the New York Court of Claims."  *Koehl v. Dalsheim*, 85 F.3d 86, 88 (2d Cir. 1996).

As noted above, an inmate's verbal complaints to corrections officers and prison officials have been found to constitute activity protected by the First Amendment. Although Plaintiff has not alleged facts showing that Donovan was aware of his parents' call to Boll, given that the search and confiscation of Plaintiff's property took place only one day after his parents' telephone call to Boll, the Court finds that Plaintiff has made a sufficient showing that there may have been a causal connection for purposes of this motion to dismiss.

As to the adverse action requirement, the Supreme Court has held that "prisoners have no legitimate expectation of privacy." *Hudson v. Palmer*, 468 U.S. 517, 530 (1984). As a result, many of the district courts in the Second Circuit have found that cell searches, even if conducted for retaliatory reasons, cannot constitute an adverse action for purposes of a retaliation claim. *See, e.g., Vofelfang v. Capra*, 889 F. Supp. 2d 489, 509 (S.D.N.Y. 2012) ("inmate has no right to be free from searches of any kind, including those alleged to be retaliatory.") (quoting *Rodriguez v. McClenning*, 399 F. Supp. 2d 228, 239 (S.D.N.Y. 2005)) (internal quotation marks omitted). Even though district courts have found that cell searches alone are not actionable under § 1983, even if retaliatory, allegations that a defendant confiscated personal property and/or legal papers during the course of a cell search have been found sufficient to deter an inmate of ordinary firmness from exercising his constitutional rights. *See, e.g., Amaker v. Fischer*, No. 10-CV-0977A, 2014 WL 4772202, at *10, 2014 U.S. Dist. LEXIS 136117, at *22 (W.D.N.Y. Sept. 27, 2014); *Phelan v. Hersh*, No. 10-CV-0011 (GLS/RFT), 2011 WL 6031940, at *6, 2011 U.S. Dist. LEXIS 4252 (N.D.N.Y. Sept. 13, 2011).

Based upon the foregoing, the Court finds that Plaintiff's allegations that Donovan confiscated his legal documents and kosher food during a cell search in retaliation for Plaintiff's

parents' complaints to Boll the day before states a plausible claim for retaliation and recommends denial of Donovan's motion to dismiss Plaintiff's retaliation claim against him.

### G.     Supervisory Liability Claims Against Boll and Haywood

Defendants Boll and Haywood seek dismissal of Plaintiff's Amended Complaint on the grounds that he has failed to allege facts showing the personal involvement necessary for supervisory liability.  (Dkt. 37-5 at 12-16.)  Plaintiff has alleged that Boll and Haywood, "after learning of the violations of [his] constitutional rights failed to remedy the wrong (Supra at 28); created a custom and policy under which [his] constitutional rights were violated (Supra at 29-30, 35, 38, 42-43); and, was (sic) grossly negligent in that they failed to adequately supervise the subordinates whom (sic) also violated my said rights."[15]  (Dkt. No. 24 at ¶ 54.)  According to Plaintiff, Boll and Haywood learned of the violation of his constitutional rights through several letters written to their office, Plaintiff's parents' telephone conversation with Boll, Plaintiff's pending lawsuit against Potter and other pending lawsuits, and several grievances filed by Plaintiff.  *Id*. at ¶ 55.

---

[15]  Paragraph 8 of Plaintiff's Amended Complaint, cited in Plaintiff's supervisory liability claim, references his parents' telephone call to Boll on May 9, 2013.  *Id*. at ¶ 28.  Paragraph 29 (Paragraph 30 is void) deals with the cell search and Donovan taking Plaintiff's legal mail and kosher food.  *Id*. at ¶¶ 29-30.  Paragraph 35 contains allegations regarding the destruction of the microwave by Potter.  *Id*. at ¶ 35.  Paragraph 38 references Plaintiff's Article 78 proceeding against Boll for failing to stop the unspecified reckless retaliation, despite knowledge of the facts; refusal to address the destruction of Plaintiff's legal papers and confiscation of his kosher food in retaliation for his parent's contacting Boll; and destruction of the microwave by Potter.  *Id*. at ¶ 38.  Paragraphs 42 and 43 allege Haywood's refusal to comment on the findings of her investigation of Dobbs, Maher, and Goppert regarding Plaintiff's missed court deadline, and refusal to do anything after learning of the retaliation by Maher, Dobbs, Goppert, and Donovan. *Id*. at ¶¶ 42-43.

"[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Smith v. Local 819 I.B.T. Pension Plan*, 291 F.3d 236, 240 (2d Cir. 2002) (citation and internal quotation marks omitted). Conclusory allegations that a supervisory official was aware of alleged constitutional violations and failed to remedy them fail to state a claim for supervisory liability.[16] *See Carter v. Artuz*, No. 95CIV2362CSHKNF, 95CIV4785CSHKNF, 1999 WL 350868, at *4, 1999 U.S. Dist. LEXIS 8338, at *11 (S.D.N.Y. June 1, 1999). Furthermore, Plaintiff's wholly conclusory claims that Boll and Haywood, as a supervisory officials, created a custom and policy under which Plaintiff's constitutional rights were violated, are legally insufficient to state a claim under any of the categories identified in *Colon*. *See Koehl v. Bernstein,* No. 10 Civ. 3808 (SHS)(GWG), 2011 WL 2436817, at *19, 2011 U.S. Dist. LEXIS 64466, at *56 (S.D.N.Y. June 17, 2011) ("While personal involvement of a supervisor may be established by showing that [she or] he created a policy or custom under which the violation occurred . . . , conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement.") (internal citations omitted). Likewise, conclusory allegations that a supervisory official has failed to train or properly monitor the actions of subordinate employees do not suffice to establish the requisite personal involvement for a supervisory liability claim. *See Pettus*, 554 F.3d at 300; *Bridgewater*, 832 F. Supp. at 348; *White,* 2010 WL 624081, at *6.

---

[16] District courts in the Second Circuit have held that supervisory liability for failure to remedy constitutional violations after learning of them applies only to ongoing violations, not those which can no longer be remedied. *See, e.g., Bridgewater,* 832 F. Supp. 2d at 348 (citing *Odom v. Calero*, No. 06 Civ. 15527 (LAK)(GWG), 2008 WL 2735868, at *7, 2008 U.S. Dist. LEXIS 52408, at *18 (S.D.N.Y. July 10, 2008)).

1. <u>Haywood</u>

In addition to the conclusory assertions that fail to state a claim, Plaintiff has alleged that Haywood conducted an investigation into the actions of Dobbs, Maher, and Goppert in withholding his amended complaint from the mail and: (1) stated in a letter to Plaintiff (not included as an exhibit to the Amended Complaint) that she would not comment on Plaintiff's concerns; (2) and when Plaintiff returned Haywood's letter with a demand that she amend it consistent with his demand that an additional investigation be conducted, she refused to accede to the demand. *Id*. at ¶¶ 42-43, 56. Plaintiff also claims that Haywood failed to act on Maher, Dobbs, and Goppert's retaliatory conduct in withholding his mail when she learned of it. *Id*. at ¶¶ 42-43.

Plaintiff has acknowledged that Haywood conducted an investigation of Maher, Dobbs, and Goppert's conduct with regard to the missed filing deadline. *Id*. at ¶ 42. However, his Amended Complaint does not include allegations showing the facts and circumstances surrounding the investigation by Haywood, i.e., whether it was undertaken in response to his direct complaints to her or as a part of her designated duties in the Office of Counsel. Although Plaintiff has included numerous exhibits as a part of his Amended Complaint, he has neither included the letter from Haywood in which she allegedly refused to comment on his complaint, nor has he alleged any specific detail as to its content.

Plaintiff has not alleged facts showing that there was any action Haywood could have taken to remedy the missed filing deadline for the amended complaint by the time she became aware of it. *See Bridgewater,* 832 F. Supp. 2d at 348. Plaintiff has not alleged that he attempted

to remedy his inability to file the amended complaint in a timely manner by seeking an extension with the district court on the grounds that his amended complaint had been held for a security review. *See Waters v. Sunshine*, No. 07 Civ. 4753 (DLI)(LB), 2009 WL 750217, at *6, 2009 U.S. Dist. LEXIS 22445, at *16-19 (E.D.N.Y. Mar. 19, 2009) (plaintiff has not suffered a constitutional deprivation of access to court if he has other avenues available to bring his claims before the court).

Furthermore, a complaint that fails to state a claim for the underlying unlawful conduct also fails to state a claim against supervisory officials with respect thereto. *Delaney v. Zaki*, No. 9:13-CV-0648 (DNH/TWD), 2014 WL 4966914, at *8, 2014 U.S. Dist. LEXIS 137611, at *17 (N.D.N.Y. Sept. 2, 2014) (citing *Alston v. Bendheim*, 672 F. Supp. 2d 378, 388-89 (S.D.N.Y. 2009); *Clarke v. Sweeney*, 312 F. Supp. 2d 277, 298 (D. Conn. 2004) ("As there was no underlying deprivation of constitutional rights, accordingly, there can be no supervisory liability . . . .").

Plaintiff has failed to state a claim for denial of access to court against Maher, Dobbs, and Goppert and, therefore, has failed to state a supervisory liability claim in connection therewith. Plaintiff has failed to alleged facts plausibly showing that his underlying claim for denial of access to court in the federal court action was non-frivolous in nature. His only claimed injury is his inability to file the amended complaint in a timely manner. *See Lewis*, 518 U.S. at 348-349. Furthermore, Plaintiff has failed to describe the underlying claims in his Amended Complaint well enough for the court to determine whether they have any arguable basis in fact or law. *See Christopher*, 536 U.S. at 415-16. In fact, he has not described the claims at all.

Plaintiff has likewise failed to state a claim against Maher, Dobbs, and Goppert for interference with legal mail in that as with his claim for denial of access to court, he has failed to allege "actual injury" to a non-frivolous claim. *See Davis*, 320 F.3d at 351 (to state a claim for denial of access to court based upon interference with legal mail, a plaintiff must allege that the interference hindered efforts to pursue a legal claim, i.e., caused actual injury such as the dismissal of an otherwise meritorious claim). While Plaintiff contends that Maher, Dobbs, and Goppert violated his constitutional rights by opening his legal mail outside of his presence, an isolated instance of mail tampering is generally insufficient to establish a constitutional violation. *See Davis*, 320 F.3d at 351. Rather, an inmate must show that prison officials "regularly and unjustifiably interfered with incoming mail." *Id.* (citation and internal quotation marks omitted).

Nor has Plaintiff stated a claim for retaliation against Maher, Dobbs, and Goppert. Plaintiff has alleged in conclusory fashion that the failure to send out his amended complaint was in retaliation for unspecified grievances and lawsuits he had filed against the facility. *Id.* at ¶ 62. "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty*, 713 F.2d at 13. Therefore, Plaintiff cannot be found to have stated a supervisory liability claim against Haywood for failure to take action with respect to Maher, Dobbs, and Goppert's alleged retaliation. *See Delaney*, 2014 WL 4966914, at *8.

Given the conclusory nature of Plaintiff's failure to remedy, custom and policy, and failure to properly train and monitor subordinates claims against Haywood, the Court recommends that those supervisory claims be dismissed without prejudice. In addition, given Plaintiff's failure to state claims against Haywood for allegedly refusing to accede to his demand for an additional investigation of the withholding of his amended complaint, and failing to take

action with respect to Maher, Dobbs, and Goppert's allegedly retaliatory conduct, the Court recommends that Plaintiff's those claims against Haywood be dismissed without prejudice.

## 2. Boll

Plaintiff has alleged generally that Boll learned of the violation of his constitutional rights through several letters written to the Office of Counsel, Plaintiff's parents' telephone conversation with Boll, Plaintiff's pending lawsuit against Potter and other pending lawsuits, and several grievances filed by Plaintiff. *Id.* at ¶ 55. However, the only communications specifically identified by Plaintiff are the phone call from Plaintiff's parents on May 9, 2013, and a June 11, 2013, letter from Plaintiff regarding the withholding of his amended complaint from the mail, to which Boll responded on July 2, 2013 (Dkt. No. 24 at 68). Furthermore, Plaintiff has failed to allege facts identifying the grievances, and lawsuits from which Boll allegedly learned of the violations of his constitutional rights and facts from which her awareness can be inferred.[17]

Plaintiff has alleged that the subject matter of his parents' May 9, 2013, telephone call with Boll included harassment by Potter and the withholding of his amended complaint by Maher, Dobbs and Goppert. *Id.* at ¶ 28. Plaintiff has failed to describe the specific harassing conduct by Potter that was complained of by his parents in their call with Boll.[18] However, given the temporal proximity between Potter's refusal on May 6, 2013, to allow Plaintiff to go to the law library for copying and notary services necessary to mail out his brief in a timely manner, the

---

[17] Plaintiff's parents' call to Boll occurred prior to Donovan's alleged taking of Plaintiff's legal papers and kosher food (May 10, 2013) and Potter's alleged breaking of the microwave (May 18, 2013). (Dkt. No. 24 at ¶¶ 29, 35.) Therefore, the call cannot be found to have placed Boll on notice of those incidents.

[18] It is well-established that verbal harassment alone is insufficient to support a constitutional claim. *See Feldman v. Lyons*, 852 F. Supp. 2d 274, 280 (N.D.N.Y. 2012).

Court can infer that incident was raised in the May 9, 2013, telephone conversation. *Id*. at ¶¶ 6-7, 28.

Even if complaints were made to Boll concerning the May 6, 2013, law library incident and the withholding of the amended complaint, Plaintiff has failed to state a supervisory liability claim against her with respect to his denial of access to court claim. As with his claim regarding the amended complaint withheld from mailing,[19] the only injury alleged by Plaintiff with regard to the May 6, 2013, law library incident was his failure file his supplemental brief in a timely manner. Furthermore, as noted above, Plaintiff's Amended Complaint does not describe the underlying claims in his Article 78 proceeding as required to state a claim for denial of access to court and interference with legal mail. *See Christopher*, 536 U.S. at 415-16; *Davis*, 320 F.3d at 351. Therefore, the Court finds that Plaintiff has failed to state a supervisory liability claim against Boll with regard to his denial of access to court arising out of the May 6, 2013, law library incident and the withholding of his amended complaint from the mail.

The Court has concluded that Plaintiff has stated a claim for retaliation against Potter with regard to the May 6, 2013, law library incident. In addition, the Court has inferred that the May 6, 2013, incident was raised by Plaintiff's parents in their May 9, 2013, telephone conversation with Boll. It also appears, given Boll's reference in her July 2, 2013, to a claim by Plaintiff in his June 11, 2013, letter to Boll concerning denial of access to the law library, that Boll had been made aware of and investigated the incident and found Plaintiff had not been denied access to the law library. (Dkt. No. 254 at 68.) Reading the allegations in the Amended

---

[19] The Court's analysis of Plaintiff's supervisory liability claim against Haywood relating to the withholding of Plaintiff's amended complaint from the mail applies to the same claim against Boll.

Complaint liberally, as it must do, and construing all reasonable inferences in Plaintiff's favor, the Court finds that Plaintiff has stated a supervisory liability claim against Boll with regard to Plaintiff's retaliation claim against Potter in connection with the May 6, 2013, law library incident.

In light of the foregoing, the Court recommends that Plaintiff's conclusory failure to remedy, custom and policy, and failure to properly train and monitor subordinates claims against Boll, as well as supervisory liability claims with regard to Plaintiff's denial of access to court, interference with mail, and improper opening of mail claims be dismissed without prejudice. The Court recommends that Boll's motion to dismiss be denied as to Plaintiff's supervisory liability claim against her with respect to Potter's alleged retaliation in connection with the May 6, 2013, law library incident.

**H.    Retaliation Claims Against Boll and Haywood**

Plaintiff has alleged in wholly conclusory terms that Boll and Haywood had a custom, policy and practice of ordering retaliation against inmates whose parents called the DOCCS Office of Counsel on behalf of their children.  (Dkt. No. 24 at ¶ 29.)  Wholly conclusory claims of retaliation "can be dismissed on the pleadings alone."  *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996).  Therefore, the Court recommends that Plaintiff's retaliation claims against Boll and Haywood be dismissed without prejudice.

**ACCORDINGLY**, it is hereby

**RECOMMENDED**, that Defendants' motion to dismiss Plaintiff's Amended Complaint pursuant to Rule 12(b)(6) (Dkt. No. 37) be **GRANTED** in part and **DENIED** in part; and it is further

41

**RECOMMENDED**, that Defendant Potter and Graziano's motion to dismiss Plaintiff's retaliation claims against them arising out of the May 6, 2013, law library incident, on the grounds that the claim is duplicative of a claim being asserted against Potter in *Guillory v. Morris*, 9:13-CV-0378 (NAM/TWD) (N.D.N.Y.) be denied without prejudice; and it is further

**RECOMMENDED**, that Plaintiff's Amended Complaint **BE DISMISSED WITHOUT PREJUDICE** as to the following claims: (1) First Amendment denial of access to courts, interference with legal mail, improper opening of legal mail, and retaliation claims against Defendants Maher, Dobbs, and Goppert for failure to exhaust; (2) First Amendment denial of access to courts claim against Defendants Potter and Graziano for failure to state a claim; (3) First Amendment retaliation claim against Defendant Potter arising out of the destruction of the microwave oven in Plaintiff's housing unit; (4) First Amendment claim for retaliation against Defendant Graziano for failure to state a claim; (5) supervisory liability claim against Defendant Graziano for failure to state a claim; (6) supervisory liability claims against Defendant Haywood for failure to state a claim; (7) supervisory liability claims against Defendant Boll for generally failing to remedy wrongs, creating and allowing to continue customs and policies under which under which constitutional practices occur, and failure to supervise and monitor subordinates for failure to state a claim; (8) supervisory liability claim against Defendant Boll in connection with Plaintiff's denial of access to court claims against Defendants Potter and Graziano relating to the May 6, 2013, law library incident for failure to state a claim; (9) supervisory liability claim against Defendant Boll with regard to Plaintiff's denial of access to court, interference with legal mail, and improper opening of legal mail claims against Defendants Maher, Dobbs, and Goppert in connection with the amended complaint withheld from mailing to the court, for failure to state

a claim; and (10) retaliation claims against Haywood and Boll for failure to state a claim; and it is further

**RECOMMENDED**, that Plaintiff be granted leave to amend with regard to all of the claims dismissed without prejudice for failure to exhaust administrative remedies and/or for failure to state a claim; and it is further

**RECOMMENDED**, that Defendants' motion to dismiss for failure to state a claim be denied as to the following claims: (1) Plaintiff's retaliation claim against Defendant Potter arising out of the May 6, 2013, law library incident; (2) Plaintiff's retaliation claim against Defendant Donovan with regard to taking Plaintiff's legal papers and kosher food; and (3) Plaintiff's supervisory liability claim against Defendant Boll with regard to Plaintiff's retaliation claim against Potter with regard to the May 6, 2013, law library incident; and it is hereby

**ORDERED**, that the Clerk provide Plaintiff with copies of all unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (per curiam).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).

Dated: December 11, 2014
       Syracuse, NY

Thérèse Wiley Dancks
United States Magistrate Judge

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
W.D. New York.
Anthony AMAKER, Plaintiff,
v.
Brian S. FISCHER, et al., Defendants.

No. 10–CV–0977A.
Signed Sept. 24, 2014.

Anthony D. Amaker, Stormville, NY, pro se.

George Michael Zimmermann, Office of the New York State Attorney General, Buffalo, NY, for Defendants.

DECISION AND ORDER

RICHARD J. ARCARA, District Judge.

**\*1** The above-referenced case was referred to Magistrate Judge H. Kenneth Schroeder, Jr., pursuant to 28 U.S.C. § 636(b)(1)(B). On August 27, 2014, Magistrate Judge Schroeder filed a Report and Recommendation (Dkt. No. 60), recommending that the defendants' motion to dismiss the plaintiff's amended complaint for failure to state a cause of action (Dkt. No. 32) be granted in part.

The Court has carefully reviewed the Report and Recommendation, the record in this case, and the pleadings and materials submitted by the parties, and no objections having been timely filed, it is hereby

ORDERED, that pursuant to 28 U.S.C. § 636(b)(1), and for the reasons set forth in Magistrate Judge Schroeder's Report and Recommendation, the defendants' motion to dismiss (Dkt. No. 32) is granted

with respect to plaintiff's claims against defendants in their official capacities, excluding injunctive relief against Commissioner Fischer and Deputy Commissioner LeClaire, and is also granted with respect to the plaintiff's claims against Commissioner Fischer, NYSDOCS Deputy Commissioner LeClaire, Attica Superintendent Bradt, C.O. Cartwright, C.O. Klodzinski, C.O. Buth, Captain Brown, Sgt. Cunningham, Sgt. Leonard, C.O. Hendzel, Nurse Sharpe and Nurse Cygren in their individual capacities. It is further ordered that the defendants' motion to dismiss (Dkt. No. 32) is granted except with respect to the following claims as set forth by the plaintiff:

(1) denial of attendance at religious services against Deputy Superintendent Dolce and Captain Robinson;

(2) retaliatory cell search on September 1, 2011 against C.O. Steck;

(3) retaliatory denial of water and breakfast on November 1, 2011 against C.O. LaCappriuccia;

(4) retaliatory cell sell search on November 11, 2011 against Sgt. Erhardt; C.O. Malik; and C.O. Carney;

(5) retaliatory denial of electricity on November 17, 2011 against C.O. Malik;

(6) denial of meals on November 29, 2010 against C.O. Piadlo;

(7) denial of sufficient access to the law library against Deputy Superintendent Dolce and C.O. Adamy;

(8) expungement of false information in plaintiff's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**

prison file regarding his risk of escape against Deputy Superintendent Chappius and C.O. O'Connors; and

(9) denial of due process in disciplinary hearing against Captain Robinson.

The case is referred back to Magistrate Judge Schroeder for further proceedings.

IT IS SO ORDERED.

**REPORT, RECOMMENDATION AND ORDER**

H. KENNETH SCHROEDER, JR., United States Magistrate Judge.

This case was referred to the undersigned by the Hon. Richard J. Arcara, pursuant to 28 U.S.C. § 636(b)(1), for all pretrial matters and to hear and report upon dispositive motions. Dkt. # 11.

Currently before the Court is defendants' motion to dismiss plaintiff's amended complaint for failure to state a cause of action pursuant to Rule 12(b)(1) & (6) of the Federal Rules of Civil Procedure. Dkt. # 32. For the following reasons, it is recommended that defendants' motion to dismiss be granted in part.

**PROCEDURAL HISTORY**

**\*2** Plaintiff commenced this action against New York State Department of Corrections ("NYSDOCS"), Commissioner Fischer; NYSDOCS Deputy Commissioner LeClaire; Attica Superintendent Bradt; Attica Deputy Superintendent Chappius; Sergeant ("Sgt."), Erhardt; and Corrections Officer ("C.O."), Cartwright by filing a complaint on December 2, 2010. Dkt. # 1. C.O. Klodzinski and C.O. Padlo; FN1 who were named in the factual allegations of plaintiffs complaint but not in the caption, were added as defendants by Order entered February 17, 2011. Dkt. # 5. Defendants moved to dismiss by Notice of Motion dated April 25, 2011. Dkt. # 10.

FN1. This defendant is identified as C.O. Piablo in CM/ECF but will be referred to as C.O. Piadlo, which is how this defendant is named in both the amended and proposed second amended complaints.

Plaintiff filed an amended complaint dated September 1, 2011 adding Deputy Superintendent Dolce; C.O. Adamy; C.O. Bust; FN2 Captain Brown; C.O. Steck; Sgt. Cunningham; Sgt. Leonard; C.O. Hendzel; Nurse Sharpe; Nurse Cygren; and C.O. O'Connors as defendants. Dkt. # 17. By Decision and Order entered September 30, 2011, the Court directed that the amended complaint be served upon the additional defendants. Dkt. # 20.

FN2. The proposed amended complaint (Dkt.# 25), replaces C.O. Bust with C.O. Buth, which is how the Court will refer to him in this Report, Recommendation and Order.

On November 18, 2011, plaintiff filed a Motion to Amend his Complaint to add Captain Robinson; C.O. Malik; Lt. Lambert; C.O. Carney; C.O. Wegner; C.O. LaCappriuccia; Lt. Brawaski; Ms. Prusak; and C.O. Connors as defendants. Dkt. # 25.

Defendants filed a second motion to dismiss on March 27, 2012. Dkt. # 32.

**FACTS**

At approximately 10:00 am on November 6, 2010, as plaintiff was walking to recreation, Sgt. Erhardt, C.O. Klodzinski FN3 and C.O. Cartwright directed plaintiff to undergo a pat frisk. Dkt. # 25, ¶ 7. Plaintiff alleges that C.O. Cartwright fondled his genitalia and ran his hands between his buttocks as Sgt. Erhardt and C.O. Klodzinski observed. Dkt. # 25, ¶ 7. Plaintiff alleges that the forcible touching and squeezing of his penis, anus and testicles lasted 45 seconds, during which time C.O. Cartwright "was

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**

breathing hard and speaking in [plaintiff's] ear about there was an Amaker here before." Dkt. # 25, ¶ 7.

> FN3. C.O. Klodzinski is a defendant in plaintiff's civil rights action, 06–CV–490.

Before plaintiff was allowed to leave, C.O. Cartwright directed plaintiff to take off his boots and provide an address to mail them out of the facility, even though numerous other inmates were allowed to wear similar boots. Dkt. # 25, ¶¶ 7–8. Plaintiff mailed the boots to the Court.[FN4] Dkt. # 25, ¶ 8. Plaintiff was directed to return to his cell barefoot and was denied recreation. Dkt. # 25, ¶ 7. Plaintiff claims that his boots were confiscated in retaliation for the award of a permanent injunction entered on June 23, 2010 which enjoined defendants in 06–CV–490 from precluding plaintiff's attendance at Nation of Islam services and classes on account of plaintiff's dreadlocks, and from punishing plaintiff for refusing to cut his hair or refusing to change his religious affiliation. 06–CV–490 at Dkt. # 245.

> FN4. The Court returned the boots to plaintiff on November 6, 2010.07–CV–279 at Dkt. # 115.

Despite correspondence with Deputy Superintendent Dolce,[FN5] plaintiff alleges that he has been not been allowed to attend Nation of Islam services and classes on Friday evenings. Dkt. # 25, ¶ 9.

> FN5. Deputy Superintendent Sandra Doice [sic] is a defendant in 06–CV–490.

**\*3** On November 8, 2010, plaintiff wrote Deputy Superintendent Dolce to request special access to the law library. Dkt. # 25, ¶ 14. Deputy Superintendent Dolce forwarded the request to C.O. Adamy, who afforded plaintiff "6 modules of callouts." Dkt. # 25, ¶ 14. When plaintiff requested additional time due to additional court deadlines, Deputy Superintendent

Dolce and C.O. Adamy "conspired to limit his time further to only 3 modules." Dkt. # 25, ¶ 14. In response to plaintiff's grievances, Deputy Superintendent Dolce and C.O. Adamy falsely stated that plaintiff was receiving regular access to the law library. Dkt. # 25, ¶ 15. Plaintiff also alleges that Deputy Superintendent Dolce and C.O. Adamy prevented plaintiff from using the computer, word processor or type writer to prepare his legal papers. Dkt. # 25, ¶ 16. Plaintiff alleges that an appeal was dismissed because of the limitation of his time in the law library. Dkt. # 25, ¶ 16. In addition, due to a reduction in access to the law library due to a scheduling conflict during Ramadan, plaintiff alleges that he "has been unable to complete several appeals [sic] deadlines and filing of Notice of Appeals." Dkt. # 25, ¶ 17.

On November 29, 2010, C.O. Piadlo refused to allow plaintiff to enter the messhall for breakfast because plaintiff's dreadlocks were fastened into a ponytail with his hair and the rules regarding fastening of dreadlocks had recently been changed to require that dreadlocks be fastened with a rubberband. [FN6] Dkt. # 25, ¶ 10. Plaintiff alleges that he was denied breakfast and lunch while other inmates with ponytails fastened with their hair were allowed to proceed to the mess hall. Dkt. # 25, ¶ 10. When plaintiff asked to speak to Sgt. Erhardt, Sgt. Erhardt told plaintiff to return to his cell. Dkt. # 25, ¶ 10. When plaintiff asked to speak to a lieutenant, C.O. Piadlo told plaintiff to "write whoever you want." Dkt. # 25, ¶ 10.

> FN6. Effective September 2, 2010, NYSDOCS' Directive 4914, titled Inmate Grooming Standards, was amended to allow dreadlocks, providing that inmates "wearing below shoulder length dreadlocks must tie them back in a ponytail with barrette, rubber band, or other fastening device approved by the Superintendent."

In December of 2010, Deputy Superintendent Chappius and C.O. O'Connors placed plaintiff's name

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**

on an escape risk list and have refused to remove erroneous information from plaintiff's files, including records relied upon for parole and transfer. Dkt. # 25, ¶ 28. Plaintiff alleges that the misinformation has been "created for retaliation purposes by [Deputy Commissioner] LeClaire and [Commissioner] Fischer and other former defendants in plaintiff's pending lawsuit on religious exercise for wearing dreadlocks." Dkt. # 25, ¶ 28.

In retaliation for the filing of a grievance against Nurse Sharpe for denial of medical care for a persistent cough following a cold, plaintiff alleges that Nurse Sharpe left a note for C.O. Hendzel and Nurse Cygren to read upon his arrival at sick call on February 4, 2011, which plaintiff complains is a violation of HIPAA. Dkt. # 25, ¶ 19. Plaintiff complained that C.O. Hendzel's presence at sick call was a violation of HIPAA, but Nurse Cygren informed plaintiff that C.O. Hendzel could remain. Dkt. # 25, ¶ 19. Nurse Cygren accused plaintiff of trying to overdose and refused to provide plaintiff with cough syrup. Dkt. # 25, ¶ 19. Upon taking his blood pressure and discovering it was high, plaintiff was placed in the infirmary for 72 hours of observation. Dkt. # 25, ¶ 19. Plaintiff's grievance regarding the incident was denied by Lt. Brawaski. Dkt. # 25, ¶ 19.

**\*4** Following plaintiff's move to C-block on February 23, 2011, plaintiff was denied attendance at Nation of Islam services. Dkt. # 25, ¶ 21. Upon investigation, Captain Robinson informed plaintiff that he was not on the call out list, but the Imam reviewed the call out list and informed plaintiff that he was on the call out list. Dkt. # 25, ¶ 21.

Plaintiff complains that since July of 2011, C.O. LaCappriuccia has been denying plaintiff hot water during the 7 to 11 shift. Dkt. # 25, ¶ 33.

Plaintiff complains that C.O. Buth reviewed plaintiff's legal mail from the Court of Claims on August 17, 2011. Dkt. # 25, ¶ 22. Following plaintiff's complaint to Superintendent Bradt,[FN7] as plaintiff was walking to the law library on August 21, 2011, C.O. Buth directed plaintiff to undergo a pat frisk. Dkt. # 25, ¶ 22. C.O. Buth informed plaintiff that he should have better things to do than complain about him reading plaintiff's legal mail. Dkt. # 25, ¶ 22. Plaintiff alleges that C.O. Buth committed a "degrading act of rape" during the course of the pat frisk by rubbing plaintiff's penis, fondling and squeezing plaintiff's buttocks and running his index finger across plaintiff's anus. Dkt. # 25, ¶ 22. When the pat frisk was complete, plaintiff alleges that C.O. Buth told plaintiff "to go ahead and write more complaints" while plaintiff was at the law library. Dkt. # 25, ¶ 23. C.O. Malik and C.O. Steck are alleged to have been present while C.O. Buth conducted the pat frisk. Dkt. # 25, ¶ 23.

> FN7. Although Superintendent Bradt is not a defendant in 06–CV–490, he was the Superintendent at Elmira during the time frame that this Court found officials at Elmira in contempt of the permanent injunction in 06–CV–490. Testimony at the contempt hearing established that Superintendent Bradt instructed Captain Hughes not to inform Elmira correctional officers about the existence of the injunction. 06–CV–490 at Dkt. # 297, pp. 8 & 13.

Plaintiff filed a rape complaint against C.O. Buth. Dkt. # 25, ¶ 25. Sgt. Leonard interviewed plaintiff about the complaint on August 28, 2011. Dkt. # 25, ¶ 25. On September 1, 2011, C.O. Steck entered plaintiff's cell, spit chewing tobacco and coffee on plaintiff's clothes and floor and confiscated plaintiff's legal documents and food. Dkt. # 25, ¶ 26.

Plaintiff also complains that he has been denied sick call and legal supplies by Deputy Superintendent Dolce subsequent to the filing of the rape complaint against C.O. Buth. Dkt. # 25, ¶ 27. For example, plaintiff alleges that he was only provided "9 sheets of

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**

writing paper and no carbon paper." Dkt. # 25, ¶ 27. When Lt. Brawaski interviewed plaintiff with respect to his complaint, Lt. Brawaski responded, "[w]hy should we give you any more paper to write this bullshit about rape." Dkt. # 25, ¶ 27.

Since September 1, 2011, Ms. Prusak is alleged to have "intentionally conceal [ed] all the names of the officers in A–Block," thereby impeding his ability to file accurate grievances and court documents. Dkt. # 25, ¶ 34.

On September 23, September 27 and October 26, 2011, the Court conducted a hearing with respect to plaintiff's motion for contempt of the Court's permanent injunction enjoining defendants in 06–CV–490 from punishing plaintiff for refusing to cut his hair or refusing to change his religious affiliation and from precluding plaintiff's attendance at Nation of Islam services and classes because of his dreadlocks.

**\*5** On November 1, 2011, plaintiff alleges that C.O. LaCappriuccia turned off the water in plaintiff's cell in retaliation for plaintiff's testimony in the contempt proceeding in 06–CV–490. Dkt. # 25, ¶ 29. In addition, C.O. LaCappriuccia denied plaintiff breakfast. Dkt. # 25, ¶ 29. Plaintiff's water was restored 24 hours later. Dkt. # 25, ¶ 29.

C.O. Connors is alleged to have threatened to remove plaintiff from the list for prescribed diet meals. Dkt. # 25, ¶ 29.

Prior to an interview regarding plaintiff's complaint of harassment, which plaintiff alleges was read by corrections officers, C.O. Wegner conducted a pat frisk during which he ran his fingers between plaintiff's buttocks." Dkt. # 25, ¶ 29.

On November 11, 2011, plaintiff alleges that C.O. Malik, C.O. Carney and Sgt. Erhardt "conspired with Lt. Lambert to retaliate while plaintiff was in the

messhall." Dkt. # 25, ¶ 30. Specifically, plaintiff alleges that C.O. Malik and C.O. Carney removed two jars of water from plaintiff's cell and took it to Sgt. Erhardt, who falsely claimed it was alcohol. Dkt. # 25, ¶ 30. Plaintiff complains that Captain Robinson denied plaintiff due process during the resulting disciplinary hearing by depriving him of the ability to call witnesses and finding plaintiff guilty without evidence that the liquid contained alcohol. Dkt. # 25, ¶ 31.

On November 17, 2011, C.O. Long returned plaintiff's legal mail to plaintiff. Dkt. # 25, ¶ 32. Plaintiff alleges that the disbursement form had been removed from his legal mail so as to allow C.O. Long to read his legal mail before returning it to plaintiff. Dkt. # 25, ¶ 32. After filing a grievance, plaintiff alleges that the power was cut off to his cell at 6:00 that evening and that at 8:30 p.m., C.O. Malik walked past his cell, whistling. Dkt. # 25, ¶ 32.

### DISCUSSION AND ANALYSIS
**Dismissal Standard–Rule 12(b)(1)**

A case is properly dismissed for lack of subject matter jurisdiction under Rule 12(b)(1) of the Federal Rules of Civil Procedure when the district court lacks the statutory or constitutional power to adjudicate it. *Markarova v. United States,* 201 F.3d 110, 113 (2d Cir.2000). To defeat a motion to dismiss pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure, the plaintiff bears the burden of proving subject matter jurisdiction by a preponderance of the evidence. *Id.*

*Eleventh Amendment immunity*

Defendants argue that the Eleventh Amendment divests the Court of jurisdiction over plaintiff's official capacity claims seeking monetary damages. Dkt. # 32, p. 11.

"The Eleventh Amendment to the Constitution bars suits against a state in federal court unless that state has consented to the litigation or Congress has permissibly enacted legislation specifically overriding

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

the state's immunity." *Russell v. Dunston,* 896 F.2d 664, 667 (2d Cir.) (citations omitted), *cert. denied,* 498 U.S. (1990). "It is well-established that New York State has not consented to § 1983 suits in federal court and that § 1983 was not intended to override a state's sovereign immunity." *Mamot v. Board of Regents,* 367 Fed. Appx 191 (2d Cir.2010), *citing Trotman v. Palisades Interstate Park Comm'n,* 557 F.2d 35, 38–49 (2d Cir.1977) *and Quern v. Jordan,* 440 U.S. 332, 342, 99 S.Ct. 1139, 59 L.Ed.2d 358 (1979).

**\*6** "The immunity recognized by the Eleventh Amendment extends beyond the states themselves to state agents and state instrumentalities that are, effectively, arms of a state." *Woods v. Roundout Valley Central School Dist. Bd of Educ.,* 466 F.3d 232, 236 (2d Cir.2006). Thus, the Eleventh Amendment also "bars claims for money damages against state officials acting in their official capacities." *Kentucky v. Graham,* 473 U.S. 159, 167–68, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985).

In accordance with the *Ex Parte Young* doctrine, suits against state officials in their official capacities are permitted for prospective injunctive relief to stop ongoing violations of federal law. *Mary Jo C. v. New York State & Local Ret.Sys.,* 707 F.3d 144, 166 (2d Cir.2013). However, "an inmate's transfer from a prison facility generally moots claims for declaratory and injunctive relief against officials of that facility." *Salahuddin v. Goord,* 467 F.3d 263, 272 (2d Cir.2006); *Keitt v. New York City,* 882 F.Supp.2d 412, 449 (S.D.N.Y.2011) (conjecture that plaintiff could be returned to Attica in the future is insufficient to sustain claim for injunctive relief).

As plaintiff is no longer incarcerated at Attica, it is recommended that his claims for injunctive relief against officials at Attica be dismissed as moot except to the extent that plaintiff may be seeking expungement from his record of the allegedly false misbehavior report regarding possession of alcohol. *See Navarez v. Hunt,* 770 F.Supp.2d 565, 568

(W.D.N.Y.2011) (official capacity claim for expungement of disciplinary charges is not barred by Eleventh Amendment). In addition, plaintiff's attempt to enjoin Commissioner Fischer and Deputy Commissioner LeClaire from relying upon misinformation contained in records used to assess plaintiff's suitability for transfer and parole is not barred by the Eleventh Amendment.

**Dismissal Standard–Rule 12(b)(6)**

To survive a motion to dismiss pursuant Rule 12(b)(6) of the Federal Rules of Civil Procedure, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal,* 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009), *quoting Bell Atlantic v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Application of this standard is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679. The Court remains obligated to construe a *pro se* complaint liberally and to interpret *pro se* pleadings to raise the strongest arguments that they suggest. *Hill v. Curcione,* 657 F.3d 116, 122 (2d Cir.2011); *Triestman v. Federal Bureau of Prisons,* 470 F.3d 471 (2d Cir.2006) (district court obliged to interpret *pro se* complaint to raise those causes of action supported by the facts alleged regardless of the causes of action asserted).

*Exhaustion of Administrative Remedies*

**\*7** Defendants argue that plaintiff has conceded his failure to properly exhaust administrative remedies with respect to several claims and has failed to allege compliance with the grievance process with respect to other claims. Dkt. # 32, p. 13.

Plaintiff responds that exhaustion is an affirmative defense and proffers multiple reasons, including

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**

defendants' interference with the inmate grievance system, to excuse his failure to properly exhaust some of his claims. Dkt. # 47, pp. 21–22.

The PLRA states: "No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). In *Porter v. Nussle,* the Supreme Court held that exhaustion of administrative remedies is mandatory and should be applied broadly. 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Because exhaustion is an affirmative defense rather than a jurisdictional predicate, however, a motion to dismiss pursuant to Rule 12(b)(6) should only be granted if it is clear from the face of the complaint that plaintiff has failed to exhaust his administrative remedies. *Jones v. Bock,* 549 U.S. 199, 216, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007); *Richardson v. Goord,* 347 F.3d 431 (2d Cir.2003); *Jenkins v. Haubert,* 179 F.3d 19, 28–29 (2d Cir.1999).

In the instant case, it is recommended that this issue of exhaustion of administrative remedies be addressed in the context of a motion for summary judgment with a more fully developed record regarding plaintiff's efforts to pursue administrative remedies and the availability of such remedies to plaintiff. *See Ruggerio v. County of Orange,* 467 F.3d 170, 175 (2d Cir.2006) (recognizing exceptions to mandatory exhaustion requirement).

*42 U.S.C. § 1983*

42 U.S.C. § 1983 provides, in relevant part, that

Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in

an action at law, suit in equity, or other proper proceeding for redress....

"By its terms ... the statute creates no substantive rights; it merely provides remedies for deprivations of rights established elsewhere." *City of Oklahoma City v. Tuttle,* 471 U.S. 808, 816, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985). Thus, the first inquiry in any § 1983 suit is whether plaintiff's federally protected rights have been violated. *Russell v. Coughlin,* 910 F.2d 75, 77 (2d Cir.1990), *citing Martinez v. California,* 444 U.S. 277, 284, 100 S.Ct. 553, 62 L.Ed.2d 481 (1980).

**First Amendment Denial of Religious Services**

"It is well established that prisoners have a constitutional right to participate in congregate religious services." *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993), *citing Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir.), *cert. denied,* 492 U.S. 909, 109 S.Ct. 3224, 106 L.Ed.2d 573 (1989) ( "prisoners should be afforded every opportunity to attend religious services, whenever possible."). "A prisoner's first amendment right to the free exercise of his religious beliefs may only be infringed to the extent that such infringement is 'reasonably related to legitimate penological interests.' " *Young,* 866 F.2d at 570, *quoting O'Lone v. Estate of Shabazz,* 482 U.S. 342, 107 S.Ct. 2400, 96 L.Ed.2d 282 (1987).

**\*8** Plaintiff's allegations that he has been repeatedly denied attendance at Nation of Islam Services and Friday night classes since his arrival at Attica despite complaints to Deputy Superintendent Dolce and an investigation by C.O. Robinson are sufficient to state a plausible religious exercise claim. *See Young,* 866 F.2d at 570 (allegations that plaintiff was precluded from attending religious services, classes, and any of the activities associated with the celebration of Ramadan were sufficient to state a claim). Accordingly, it is recommended that this aspect of defendants' motion to dismiss be denied.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**

## First Amendment Interference with Legal Mail

"Interference with legal mail implicates a prison inmate's rights to access the courts and free speech as guaranteed by the First and Fourteenth Amendments to the U.S. Constitution." *Davis v. Goord,* 320 F.3d 346, 351 (2d Cir.2003). To state a claim, however, such interference must be alleged to be more than an isolated instance. *Cancel v. Goord,* No. 00 CIV 2042, 2001 WL 303713, at *6 (S.D.N.Y. Mar. 29, 2001), *citing Washington v. James,* 782 F.2d 1134, 1139 (2d Cir.1986). In addition, to state a claim of denial of access to the courts due to interference with legal mail, plaintiff must allege that the interference hindered plaintiff's efforts to pursue his legal claims, *i.e.,* caused actual injury such as the dismissal of an otherwise meritorious claim. *Davis,* 320 F.3d at 351, *citing Monsky v. Moraghan,* 127 F.3d 243, 247 (2d Cir.1997), *cert. denied,* 525 U.S. 823, 119 S.Ct. 66, 142 L.Ed.2d 52 (1998). As plaintiff alleges only one instance of C.O. Buth opening his incoming legal mail, it is recommended that this claim be dismissed as an isolated instance.

## First Amendment Retaliation

In order to survive a motion to dismiss, a plaintiff asserting First Amendment retaliation claims must plausibly allege: (1) that the speech or conduct at issue was protected; (2) that the defendant took adverse action against the plaintiff; and (3) that there was a causal connection between the protected speech and the adverse action. *Davis,* 320 F.3d at 352. "Only retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Id.* at 353, *quoting Dawes,* 239 F.3d 489, 493 (2d Cir.2001). "Insulting or disrespectful comments directed at an inmate generally do not rise to this level." *Id., quoting Dawes,* 239 F.3d at 492. In other words, the alleged retaliation must be more than *de minimis.*

To plausibly allege causation, plaintiff must al-

lege facts suggesting that the protected conduct was a substantial or motivating factor in the prison official's determination to take action against him. *Burton v. Lynch,* 664 F.Supp.2d 349, 367 (2d Cir.2009). Circumstantial facts indicating retaliatory motive include: (1) temporal proximity between the protected activity and the alleged retaliatory act; (2) an inmate's prior good disciplinary record; (3) vindication at a hearing on the matter; and (4) statements by the defendant concerning his motivation. *Id., quoting Baskerville v. Blot,* 224 F.Supp.2d 723, 732–33 (S.D.N.Y.2002). "[A] complaint which alleges retaliation in wholly conclusory terms may safely be dismissed on the pleadings alone." *Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983).

### Retaliatory Transfer into Attica

**\*9** Although a prisoner has no liberty interest in remaining at a particular correctional facility, prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights. *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). In the instant case, however, plaintiff's allegations that he was transferred back to Attica in retaliation for the permanent injunction fails for lack of a plausible connection between the alleged protected activity and the transfer. The issuance of the permanent injunction on June 23, 2010 is insufficient to plausibly suggest retaliatory motive given that the preliminary injunction had been in place since December 18, 2007 and the permanent injunction, which was issued while plaintiff was housed at the Elmira Correctional Facility four months prior to plaintiff's transfer to Attica, was rendered moot by a change in Inmate Grooming Standards [FN8] effective more than two months before plaintiff's transfer to Attica. Accordingly, it is recommended that plaintiff's claim of retaliatory transfer against Commissioner Fischer and Deputy Commissioner LeClaire be dismissed.

FN8. Directive 4914, which regulates Inmate Grooming Standards, was modified on September 2, 2010 to allow the "dreadlock hair-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**

style." 06–CV–490 at Dkt. # 297, p. 15.

*November 6, 2010–Boots & Recreation*

C.O. Cartwright's direction that plaintiff mail out his boots and return to his cell rather than attend recreation on November 6, 2010 does not rise to the level of conduct which would deter an ordinary inmate from exercising his constitutional rights. In any event, for the reasons set forth above, the issuance of the permanent injunction on June 23, 2010 is insufficient to plausibly suggest retaliation as C.O. Cartwright's motive for denying plaintiff continued possession of his boots on November 6, 2010. Accordingly, it is recommended that C.O. Cartwright's motion to dismiss be granted with respect to plaintiff's claim of retaliation.

*November 29, 2010–Denial of Breakfast & Lunch*

Plaintiff's allegations that C.O. Piadlo denied plaintiff entry into the mess hall in retaliation for his prior lawsuit is wholly conclusory. There is no allegation that C.O. Piadlo was aware of any protected activity by plaintiff occurring close in time to this incident and, as set forth above, even if C.O. Piadlo was aware of the issuance of the permanent injunction, it is insufficient to establish retaliatory motive. Accordingly, it is recommended that C .O. Piadlo's motion to dismiss be granted with respect to plaintiff's claim of retaliation.

*February 4, 2011–Sick Call Note*

It is recommended that plaintiff's allegation that in retaliation for the filing of a grievance against her, Nurse Sharpe "left a note to share between [C.O. Hendzel and Nurse Cygren] prior to [plaintiff's] arrival at sick call," be dismissed for failure to plausibly allege adverse action against plaintiff.

*August 21, 2011 Pat Frisk*

The United States Supreme Court has held that "prisoners have no legitimate expectation of privacy." *Hudson v. Palmer,* 468 U.S. 517, 530, 104 S.Ct. 3194, 82 L.Ed.2d 393 (1984). As a result, cell searches and pat frisks, even if conducted for retaliatory reasons, cannot constitute an adverse action as required to support a First Amendment retaliation claim. *See Vogelfang v. Capra,* 889 F.Supp.2d 489, 509 (S.D.N.Y.2012) ("inmate has no right to be free from searches of any kind, including those alleged to be retaliatory"); *Henry v. Annetts,* No. 08 Civ. 286, 2010 WL 3220332, at *2 (S.D.N.Y. July 22, 2010) (Cell searches and pat frisks are an ordinary part of prison life and do not deter the average inmate from continuing to exercise First Amendment rights). Accordingly, plaintiff's allegations that C .O. Buth subjected plaintiff to a pat frisk on August 21, 2011 in retaliation for plaintiff filing a grievance against C.O. Buth on August 17, 2011, fails to state a plausible claim of retaliation against C.O. Buth. As a result, it is recommended that C.O. Buth's motion to dismiss be granted with respect to plaintiff's claim of retaliation.

*September 1, 2011 Cell Search*

**\*10** "Although a cell search is not considered to be actionable under § 1983, regardless of any retaliatory motives," allegations of more than a mere cell search, *to wit,* allegations that corrections officers "tore up" or "trashed" an inmates cell and confiscated or damaged personal property and/or legal papers, may be sufficient to plausibly allege conduct that would deter an inmate of ordinary firmness from exercising his constitutional rights. *See Phelan v. Hersh,* No. 10–CV–0011, 2011 WL 6031940, at *6 (N.D.N.Y. Sept. 13, 2011); *Shariff v. Poole,* 689 F.Supp.2d 470, 481 (W.D.N.Y.2010); *Keesh v. Goord,* 04–CV–271, 2007 WL 2903682, at *8 (W.D.N.Y. Oct.1, 2007). Thus, plaintiff's allegation that C.O. Steck trashed his cell and removed legal documents and food for fasting from his cell immediately after Sgt. Leonard interviewed plaintiff regarding his rape complaint against C.O. Buth is sufficient to state a claim of retaliation against C.O. Steck.

**Eighth Amendment**

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**

To state an Eighth Amendment claim based on conditions of confinement, an inmate must allege that: (1) objectively, the deprivation the inmate suffered was sufficiently serious that he was denied the minimal civilized measure of life's necessities; and (2) subjectively, the defendant acted with a sufficiently culpable state of mind, such as deliberate indifference to the inmate's health or safety. *Walker v. Schult,* 717 F.3d 119, 125 (2d Cir.2013).

*Sexually inappropriate pat frisks*

Although sexual abuse of a prisoner by a corrections officer may in some circumstances violate a prisoner's right to be free from cruel and unusual punishment, isolated episodes of forcible touching "do not involve a harm of federal constitutional proportions as defined by the Supreme Court." *Boddie v. Schnieder,* 105 F.3d 857, 861 (2d Cir.1997); *See Davis v. Castleberry,* 364 F.Supp.2d 319, 321 (W.D.N.Y.2005) (allegation of sexual fondling during a single pat frisk is not sufficiently egregious to state a claim under § 1983); *Montero v. Crusie,* 153 F.Supp.2d 368, 373 (allegation that defendant squeezed plaintiff's genitalia during pat frisks on several occasions not sufficiently serious to state 8th amendment claim). Accordingly, it is recommended that the motion to dismiss be granted with respect to plaintiff's complaints of sexually inappropriate pat frisks by C.O. Cartwright and C.O. Buth. As plaintiff's failure to intervene claim against Sgt. Erhardt and C.O. Klodzinski and any suggestion of such a complaint against C.O. Steck is dependent upon a plausible claim of a constitutional violation by C.O. Cartwright and C.O. Buth, it is recommended that these claims be dismissed as well.

*November 29, 2010–Denial of Breakfast & Lunch*

As defendant concedes (Dkt.# 32, pp. 21–22), plaintiff's allegation that C.O. Piadlo denied him breakfast and lunch because his dreadlocks were not fastened with a rubberband are sufficient to state an Eighth Amendment Claim. *Dwonczyk v. Syracuse City Police Dep't.,* 710 F.Supp.2d 248, 269

(N.D.N.Y.2008) ("Where a prisoner is deprived of two out of three meals served regularly each day, a constitutional violation may exist if that one meal is nutritionally inadequate."); *Brooks v. Chappius,* 450 F.Supp.2d 220, 224 (W.D.N.Y.2006). Accordingly, it is recommended that this aspect of C.O. Piadlo's motion to dismiss be denied.

**Fourteenth Amendment Right of Access to the Court**

**\*11** "[T]he fundamental constitutional right of access to the courts requires prison authorities to assist inmates in the preparation and filing of meaningful legal papers by providing prisoners with adequate law libraries or adequate assistance from persons trained in the law." *Lewis v. Casey,* 518 U.S. 343, 346, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996), *quoting Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). Because prison law libraries are "only the means for ensuring a reasonably adequate opportunity to present claimed violations of fundamental constitutional rights to the courts," allegations of denial of access to the prison law library are insufficient to state a claim; plaintiff must also allege that such a denial caused actual injury, such as the dismissal of an otherwise meritorious claim. *Id.* at 349–351; *See Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (prejudice is an essential element of a claim of denial of access to the court). "A delay in being able to work on one's legal action or communicate with the courts does not rise to the level of a constitutional violation." *Id.*

Although the Court notes that plaintiff's allegations are not that he was denied reasonable access to the law library, but that the additional access he was afforded remained insufficient given the number of court deadlines he was facing, plaintiff's allegations that Deputy Superintendent Dolce and C.O. Adamy were hindering his efficiency in the law library and arbitrarily denying his request for additional time, combined with his allegation that plaintiff's appeal was dismissed in February of 2011 and that he has

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**

been unable to complete several appeals deadlines and file Notices of Appeal because of the limitations placed upon his access to the law library, are sufficient to proceed to discovery.

In contrast, plaintiff's allegation that a complaint to Albany was sent back because he was denied sufficient writing supplies by Deputy Superintendent Dolce is insufficient to plausibly allege actual injury. Although plaintiff's opposition to the motion to dismiss argues that defendants failure to provide him with adequate paper has prevented him from communicating with the court and states that he has been "unable to address post-conviction relief and appeals in Article 78 since his arrival," such allegations fail to demonstrate actual prejudice, *i.e.*, that the deadline for doing so has passed, thereby foreclosing, or otherwise prejudicing, plaintiff's claims.

**Fourteenth Amendment Right to Medical Confidentiality**

An inmate's right to prevent the unwanted disclosure of his personal health information is protected by the due process clause of the Fourteenth Amendment. *Davidson v. Desai,* 817 F.Supp.2d 166, 191 (W.D.N.Y.2011). That right is not absolute, however, but varies with the condition and may be compromised to account for legitimate penological interests. *Powell v. Schriver,* 175 F.3d 107, 111–12 (2d Cir.1999). Medical conditions warranting constitutional protection within the prison context are generally limited to diagnoses which are both serious and intimate in nature, such that their disclosure would likely expose an inmate to ridicule, discrimination or potential violence. *See Myers v. Dolac,* No. 09–CV–6642, 2013 WL 5175588, at *7 (W.D.N.Y. Sept.12, 2013) (collecting cases determining that HIV positive status, hepatitis C, sickle cell anemia and transexualism are protected while fibromyalgia, arthritis and sleep apnea are not). As plaintiff's complaints of a persistent cough fail to rise to the level of a serious and deeply personal medical concern, his allegation that Nurse Cygren permitted C.O. Hendzel to remain in the sick call room

with plaintiff fails to state a claim. Accordingly, it is recommended that the motion to dismiss be granted with respect to plaintiff's claim of lack of medical confidentiality against Nurse Cygren and C.O. Hendzel.

**Fourteenth Amendment Right to Expungement**

**\*12** "A prisoner has a limited constitutional right to have incorrect information expunged from his record." *Farinaro v. Coughlin,* 642 F.Supp. 276, 281–82 (S.D.N.Y.1986), *citing Paine v. Baker,* 595 F.2d 197 (4th Cir.), *cert. denied,* 444 U.S. 925, 100 S.Ct. 263, 62 L.Ed.2d 181 (1979); *See Pruett v. Levi,* 622 F.2d 256, 258 (6th Cir.1980) (recognizing constitutional claim where, following a proper request for correction, false information is used to deprive a person of liberty); *Silverman v. Pennsylvania,* 527 F.Supp. 742, 745 (W.D.Pa.1981), *aff'd.,* 707 F.2d 1395 (3d Cir.1983). More specifically, "a plaintiff has a clearly established constitutional right to have accurate information in his prison file when such information is relied on in a parole hearing." *Lowrance v. Coughlin,* 862 F.Supp. 1090, 1119 (S.D.N.Y.1994).

To state a claim, plaintiff must allege that particular information is false; that it is probable that such information will be relied upon for decision regarding parole or good time credits, not merely for decisions about internal matters such as work assignments; that the error must not be merely technical, but must pertain to the inmate's prior criminal record or disciplinary offenses; and that the inmate requested that the information be expunged, but prison officials refused. *Farinaro,* 642 F.Supp. at 282, *citing Paine,* 595 F.2d at 201–03.

Plaintiff's allegations that Deputy Superintendent Chappius and C .O. O'Connors placed incorrect information regarding his escape risk in records used for parole and transfer determinations and refused to correct such information, are sufficient to state a claim.

**Personal Involvement**

It is well settled that the personal involvement of defendants in an alleged constitutional deprivation is a prerequisite to an award of damages under § 1983. *Gaston v. Coughlin,* 249 F.3d 156, 164 (2d Cir.2001); *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995); *Al–Jundi v. Estate of Rockefeller,* 885 F.2d 1060,1065 (2d Cir.1989). Personal involvement may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation; (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong; (3) the defendant created or permitted the continuation of a policy or custom under which unconstitutional practices occurred; (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts; or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating unconstitutional acts were occurring. *Colon,* 58 F.3d at 873. "There is no *respondeat superior* liability in § 1983 cases." *Green v. Bauvi,* 46 F.3d 189, 194 (2d Cir.1995). Thus, supervisory officials may not be held liable merely because they held a position of authority. *Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996).

*Commissioner Fischer & Deputy Commissioner Le-Claire*

**\*13** Plaintiff's allegations that Commissioner Fischer and Deputy Commissioner LeClaire sanctioned the conduct of defendants who denied plaintiff access to the messhall because his dreadlocks were fastened with his hair, as evidenced by those defendants informing plaintiff that he could write whoever he wanted, and that the misinformation in his inmate record has been "created for retaliation purposes by Mr. LeClaire and Fischer and other former defendants in plaintiff's pending lawsuit on religious exercise for wearing dreadlocks," are wholly conclusory and fail to plausibly alleged defendants' personal involvement in the denial of plaintiff's constitutional rights. Accordingly, it is recommended that this aspect of defendants'

motion to dismiss be granted.

*Superintendent Bradt*

Plaintiff's allegations that Superintendent Bradt made rounds in the block with Deputy Superintendent Dolce prior to plaintiff being denied attendance at Nation of Islam Services; sanctioned the conduct of defendants who denied plaintiff access to the messhall because his dreadlocks were fastened with his hair, as evidenced by those defendants informing plaintiff that he could write whoever he wanted; and directed another officer to investigate plaintiff's complaint are wholly conclusory and fail to plausibly alleged defendants' personal involvement in the denial of plaintiff's constitutional rights.

*Deputy Superintendent Chappius*

Plaintiff's allegation that Deputy Superintendent Chappius sanctioned the conduct of defendants who denied plaintiff access to the messhall because his dreadlocks were fastened with his hair, as evidenced by those defendants informing plaintiff that he could write whoever he wanted, is wholly conclusory and fails to plausibly allege defendant's personal involvement in the denial of plaintiff's constitutional rights.

*Captain Brown*

Plaintiff's allegations that Captain Brown assigned Sgt. Cunningham to investigate plaintiff's complaint and called him a liar and "has allowed other officers to read my personal mail" fail to plausibly allege defendant's personal involvement in the denial of plaintiff's constitutional rights.

*Sgt. Cunningham*

Plaintiff's allegations that Sgt. Cunningham had conducted a previous investigation into a prior complaint about the denial of electricity to plaintiff's cell and that Sgt. Cunningham was the area supervisor when C.O. Steck searched his cell fail to plausibly allege defendant's personal involvement in the denial

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**

of plaintiff's constitutional rights.

*Sgt. Leonard*

Plaintiff's allegation that Sgt. Leonard inter-viewed him about his rape complaint several days before C.O. Steck searched plaintiff's cell fails to plausibly allege defendant's personal involvement in the denial of plaintiff's constitutional rights.

*Health Insurance Portability & Accountability Act*

The Health Insurance Portability & Accountabil-ity Act of 1996 ("HIPAA"), 42 U.S.C. § 1320 *et seq.,* does not provide a private right of action for disclosure of confidential medical information. *McKnight v. Middleton,* 699 F.Supp.2d 507, 532 (E.D.N.Y.2010), *aff'd* 434 Fed. Appx. 32 (2d Cir.2011), *Wilkerson v. Shinseki,* 606 F.3d 1256, 1267 (10th Cir.2010); *Acara v. Banks,* 470 F.3d 569, 571 (5th Cir.2006);. Accord-ingly, it is recommended that plaintiff's cause of action pursuant to the HIPAA be dismissed for failure to state a claim.

*Prison Rape Elimination Act*

**\*14** The Prison Rape Elimination Act of 2003 ("PREA"), was enacted to address the problem of rape in prison by creating a commission to study the issue and to develop national standards for the detection, prevention, reduction and punishment of prison rape. 42 U.S.C. § 15601. Nothing in the statute suggests that PREA intended to establish a private cause of action for allegations of prison rape, and every court to ad-dress the issue has determined that PREA cannot support such a cause of action by an inmate. *See Breer v. Medor,* No. 2:12–CV–53, 2013 WL 4456896, at \*6 (D.Vt. Aug.16, 2013); *Holloway v. Dep't of Correc-tions,* No. 3:11 CV1290, 2013 WL 628648, at \*2 (D.Ct. Feb. 20, 2013); *Chao v. Ballista,* 772 F.Supp.2d 337, 341 n. 2 (D.Mass.2011); *Ball v. Beckworth,* No. CV 11–0037, 2011 WL 4375806, at \*4 (D.Mont. Aug. 31, 2011); *LeMasters v. Fabian,* No. 09–702, 2009 WL 1405176, at \*2 (D.Minn. May 18, 2009); *Bell v. County of Los Angeles,* CV 07–8187, 2008 WL 4375768, at \*6 (C.D.Cal.2008); *Chinnici v. Edwards,*

No. 1:07–cv–229, 2008 WL 3851294, at \*3 (D.Vt.2008); *Rindahl v. Weber,* CIV 08–4041, 2008 WL 5448232, at \*1 (D.S.D.2008). Accordingly, it is recommended that plaintiff's cause of action pursuant to PREA be dismissed for failure to state a claim.

*Religious Land Use and Institutionalized Persons Act*

The Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc–1 ("RLUIPA"), proscribes the government from im-posing a substantial burden on the religious exercise of an inmate, even if the burden is the result of a rule of general applicability, unless the government demon-strates that the imposition of the burden on that inmate is in furtherance of a compelling governmental inter-est and is the least restrictive means of furthering that compelling interest. 42 U.S.C. § 2000cc–1(a). RLUIPA "does not authorize monetary damages against state officers in their official capacities and does not create a private right of action against state officers in their individual capacities." *Washington v. Gonyea,* 731 F.3d 143, 144 (2d Cir.2013) (internal citation omitted). Although RLUIPA would permit injunctive relief, plaintiff is no longer housed at Atti-ca, rendering his complaints of repeated denial of access to religious services at Attica moot. *Salhuddin,* 467 F.3d at 272 ("inmate's transfer from a prison fa-cility generally moots claims for declaratory and in-junctive relief."). Accordingly, it is recommended that plaintiff's cause of action pursuant to RLUIPA be dismissed for failure to state a claim.

### CONCLUSION

For the reasons set forth above, it is recommended that defendants' motion to dismiss (Dkt.# 32), be granted with respect to plaintiff's claims against de-fendants in their official capacities, except in so far as plaintiff seeks injunctive relief against Commissioner Fischer and Deputy Commissioner LeClaire in their official capacities for expungement of misinformation relating to plaintiff's escape risk and disciplinary charges arising from the November 11, 2011 cell search.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**

**\*15** Furthermore, for the reasons set forth above, it is recommended that defendants' motion to dismiss (Dkt.# 32), be granted with respect to plaintiff's claims against Commissioner Fischer; NYSDOCS Deputy Commissioner LeClaire; Attica Superintendent Bradt; C.O. Cartwright; C.O. Klodzinski; C.O. Buth; Captain Brown; Sgt. Cunningham; Sgt. Leonard; C.O. Hendzel; Nurse Sharpe; and Nurse Cygren in their individual capacities.

Furthermore, for the reasons set forth above, it is recommended that defendants' motion to dismiss (Dkt.# 32), be granted except with respect to the following claims set forth in plaintiff's second amended complaint:

(1) denial of attendance at religious services against Deputy Superintendent Dolce and Captain Robinson;

(2) retaliatory cell search on September 1, 2011 against C.O. Steck;

(3) retaliatory denial of water and breakfast on November 1, 2011 against C.O. LaCappriuccia;

(4) retaliatory cell sell search on November 11, 2011 against Sgt. Erhardt; C.O. Malik; and C.O. Carney;

(5) retaliatory denial of electricity on November 17, 2011 against C.O. Malik;

(6) denial of meals on November 29, 2010 against C.O. Piadlo;

(7) denial of sufficient access to the law library against Deputy Superintendent Dolce and C.O. Adamy;

(8) expungement of false information in plaintiff's prison file regarding his risk of escape against Deputy Superintendent Chappius and C.O. O'Connors; and

(9) denial of due process in disciplinary hearing against Captain Robinson.

Therefore, it is hereby ORDERED pursuant to 28 U.S.C. § 636(b) (1) that:

This Report, Recommendation and Order be filed with the Clerk of the Court.

ANY OBJECTIONS to this Report, Recommendation and Order must be filed with the Clerk of this Court within fourteen (14) days after receipt of a copy of this Report, Recommendation and Order in accordance with the above statute, Fed.R.Civ.P. 72(b) and Local Rule 72(b).

The district judge will ordinarily refuse to consider *de novo* arguments, case law and/or evidentiary material which could have been, but were not presented to the magistrate judge in the first instance. *See, e.g., Patterson–Leitch Co. v. Massachusetts Mun. Wholesale Electric Co.,* 840 F.2d 985 (1st Cir.1988).

*Failure to file objections within the specified time or to request an extension of such time waives the right to appeal the District Court's Order. Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Wesolek v. Canadair Ltd.,* 838 F.2d 55 (2d Cir.1988).

The parties are reminded that, pursuant to Rule 72(b) of the Local Rules for the Western District of New York, "written objections shall specifically identify the portions of the proposed findings and recommendations to which objection is made and the basis for such objection and shall be supported by legal authority." *Failure to comply with the provisions*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4772202 (W.D.N.Y.)
**(Cite as: 2014 WL 4772202 (W.D.N.Y.))**

*of Rule 72(b) may result in the District Judge's refusal to consider the objection .*

**\*16** The Clerk is hereby directed to send a copy of this Report, Recommendation and Order to the attorneys for the parties.

**SO ORDERED.**

Filed Aug. 27, 2014.

W.D.N.Y.,2014.
Amaker v. Fischer
Slip Copy, 2014 WL 4772202 (W.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 350868 (S.D.N.Y.)
**(Cite as: 1999 WL 350868 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Kenny CARTER, Plaintiff,
v.
Christopher ARTUZ, et al., Defendants.

No. 95CIV2361CSHKNF, 95CIV4785CSHKNF.
June 1, 1999.

MEMORANDUM OPINION AND ORDER

HAIGHT, Senior District J.

**\*1** By Notice of Motion filed March 19, 1999, plaintiff *pro se,* who is currently confined at Southport Correctional Facility, seeks a preliminary injunction restraining the defendants, various prison officials at Greenhaven Correctional Facility, from "physical and mental-abuse and cruel and inhumane treatment," including poisoning him and taking his property. He also requests transfer to a federal correctional institution "where plaintiff-petitioner may receive the proper x-rays, tests and attention." In the same motion, Carter seeks reconsideration of certain aspects of this Court's Memorandum Opinion and Order dated February 1, 1999 denying his objections to Reports and Recommendations of Magistrate Judge Kevin Fox dated May 28, 1998 and November 5, 1998. For the reasons that follow, I decline to reconsider my previous opinion and deny the request for a preliminary injunction.

PRELIMINARY INJUNCTION

The amended complaint in these consolidated cases assert claims under 42 U.S.C. § 1983 alleging that the defendants violated plaintiff's civil rights by poisoning his food, drinking water, medications and shower water, denying him appropriate medical treatment and stealing his property, all while he was incarcerated at Greenhaven. The present application is at least the fourth formal motion for a preliminary injunction filed by Carter, all of which have been denied. In an Order dated December 20, 1996, rejecting one of his motions for a preliminary injunction, the Court issued Carter the following warning:

[S]hould he make a future application for injunctive relief on the grounds of purported poisoning in Green Haven, and does not accompany such a motion with new, material, evidence, he may be subject to sanctions.

Slip. Op. at 3.

Carter's present application suffers from two deficiencies. First, failing to heed my prior admonition, he has not supported his motion for injunctive relief with any evidence probative of his claims. Plaintiff asserts that he presently suffers from the following array of maladies:

(1) Blurry blind in one-eye and partially blind in the other; (2) 75% of the hairs on the (my) skin-organ has been cut-off; (3) bleeding in urine, eye; in vomit; bleeding gums; (4) impotency; malnutrition weighing 90 lbs—110 lbs; (5) inflame tonsils and mouth (sores in throat) swollen left face (pituitary glands); (6) constant black-outs; mental anxiety; mental-anguish, emotional-stress, heart attacks (slight), chest-pains; weak bladder ...

Affirmation of Kenny Carter dated March 12, 1999 at p. 3. Besides his own description of his physical ailments, the only evidence he has submitted in support of irreparable harm his preliminary injunction motion consists of: (1) an "Eye Record" from Southport Correctional Facility prescribing bifocals in September of 1998; (2) several records of visits to the

Not Reported in F.Supp.2d, 1999 WL 350868 (S.D.N.Y.)
**(Cite as: 1999 WL 350868 (S.D.N.Y.))**

health clinics at Sing Sing and Southport Correctional Facilities from February through November of 1998 which recite his various physical complaints (including a lump in the side of his face, weakness, dizziness, nausea), but which note no serious health problems; (3) a handwritten copy of a prescription for eye medication; (4) a handwritten copy of plaintiff's "Emergency Sick Call" on January 5, 1999, requesting "gauze for my bloody-eye," (5) an order of the New York Supreme Court reinstating plaintiff's application for review of a disciplinary proceeding at Greenhaven; (6) a prison official's written response to plaintiff's complaint that an insufficient number of food trays is available during meals at Southport; and (7) two written grievances made by plaintiff in early 1999 regarding theft of his property by officers at Southport. Some of these documents are not relevant to his claims of constitutional violations. The others entirely fail to demonstrate that plaintiff actually suffers from ill health, that any physical problems are the result of poisoning by prison officials or that prison officials have failed to adequately respond to his physical complaints. Nor do these documents bolster his claim that the guards have been taking his property. In short, these exhibits do not satisfy plaintiff's burden of demonstrating the requisite likelihood that he will suffer any irreparable harm in the absence of an injunction, much less that he might suffer harm as the result of alleged constitutional violations at the hands of the defendants.

**\*2** Plaintiff's preliminary injunction application suffers from a second, equally fatal flaw. Carter's amended complaint states claims against officers of Greenhaven for constitutional deprivations occurring during his confinement at that facility. His present application seeks relief for geographically and temporally distinct, but qualitatively similar, misconduct allegedly committed by officers at his current place of incarceration, Southport Correctional Facility. The only properly named defendants in the present consolidated actions have no connection to the alleged abuse that plaintiff now seeks to have restrained. Be-

cause the injunctive relief sought by plaintiff is aimed at curbing the acts of officials at a different institution not connected to the claims presently before the Court, I have no basis upon which to grant the injunctive relief.

MOTION TO RECONSIDER

Carter seeks reconsideration of those portions of the Court's February 1, 1999 Opinion denying his motion to disqualify Magistrate Judge Fox, denying in part his motion to amend the complaint, and denying his request for appointment of counsel. The standards governing a motion to reconsider pursuant to Rule 6.3 of the Local Rules of the United States District Courts of the Southern and Eastern Districts of New York are the same as those that governed former Local Rule 3(j). See *Wishner v. Continental Airlines,* No. 94 Civ. 8239(LAP), 1997 WL 615401, at \*1 (S.D.N.Y. Oct. 6, 1997). This standard "is strict, and reconsideration will generally be denied unless the moving party can point to controlling decisions or data that the court overlooked—matters, in other words, that might reasonably be expected to alter the conclusion reached by the court." *Shrader v. CSX Transp., Inc.,* 70 F.3d 255, 257 (2d Cir.1995). The Rule "is to be narrowly construed and strictly applied so as to avoid repetitive arguments on issues that have been fully considered by the court." *Wishner,* 1997 WL 615401, at \* 1 (internal quotation and citation omitted). Plaintiff has failed to satisfy this standard because he has not raised any controlling decisions or facts that change the Court's challenged conclusions.

*Appointment of Counsel*

This Court upheld the Magistrate Judge's denial of plaintiff's request for appointment of counsel on the basis that the nature and the complexity of the factual and legal issues involved in the case, and plaintiff's demonstrated ability to present his claims and successfully argue issues before this Court and the Magistrate Judge, did not suggest the need for the assistance of counsel at the present juncture. In moving for reargument, plaintiff contends that he requires the help

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 350868 (S.D.N.Y.)
**(Cite as: 1999 WL 350868 (S.D.N.Y.))**

of a lawyer to litigate against the New York Attorney General's Office, which is not cooperating in the discovery process according to plaintiff. If plaintiff believes the Attorney General's Office is not fulfilling its discovery obligations, he may make a proper request for relief before the Magistrate Judge, to whom all pre-trial matters in these cases have been referred. But plaintiff's accusation of the Attorney General's recalcitrance, has no bearing on the conclusion that the nature of the plaintiff's claims does not warrant appointment of counsel at the present time.

*Disqualification*

**\*3** In seeking reargument of my refusal to disqualify Magistrate Judge Fox, plaintiff essentially repeats the same arguments he made in the initial disqualification request. He takes issue with my conclusion that he has failed to demonstrate that Magistrate Judge Fox has displayed a "deep-seated" antagonism that makes fair judgment impossible, or any other aspect of personal bias against Carter or in favor of the defendants. Plaintiff correctly points out that extra-judicial bias can be displayed in judicial decisionmaking, as I recognized in my initial decision. But, because he fails to present any material facts demonstrating this alleged bias that I overlooked, his motion to reconsider this decision is denied.

*Motion to Amend*

Finally, plaintiff seeks reconsideration of the denial of his motion to amend his complaint to add several supervisory officials as defendants—New York State Department of Corrections Commissioner Glenn S. Goord, Southport Superintendent Michael McGinnis, Sing Sing Superintendent Charles Greiner and Downstate Superintendent John McGinnis.

In his Report and Recommendation dated November 5, 1998, Magistrate Judge Fox recommended that this Court deny plaintiff's request for permission to add claims arising from events occurring at Southport, Sing Sing and Downstate as these claims were entirely unrelated to the events arising from his confinement at Greenhaven, which were the subject of his initial claims. Plaintiff did not object to that recommendation, accepted by this Court. Therefore, although the Magistrate Judge did not rely on this theory in denying leave to add the supervisors as defendants, I conclude that because Superintendents Michael McGinnis, John McGinnis and Charles Greiner are sued as supervisory officials of the other correctional facilities as to which plaintiff has not been authorized to add claims, there is no basis upon which to hold these officials liable under the theory of respondeat superior and they are not proper defendants here.

In his Report and Recommendation, Magistrate Judge Fox held that § 1983 liability could not extend to Goord, McGinnis, Greiner and McGinnis for the alleged wrongs of their subordinates because plaintiff had failed to allege their personal involvement in the alleged deprivations. As noted, three of the would-be defendants, as supervisors of different correctional institutions, cannot be liable for events occurring at Greenhaven involving individuals they did not supervise. However, Commissioner Goord, as head of the New York State Department of Corrections, could theoretically be held liable for the unconstitutional actions of his subordinates at Greenhaven if a proper showing of personal involvement is made.

As this Court recognized in its February 1, 1999 Opinion:

[I]n order for § 1983 liability to extend to supervisory officials who are not alleged to have directly participated in the alleged deprivations, Carter must demonstrate personal involvement through one of the following exceptions to the prohibition on respondeat superior for § 1983 actions: (1) after learning of the constitutional deprivation through a report or appeal the officials failed to remedy the wrong; (2) the officials created a policy or custom under which unconstitutional practices occurred, or allowed such a policy or custom to continue after

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 1999 WL 350868 (S.D.N.Y.)
**(Cite as: 1999 WL 350868 (S.D.N.Y.))**

learning of it; or (3) the supervisors were grossly negligent in managing the subordinates who caused the unlawful action.

**\*4** Slip Op. at 10. In asking for reconsideration, however, plaintiff continues to allege nothing other than liability based on Goord's status as Commissioner and has failed to identify any material facts or controlling decisions that the Court overlooked in holding that plaintiff had not adequately alleged Goord's personal involvement in the alleged misconduct at Greenhaven.

It is true that under certain circumstances a supervisory official may be liable for failing to remedy a constitutional violation of which he was aware, but plaintiff alleges in only the most conclusory terms that Goord was notified of his complaints of constitutional deprivations and failed to take any steps to remedy the alleged violations. Such conclusory allegations are not sufficient to establish supervisory liability. *See Zaffino v. Surles,* No. 91 Civ. 1637(MGC), 1993 WL 77306, \*3 (S.D.N.Y. Mar. 12, 1993) (conclusory allegations were insufficient to establish that supervisory official was aware of the alleged constitutional violations and failed to remedy them); *see also Payne v. Axelrod,* 871 F.Supp. 1551, 1556 (N.D.N.Y.1995) (conclusory allegation of conspiracy did not warrant supervisory liability on the basis of knowing failure to remedy deprivation). Nor does plaintiff identify a particular policy under which the alleged constitutional practices occurred. The "policy" of having nurses, rather than doctors, screen patients at the prison clinics, which Carter clings to in his motion, has no connection to the misconduct alleged in the complaint. Moreover, while plaintiff talismanically asserts that the Commissioner was grossly negligent in managing his subordinates, he has not alleged any concrete fact upon which a finding of gross negligence on the part of Goord could be made. *Cf. Brodeur v. The City of New York,* No. 96 Civ. 9421(RPP), 1998 WL 557599 (S.D.N.Y. Sept. 2, 1998) (§ 1983 claim against mayor dismissed where complaint contained no specific factual allegations

allowing an inference that mayor was personally involved in depriving plaintiff's civil rights); *Smith v. Keane,* No. 96 Civ. 1269(JGK), 1998 WL 146225 (S.D.N.Y. Mar. 25, 1998) (dismissing claims against supervisor because conclusory allegations in complaint lacked any particularized facts allowing a finding of supervisor's personal involvement in constitutional violations). In the end, plaintiff's motion merely rehashes arguments previously made to, and rejected by, the Magistrate Judge and the Court; he offers nothing new to warrant a different conclusion here.

Plaintiff's motion for a preliminary injunction and reconsideration of this Court's February 1, 1999 Opinion is denied.

It is SO ORDERED.

S.D.N.Y.,1999.
Carter v. Artuz
Not Reported in F.Supp.2d, 1999 WL 350868 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5094637 (N.D.N.Y.)
**(Cite as: 2010 WL 5094637 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Jamie CISNEVAS–GARCIA a/k/a Cisneros Garcia,
a/k/a Jaime Cisneros–Garcia, Plaintiff,
v.
Roy SHIPMAN, Case Counselor; L. Doud, Counsel
Supervisor; John Doe, Educ. Supervisor; and John
Doe, Onondaga County Commissioner, Defendants.

No. 9:10–CV–179 (FJS/RFT).
Dec. 8, 2010.

Jamie Cisnevas–Garcia, a/k/a Cisneros Garcia, a/k/a
Jaime Cisneros–Garcia, Batavia, NY, pro se.

**MEMORANDUM–DECISION AND ORDER**
SCULLIN, Senior District Judge.
**I. INTRODUCTION**
  *1 The Clerk of the Court has sent Plaintiff Jamie
Cisnevas–Garcia's amended complaint to the Court for
its review. Plaintiff filed his amended complaint in
accordance with the Court's August 31, 2010 Memo-
randum–Decision and Order. See Dkt. No. 16.

  Plaintiff commenced this action seeking redress
for the alleged violation of his right to access the
courts. Plaintiff stated that he was "a federal inmate in
need for information of federal law" and claimed that
his access to the law library at the Onondaga County
Correctional Facility, where he was then confined,
was extremely limited. See Dkt. No. 1.[FN1] In his
complaint, Plaintiff named three individuals, whom he
identified as employees of Onondaga County, as De-
fendants and sought injunctive relief and compensa-
tory damages. See id. at 4.[FN2]

    FN1. Plaintiff is currently confined in the
    Buffalo Federal Detention Facility. See Dkt.
    No. 20.

    FN2. Although Plaintiff styled his complaint
    as an action pursuant to the Federal Tort
    Claims Act, see Dkt. No. 1 at 1, the Court
    read the complaint liberally in the light most
    favorable to Plaintiff as a pro se litigant and
    considered whether the allegations of the
    complaint were sufficient to state a claim
    pursuant to 42 U.S.C. § 1983 for the alleged
    violation of Plaintiff's Sixth Amendment
    right to access the courts.

  Upon review of the complaint in accordance with
28 U.S.C. § 1915(e), the Court determined that the
pleading, as drafted, failed to state a claim against
Defendants upon which this Court could grant relief
pursuant to 42 U.S.C. § 1983. See Dkt. No. 16 at 2–6.
The Court found that, "[a]lthough Plaintiff state[d]
that he had two 'open cases,' [FN3] [because] he d[id] not
allege any facts that even suggest[ed] that he ha[d]
suffered 'actual injury' in either action as a result of
the deficient access to the law library[,]" the complaint
as drafted was not sufficient. In light of his pro se
status, the Court afforded Plaintiff the opportunity to
file an amended complaint. See id. at 6–8.

    FN3. The only information that Plaintiff
    provided regarding these actions was their
    case numbers. See Dkt. No. 1 at 2. Case
    "8:09–CR–0385" identifies a criminal action
    which was pending against Plaintiff in the
    Northern District of New York. See United
    States        v.        Cisneros–Garcia,
    8:09–CR–385(GTS). Appointed counsel
    represented Plaintiff in that proceeding. See
    id. at Dkt. No. 19. Moreover, following a trial

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5094637 (N.D.N.Y.)
**(Cite as: 2010 WL 5094637 (N.D.N.Y.))**

on November 1 and 2, 2010, the jury acquitted Plaintiff of the charges against him. *See id.* at Dkt. Nos. 59, 61. As to the second action that Plaintiff referenced—09–2406—this case number does not identify an action pending in the Northern District of New York, nor did a search of the U.S. Party/Case Index locate any such case; and the Court, therefore, has no information regarding this action. See https://pacer.uspci.uscourts.gov.

Plaintiff submitted an amended complaint in compliance with the Court's Memorandum–Decision and Order. *See* Dkt. No. 17.

## II. DISCUSSION
### A. Sufficiency of the amended complaint
In his amended complaint, Plaintiff restated his claim that he was denied meaningful access to legal supplies and to the law library at the Onondaga County Correctional Facility and that he was prejudiced in he pursuit of his legal proceedings in the Northern District of New York and in the Court of Appeals for the Fourth Circuit. *See* Dkt. No. 17 at 2–4. Plaintiff also claimed that officials at the Cayuga County Correctional Facility, where he was then confined, had abridged his Sixth Amendment rights. *See id.*

As the Court discussed in its prior Memorandum–Decision and Order, an inmate alleging a denial of access to courts must show "actual injury" as a result of the deficient access to the courts; that is, that he was "hindered [in] his efforts to pursue a legal claim." *Lewis v. Casey,* 518 U.S. 343, 351 (1996); *accord Bourdon v. Loughren,* 386 F.3d 88, 93 (2d Cir.2004) (quotation omitted); *Thompson v. United States,* No. 09–CV–0964M, 2010 WL 1910293, *4 (W.D.N.Y. May 7, 2010) (quotation and other citation omitted). The cause of the injury must be the inadequacy of the access. *See Lewis,* 518 U.S. at 350–51. Thus, the mere limitation of access to legal materials,

delay in being able to work on legal matters, and/or delay in serving court documents, without more, does not state a constitutional claim. *See, e.g., Gillard v.. Burge,* No. 9:03–cv–1537, 2007 WL 1074789, *9 (N.D.N.Y. Apr. 5, 2007) (holding that a missed deadline in a federal case was not sufficient to demonstrate actual injury (quotation and other citation omitted)); *Warburton v. Underwood,* 2 F.Supp.2d 306, 312 (W.D.N.Y.1998) (holding that fourteen-day delay in service was not itself sufficient to establish actual injury (quotation omitted)); *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995) (citing cases). Rather, a plaintiff must show that prison officials had frustrated or impeded a "nonfrivolous legal claim." *Lewis,* 518 U.S. at 353. Since Plaintiff had failed to allege facts in his original complaint to explain how the claimed lack of access to the law library at the Onondaga County Jail prejudiced his right to pursue one or more nonfrivolous legal claims, the Court concluded that his complaint as drafted failed to state a claim upon which this Court may grant relief.

**\*2** Upon review, the Court finds that the amended complaint does not cure the pleading deficiencies which the Court identified in its prior Memorandum–Decision and Order. With respect to the criminal proceedings against Plaintiff in the Northern District, review of the public docket for that action shows that counsel represented Plaintiff at all times relevant to this action. *See United States v. Cisneros–Garcia,* 8:09–cr–0385 (GTS). Moreover, Plaintiff was tried before a jury, which found him not guilty of the charges against him on November 2, 2010. *See id.* at Dkt. No. 59. Accordingly, there is no basis upon which this Court could conclude that Plaintiff has sufficiently alleged that he suffered "actual injury" from the allegedly inadequate access to legal materials and supplies.

Plaintiff also refers to legal proceedings in the United States Court of Appeals for the Fourth Circuit and alleges in his amended complaint that his case "was in fact denied per 'local Rule 45 and the man-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5094637 (N.D.N.Y.)
**(Cite as: 2010 WL 5094637 (N.D.N.Y.))**

date—issue'." *See* Dkt. No. 17 at 3. Although this assertion is insufficient to establish actual injury, in light of Plaintiff's *pro se* status, the Court has reviewed the public docket for this action to consider whether the Court should grant Plaintiff a further opportunity to file an amended pleading. In *United States v. Cisneros–Garcia,* 10–6105 (4th Circuit), Plaintiff appealed the denial of his motion pursuant to 28 U.S.C. § 2255 to vacate, set aside or correct his criminal sentence. *See Cisneros Garcia v. United States,* 3:08CV618–3–V (W.D.N.C.) (Order filed January 4, 2010). The docket reveals that the Fourth Circuit dismissed the appeal on March 15, 2010, for failure to prosecute but reinstated it on April 26, 2010, upon Plaintiff's motion. *See United States v. Cisneros–Garcia,* 10–6105, Dkt. Nos. 7, 11. In light of the reinstatement of the appeal, it does not appear to this Court that Plaintiff suffered an actual injury to a non-frivolous legal claim during the period of his confinement in the Onondaga County Correctional Facility.

As noted, Plaintiff also asserts claims arising out of his subsequent confinement in Cayuga County Correctional Facility. However, because Plaintiff has not named one or more individual employees or officials at Cayuga County Correctional Facility as Defendants in this action, further consideration of those claims is unwarranted.

In sum, construing Plaintiff's amended complaint with the utmost liberality and mindful of his status as a *pro se* litigant, the Court nevertheless finds that he has failed to state a cognizable claim for the violation of his Sixth Amendment right to access the courts.[FN4] Accordingly, this action is subject to dismissal pursuant to 28 U.S.C. § 1915(e).

> FN4. The Court has also considered whether a subsequently filed request from Plaintiff seeking to name an additional Defendant and to assert a claim of wrongdoing against him, *see* Dkt. No. 19, suggests that the Court

should afford Plaintiff the opportunity to file another amended pleading and concludes that it does not. Plaintiff states that this additional Defendant ("Officer James") improperly disposed of some of Plaintiff's legal papers. *See id.* at 2. According to Plaintiff, "the disposal of said copies may have damage my case." *See id.* For all of the reasons set forth herein and in the Court's prior Memorandum–Decision and Order, this allegation is not sufficient to state a claim for the violation of Plaintiff's right to access the courts upon which this Court may grant relief pursuant to 42 U.S.C. § 1983.

**B. Motion to stay deportation**

Plaintiff has filed a renewed motion styled as an "Emergency Motion to Stay of Deportation." *See* Dkt. No. 21. According to Plaintiff, after the jury found him not guilty on November 2, 2010, he was transferred to the Buffalo Federal Detention Facility where he is awaiting removal from the United States. *See id.* at 1. Plaintiff asks that the Court grant his requested relief "in order for the plaintiff to bring his case to an end." *See id.* As the Court previously advised Plaintiff, he has not demonstrated any basis for the consideration of such a request in this civil rights action against employees of Onondaga County. *See* Dkt. No. 16 at 11. Accordingly, the Court denies Plaintiff's renewed motion to stay deportation.

### III. CONCLUSION

**\*3** Accordingly, for the above-stated reasons, the Court hereby

**ORDERS** that Plaintiff's request for leave to amend his complaint further is **DENIED;** and the Court further

**ORDERS** that Plaintiff's renewed motion for a stay of deportation is **DENIED WITHOUT PREJUDICE;** and the Court further

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 5094637 (N.D.N.Y.)
**(Cite as: 2010 WL 5094637 (N.D.N.Y.))**

ORDERS that this action is DISMISSED pursuant to 28 U.S.C. § 1915(e) for failure to state a claim upon which this Court may grant relief; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Memorandum–Decision and Order on Plaintiff in accordance with the Local Rules.

**IT IS SO ORDERED.**

N.D.N.Y.,2010.
Cisnevas-Garcia v. Shipman
Not Reported in F.Supp.2d, 2010 WL 5094637 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 652933 (N.D.N.Y.)
**(Cite as: 2014 WL 652933 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Corey FORD, Plaintiff,
v.
Joseph T. SMITH, Neville Andrews, Defendants.

No. 9:12–CV–1109 (TJM/TWD).
Feb. 19, 2014.

Corey Ford, Wallkill, NY, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Keith A. Muse, Esq., of Counsel,
Albany, NY, for Defendants.

***DECISION and ORDER***
THOMAS J. McAVOY, Senior District Judge.
**I. INTRODUCTION**
*1 This *pro se* action brought pursuant to 42
U.S.C. § 1983 was referred to the Hon. Thérèse Wiley
Dancks, United States Magistrate Judge, for a Report
and Recommendation pursuant to 28 U.S .C. § 636(b)
and Local Rule N.D.N.Y. 72.3(c). In her January 16,
2014 Report–Recommendation and Order (Dkt. No.
44), Magistrate Judge Dancks recommends that De-
fendants' motion for summary judgment (Dkt. No. 39)
be granted and Plaintiff's motion for summary judg-
ment (Dkt. No. 33) be denied as moot. No objections
to the Report–Recommendation and Order have been
filed, and the time to do so has expired.

**II. DISCUSSION**
After examining the record, this Court has de-
termined that the ReportRecommendation and Order
is not subject to attack for plain error or manifest

injustice.

**III. CONCLUSION**
Accordingly, the Court **ADOPTS** the Re-
port–Recommendation and Order for the reasons
stated therein. Defendants' motion for summary
judgment (Dkt. No. 39) is **GRANTED,** and Plaintiff's
motion for summary judgment (Dkt. No. 33) is **DE-
NIED** as moot.

**IT IS SO ORDERED.**

***REPORT–RECOMMENDATION and ORDER***
THÉRÈSE WILEY DANCKS, United States Magis-
trate Judge.
This pro se prisoner civil rights action, com-
menced pursuant to 42 U.S.C. § 1983, has been re-
ferred to me for Report and Recommendation by the
Honorable Thomas J. McAvoy, Senior United States
District Judge, pursuant to 28 U.S.C. § 636(b) and
Local Rule 72.3(c). Plaintiff Corey Ford claims that
Defendants violated his rights under the First and
Fourteenth Amendments and the Religious Land Use
and Institutionalized Persons Act by denying him
religious meals associated with the observances of
Id–Ul–Fitr and Id–Ul–Adha. (Dkt. No. 1.) Currently
pending before the Court are Plaintiff's motion for
summary judgment (Dkt. No. 33) and Defendants'
cross-motion for summary judgment (Dkt. No. 39)
pursuant to Federal Rule of Civil Procedure 56. Be-
cause Plaintiff admits that he failed to exhaust his
administrative remedies before filing this action and
there is no evidence that this failure was justified, I
recommend that the Court grant Defendants' motion
and deny Plaintiff's motion as moot.

**I. LEGAL STANDARD GOVERNING MO-
TIONS FOR SUMMARY JUDGMENT**
Under Federal Rule of Civil Procedure 56, sum-
mary judgment is warranted "if the movant shows that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 652933 (N.D.N.Y.)
**(Cite as: 2014 WL 652933 (N.D.N.Y.))**

there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Id.* at 273. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 & n. 11, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, a dispute regarding a material fact is *genuine* "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc. .,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In determining whether a genuine issue of material [FN1] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008).

> FN1. A fact is "material" only if it would have some effect on the outcome of the suit. Anderson, 477 U.S. at 248.

## II. ANALYSIS

**\*2** Defendants argue that this action must be dismissed because Plaintiff failed to exhaust his administrative remedies as required by the Prison Litigation Reform Act ("PLRA") before filing his complaint. (Dkt. No. 39–4 at 14–17.[FN2]) Defendants are correct.

> FN2. Citations to page numbers in Defendants' memorandum of law refer to the page numbers in the original document rather than to the page numbers assigned by the Court's electronic filing system.

Under the PLRA, "[n]o action shall be brought with respect to prison conditions under section 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). In order to properly exhaust administrative remedies under the PLRA, inmates are required to complete the administrative review process in accordance with the rules applicable to the particular institution to which they are confined. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (citing *Woodford v. Ngo,* 548 U.S. 81, 88, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006)). In New York state prisons, the Department of Corrections and Community Supervision ("DOCCS") has a well-established three-step inmate grievance program. N.Y. Comp.Codes R. & Regs. tit. 7, § 701.5 (2013).

Generally, the DOCCS Inmate Grievance Program ("IGP") involves the following procedure for the filing of grievances. First, an inmate must file a complaint with the facility's IGP clerk within twenty-one calendar days of the alleged occurrence. *Id.* at § 701.5(a) (2010). A representative of the facility's inmate grievance resolution committee ("IGRC") has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id* . at 701.5(b)(1). If there is no such informal resolution, then the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance (*Id.* at § 701.5(b)(2)), and issues a written decision within two working days of the conclusion of the hearing. *Id.* at § 701.5(b)(3).

Second, a grievant may appeal the IGRC decision to the facility's superintendent within seven calendar days of receipt of the IGRC's written decision. *Id.* at

Slip Copy, 2014 WL 652933 (N.D.N.Y.)
**(Cite as: 2014 WL 652933 (N.D.N.Y.))**

701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id.* at § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to the central office review committee ("CORC") for a decision under the process applicable to the third step. *Id.* at 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision. *Id.* at 701.5(d)(1)(I). CORC is to render a written decision within thirty calendar days of receipt of the appeal. *Id.* at 701.5(d)(3) (ii).

**\*3** If a prisoner has failed to properly follow each of the applicable steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Woodford,* 548 U.S. at 93. Receiving a decision from CORC *after* filing a federal lawsuit does not satisfy the PLRA's requirement that administrative remedies be exhausted *before* filing suit, and any such action much be dismissed without prejudice. *Neal v. Goord,* 267 F.3d 116, 122–23 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

Here, Plaintiff filed his complaint on July 13, 2012. (Dkt. No. 1.) Plaintiff admits that he did not receive a decision from CORC until September 5, 2012. (Dkt. No. 41–2 at 21.) Thus, Plaintiff failed to exhaust his administrative remedies.

Plaintiff's failure to exhaust, however, does not end the review. The Second Circuit has held that a three-part inquiry is appropriate where a prisoner has failed to exhaust his available administrative remedies. *Hemphill v. New York,* 380 F.3d 680, 686, 691 (2d Cir.2004).[FN3] First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Id.*

at 686 (citation omitted). Second, if those remedies were available:

> FN3. The Second Circuit has not yet decided whether the *Hemphill* rule has survived the Supreme Court's decision in *Woodford,* 548 U.S. 81, 126 S.Ct. 2378, 165 L.Ed.2d 368. *Amador v. Andrews,* 655 F.3d 89, 102 (2d Cir.2011).

the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of nonexhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense. *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

Here, as discussed above, administrative remedies were available to Plaintiff. Indeed, Plaintiff admits that he pursued those remedies. (Dkt. No. 41–2 at 20–21.) Defendants preserved the exhaustion defense by pleading it in their answer. (Dkt. No. 15 ¶ 17; *Jones,* 549 U.S. at 216; *Alster v. Goord,* 745 F.Supp.2d 317, 332 (S.D.N.Y.2010).) There is no evidence in the record that Defendants' own conduct estops them from asserting the exhaustion defense. *Cf. Ziemba v. Wezner,* 366 F.3d 161, 162–64 (2d Cir.2004) (district court directed to consider whether defendants were estopped from asserting exhaustion defense where inmate alleged that he was beaten, threatened, denied grievance forms, and transferred to another prison).

Slip Copy, 2014 WL 652933 (N.D.N.Y.)
**(Cite as: 2014 WL 652933 (N.D.N.Y.))**

Read broadly, Plaintiff's opposition papers argue that special circumstances justify his failure to exhaust before filing suit. Specifically, Plaintiff argues that his failure to exhaust was justified because CORC took six months to respond to his appeal rather than the thirty days allowed by the regulations. (Dkt. No. 41–2 at 21.) Justification "must be determined by looking at the circumstances which might understandably lead ... uncounselled prisoners to fail to grieve in the normally required way." *Giano v. Goord,* 380 F.3d 670, 678 (2d Cir.2004). Generally, the 'special circumstances' doctrine is applied where a prisoner has been threatened with physical retaliation for exhausting administrative remedies or where the prisoner reasonably misinterprets the statutory requirements of the appeals process. *Id.* at 676. CORC's failure to act within the time frame set out in the regulations does not constitute a special circumstance justifying the failure to exhaust. *See Rodriguez v. Rosner,* No. 9:12–CV–958 (TJM/ATB), 2012 U.S. Dist. LEXIS 186228, 2012 WL 7160117 (N.D.N.Y. Dec.5, 2012) (dismissing complaint for failure to exhaust where prisoner filed appeal with CORC on May 4, filed federal civil rights complaint on June 10, and received CORC response dated September 26).[FN4] Therefore, I recommend that the Court find that Plaintiff's failure to exhaust is not excused and dismiss this action without prejudice.

FN4. The Court will provide Plaintiff with a copy of this unpublished decision in accordance with the Second Circuit's decision in *Lebron v. Sanders,* 557 F.3d 76 (2d Cir.2009) (per curiam).

**\*4 ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 39) be *GRANTED;* and it is further

**RECOMMENDED** that Plaintiff's motion for summary judgment (Dkt. No. 33) be *DENIED AS MOOT;* and it is further

**ORDERED** that the Clerk provide Plaintiff with a copy of *Rodriguez v. Rosner,* No. 9:12–CV–958 (TJM/ATB), 2012 U.S. Dist. LEXIS 186228, 2012 WL 7160117 (N.D.N.Y. Dec.5, 2012).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOUR-TEEN DAYS WILL PRECLUDE APPELLATE REVIEW.* *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp.2013); *Fed.R.Civ.P.* 72, 6(a).

N.D.N.Y.,2014.
Ford v. Smith
Slip Copy, 2014 WL 652933 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2014 WL 4792110 (S.D.N.Y.)
**(Cite as: 2014 WL 4792110 (S.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Robert FUENTES, Plaintiff,
v.
B. FURCO and Dana Gage, Defendants.

No. 13–CV–6846.
Signed Sept. 25, 2014.

### MEMORANDUM AND ORDER

ALISON J. NATHAN, District Judge.

**\*1** Before the Court is Defendants' motion to dismiss Plaintiff's Complaint on the grounds that (1) Plaintiff has not exhausted his administrative remedies as required by the Prison Litigation Reform Act of 1995 ("PLRA") and (2) Plaintiff has failed to state a claim upon which relief can be granted. For the reasons stated herein, the motion is GRANTED and the claims are dismissed without prejudice on the limited ground of exhaustion.

## I. BACKGROUND

Plaintiff is a 65–year–old inmate in the custody of the New York State Department of Corrections and Community Supervision at Sing Sing Correctional Facility ("Sing Sing"). Compl. at 2. He alleges a violation of his constitutional rights stemming from the alleged deliberate indifference to his medical needs on the part of Sing Sing medical personnel.

On June 11, 2013, Plaintiff filed a complaint pursuant to the Inmate Grievance Program. Hale Decl. ¶ 8, Ex. B. The grievance was denied and Plaintiff appealed to the Superintendent, who appears to have denied the grievance on July 29, 2013. Dkt. No. 2 at

18; Hale Decl. ¶ 8, Ex. B. Plaintiff then appealed the Superintendent's denial on or about August 1, 2013, and the appeal was received by the clerk of the Central Office Review Committee on or about August 20, 2013. Hale Decl. ¶ 9, Ex. C. Plaintiff appears to have prepared and possibly mailed his Complaint to this Court on or about September 17, 2013. Dkt. No. 2 at 5. The pro se office of this Court received Plaintiff's Complaint on September 23, 2013, and the Complaint was filed with this Court on the same day. Dkt. No. 2 at 1.

## II. LEGAL STANDARD

Where a defendant asserts nonexhaustion of administrative remedies as a defense, a court must consider whether the motion should be decided via a Rule 12(b)(6) motion for failure to state a claim or a Rule 56 motion for summary judgment. "If nonexhaustion is clear from the face of the complaint (and incorporated documents), a motion to dismiss pursuant to Rule 12(b)(6) for failure to exhaust should be granted." *McCoy v. Goord,* 255 F.Supp.2d 233, 251 (S.D.N.Y.2003) (Chin, J.). On the other hand, "[i]f nonexhaustion is not clear from the face of the complaint, a defendant's motion to dismiss should be converted, pursuant to Rule 56[ ], to one for summary judgment limited to the narrow issue of exhaustion and the relatively straightforward questions about the plaintiff's efforts to exhaust, whether remedies were available, or whether exhaustion might be, in very limited circumstances, excused." *Id.* (citing *Torrence v. Pesanti,* 239 F.Supp.2d 230, 233–34 (D.Conn.2003)). Read together, Rules 12 and 56 suggest that "if a district court considers matters outside of the pleadings, it must then convert a motion under Rule 12(b)(6) to one for summary judgment and ensure that the opposing party is given proper notice of the conversion." *Id.* (citing *Villante v. Dep't of Corr. of City of N.Y.,* 786 F.2d 516, 521 (2d Cir.1986)).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4792110 (S.D.N.Y.)
**(Cite as: 2014 WL 4792110 (S.D.N.Y.))**

***2** Here, conversion of Defendant's motion to dismiss to one for summary judgment is proper because both parties submitted and referenced documents outside of the pleadings relating to the very narrow issue of exhaustion. *See, e.g., Bennett v. Wesley,* No. 11 Civ. 8715(JMF), 2013 U.S. Dist. LEXIS 61133, at *7, 2013 WL 1798001 (S.D.N.Y. Apr. 29, 2013). Moreover, pursuant to Local Rule 12.1, Defendants provided Plaintiff with notice, Dkt. No. 19, that the Court might treat Defendants' motion to dismiss pursuant to Rule 12(b)(6) as a motion for summary judgment. *See, e.g., id.* (citing *Hernandez v. Coffey,* 582 F.3d 303, 308 n. 2 (2d Cir.2009) (citing cases finding that a Local Rule 12.1 Notice provides sufficient notice to *pro se* parties)).

Summary judgment shall be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(a). A genuine dispute as to any material fact exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). On a motion for summary judgment, a court views all evidence in the light most favorable to the non-movant, *Overton v. NY. State Div. of Military & Naval Affairs,* 373 F.3d 83, 89 (2d Cir.2004), and "resolve[s] all ambiguities and drCir. Ct. ()aw[s] all permissible factual inferences in favor of the party against whom summary judgment is sought," *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc.,* 391 F.3d 77, 83 (2d Cir.2004).

## III. DISCUSSION

The PLRA contains an exhaustion of remedies requirement, which provides that "[n]o action shall be brought with respect to prison conditions under [42 U.S.C. § 1983], or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Section 1997e(a) *"requires* exhaustion of available adminis-

trative remedies *before* inmate-plaintiffs may bring their federal claims to court at *all." Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001) (citation omitted, emphasis in original), *overruled on other grounds, Porter v. Nussle,* 534 U.S. 516, 523, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002). Failure to exhaust administrative remedies prior to filing suit in federal court is an absolute bar to this court's adjudication of Plaintiff's claims—"Subsequent exhaustion after suit is filed [ ] is insufficient." *Neal,* 267 F.3d at 122.

The Court must therefore determine whether Plaintiff exhausted his administrative remedies before bringing this suit, which requires examining the administrative remedies created by the relevant institution. *Jones v. Bock,* 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2d Cir.2007). Here, those remedies are set forth in Title 7 of New York's Codes, Rules and Regulations (N.Y.C.R.R.), which creates a three-step internal complaint process known as the Inmate Grievance Program ("IGP"). *Torres v. Carry,* 672 F.Supp.2d 338, 343 (S.D.N.Y.2009); *see also Garcia v. Heath,* No. 12 Cv. 4695, 2013 U.S. Dist. LEXIS 90480, at *10–11, 2013 WL 3237445 (S.D.N.Y. June 25, 2013). First, the inmate must file a complaint within 21 days of an alleged occurrence to the Inmate Grievance Review Committee ("IGRC"). 7 N .Y.C.R.R. § 701.5(a). The IGRC then reviews the grievance and makes a formal or informal determination. § 701.5(b). If the inmate wants to appeal the IGRC's determination, he must appeal to the superintended by submitting an appeal form to the grievance clerk within seven calendar days after receipt of the IGRC's written response. § 701.5(c). Finally, the third step in the process is an appeal to the Central Office Review Committee ("CORC"), which must be made within seven days after receipt of the superintendent's written response. § 701.5(d). "The CORC shall review each appeal, render a decision on the grievance, and transmit its decision ... within thirty (30) calendar days from the time the appeal was received." § 701.5(d)(3)(ii). Section 701.5 does not indicate what happens when the CORC fails to render a decision

Slip Copy, 2014 WL 4792110 (S.D.N.Y.)
**(Cite as: 2014 WL 4792110 (S.D.N.Y.))**

within 30 days of receiving a grievant's appeal.

**\*3** Documents supplied by both Plaintiff and Defendants indicate that Plaintiff timely completed the first two steps of the administrative review process and timely filed an appeal to the CORC, but that the CORC had not rendered a decision on his appeal at the time that Plaintiff filed his Complaint with this Court. *See* Hale Decl. at 2; Ex. B and C (Dkt. No. 18). As far as this Court is aware, the CORC still has not rendered a decision regarding Plaintiff's appeal, which was submitted to the CORC on or about August 1, 2013 and received by the CORC on or about August 20, 2013. Hale Decl. Ex. C (Dkt. No. 18 at 11). Plaintiff filed his Complaint commencing this lawsuit on September 23, 2013, Compl. at 1, which is 34 calendar days after the CORC received his appeal.

Thus, it is apparent that Plaintiff brought suit more than 30 calendar days after the CORC received his appeal, but before the CORC issued a response. What this means for Plaintiff's exhaustion of remedies is unclear, however, due to the IGP's silence as to the effect of the CORC's failure to issue a response within 30 days. This silence has created problems for federal courts applying the PLRA. *See, e.g., Couvertier v. Jackson,* No. 9:12–CV–1282 (GLS/DEP), 2014 U.S. Dist. LEXIS 85873, at \*12 (N.D.N.Y. May 22, 2014) (noting "[t]he IGP provides no mechanism for enforcing the requirement that the CORC issue a decision in thirty days"); *see also Peoples v. Fischer,* No. 11 Civ. 2694(SAS), 2012 U.S. Dist. LEXIS 62428, at \*15–20 , n. 125, 2012 WL 1575302 (S.D.N.Y. May 3, 2012) (analyzing the effect of the CORC's failure to timely respond to an appeal). And there is no clear answer as to how a court should proceed under the PLRA when it appears that an inmate plaintiff has followed all the requirements of his institution's administrative procedures, but the final review panel is delinquent in its response to his appeal. On the one hand, an inmate plaintiff should not be penalized for his institution's failure to follow its own administrative procedures. *Peoples,* 2012 U.S. Dist. LEXIS 62428, at

33 n. 125, 2012 WL 1575302. On the other hand, in light of the PLRA's purpose, a court should hesitate to decide the underlying action before according the CORC the first opportunity to do so.

The Second Circuit has not addressed this issue, but district courts in the Circuit have fashioned solutions that attempt to balance the PLRA's goal of allowing institutions the first opportunity to address an inmate's grievances against the inmate's right to a federal forum when he has complied with all of the procedural formalities expected of him. In such circumstances, it appears that Courts tend to hold that a CORC response is required for exhaustion to be satisfied, but that a motion to dismiss or for summary judgment should be granted without prejudice to allow the inmate plaintiff to refile his complaint once the CORC responds to his appeal. *See, e.g., Rambert v. Mulkins,* No. 11 Civ. 7421(KPF), 2014 U.S. Dist. LEXIS 74091, at \*46–48, 2014 WL 2440747 (S.D.N.Y. May 30, 2014); *Bennett,* 2013 U.S. Dist. LEXIS 61133, at \*17–18, 2013 WL 1798001 (S.D.N.Y. Apr. 29, 2013); *Torres,* 672 F.Supp.2d at 345–46; *McCoy,* 255 F.Supp.2d at 245–251.[FN1]

> [FN1.] In a thorough and well-reasoned opinion, then-district Judge Chin analyzed the procedural peculiarity that necessitates a grant of summary judgment without prejudice in the context of a failure to exhaust administrative remedies under the PLRA when the failure to exhaust is not apparent from the face of the complaint. *McCoy,* 255 F.Supp.2d at 245–251. The Court agrees with his analysis.

**\*4** The Court follows that approach here and GRANTS the motion for summary judgment and dismisses the claims without prejudice. Summary judgment is based on the very narrow issue of exhaustion of administrative remedies. This approach is consistent with the principle that "failure to exhaust administrative remedies is usually a 'curable, proce-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2014 WL 4792110 (S.D.N.Y.)
**(Cite as: 2014 WL 4792110 (S.D.N.Y.))**

dural flaw' that can be fixed by exhausting those remedies and then reinstituting the suit." *Neal,* 267 F.3d at 123 (quoting *Snider v. Melindez,* 199 F.3d 108, 111–12 (2d Cir.1999)). The Court further holds that if no CORC decision is rendered within 30 days from the date of this Order, Plaintiff may re-file his complaint with this Court, which will re-open the case and, upon reopening, will "deem administrative remedies to be unavailable such that [Plaintiff] may proceed with his claim." *Torres,* 672 F.Supp.2d at 345–46.

Because the Court is granting the motion based on failure to exhaust administrative remedies, it need not consider Defendants' alternative arguments that Plaintiff failed to state a claim upon which relief can be granted.

**IV. CONCLUSION**

For the reasons stated herein, Defendants' motion to dismiss is GRANTED and the claims are dismissed without prejudice. In light of the Court's resolution of the motion to dismiss, Plaintiff's application for pro bono counsel is DENIED as moot. This resolves Dkt. Nos. 16 and 23. The Clerk of Court is directed to close this case.

SO ORDERED.

S.D.N.Y.,2014.
Fuentes v. Furco
Slip Copy, 2014 WL 4792110 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Raymond GONZALES, Plaintiff,
v.
D. CARPENTER, et al, Defendants.

No. 9:08–CV–629 (LEK/ATB).
Jan. 3, 2011.

Raymond Gonzales, pro se.

Richard Lombardo, Asst. Attorney General, for Defendants.

**REPORT–RECOMMENDATION**

ANDREW T. BAXTER, United States Magistrate Judge.

**\*1** This matter has been referred to me for Report and Recommendation by Senior U.S. District Judge Lawrence E. Kahn, pursuant to 28 U.S.C. § 636(b) and LOCAL RULES N.D.N.Y. 72.3(c). Plaintiff's amended complaint ("AC," Dkt. No. 110) seeks monetary damages, under 42 U.S.C. § 1983, for various alleged violations of his constitutional rights arising from his confinement by the New York State Department of Correctional Services ("DOCS") and the Office of Mental Health ("OMH"), between July 2007 and February 2008. Presently before this court is defendants' motion to dismiss the amended complaint for failure to state a claim, pursuant to FED. R. CIV. P. 12(b) (6). (Dkt. No. 120). Plaintiff has filed a memorandum of law, affidavit, and voluminous documentary exhibits in opposition to the defendants' motion. (Dkt. No. 129). This court recommends granting defendants' motion and dismissing the amended complaint in its entirety, for the following reasons.

**I. Facts and Contentions**[FN1]

    FN1. On June 16, 2008, plaintiff commenced this civil rights action by filing a complaint (Dkt. No. 1) against 29 defendants. By order dated June 20, 2008 (Dkt. No. 4), Judge Kahn dismissed six of those defendants. On April 24, 2009, the New York State Attorney General's Office filed a motion to dismiss the complaint on behalf of 20 of the remaining defendants. (Dkt. No. 76). By order dated August 28, 2009, Judge Kahn granted plaintiffs request to dismiss this action with prejudice as against two of the remaining defendants (not represented by the Attorney General). (Dkt. No. 104). On January 22, 2010, plaintiff filed a motion for leave to file an amended complaint. (Dkt. No. 106). By order dated March 31, 2010, Judge Kahn granted plaintiff's motion to amend and denied the pending motion to dismiss the original complaint as moot. (Dkt. No. 109). The current motion to dismiss was filed by the Attorney General's Office on June 23, 2010, on behalf of all 14 defendants named in the amended complaint. On July 9, 2010, plaintiff filed a letter requesting permission to again amend his complaint, rather than respond to the defendant's motion to dismiss. (Dkt. No. 122). By text order dated July 12, 2010, this court denied plaintiff's motion to amend his complaint again, and provided him with an extension of time to file his opposition to the motion to dismiss.

    Plaintiff's current claims arise from events, between July 24, 2007 and February 13, 2008, relating to his transfers among and between the Special Housing

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

Unit ("SHU") at Upstate Correctional Facility ("Up-state"), the SHU and the OMH satellite unit at Great Meadow Correctional Facility ("Great Meadow"), and the Central New York Psychiatric Center ("CNYPC"), which was operated by OMH.[FN2] The amended complaint names 14 defendants from DOCS and OMH. The DOCS defendants are Brian Kourofsky, a sergeant assigned to the SHU at Upstate; David Rock, the Superintendent at Great Meadow; David Carpenter, Deputy Superintendent for Programs and, for a time, the Acting Superintendent at Great Meadow; John Baisley, a lieutenant assigned to Great Meadow; Mark Cleveland, James Rando, and Richard Reynolds, sergeants assigned to the SHU at Great Meadow; and Gary DeFranco, a correction officer at Great Meadow. The OMH defendants are Hasan Rahman, Kalyana Battu, and Jose Gonzalez, psychiatrists assigned to Great Meadow; Pamela Roberts, a psychiatrist's assistant assigned to Great Meadow; Donald Sawyer, Executive Director at CNYPC; and Rajeshwar Kartan, a psychiatrist assigned to CNYPC.

> FN2. Plaintiff was also briefly confined at Downstate Correctional Facility ("Downstate"), although his stay there does not figure into his various claims.

The defendant's memorandum of law fairly and cogently sets forth the factual allegations of plaintiff's lengthy, and not entirely comprehensible, amended complaint. (Defs.' Memo. of Law at 2–13, Dkt. No. 120–1 at 4–15). This court will briefly summarize and supplement the pertinent facts here, and will provide relevant details, as necessary, in the analysis of plaintiff's claims below.

From at least 2001, plaintiff was confined in various DOCS facilities in the Northern and Western Districts of New York. Between 2001 and 2009, plaintiff filed eight civil rights actions in federal court and two cases in the New York Court of Claims relating to various complaints arising from his confinement. (AC ¶¶ 20–29). Two of the more recent civil

rights complaints included allegations regarding plaintiff's confinement at Upstate in 2006 and early 2007, although Brian Kourofsky—the only defendant from Upstate in this action-was not named as a defendant in the prior actions. (9:06–CV–1424, 2/22/2010 Decision and Order of Hood, DJ, Dkt. No. 95 at 1–5 [FN3]; 9:07–CV–406, Complaint ¶¶ 27–168, Dkt. No. 1). In July 2007, while he was confined at Upstate, and thereafter, to the extent allowed, plaintiff was working on perfecting an appeal of a state conviction involving an alleged assault on a DOCS employee at Attica Correctional Facility ("Attica"), in Wyoming County, in the Western District of New York. (AC ¶¶ 60–61).

> FN3. Judge Hood's decision is reported as *Gonzales v. Wright,* 9:06–CV–1424 (JMH), 2010 WL 681323, at *1–2 (N.D.N.Y. Feb. 23, 2010).

**\*2** Throughout the amended complaint, plaintiff consistently and vehemently denies that he suffered from mental illness or needed mental health treatment. However, beginning in July 2007, DOCS began a series of steps which subjected plaintiff to unwanted evaluations and treatment for mental illness. In support of a certification stating that plaintiff was suffering from a mental illness requiring involuntary treatment, psychiatrist Hasan Rahman concluded that plaintiff was suffering from chronic delusional disorder. Defendant Rahman noted that:

> [Gonzales] has been ... putting underwear on top of his head with the belief that chemicals or poisons [are] coming through the roof and [he is] smearing feces ... in SHU as well as in OBS. He is having many tickets for bizarre and unhygenic behaviors.

> (AC, Ex. H, Dkt. No. 110–2 at 20).[FN4]

> FN4. Sealed Ex. 8 to defense attorney Lombardo's declaration (Dkt. No. 120–2) de-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

scribes, in more detail, some of the behaviors of plaintiff at Upstate which caused the defendant psychiatrists to conclude that plaintiff was suffering from serious mental illness and required treatment. At least one of plaintiff's prior civil rights complaints alleged that DOCS employees at Upstate subjected him to "infections harmful chemical substances" by placing the substances in the ventilation system and burned him with laser beams shot through the lights in his cell. (9:06–CV–1424, Dkt. No. 95 at 2–3 & n. 3, 2010 WL 681323, at *1).

Plaintiff was confined in the OMH mental health satellite unit at Great Meadow, and examined by various of the defendant psychiatrists, between July 24 and August 1, 2007 and, later, between September 24th and October 1st of the same year.[FN5] On or about October 1, 2007, plaintiff was transferred to CNYPC. Eventually, OMH took plaintiff to court and obtained orders involuntarily committing him to CNYPC for up to six months (AC, Ex. M, Dkt. No. 110–2 at 30), and allowing plaintiff's treating psychiatrists to involuntarily medicate him (AC, Ex. Q, Dkt. No. 110–2 at 41–42). Plaintiff was released from CNYPC and returned to a DOCS facility on February 13, 2008.

> FN5. Plaintiff was discharged from the Great Meadow OMH satellite unit and returned to the Upstate SHU on August 1, 2007. On August 24, 2007, plaintiff was transferred to Downstate Correctional Facility, and then sent back to the SHU at Great Meadow on August 30, 2007. On September 24, 2007, plaintiff was returned to the satellite unit at Great Meadow.

Liberally construed, the amended complaint claims that plaintiff's constitutional rights were violated in connection with his confinement by DOCS and OMH between July 2007 and February 2008 in the following ways. Plaintiff alleges that his transfers

to the OMH satellite unit at Great Meadow, his involuntary confinement and treatment at CNYPC, and various other alleged adverse actions were taken against him, as part of a conspiracy to retaliate for the exercise of his First Amendment rights—his right to pursue civil rights and other actions against DOCS, as well as his appeal of his conviction involving the alleged assault on a DOCS employee at Attica. Plaintiff claims that his transfers and other actions taken by DOCS were also carried out pursuant to a conspiracy to deny him access to courts, in particular, by interfering with his ability to perfect the appeal of his criminal conviction. Plaintiff also contends that his classification as mentally ill, and the conditions of his confinement and the involuntary treatment he suffered at the satellite unit at Great Meadow and CNYPC violated his rights under N .Y. Correction Law § 402, as well as his Fourteenth Amendment right to due process and his Eighth Amendment right not to be subjected to cruel and unusual conditions of confinement, or deliberate indifference to his medical and basic needs.

Defendants argue that plaintiff's various claims are frivolous, irrational, and incredible, and fail to state viable causes of action under Section 1983. This court agrees that plaintiff's conclusory claims of retaliation are insufficient to establish a plausible link between activity protected by the first amendment—*e.g.,* filing civil rights complaints against DOCS—and any adverse actions taken against him. The documents attached to the motion papers of both sides establish that the actions of the defendants were not the cause of any concrete harm to plaintiff in connection with the pursuit of his criminal appeal, thereby undermining plaintiff's claim that defendants unconstitutionally interfered with his right of access to courts. The transfers and involuntary treatment and medication of plaintiff for perceived mental illness were not carried out in such a way that violated plaintiff's due process rights; and, even if procedures under N.Y. Correc. Law § 402 were not properly followed, that would not support a constitutional claim

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

under Section 1983. Finally, plaintiff fails to state a plausible claim that the conditions of his confinement or the conduct of any of the named defendants against him constituted deliberate indifference to his serious medical needs or cruel and unusual punishment.[FN6] Accordingly, this court will recommend that defendants' motion to dismiss be granted and the amended complaint dismissed in its entirety.

> FN6. The defendants also advance arguments that particular defendants were not personally involved in alleged constitutional violations and, hence, cannot be liable for damages. As discussed briefly below, to the limited extent it is necessary to address the personal involvement arguments, they further support dismissal of plaintiff's amended complaint. Defendants also assert that they should be protected by qualified immunity, which the court will address briefly at the end of this report-recommendation.

**II. *Motion to Dismiss***

**\*3** To survive dismissal for failure to state a claim, the complaint must contain sufficient factual matter, accepted as true, to state a claim that is "plausible on its face." *Ashcroft v. Iqbal,* —— U.S. ——, 129 S.Ct. 1937, 1949 (2009) (quoting *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007)). "[T]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements," do not suffice. *Id.* (citing *Bell Atl. Corp.,* 550 U.S. at 555). Plaintiff's factual allegations must also be sufficient to give the defendant " 'fair notice of what the ... claim is and the grounds upon which it rests.' " *Bell Atl. Corp.,* 550 U.S. at 555 (citation omitted).

When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor. *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations omitted); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d 69, 71 (2d Cir.1995). The court must heed its particular obligation to treat *pro se* pleadings with liberality. *Phillips v. Girdich,* 408 F.3d 124, 128 (2d Cir.2005); *Tapia–Ortiz v. Doe,* 171 F.3d 150, 152 (2d Cir.1999) (*per curiam* ).

In deciding a motion to dismiss, the court may review documents integral to the complaint upon which the plaintiff relied in drafting his pleadings, as well as any documents attached to the complaint as exhibits and any statements or documents incorporated into the complaint by reference. *Rothman v. Gregor,* 220 F.3d 81, 88 (2d Cir.2000); *Int'l Audiotext Network, Inc. v. Am. Tel. & Tel. Co.,* 62 F.3d at 72 (the court may take into consideration documents referenced in or attached to the complaint in deciding a motion to dismiss, without converting the proceeding to one for summary judgment). In this case, plaintiff attached a significant number of documents to his amended complaint that this court has considered in making its recommendation. In the case of a motion to dismiss involving a *pro se* plaintiff, the court may look beyond the complaint to plaintiff's opposition papers. *See Locicero v. O'Connell,* 419 F.Supp.2d 521, 525 (S.D.N.Y.2006) (citation omitted).[FN7]

> FN7. In support of the motion to dismiss, the defense attorney filed a supporting declaration, which included a limited number of supporting documents, one of which was filed under seal (Ex. 8). (Dkt. No. 120–2). All of the documents submitted by the defendants, with the exception of Ex. 8, were also attached to plaintiff's affidavit in opposition to the defense motion. Ex. 8 includes the papers supporting the petition to allow CNYPC to administer medication to plaintiff over his objection. Plaintiff attached the petition to his amended complaint (Ex. P, Dkt. No. 110–2 at 37–39), but not the supporting papers referenced in the petition. (Lombardo Decl. ¶¶ 9–11).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

A court should dismiss an *in forma pauperis* ("*IFP*") case [FN8] at any time if the court determines, *inter alia,* that the action is frivolous. 28 U.S.C. § 1915(e)(2)(B)(I). In determining whether a case is frivolous, the court must consider whether the complaint lacks an arguable basis in law or in fact. *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). "[T]he *in forma pauperis* statute, unlike Rule 12(b)(6), 'accords judges not only the authority to dismiss a claim based on an indisputably meritless legal theory, but also the unusual power to pierce the veil of the complaint's factual allegations and dismiss those claims whose factual contentions are clearly baseless.' " *Denton v. Hernandez,* 504 U.S. 25, 32 (1992) (quoting *Neitzke,* 490 U.S. at 327). Dismissal of an IFP action is proper, for example, when the allegations are the product of delusion or fantasy. *Id.* (quoting *Neitzke,* 490 U.S. at 328); *Livingston v. Adirondack Beverage Co.,* 141 F.3d 434, 437 (2d Cir.1998).

> FN8. Plaintiff was granted IFP status in the instant case. (Dkt. No. 4).

## III. Retaliation

### A. Legal Standards

**\*4** While "[a] prisoner has no liberty interest in remaining at a particular correctional facility, prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights .... " *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998).[FN9] In order to establish a claim of retaliation for the exercise of a constitutional right, plaintiff must show first, that he engaged in constitutionally protected conduct, and second, that the conduct was a substantial motivating factor for "adverse action" taken against him by defendants. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (citing *Gayle v. Gonyea,* 313 F.3d 677 (2d Cir.2002); *Hendricks v. Coughlin,* 114 F.3d 390 (2d Cir.1997)). The plaintiff must establish a causal connection between the protected conduct or speech and

the adverse action. *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004) (citing *Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506 (2002)).

> FN9. It is well-established that convicted prisoners have no right to choose the prison in which they are housed. *Montanye v. Haymes,* 427 U.S. 236, 243 (1976). Prison authorities are entrusted with unfettered discretion to transfer prisoners from one institution to another. *Pugliese v. Nelson,* 617 F.2d 916, 922–23 (2d Cir.1980).

The Second Circuit has defined "adverse action" in the prison context as "retaliatory conduct 'that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights.' " *Gill v. Pidlypchak,* 389 F.3d at 381 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003), *superseded by* 2003 U.S.App. LEXIS 13030 (2d Cir. Feb. 10, 2003)) (omission in the original). This objective test applies even if the plaintiff was not himself subjectively deterred from exercising his rights. *Id.*

Claims of retaliation are "easily fabricated" and "pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration." *Bennett,* 343 F.3d at 137 (citation omitted). Accordingly, a plaintiff must set forth non-conclusory allegations to state a viable claim of retaliation. *Id.*[FN10]

> FN10. Even if plaintiff makes the appropriate showing, defendants may avoid liability if they demonstrate that they would have taken the adverse action even in the absence of the protected conduct. *Id.* (citing, inter alia, *Mount Healthy Sch. Dist. v. Doyle,* 429 U.S. 274, 287 (1977)).

In order to support a claim for conspiracy pursuant to section 1983, there must be "(1) an agreement

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

...; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v.. County of Nassau,* 292 F.3d 307, 324–25 (2d Cir.2002); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 468 (N.D.N.Y.2009). An agreement must be proven with specificity, as bare allegations of a conspiracy supported only by allegations of conduct easily explained as individual action is insufficient. *See Iqbal v. Hasty,* 490 F.3d 143, 177 (2d Cir.2007), *overruled on other grounds sub nom. Ashcroft v. Iqbal,* ––– U.S. ––––, 129 S.Ct. 1937 (2009); *see also Gyadu v. Hartford Ins. Co.,* 197 F.3d 590, 591 (2d Cir.1999). "A complaint containing only conclusory, vague, or general allegations of a conspiracy to deprive a person of constitutional rights cannot withstand a motion to dismiss." *Sommer v. Dixon,* 709 F.2d 173, 175 (2d Cir.).

**B. Application**

Plaintiff appears to allege that all 14 defendants, who worked at three different New York state facilities, conspired to retaliate against him for filing prior civil law suits, and for pursuing an appeal of his conviction for assaulting a DOCS employee at Attica. (AC, Claims for Relief A–E). Plaintiff claims that his transfers to the OMH satellite unit at Great Meadow (AC ¶¶ 46, 95), the delay of his legal papers after his move to Great Meadow SHU in September 2007 (AC ¶¶ 66–69), and his transfer to CNYPC and the applications for court orders to have him committed and involuntarily medicated (AC ¶¶ 121, 126), were all the result of a retaliatory conspiracy.

**\*5** The plaintiff's prior legal actions (AC ¶¶ 20–29) were constitutionally protected activity for a prisoner. And this court will assume, for the purposes of this motion, that the various transfers and involuntary treatment and medication of plaintiff constituted "adverse action" against him. *See, e.g., Morales v. Mackalm,* 278 F.3d 126, 131–32 (2d Cir.2002) (the allegation that defendants transferred inmate plaintiff to a psychiatric facility must be construed as describing an adverse action), *abrogated on other grounds*

*sub nom. Porter v. Nussle,* 534 U.S. 516, 532 (2002). However, the plaintiff's conclusory allegations of retaliation do not establish a plausible claim that there was any causal connection between his protected activity and any alleged adverse actions taken against him. With one exception, discussed further below, the amended complaint does not set forth any specific factual allegations that support plaintiff's claim that he was the subject of intentional retaliation by any of the defendants. Plaintiff's conclusory and frivolous charges of pervasive and collusive retaliation against him do not support a plausible inference that the defendants retaliated against him, for filing various lawsuits and pursuing a criminal appeal, by transferring him to facilities where he received involuntary mental health treatment and medication.

There is no indication that any of the defendants named in this action were involved in any of plaintiff's prior litigation. (AC ¶¶ 20–29). Plaintiff's appeal for an assault conviction, and most of his civil rights complaint against DOCS involved facilities other than Upstate, Great Meadow, and CNYPC, where the named defendants in this action were assigned.

Four of plaintiff's prior civil rights actions involved alleged prior incidents at Upstate, where only one of the named defendants in this action (Sgt.Kourofsy) worked.[FN11] The only allegation against defendant Kourofsky in the amended complaint in this action was that he advised plaintiff, on July 24, 2007, that, as a result of orders from "Albany," plaintiff was being transferred from Upstate to Great Meadow. (AC ¶¶ 31–41). The first alleged retaliatory adverse action about which plaintiff complains involves his confinement and mental health treatment in the OMH satellite unit at Great Meadow. Plaintiff alleges nothing to support a plausible inference that a correctional sergeant, with no connection to the DOCS or OMH medical staff, could have caused the inmate's transfer for a mental health evaluation,[FN12] even if Sgt. Kourofsky knew of plaintiff's various prior lawsuits and was inclined to retaliate

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

against him (which plaintiff also does not allege in the amended complaint).[FN13] Nor does the amended complaint set forth any factual allegations which would suggest that Sgt. Kourofsky at Upstate would have had any control over the conditions of plaintiff's confinement at Great Meadow [FN14] or any influence over the treatment provided to plaintiff at the OMH satellite unit.[FN15] Accordingly, defendant Kourofsky could not have been personally involved in how plaintiff was treated at Great Meadow, and could not be liable under Section 1983, even if plaintiff's constitutional rights were violated at that facility.[FN16]

> FN11. One of those cases dated back to 2001 (AC ¶ 20; Dkt. No. 9:01–CV–1811, Dkt. No. 47) and one was a suit against federal agents (AC ¶ 26; 9:07–CV–458, Dkt. No. 1).

> FN12. *See, e.g., McQuilkin v. Central New York Psychiatric Center,* 9:08–CV–975 (TJM/DEP), 2010 WL 3765847, at *15 (N.D.N.Y. Aug. 27, 2010) (Report–Recommendation) (plaintiff's claim that he was transferred to CNYPC in retaliation for serving a notice of summons on the prison superintendent fails because the record reflects that the transfer decision was made by OHM care providers following an evaluation of plaintiff's mental status), adopted, 2010 WL 3765715 (N.D.N.Y. Sept. 20, 2010).

> FN13. Perhaps to bolster the conclusory claims of retaliation in his amended complaint, plaintiff makes additional allegations with respect to defendant Kourofsky in his papers opposing defendants' motion. Plaintiff claims that Sgt. Kourofsky "ordered" at least two searches of plaintiff's cell in the Fall of 2006, during which officers damaged the legal papers relating to plaintiff's appeal. (Pltf.'s Aff. ¶¶ 21, 25, Dkt. No. 129–2). The supporting documents that plaintiff provides concerning these cell searches, do not men-

tion Sgt. Kourofsky, nor do they reference any legal papers. (Ex. G, Dkt. No. 129–3 at 22; Ex. J, Dkt. No. 129–3 at 29). Moreover, in a prior complaint in which plaintiff alleges a retaliatory cell search at Upstate, during the same time period, that damaged the papers relating to plaintiff's criminal appeal, plaintiff does not implicate Sgt. Kourofsky. (9:06–CV–1424, Dkt. No. 1 ¶¶ 126, 134–42; Dkt. No. 95 at 3–4, 27–28, 2010 WL 681323, at *1, 13). In any event, even if plausible, these allegations are not part of the amended complaint in this case and do not provide any support for an inference that Sgt. Kourofsky caused plaintiff's transfer for a psychiatric evaluation in July 2007.

> FN14. *See, e.g., Green v. Bauvi,* 792 F.Supp. 928, 941–942 (S.D.N.Y.1992) (inmate may recover damages for unconstitutional conditions of confinement only from persons who created or were responsible for those conditions).

> FN15. *Smith v. Woods,* 9:05–CV–1439 (LEK/DEP), 2008 WL 788573 at *9 (N.D.N.Y. March 20, 2008) (social worker and psychologist in prison had no authority to override the decision of the treating psychiatrist regarding appropriate treatment of an inmate/patient and could not be liable for the doctor's medical decisions). *See also Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) (the failure of non-doctors at a prison to intercede in the medical treatment of an inmate is not unreasonable, because they lack the authority to intervene in medical decisions).

> FN16. *See, e.g., Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (personal involvement is a prerequisite to the assessment of damages in a section 1983 case); *Richardson*

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

*v. Goord,* 347 F.3d 431, 435 (2d Cir.2003).

**\*6** The only factual allegation in the amended complaint that supports an inference that any defendant harbored a retaliatory motive against plaintiff involves defendant Rando, a sergeant assigned to the Great Meadow SHU. After he was transferred back to Great Meadow (on August 30, 2007), plaintiff was visited (on September 4th) by attorneys assigned to assist him in several civil rights suits he filed in the Western District of New York (involving facilities other than Great Meadow and Upstate, which are in the Northern District of New York). (AC ¶ 68). Plaintiff alleges that, on September 11, 2007, he asked Sgt. Rando about obtaining his legal papers, and defendant Rando said that plaintiff would not get his papers because he had five lawsuits filed. (AC ¶ 69). Notwithstanding this alleged "retaliatory" comment, plaintiff received his legal papers a week later (on September 18th), from defendant Cleveland. (AC ¶ 70).

Cases in this circuit have held that the theft, confiscation, or destruction of an inmate's legal documents can constitute "adverse action" for the purposes of a retaliation claim. *See, e.g., Smith v. City of New York,* 03 Civ. 7576, 2005 WL 1026551, at *3 (S .D.N.Y. May 3, 2005); *Smith v. Maypes–Rhynders,* 07 Civ. 11241, 2009 WL 874439, at *5 (S.D.N.Y. Mar. 31, 2009). However, a mere delay in the transfer of plaintiff's legal papers, even if motivated by retaliation, would appear to be the type of *de minimis* action that would not be considered "adverse." *See, e.g., Rivera v. Pataki,* No. 04 Civ. 1286, 2005 WL 407710, at *19 (S.D.N.Y. Feb. 7, 2005) (several temporary incidents of actively preventing plaintiff from mailing his legal documents were not sufficiently serious to constitute "adverse action"). Moreover, it seems implausible that a DOCS employee at the Great Meadow SHU would be motivated to retaliate against an inmate who had been confined there for less than two weeks on the basis of law suits that did not involve defendant Rando, or anyone else at Great Meadow.

The fact that defendant Rando allegedly told plaintiff he would not get his legal papers back, but they were, in fact, delivered a week later by another sergeant, undercuts the inference that Sgt. Rando was the cause of the delay in plaintiff's receipt of his documents. *See, e.g., Key v. Toussaint,* 660 F.Supp.2d 518, 526 (S.D.N.Y.2009) (the fact that the inmate plaintiff's property was ultimately returned to him further suggests that the defendants did not intentionally lose or steal his personal property, notwithstanding the vague threats one defendant made to plaintiff). While plaintiff alleges that his legal papers were not delivered to him until 19 days after his return to Great Meadow, he was transferred from Upstate to Downstate to Great Meadow over the course of six days, which might be expected to cause delays in the transfer of papers and personal possessions. While the timing of defendant Rando's alleged remarks during the period while plaintiff's papers were delayed provides some support for an inference of retaliation, this court finds the plaintiff's allegations do not state a plausible claim against defendant Rando. *See, e. g., McQuilkin v. CNYPC,* 2010 WL 3765847, at *15 (the service of a summons on the prison superintendent, followed in short order by the seizure of the plaintiff's personal property, was an insufficient basis upon which a reasonable factfinder could find retaliation); *Williams v. Goord,* 111 F.Supp.2d 280, 290 (S.D.N .Y.2000) (although the temporal proximity of a protected activity and the alleged adverse action provides circumstantial evidence of retaliation, such evidence, without more, is insufficient to survive summary judgment) (citing *Ayers v. Stewart,* 101 F.3d 687 (Table), No. 96–2013, 1996 WL 346049, at *1 (2d Cir. June 25, 1996).

**\*7** Nothing else in the amended complaint provides any factual support for plaintiff's claim that all of the defendants conspired to retaliate against him by, *inter alia,* falsely labeling him as mentally ill and subjecting him to involuntary and unneeded mental health treatment and medication. As discussed further

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

below, the records submitted by plaintiff, and the adjudication of issues relating to his mental health in two state court proceedings, demonstrate that many of the allegations in the amended complaint reflect plaintiff's delusions and paranoia, notwithstanding his vehement denials of mental illness. Plaintiff's claims in this and prior civil rights complaints indicate that he suffers from "a victimization fantasy." *Gonzales v. Wright,* 2010 WL 681323, at * 12 (as courts in the Second Circuit have consistently recognized, "it is utterly unjust to haul people into federal court to defend against, and disprove, delusions") (collecting cases). In that context, the court finds that all of plaintiff's allegations of retaliation, even if, in a few instances they might arguably survive under the standards of Rule 12(b)(6), are the results of plaintiff's delusions and fantasy, and are clearly without factual basis, and subject to dismissal as frivolous under 28 U.S.C. § 1915(e)(2)(B)(I). *Denton v. Hernandez,* 504 U.S. at 32 (citing *Neitzke,* 490 U.S. at 327–28).

### IV. Access to the Courts

#### A. Legal Standards

"A prisoner has a constitutional right of access to the courts for the purpose of presenting his claims, a right that prison officials cannot unreasonably obstruct and that states have affirmative obligations to assure." *Washington v. James,* 782 F.2d 1134, 1138 (2d Cir.1986). In order to establish a claim that a prisoner's right of access to the courts has been abrogated, the plaintiff must establish that deliberate and malicious interference impeded his access to the courts, and that, as a result of that interference, the inmate suffered actual injury. *See Lewis v. Casey,* 518 U.S. 343, 349, 351 (1996); *Cancel v. Goord,* 00–CV–2042, 2001 WL 303713, at *4 (S.D.N.Y. March 29, 2001). *Lewis* also requires a showing of prejudice to an existing meritorious action involving a direct or collateral attacks on the inmate's conviction, or to a challenge to the conditions of confinement. 518 U.S. at 353, 355. "Mere 'delay in being able to work on one's legal action or

communicate with the courts does not rise to the level of a constitutional violation.' " *Davis v. Goord,* 320 F.3d at 352 (citing *Jermosen v. Coughlin,* 877 F.Supp. 864, 871 (S.D.N.Y.1995)).

#### B. Application

Plaintiff alleges that all 14 defendants, from three different facilities, conspired to deprive him of access to the courts in connection with his appeal of his conviction for assaulting a DOCS employee at Attica, and his various civil rights actions. (AC, Claims for Relief A–E). Plaintiff claims that his transfers to the OMH satellite unit at Great Meadow (AC ¶¶ 46, 49, 95), the delay of his legal papers after his move to Great Meadow SHU in September 2007 (AC ¶¶ 66–69), and his transfer to CNYPC and the applications for court orders to have him committed and involuntarily medicated (AC ¶¶ 121, 126, 128, 133), were all the result of the conspiracy to violate his First Amendment right of access to courts. As with the alleged conspiracy to retaliate against plaintiff, the conclusory allegations of a pervasive illegal agreement to deny him access to the courts are insufficient to state a valid cause of action for conspiracy under Section 1983. In any event, under the facts that plaintiff has asserted in opposition to this motion, he cannot establish a plausible claim that any of the named defendants actually prejudiced him by impeding his ability to pursue his criminal appeal or his civil rights actions.

**\*8** Plaintiff alleges that the defendants' purported conspiracy actually prejudiced him only with respect to his efforts to perfect his criminal appeal between July 24, 2007, when he was first transferred to Great Meadow, to February 13, 2008, when he was released from CNYPC. The motion papers of both the defendants and the plaintiff extensively describe and document the protracted period during which plaintiff was attempting to perfect this appeal. (Lombardo Dec., Dkt. No. 120–2; Pltf.'s Aff., Dkt. No. 129–2). For the purposes of deciding the instant motion as to the allegations in the amended complaint, it is not

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

necessary to review the entire procedural history of plaintiff's appeal.

On May 21, 2007, the Supreme Court, Appellate Division, Fourth Department, granted plaintiff the last of several extensions, **until August 20, 2007,** to perfect his *pro se* appeal from his conviction involving the alleged assault of a DOCS employee. (Pltf.'s Aff ¶ 42; Ex. Q, Dkt. No. 129–3 at 48). By that time, plaintiff had drafted an appellate brief, assembled the record of the trial court proceedings needed for the appendix, and submitted these papers to the Clerk of the Appellate Division. (Pltf.'s Aff. ¶ 33). However, on January 26, 2007, the Clerk rejected this submission and returned plaintiff's papers because he failed to submit either a stipulation of all parties regarding the contents of the record, or an order of the trial court settling the contents of the record. (Pltf.'s Aff. ¶ 36; Ex. M, Dkt. No. 129–3 at 39).

Plaintiff was confined at the Great Meadow OMH satellite unit for the first time from July 24, 2007 until August 1st, when he was returned to Upstate. On August 14th, plaintiff requested another extension from the Appellate Division, because, despite numerous prior requests, he had not yet received a stipulation or order settling the record from the District Attorney or trial judge. (Pltf.'s Aff. ¶ 54).[FN17] Shortly thereafter, on August 17th, plaintiff received the executed, certified stipulation necessary to complete his appellate papers, and began preparations to perfect his appeal. (Pltf.'s Aff. ¶¶ 56, 57; Ex. Y, Dkt. No. 129–3 at 64–65). Plaintiff's affidavit does not explain why, despite the fact that he had all of the necessary papers in his cell at Upstate, he did not submit the documents necessary to perfect his appeal by the August 20, 2007 deadline.

> FN17. In his affidavit in opposition to plaintiff's motion, plaintiff alleges that, on August 4, 2007, defendant Kourofsky ordered a search of his cell, during which two officers "did spread some liquid and stain a lot of

pages of several copies of the briefs of his appeal." (Pltf.'s Aff. ¶ 52). These allegations were not made in the amended complaint, and plaintiff does not allege, even in his later affidavit, that the alleged cell search was the cause of his failure to submit his appeal by the August 20th deadline.

On August 24, 2007, plaintiff was transferred to Downstate, and then was sent to Great Meadow on August 30th. (Pltf.'s Aff. ¶ 60). On September 18th, while in the SHU at Great Meadow, plaintiff received a notice from the Appellate Division that his request for a further extension of his appeal was denied; however, plaintiff was given leave to renew his motion upon a showing that his appeal had merit. (Pltf.'s Ex. ¶ 62; Ex. Z, Dkt. No. 129–3 at 67). On September 18, 2007, plaintiff received his transferred legal papers while still in the Great Meadow SHU. (Pltf.'s Aff. ¶ 65). Plaintiff claims that he was working on an application to renew his motion to perfect his appeal on September 24th, when he was removed to the satellite unit at Great Meadow, where he was not allowed to have his papers. From there, plaintiff was transferred to CNYPC, and was held there until February 13, 2008. Plaintiff alleges that he was unable to get access to his legal papers or work to perfect his appeal during the period he was confined at CNYPC. (Pltf.'s Aff. ¶¶ 66–68).

**\*9** On April 18, 2008, a month after his release from CNYPC, plaintiff submitted another application to the Appellate Division in an apparent effort to get permission to belatedly perfect his appeal. On May 14, 2008, the Appellate Division denied his application, again "with leave to renew upon a showing of sufficient facts to demonstrate a meritorious appeal." (Pltf.'s Aff, Ex. 1, Dkt. No. 129–3 at 70). Plaintiff complains, in his affidavit, that he was unable to make any further submission to the Appellate Division because his legal papers were not returned to him. (Pltf.'s Aff. ¶ 68). However, the attachments to plaintiff's affidavit in opposition to defendant's motion includes

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
(Cite as: 2011 WL 768990 (N.D.N.Y.))

a copy of his appellate brief (Ex. W, Dkt. No. 129–4 at 1–47), his proposed appendix (Ex. X, Dkt. No. 129–6 at 1–80), and the executed stipulation as to the contents of the record (Ex. Y, Dkt. No. 129–3 at 64–65).

The facts acknowledged by plaintiff and the documents that he has submitted in opposition to defendants' motion, establish that the conduct of the defendants, in transferring him to Great Meadow and them committing him to CNYPC, was not the cause of his failure to perfect his appeal. The District Attorney and the trial judge in plaintiff's criminal case (neither of whom are defendants here) delayed in providing the requested stipulation as to the contents of the record, thereby preventing plaintiff from perfecting his appeal before August 17, 2007. Plaintiff provides no explanation as to why he did not submit, to the Appellate Division, the necessary paperwork, all of which he had at the Great Meadow SHU between August 17th and August 24th, when he was transferred to the satellite unit. In any event, after plaintiff was released from CNYPC in February 2008, he was in the same position with respect to his appeal as he was after August 20, 2007—he could renew his motion to perfect his appeal upon a showing that his appeal had merit. Plaintiff's stated excuse for not renewing his motion and making a showing of merit—that his legal papers were not returned to him after his release from CNYPC—is clearly baseless given that he has attached those very papers to his affidavit in opposition to the instant motion.

This court finds that plaintiff's failure to perfect his appeal was not caused by any action of the defendants in this action; plaintiff either concluded that he could not establish that his appeal had merit or he failed, without excuse, to take available steps to perfect his appeal. Either way, based on the authority cited above, plaintiff's claim that the defendants maliciously impeded him in pursuing a meritorious action, in violation of his First Amendment right of access to courts, must fail.

## V. Confinement at the OHM Satellite Unit at Great Meadow

Plaintiff asserts that he was unlawfully confined to the OMH satellite unit at Great Meadow for two periods in 2007 by defendant Kourofsky, a corrections sergeant at Upstate; defendants Rock, Carpenter, Baisley, Cleveland, Rando, Reynolds, and DeFranco, on the administrative or corrections staff at Great Meadow; defendant Roberts, an OMH psychiatrist's assistant at Great Meadow; and defendants Rahman, Battu, and Gonzalez, OMH psychiatrists assigned to Great Meadow. While the amended complaint is not entirely clear about which of plaintiff's constitutional rights were allegedly infringed by his confinement in the satellite unit, this court will consider possible due process and Eighth Amendment violations.

*10 The court concludes that the short-term confinement of plaintiff in a prison mental health clinic for observation did not implicate a liberty interest triggering due process protection. Nothing involving plaintiff's stay at the OMH satellite unit subjected him to cruel and unusual punishment under the Eighth Amendment. Accordingly, this court recommends dismissal of the claims involving plaintiff's confinement at the Great Meadow satellite unit.

### A. Due Process

Plaintiff was confined in the satellite unit at Great Meadow, for psychiatric observation and treatment, from July 24 through August 1, 2007, and again, from September 24th through October 1st, when he was moved to CNYPC. The amended complaint contains very few factual allegations about the conditions of plaintiff's confinement in the satellite unit. Plaintiff complains that he was "confined in the satellite unit naked only with a gown for person crazy [sic]," (AC ¶ 43) and that he was asked a lot of "stupid" questions by the defendant psychiatrists (AC ¶¶ 44, 48, 90). Although plaintiff alleges that at least one of the psychiatrists at the Great Meadow satellite unit prescribed him unwanted medication (AC ¶ 52), he does not claim he was actually involuntarily medicated at

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

Great Meadow, and the psychiatrist's report indicates that plaintiff resisted treatment and refused all medication. (AC, Ex. H, Dkt. No. 110–2 at 20).

Plaintiff has consistently claimed that he was not mentally ill, and did not require or want mental health treatment. The psychiatrists who observed plaintiff at the satellite unit all ultimately concluded that plaintiff was in need of involuntary care and treatment in an inpatient hospital for the mentally ill, and that, as a result of his mental illness, plaintiff posed a substantial threat of harm to himself and others. (AC, Ex. H & I, Dkt. No. 110–2 at 18–22). As discussed below, the conclusion that plaintiff was mentally ill and required treatment and medication was subsequently validated by several other psychiatrists and two state court judges.

To establish a claim based on a violation of due process, a plaintiff must establish a constitutionally protected liberty or property interest that a plaintiff was denied without due process. *See, e.g., Perry v. McDonald,* 280 F.3d 159, 173 (2d Cir.2001). A state prisoner generally has no liberty interest in being housed in a particular facility. *Montanye v. Haymes,* 427 U.S. 236, 243 (1976); *Matiyn v. Henderson,* 841 F.2d 31, 34 (2d Cir.1988). "[A] prisoner's restricted confinement within a prison does not give rise to a liberty interest, warranting procedural due process protection, unless the conditions 'impose[ ] atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sealey v. Giltner,* 197 F.3d 578, 583 (2d Cir.1999) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). Atypicality in a *Sandin* inquiry is normally a question of law. *Colon v. Howard,* 215 F.3d 227, 230–31 (2d Cir.2000); *Sealey,* 197 F.3d at 585. When determining whether a plaintiff possesses a liberty interest, district courts must examine the specific circumstances of confinement, including analysis of both the length and conditions of confinement. *See Sealey,* 197 F.3d at 586; *Arce v. Walker,* 139 F.3d 329, 335–36 (2d Cir.1998).

**\*11** It is clear that a prisoner's transfer to a mental hospital is "qualitatively different" from the punishment characteristically suffered by a person convicted of crime, and implicates a liberty interest protected by the Due Process Clause. *Sandin v. Conner,* 515 U.S. at 479 n. 4, 484 (citing *Vitek v. Jones,* 445 U.S. 480, 493–94 (1980)). However, this court does not equate plaintiff's relatively brief period of observation and treatment in the Great Meadow satellite unit with a transfer to a mental hospital. *See, e.g., Cabassa v. Gummerson,* 9:01–CV–1039, 2008 WL 4416411, at \*11 (N.D.N.Y. Sept. 24, 2008) (distinguishing confinement in a prison infirmary for, *inter alia,* mental health problems, and commitment to a "mental hospital," and finding that a total confinement of 101 days in the infirmary plus 60 days in segregated housing did not implicate a liberty interest). This court concludes that temporary confinement of an inmate with clear mental health problems for a total of less than 30 days [FN18] for observation and evaluation in the psychiatric unit within a prison does not implicate a liberty interest. *See, e.g., Gay v. Turner,* 994 F.2d 425, 427 (8th Cir.1993) (five temporary transfers to the mental health unit for evaluation did not implicate Due Process Clause); *Jefferson v. Helling,* 324 Fed. Appx. 612, 613 (9th Cir.2009) (plaintiff's emergency transfer to, and short-term detention in a prison's mental health unit did not entitle inmate to a prior hearing); *Anderson v. Banks,* 06–CV–0625 (GLS/DRH), 2008 WL 3285917, at \*7–8 (N.D.N.Y. Aug. 7, 2008) (transfer of inmate to mental health unit for monitoring and observation for three days was justified and did not constitute an undue hardship given plaintiff's mental health history and current symptoms); *Nwaokocha v. Sadowshi,* 369 F.Supp.2d 362, 373–74 (E.D.N.Y.2005) (finding that, where a prisoner is mentally ill and displaying "significant warning signs" of an altered mental state, "time of segregation on a justified suicide watch" falls within the purview of discretionary confinement decisions made by the corrections department and normally expected by a prisoner, implicating no liberty interest). The conclusion that due process protection would not apply to

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

plaintiff's temporary confinements in the OMH satellite unit is reinforced by the observation of the court in *Nwaokocha,* which was echoed by Judges Homer and Sharpe in *Anderson v. Banks:*

> FN18. In the absence of a detailed factual record, cases in this circuit typically affirm dismissal of due process claims in cases where the period of time spent in segregated housing was short—e.g., 30 days—and there was no indication that the plaintiff endured unusual conditions. *Palmer v. Richards,* 364 F.3d 60, 65–66 (2d Cir.2004). (collecting cases). While this authority is not dispositive in the context of confinement in a prison mental health unit, it supports the conclusion that plaintiff's confinement was, in the absence of any allegations of unusual conditions of confinement, sufficiently short to avoid due process scrutiny.

Given the emotional and psychological challenge that prison imposes on mentally ill inmates, and the sometimes severe effects that can result-including, but not limited to, inmate suicides and harm to others-it is important that prison officials be encouraged to attend to mental health considerations rather than be penalized for having done so. *Nwaokocha,* 369 F.Supp. at 374 (citations omitted); *Anderson v. Banks,* 2008 WL 3285917, at *2, 7 n. 7.

**B. Eighth Amendment**

**1. Conditions of Confinement**

**\*12** The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter,* 501 U.S. 294, 297 (1991); *Estelle v. Gamble,* 429 U.S. 97, 104 (1976). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan,* 511 U.S. 825, 837 (1994); *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer,* 511 U.S. at 834.

Conditions of confinement are not cruel and unusual for Eight Amendment purposes simply because they are "restrictive and even harsh." *Anderson v. Coughlin,* 757 F.2d 33, 35 (2d Cir.1985). Rather, many unpleasant aspects of prison life "are part of the penalty that criminal offenders pay for their offenses against society." *Id.* (citation omitted). Plaintiff's complaints about the conditions of confinement in the Great Meadow satellite unit were limited to his objection that he was clothed only in a hospital gown, like a "crazy" person. (AC ¶ 43). Being required to wear a hospital gown for a mental health evaluation hardly constitutes cruel and unusual conditions of confinement that would violate plaintiff's Eighth Amendment rights. *See, e.g., Salahuddin v. Dalsheim,* 94 CIV. 8730, 1996 WL 384898, at *14 (S.D.N.Y. July 9, 1996) (an inmate who claimed that he was deprived "of his belt, shoe laces, and personal property for seven days, subjected to 24–hour observation, placed with mentally ill inmates, denied a change of 'Greens,' and otherwise subjected to the regulations governing inmates in the [Mental Health Unit]" did not establish an objectively serious deprivation).[FN19] *Cf. Borges v.. McGinnis,* 03–CV–6375, 2007 WL 1232227, at *4–6 (W.D.N.Y. Apr. 26, 2007) (keeping inmate, clothed only in paper gown and slippers, with a thin mattress and no blanket, in a room with an open window that reduced the temperature to approximately 50 degrees, for three days, did not meet the objective element of an Eighth Amendment violation)

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
(Cite as: 2011 WL 768990 (N.D.N.Y.))

FN19. Unlike the plaintiff in this case, Salahuddin did not have a mental health designation which would have supported his confinement in the mental health unit. *Salahuddin,* 1996 WL 384898, at *3.

## 2. Allegedly Inadequate Medical Care

Deliberate indifference to a convicted prisoner's serious medical needs constitutes cruel and unusual punishment, in violation of the Eighth Amendment, as made applicable to the states through the Fourteenth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). There are two elements to the deliberate indifference standard. *Smith v. Carpenter,* 316 F.3d 178, 183–84 (2d Cir.2003). The first element is objective and measures the severity of the deprivation, while the second element is subjective and ensures that the defendant acted with a sufficiently culpable state of mind. *Id* .

**\*13** The objective prong of the standard is satisfied "when (a) the prisoner was 'actually deprived of adequate medical care,' meaning prison officials acted unreasonably in response to an inmate health risk under the circumstances, and (b) 'the inadequacy in medical care is sufficiently serious.' *Bellotto v. County of Orange,* 248 Fed. Appx. 232, 236 (2d Cir.2007) (quoting *Salahuddin v. Goord,* 467 F.3d 263, 279–80 (2d Cir.2006)). If the "unreasonable care" consists of a failure to provide any treatment, then the court examines whether the inmate's condition itself is "sufficiently serious." *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). When a prisoner alleges "a temporary delay or interruption in the provision of otherwise adequate medical treatment," the court must focus on the seriousness of the particular risk of harm that resulted from the challenged delay or interruption, rather than the prisoner's underlying medical condition alone." *Id.* at 185. The standard for determining when a deprivation or delay in a prisoner's medical need is sufficiently serious, contemplates a condition of urgency that may result in degeneration of the patient's condition or extreme pain. *Bellotto v.*

*County of Orange,* 248 Fed. Appx. at 236 (citing *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998) and *Smith v. Carpenter,* 316 F.3d at 187 (actual medical consequences are highly relevant)).

The subjective prong of the deliberate indifference test is satisfied when an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it." *Farmer v. Brennan,* 511 U.S. 825, 847 (1994). A plaintiff is not required to show that a defendant acted or failed to act "for the very purpose of causing harm or with knowledge that harm will result," but must show that the official was aware of facts from which one could infer that "a substantial risk of serious harm" exists, and that the official drew that inference. *Id.* at 835, 837.

In this case, plaintiff clearly disagreed with the medical judgment of the OMH psychiatrists that he required mental health observation, treatment, and medication. However, a difference of opinion between a prisoner and prison doctors regarding medical treatment does not, as a matter of law, constitute deliberate indifference. *Chance v. Armstrong,* 143 F.3d at 703. Even if the defendants had been negligent in diagnosing or treating plaintiff's mental health conditions, that would not constitute "deliberate indifference." *Farmer v. Brennan,* 511 U.S. at 835. Because plaintiff's claims amount to mere disagreement regarding treatment, or perhaps, allegations of medical malpractice, they are not actionable under Section 1983. *Ross v. Kelly,* 784 F.Supp. 35, 44–45 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (1992) (table); *Kellam v. Hunt,* 9:04–CV–1225 (LEK/GJD), 2007 WL 2764814, at *6 (N.D.N.Y. Sept. 20, 2007) (disagreements over medications, diagnostic techniques, forms of treatment, and the timing of their intervention implicate medical judgments and not the constitutional standards for medical care).[FN20]

FN20. It should be noted that, even if plaintiff's treatment in the satellite unit constituted

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

a constitutional violation, only the psychiatrists, who determined the duration of his confinement and the course of his treatment, would be personally involved and liable under Section 1983. See notes 12 & 14–16 above. *See also Brock v.. Wright,* 315 F.3d 158, 164 (2d Cir.2003) (prison superintendent with no medical training who deferred completely to a prison doctor in ruling on a grievance regarding medical care, while perhaps negligent, was not "deliberately indifferent"); *Greenwaldt v. Coughlin,* No. 93 Civ. 6551(LAP), 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995) ("[I]t is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."). Accordingly, defendants Kourofsky, Rock, Carpenter, Baisley, Cleveland, Rando, Reynolds, DeFranco, and Roberts would be entitled to dismissal on plaintiff's claims regarding his confinement and treatment in the satellite unit even his constitutional rights had been violated.

## 3. Excessive Force

**\*14** The amended complaint alleges that, on September 24, 2007, defendants Cleveland, Rando, Reynolds, and DeFranco forcibly removed plaintiff from his SHU cell at Great Meadow when he admittedly refused to come out to be evaluated by defendant Battu, an OMH psychiatrist. (AC ¶ 88). Plaintiff does not claim that he was the victim of excessive force, or that he was injured, and his factual allegations are insufficient to state a cause of action under the Eighth Amendment.

The Eighth Amendment's prohibition against cruel and unusual punishment precludes the "unnecessary and wanton infliction of pain ." *Gregg v. Georgia,* 428 U.S. 153, 173 (1976); *Sims v. Artuz,* 230 F.3d 14, 20 (2d Cir.2000). To sustain a claim of excessive force under the Eighth Amendment, a plaintiff must establish both objective and subjective elements. *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999).

In order to satisfy the objective element of the constitutional standard for excessive force, the defendants' conduct must be " 'inconsistent with the contemporary standards of decency.' " *Whitely v. Albers,* 475 U.S. 312, 327 (1986) (citation omitted); *Hudson,* 503 U.S. at 9. "The Eighth Amendment's prohibition of 'cruel and unusual' punishments necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort repugnant to the conscience of mankind." *Hudson,* 503 U.S. at 9–10 (citations omitted). " 'Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.' " *Sims,* 230 F.3d at 22 (citation omitted).

The subjective element requires a plaintiff to demonstrate the "necessary level of culpability, shown by actions characterized by wantonness." *Id.* at 21 (citation omitted). The wantonness inquiry "turns on 'whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm.' " *Id.* (quoting *Hudson,* 503 U.S. at 7).

Plaintiff's allegation that the defendants knocked him down, grabbed him, and placed him in handcuffs in order to remove him from his cell (AC ¶ 88) are not sufficient to satisfy the objective prong of the Eighth Amendment analysis. *See, e.g., Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (allegations that an inmate was "bumped, grabbed, elbowed, and pushed ..." by correction officers are "not sufficiently serious or harmful to reach constitutional dimensions ..."). Moreover, the amended complaint do not provide any factual support for a claim that the defendant correction officers did not make a good faith effort to maintain and restore discipline in the face of plaintiff's

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

refusal to obey direct orders. When an inmate refuses to comply with an order to exit his cell, reasonable force may be used to enforce the directive. *See, e.g., Harris v. Ashlaw,* 9:07–CV–0358 (LEK/DEP), 2007 WL 4324106, at *7 (N.D.N.Y. Dec. 5, 2007) (citing *Brown v. Busch,* 954 F.Supp. 588, 594–97 (W.D.N.Y.1997) (prison officials did not use excessive force against inmate who had refused to comply with a direct order, where officials forced inmate back into his cell by allegedly pushing, shoving, and striking him)); *James v. Coughlin,* 13 F.Supp.2d 403, 408–10 (W.D.N.Y.1998) (alleged conduct of corrections officer in pushing inmate back into his cell when inmate refused to comply with order to remain silent and became loud, boisterous, and disorderly did not involve a violation of eighth amendment).

## VI. Involuntary Confinement and Medication at CNYPC

**\*15** Plaintiff alleges that he was involuntarily confined and treated at CNYPC between October 1, 2007 and February 13, 2008 (AC ¶¶ 107, 148), in violation of various rights under the U.S. Constitution and N.Y. Correc. Law § 402.[FN21] Although it is not entirely clear from the amended complaint, it appears the intended defendants for this claim are defendants Rock and Carpenter, the Superintendent and Acting Superintendent of Great Meadow; defendants Roberts, Rahman, Battu, and Gonzalez—on the OMH mental health staff at Great Meadow; and defendants Sawyer and Kartan of CNYPC.[FN22] Plaintiff alleged that he experienced a significant change in his living conditions and was housed together with mentally ill prisoners, which placed his life in danger. (AC ¶¶ 108–109). The amended complaint does not provide any further factual allegations regarding how plaintiff's life was placed in danger at CNYPC.

FN21. Under Section 402, the superintendent of a correctional facility, upon receiving a report from a physician that an inmate is, in his or her opinion, mentally ill, must apply to the court for designation of two examining physicians. The two physicians, after conducting a personal examination, may certify that the inmate is mentally ill and in need of care and treatment, if deemed appropriate. N.Y. Correc. Law § 402. In the event that certification is made by the two examining physicians, the superintendent must then apply to an appropriate state court judge for an order of commitment, with notice to the affected inmate, as well as any known relative. N.Y. Correc. Law § 402(3). The inmate thereafter may request a hearing, and the court additionally may request one of its own initiative. N.Y. Correc. Law § 402(5). In the event the court determines that the person is mentally ill and in need of care and treatment, the court may order him or her committed for a period not to exceed six months so that the inmate may be transferred into an OMH facility. *Id.*

FN22. Defendants argue that certain of the defendants would not be liable under Section 1983, even if plaintiff's constitutional rights were violated in connection with his commitment to, and treatment at CNYPC, because they were not personally involved in those actions. (Defs.' Memo. of Law at 21). In the context of a motion to dismiss, at least defendant Rock would be entitled to dismissal on this basis, under the authority cited in notes 12 and 15, above.

N.Y. Correc. Law § 402(9) authorizes the admission of an inmate to a mental hospital on an emergency basis, pending the filing of a commitment petition, upon the certification of two physicians that the inmate suffers from a mental illness which is likely to result in serious harm to himself or others. Such certifications were made by defendant Rahman on October 1, 2007 (AC, Ex. H, Dkt. No. 110–2 at 19–20) and defendant Battu on September 28, 2007 (AC, Ex. I, Dkt. No. 110–2 at 22). On October 1, 2007, de-

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

fendant Carpenter, as Acting Superintendent of Great Meadow, applied to the New York Supreme Court, Oneida County to cause an examination of the plaintiff by two physicians. (AC, Ex. G, Dkt. No. 110–2 at 17). By order dated October 4, 2007 (AC, Ex. F, Dkt. No. 110–2 at 15), Supreme Court Justice Robert F. Julian designated two psychiatrists, Drs. Sangani and Kamath to examine the plaintiff. On October 14, 2007, Drs. Sangani and Kamath signed a certificate, stating that the plaintiff was mentally ill and in need of care and treatment. (AC, Ex. L, Dkt. No. 110–2 at 28).

On October 15, 2007, defendants Sawyer and Carpenter filed a notice and petition, pursuant to N.Y. Correc. Law § 402(3), seeking an order committing the plaintiff to CNYPC. (AC, Exs. J & K, Dkt. No. 110–2 at 24, 26). Plaintiff received the notice on October 24th (AC ¶ 129), and a lawyer from Mental Hygiene Legal Services was appointed to represent him in connection with the court hearing. (AC ¶ 134). At the hearing on the application to commit him, plaintiff made statements and submitted documents (AC ¶ 137), and defendant Kartan testified in support of the application (AC ¶ 138). Following the hearing, on October 24, 2007, Justice Anthony F. Shaheen committed plaintiff to the custody of CNYPC for a period not to exceed six months. (AC ¶ 139; Ex. M, Dkt. No. 110–2 at 30).

On October 16, 2007, defendant Kartan notified plaintiff that he intended to seek court authorization to medicate plaintiff over his objections. (AC ¶ 140; Ex. N, Dkt. No. 110–2 at 32). On November 27th, plaintiff was provided with a notice and a copy of a petition dated November 13th, advising him of a court hearing at which CNYPC would seek permission to involuntarily medicate plaintiff. (AC ¶ 141; Exs. O & P, Dkt. No. 110–2 at 34–35, 37–39; Lombardo Dec., Ex. 8 (sealed), Dkt. No. 120–2). Plaintiff was provided with legal representation from Mental Hygiene Legal Services in connection with the hearing, on December 6th, to determine whether he would be involuntarily medicated. (AC ¶¶ 142–43). Following the hearing,

Supreme Court Justice John W. Grow entered an order finding that plaintiff lacked the capacity to make a reasoned decision regarding his own treatment and authorizing CNYPC to administer medication to him, over his objection. (AC, Ex. Q, Dkt. No. 110–2 at 41–42).

**\*16** Plaintiff alleges that the various mental health professionals, who attested to his mental illness and his need for treatment and medication, provided false diagnoses, as part of a conspiracy with other defendants. (AC ¶¶ 126, 130, 133,138, 144). Plaintiff originally named Drs. Sangani and Kamath as defendants, but requested that they be dismissed from the action, with prejudice. (Dkt.Nos.103, 104). By order dated June 20, 2008, Senior District Judge Lawrence E. Kahn held that any testimony provided by defendant Kartan in state court proceedings supporting the commitment and involuntary medication of plaintiff would be absolutely privileged under New York state law, and could not support a claim under section 1983. (Dkt. No. 4 at 4–5).

While it is not entirely clear which constitutional rights plaintiff alleges were violated by his involuntary commitment and treatment to CNYPC, this court will consider possible claims under the Due Process Clause and the Eighth Amendment. The court concludes that, although plaintiff was entitled to due process protection in connection with his commitment to CNYPC and involuntary medication, he received more-than-adequate process under New York state procedures. Even if the applicable state procedures were not followed to the letter, this would not support a federal constitutional due process claim. This court further finds that the conditions of plaintiff's confinement at CNYPC and his treatment and medication did not violate his Eighth Amendment rights. Accordingly, the court concludes that plaintiff's claims relating to his commitment and treatment at CNYPC do not state viable causes of action under section 1983 and should be dismissed.

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

**A. Due Process and N.Y. Correction Law § 402**

A prisoner's transfer to a mental hospital, and the corresponding loss of liberty and "stigmatizing consequences," trigger Due Process protection. *Vitek v. Jones,* 445 U.S. at 491–92, 493–94. "When a person's liberty interests are implicated, due process requires at a minimum notice and an opportunity to be heard." *Mental Hygiene Legal Service v. Spitzer,* 07 Civ. 2935, 2007 WL 4115936, at *5 (S.D.N.Y. Nov. 16, 2006) (citing *Hamdi v. Rumsfeld,* 542 U.S. 507, 533 (2004) (plurality opinion). The Supreme Court has approved the use of involuntary confinement where there has been a determination that the person in question currently suffers from a "mental abnormality" and is likely to pose a future danger to the public. *Abdul–Matiyn v. Pataki,* 9:06–CV–1503 (DNH/DRH), 2008 WL 974409, at *10 (N.D.N.Y. Apr. 8, 2008) (citing *Kansas v. Hendricks,* 521 U.S. 346, 371 (1997)).[FN23]

> FN23. The discussion of the applicable due process standards draws heavily on Magistrate Judge Peeble's analysis in *McQuilkin v. CNYPC,* 2010 WL 3765847, at *19–20.

Similarly, involuntary medication with psychotropic drugs "imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life," thereby creating a protected liberty interest. *Sandin v. Conner,* 515 U.S. at 479 n. 4, 484 (citing *Washington v. Harper,* 494 U.S. 210, 221–222 (1980). A state may treat a prisoner with anti-psychotic drugs against his will if an administrative determination concludes he is "dangerous to himself or to others and the treatment is in the inmates' medical interest." *Washington v. Harper,* 494 U.S. at 225–227. The Second Circuit has held that "due process requires an opportunity for hearing and review of a decision to administer antipsychotic medication—but such a hearing need not be judicial in nature." *Project Release v. Prevost,* 722 F.2d 960, 981 (2d Cir.1983)). Moreover, due process does not require a guarantee that a physician's assessments in

their commitment evaluation be correct. *Rodriguez City of New York,* 72 F.3d 1051, 1062 (2d Cir.1995).

**\*17** As outlined above, the amended complaint and supporting documents establish that plaintiff was committed to CNYPC only after notice and a judicial hearing, with the assistance of counsel, pursuant to N.Y. Correc. Law § 402. The order committing plaintiff to CNYPC for care and treatment was based on the finding of at least two examining psychiatrists that, as a result of his mental illness, plaintiff posed a substantial threat of harm to himself or others. (AC, Ex. L, Dkt. No. 110–2 at 28). It is clear, from the face of the complaint and the attached exhibits, that plaintiff received adequate procedural due process in connection with his commitment to CNYPC. *McQuilkin v. CNYPC,* 2010 WL 3765847, at *20.

In connection with his involuntary medication, plaintiff again received notice, and participated in a judicial hearing, with assistance of counsel. The court, which ordered that medication be administered to plaintiff over his objection, relied on psychiatric reports that plaintiff posed a danger to himself and others (Lombardo Dec., Ex. 8 (sealed), Dkt. No. 120–2), ruled that plaintiff lacked "the capacity to make a reasoned decision concerning his own treatment," and found that "the proposed treatment is appropriate, narrowly tailored to the needs of the patient, and is in the patient's best interests ..." (AC, Ex. Q, Dkt. No. 110–2 at 41–42). Plaintiff received procedural protection under New York law that exceeded what was required by the Due Process Clause. *Sheridan v. Dubow,* 92 Civ. 6024, 1993 WL 336946, at *3 (S.D.N.Y. Sept. 3, 1993) (in New York State, a patient who refuses to consent to the administration of anti-psychotic drugs is entitled to a *de novo* judicial determination where the patient is afforded representation by counsel, exceeding the federal due process requirements of *Washington v. Harper* ) (citing *Rivers v. Katz,* 67 N.Y.2d 485, 496 (1983)).

To the extent that plaintiff argues that defendants

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

failed to follow the procedures outlined in the Section 402 or other New York statutes, his challenge to his commitment and involuntary medication would still fail. Section 1983 imposes liability for violations of rights protected by the Constitution and laws of the United States, and not for violations arising solely out of state or common law principles. *See, e.g., Pollnow v. Glennon,* 757 F.2d 496, 501 (2d Cir.1985); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009)* ("A violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983.") (collecting cases). For this reason, even if defendants had failed to follow the letter of the New York provisions with regard to his confinement and treatment, that failure would not provide the basis a cognizable section 1983 claim. *McQuilkin v. CNYPC,* 2010 WL 3765847, at *20 n. 20.

Plaintiff argues that the state judges and the defendants responsible for his commitment to CNYPC and involuntary medication were wrong and/or malicious; he claims he was not mentally ill and did not require mental health treatment and medication. Defendants argue, persuasively, that plaintiff is precluded from a factual challenge to the basis for his commitment and involuntary medication, determined in a prior state court proceedings, in which he had a full and fair opportunity to try to establish that he was not mentally ill or in need of treatment. (Defs.' Memo. of Law at 21) (citing *Kulak v. City of New York,* 88 F.3d 63, 71–72 (2d Cir.1996)* (issue preclusion bars Section 1983 claim based upon involuntary commitment where state court, in a habeas proceeding, had previously held that plaintiffs confinement to mental hospital was lawful).[FN24] *See also Harvey v. Sawyer,* 09–CV–598 (FJS/DRH), 2010 WL 3323665, at *4–5 (N.D.N.Y. July 22, 2010)* (Report–Recommendation) (plaintiff was collaterally estopped from pursuing Eighth Amendment or Due Process claims relating to his confinement and involuntary medication at CNYPC because he had a full and fair opportunity to participate in prior court hearings which resulted in the confinement and involuntary medication, and which

determined, *inter alia,* that he was mentally ill, in need of treatment for his own health and safety, and incompetent to make decisions about his own care), adopted, 2010 WL 3323669 (N.D.N.Y. Aug. 20, 2010).

> FN24. Under the Full Faith and Credit Statute, 28 U.S.C. § 1738, the federal court must afford a prior state court judgment the same preclusive effect that the judgment would be given in the courts of the state in which it was decided. *Giakoumelos v. Coughlin,* 88 F.3d 56, 59 (2d Cir.1996)* (citing *Kremer v. Chemical Constr. Corp.,* 456 U.S. 461, 466 (1982)). Pursuant to New York law, the doctrine of collateral estoppel applies when a litigant in a prior proceeding asserts an issue of fact or law in a subsequent proceeding and the issue has been necessarily decided in the prior action, is decisive of the present action, and the litigant had a full and fair opportunity in the prior action to contest the decision. *Id.* (citing *Schwartz v. Public Administrator,* 24 N.Y.2d 65, 71 (1969))

**\*18** Magistrate Judge Peebles and District Judge McAvoy, in this district, have held the *Rooker–Feldman* doctrine [FN25] precludes an inmate plaintiff from basing a 1983 action on injuries allegedly resulting from confinement in a mental hospital and involuntary medication that resulted from prior state court rulings. *McQuilkin v. CNYPC,* 2010 WL 3765847, at *18–19 (Report–Recommendation) adopted, 2010 WL 3765715. In any event, plaintiff received adequate due process under federal constitutional standards in connection with his commitment and involuntary medication, and his claims that he was not mentally ill or in need of treatment are clearly the result of delusions. For all of these reasons, plaintiff's challenge to his commitment and treatment, based on the Due Process Clause and N.Y. Correc. Law § 402, are frivolous, fail to state a claim, and should be dismissed.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

FN25. "Where a federal suit follows a state suit, the former may be prohibited by the so-called *Rooker–Feldman* doctrine in certain circumstances." *Hoblock v. Albany County Board of Elections,* 422 F.3d 77, 83 (2d Cir.2005). A federal district court "has no authority to review final judgments of state court judicial proceedings." *District of Columbia v. Feldman,* 460 U.S. 462, 482 (1983). "To do so would be an exercise of appellate jurisdiction ..." which only the Supreme Court possesses over state court judgments. *Rooker v. Fidelity Trust Co.,* 263 U.S. 413, 416 (1923). In order for the Rooker–Feldman doctrine to apply, plaintiff must have lost in the state court; he must complain of injuries caused by the state court judgment; he must invite the federal court to review and reverse the judgment; and the state court judgment must have been rendered prior to the filing of the federal district court proceeding. *Hoblock v. Albany County Bd. of Elections,* 422 F.3d at 85.

## B. Eighth Amendment

Based on the authority cited in Sections V.B. 1. and 2., any Eighth Amendment challenge to plaintiff's confinement and treatment at CNYPC should be dismissed. Plaintiff's only complaint about the conditions of confinement at CNYPC was that he was confined with mentally ill prisoners, which, he claims, without any supporting factual allegations, endangered him. Plaintiff fails to state a plausible claim that the conditions at CNYPC subjected him to a substantial risk of serious harm. With respect to his medical treatment, plaintiff relies solely on his disagreement with the medical judgment of the mental health professionals about his diagnosis and treatment. Such disagreement, or even a claim that the defendants committed medical malpractice, would not support a constitutional claim based on inadequate care. *McQuilkin v. CNYPC,* 2010 WL 3765847, at *17.

## VII. Qualified Immunity

The defendants have asserted that they are entitled to qualified immunity in connection with plaintiff's claims. In determining whether qualified immunity applies, the court may first consider whether "the facts alleged show the [defendant's] conduct violated a constitutional right." *Saucier v. Katz,* 533 U.S. 194, 201(2001), modified by *Pearson v. Callahan,* 555 U.S. 223, 129 S.Ct. 808, 818 (2009) (holding that, "while the sequence set forth [in Saucier] is often appropriate, it should no longer be regarded as mandatory in all cases"). "If no constitutional right would have been violated were the allegations established, there is no necessity for further inquiries concerning qualified immunity." *Saucier,* 533 U.S. at 201. This court need not address qualified immunity with respect to plaintiff's various causes of action because, as discussed above, he has not established any alleged violations of his constitutional rights.[FN26]

FN26. In general, "the defense of qualified immunity cannot support the grant of a ... 12(b)(6) motion for failure to state a claim upon which relief can be granted." *Green v. Maraio,* 722 F.2d 1013, 1018 (2d Cir.1983). This is so because qualified immunity is an affirmative defense that must be pleaded by the official claiming it. *Stachell v. Dilworth,* 745 F.2d 781, 784 (2d Cir.1984) (citing *Harlow v. Fitzgerald,* 457 U.S. 800, 815 (1982). Dismissal for failure to state a claim is thus generally appropriate only where the complaint itself sets up on its face the qualified immunity defense. *See, e.g., Green v. Maraio,* 722 F.2d at 1019. There may well be some defendants who would be entitled to qualified immunity based solely on the allegations in the complaint and supporting documents—*e.g.* the defendants without medical qualifications who deferred to the decisions of treating physicians with respect to plaintiff's mental health treatment. See,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)
**(Cite as: 2011 WL 768990 (N.D.N.Y.))**

e.g., *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000) (non-doctors, whose failure to intercede in the medical treatment of an in-mate was, even if wrongful, not objectively unreasonable, were entitled to summary judgment on qualified immunity grounds).

**WHEREFORE,** based on the findings above, it is

**RECOMMENDED,** that defendants' motion to dismiss (Dkt. No. 120) be **GRANTED,** and that plaintiff's amended complaint be **DISMISSED IN ITS ENTIRETY.**

**\*19** Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing re-port. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Secretary of Health and Human Services,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2011.
Gonzales v. Carpenter
Not Reported in F.Supp.2d, 2011 WL 768990 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Kenneth Carl GROVES, Sr., Plaintiff,
v.
Brett DAVIS, Secure Care Treatment Aid; David W.
Sill, Secure Care Treatment Aid; Thomas Nicolette,
RN, Ward Nurse; Charmaine Bill, Treatment Team
Leader; Jill E. Carver, Social Worker, Primary Ther-
apist; Edwin Debroize, Psychologist Assist; Jeff
Nowicki, Chief of Mental Health Treatment Serv.;
Terri Maxymillian, Ph.D., Dir. of Mental Health
Serv.; Sgt. Sweet, Security Services, CNYPC; Mi-
chael Hogan, Comm'r, Dep't of Mental Health, De-
fendants.

No. 9:11–CV–1317 (GTS/RFT).
Feb. 28, 2012.

Kenneth Carl Groves, Sr., Marcy, NY, pro se.

**MEMORANDUM DECISION and ORDER**
Hon. GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court, in this *pro se* civil
rights action filed by Kenneth Carl Groves, Sr.
("Plaintiff"), against numerous employees of New
York State or the Central New York Psychiatric
Center ("Defendants"), are Plaintiff's motion to pro-
ceed *in forma pauperis,* his motion for a temporary
restraining order and preliminary injunction, and his
motion for appointment of counsel. (Dkt.Nos.2, 3, 4.)
[FN1] For the reasons set forth below, Plaintiff's motion
to proceed *in forma pauperis* is granted; his motion for
a preliminary injunction is denied; his motion for
appointment of counsel is denied; Plaintiff's claims of
deliberate indifference to his mental health needs

against Defendants Bill, Carver and DeBroize are *sua
sponte* dismissed with prejudice; Plaintiff's claims
against Defendants Bill, Carver, DeBroize, Nowicki,
Maxymillian, and Hogan arising from their alleged
personal involvement in the August 8, 2011 assault are
*sua sponte* dismissed without prejudice and with leave
to amend in this action in accordance with
Fed.R.Civ.P. 15; Sgt. Sweet is *sua sponte* dismissed
without prejudice as a Defendant in this action; the
Clerk is directed to issue summonses, and the U.S.
Marshal is directed to effect service of process on
Defendants Davis, Sill, and Nicolette.

FN1. This is the fourth civil rights action
filed by Plaintiff in this District. Generally,
two of these actions arose out of Plaintiff's
refusal to consent to a strip search and the
subsequent actions taken against Plaintiff
as a result of his refusal. *See Groves v. New
York,* 09–CV–0406, Decision and Order
(N.D.N.Y. filed May 11, 2009) (Hurd, J.)
(*sua sponte* dismissing complaint pursuant to
28 U.S.C. § 1915[e][2][B] ); *Groves v. The
State of New York,* 9:09–CV–0412, Decision
and Order (N.D.N.Y. filed Mar. 26, 2010)
(Sharpe, J.) (granting defendants' motion to
dismiss the complaint pursuant to
Fed.R.Civ.P. 12[b][6] ). The third action al-
leged numerous violations of Plaintiff's con-
stitutional rights during the period July 23,
2009, and August 26, 2009, and was dis-
missed without prejudice upon Plaintiff's
request in October, 2010. *See Groves v.
Maxymillian,* 9:09–CV–1002, Decision and
Order (N.D.N.Y. filed Oct. 8, 2010)
(Suddaby, J.). As a result, it does not appear
that the current action is barred because of res
judicata, collateral estoppel, and/or the rule
against duplicative litigation.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

## I. RELEVANT BACKGROUND

On November 7, 2011, Plaintiff commenced this action *pro se* by filing a civil rights Complaint, together with a motion to proceed *in forma pauperis*. (Dkt. Nos.1, 2.) [FN2] Liberally construed, Plaintiff's Complaint alleges that the following constitutional violations against him occurred during his confinement at Central New York Psychiatric Center ("CNYPC"): (1) Defendants Davis and Sill used excessive force against him under the Eighth and/or Fourteenth Amendments; (2) Defendant Nicolette knew of and failed to take action to protect Plaintiff from the assault under the Eighth and/or Fourteenth Amendments; (3) Defendants Bill, Carver, and De-Broize were deliberately indifferent to his mental health needs under the Eighth and/or Fourteenth Amendments; and (4) Defendants Bill, Carver, De-Broize, Nowicki, Maxymillian, Bosco, and Hogan failed to "adequately train the staff under their supervision" and to take appropriate action in response to the incident. (*See generally* Dkt. No. 1.) For a more detailed description of Plaintiff's claims, and the factual allegations giving rise to those claims, the reader is referred to Part III.B of this Decision and Order.

> FN2. At that time, Plaintiff also filed motions for injunctive relief and for appointment of counsel. (Dkt.Nos.3, 4.)

## II. MOTION TO PROCEED *IN FORMA PAUPERIS*

Because Plaintiff sets forth sufficient economic need, the Court finds that Plaintiff may properly commence this action *in forma pauperis*. (Dkt. No. 2.)

## III. *SUA SPONTE* REVIEW OF PLAINTIFF'S COMPLAINT

In light of the foregoing, the Court must now review the sufficiency of the allegations that Plaintiff has set forth in his Complaint in light of 28 U.S.C. § 1915(e)(2)(B). This is because Section 1915(e)(2)(B) directs that, when a plaintiff seeks to proceed *in forma pauperis*, "(2) ... the court shall dismiss the case at any

time if the court determines that—... (B) the action ... (i) is frivolous or malicious; (ii) fails to state a claim on which relief may be granted; or (iii) seeks monetary relief against a defendant who is immune from such relief." 28 U.S.C. § 1915(e)(2)(B).[FN3]

> FN3. The Court notes that, similarly, Section 1915A(b) directs that a court must review any "complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity" and must "identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted; or ... seeks monetary relief from a defendant who is immune from such relief." 28 U.S.C. § 1915A(b).

### A. Governing Legal Standard

**\*2** It has long been understood that a dismissal for failure to state a claim upon which relief can be granted, pursuant to Fed.R.Civ.P. 12(b)(6), can be based on one or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2); or (2) a challenge to the legal cognizability of the claim. *Jackson v. Onondaga Cnty.,* 549 F.Supp.2d 204, 211, nn. 15–16 (N.D.N.Y.2008) (McAvoy, J., adopting Report–Recommendation on *de novo* review).

Because such dismissals are often based on the first ground, a few words regarding that ground are appropriate. Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a pleading contain "a *short and plain* statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2) [emphasis added]. In the Court's view, this tension between permitting a "short and plain statement" and requiring that the statement "show[ ]" an entitlement to relief is often at the heart of misunderstandings that occur regarding the pleading standard established by

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

Fed.R.Civ.P. 8(a)(2).

On the one hand, the Supreme Court has long characterized the "short and plain" pleading standard under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal." *Jackson,* 549 F.Supp.2d at 212, n. 20 (citing Supreme Court case). On the other hand, the Supreme Court has held that, by requiring the above-described "showing," the pleading standard under Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests." *Jackson,* 549 F.Supp.2d at 212, n .17 (citing Supreme Court cases) (emphasis added).

The Supreme Court has explained that such *fair notice* has the important purpose of "enabl[ing] the adverse party to answer and prepare for trial" and "facilitat[ing] a proper decision on the merits" by the court. *Jackson,* 549 F.Supp.2d at 212, n. 18 (citing Supreme Court cases); *Rusyniak v. Gensini,* 629 F.Supp.2d 203, 213 & n. 32 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases). For this reason, as one commentator has correctly observed, the "liberal" notice pleading standard "has its limits." 2 *Moore's Federal Practice* § 12.34[1][b] at 12–61 (3d ed.2003). For example, numerous Supreme Court and Second Circuit decisions exist holding that a pleading has failed to meet the "liberal" notice pleading standard. *Rusyniak,* 629 F. Supp .2d at 213, n. 22 (citing Supreme Court and Second Circuit cases); *see also Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949–52, 173 L.Ed.2d 868 (2009).

Most notably, in *Bell Atlantic Corp. v. Twombly,* the Supreme Court reversed an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1. *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007). In doing so, the Court "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for

failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Twombly,* 127 S.Ct. at 1968–69. Rather than turn on the *conceivability* of an actionable claim, the Court clarified, the "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965–74. The Court explained that, while this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading must contain at least "some factual allegation[s]." *Id* . at 1965. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]," assuming (of course) that all the allegations in the complaint are true. *Id.*

**\*3** As for the nature of what is "plausible," the Supreme Court explained that "[a] claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal,* 129 S.Ct. at 1949. "[D]etermining whether a complaint states a plausible claim for relief ... [is] a context-specific task that requires the reviewing court to draw on its judicial experience and common sense.... [W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not show[n]—that the pleader is entitled to relief." *Id.* at 1950 [internal quotation marks and citations omitted]. However, while the plausibility standard "asks for more than a sheer possibility that a defendant has acted unlawfully," *id.,* it "does not impose a probability requirement." *Twombly,* 550 U.S. at 556.

Because of this requirement of factual allegations plausibly suggesting an entitlement to relief, "the tenet that a court must accept as true all of the allegations contained in the complaint is inapplicable to legal conclusions. Threadbare recitals of the elements of a cause of action, supported by merely conclusory statements, do not suffice." *Iqbal,* 129 S.Ct. at 1949.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

Similarly, a pleading that only "tenders naked assertions devoid of further factual enhancement" will not suffice. *Iqbal,* 129 S.Ct. at 1949 (internal citations and alterations omitted). Rule 8 "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation." *Id.* (citations omitted).

This pleading standard applies even to *pro se* litigants. While the special leniency afforded to *pro se* civil rights litigants somewhat loosens the procedural rules governing the form of pleadings (as the Second Circuit has observed), it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12. [FN4] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow. [FN5] Stated more simply, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended." *Jackson,* 549 F.Supp.2d at 214, n. 28 [citations omitted].[FN6]

FN4. *See Vega v. Artus,* 610 F.Supp.2d 185, 196 & nn. 8–9 (N.D.N.Y.2009) (Suddaby, J.) (citing Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

FN5. *See Vega,* 610 F.Supp.2d at 196, n. 10 (citing Supreme Court and Second Circuit cases); *Rusyniak,* 629 F.Supp.2d at 214 & n. 34 (citing Second Circuit cases).

FN6. It should be emphasized that Fed.R.Civ.P. 8's plausibility standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which (when reviewing a *pro se* pleading) the Court stated, *"Specific* facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, 93, 127 S.Ct. 2197, 167 L.Ed.2d 1081 (2007) [emphasis added]. That statement was merely an abbreviation of the often-repeated point of law—first offered in *Conley* and repeated in *Twombly*—that a pleading need not "set out *in detail* the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley,* 355 U.S. at 47) [emphasis added]. That statement did not mean that all pleadings may achieve the requirement of "fair notice" without ever alleging any facts whatsoever. Clearly, there must still be enough fact set out (however set out, whether in detail or in a generalized fashion) to raise a right to relief above the speculative level to a plausible level. *See Rusyniak,* 629 F.Supp.2d at 214 & n. 35 (explaining holding in *Erickson* ).

**B. Analysis of Plaintiff's Complaint**

The Court prefaces its analysis of Plaintiff's Complaint by noting that, although Plaintiff is a civilly committed sex offender and no longer a prisoner, the Court will look to cases addressing prisoner's rights in analyzing Plaintiff's claims, because "confinement of civilly committed patients is similar to that of prisoners." *Holly v. Anderson,* 04–CV–1489, 2008 WL 1773093, at *7 (D.Minn. Apr.15, 2008); *see also Morgan v. Rabun,* 128 F.3d 694, 697 (8th Cir.1997) ("The governmental interests in running a state mental hospital are similar in material aspects to that of running a prison."). Thus, whereas claims of excessive force by convicted criminals are analyzed under the Eighth Amendment to the United States Constitution, because Plaintiff is a civilly committed sex offender and no longer a prisoner, his substantive rights to be free from unsafe conditions of confinement arise under the Due Process Clause of the Fourteenth Amendment. In *Youngberg v. Romeo,* 457 U.S. 307, 102 S.Ct. 2452, 73 L.Ed.2d 28 (1982), the Court stated "[i]f it is cruel and unusual punishment to hold con-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

victed criminals in unsafe conditions, it must be unconstitutional [under the Due Process Clause] to confine the involuntarily committed-who may not be punished at all-in unsafe conditions." *Youngberg, 457 U.S. at 315–16.* As have numerous other courts which have considered the issue, this Court has found that "the standard for analyzing a civil detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard." *Groves v. Patterson,* 09–CV–1002, Memorandum–Decision and Order at *15–16 (N.D.N.Y. filed Nov. 18, 2009). [FN7]

> FN7. *See Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) ("[W]hile the Supreme Court has not precisely limned the duties of a custodial official under the Due Process Clause to provide needed medical treatment to a pretrial detainee, it is plain that an unconvicted detainee's rights are at least as great as those of a convicted prisoner."); *Walton v. Breeyear,* 05–CV–0194, 2007 WL 446010, at *8, n. 16 (N.D.N.Y. Feb.8, 2007) (Peebles, M.J.) (noting that pretrial detainees enjoy protections under the due process clause of the Fourteenth Amendment parallel to those afforded to sentenced prisoners by the Eighth Amendment); *Vallen v. Carrol,* 02–CV–5666, 2005 WL 2296620, at ——8–9 (S.D.N.Y. Sep.20, 2005) (finding that the Eighth Amendment standard of "deliberate indifference" is the correct one for Section 1983 claims brought by involuntarily committed mental patients based on alleged failures to protect them that violated their substantive due process rights); *Bourdon v. Roney,* 99–CV–0769, 2003 WL 21058177, at *10 (N.D.N.Y. Mar.6, 2003) (Sharpe, M.J.) ("The standard for analyzing a pretrial detainee's Fourteenth Amendment [conditions of confinement] claim is the same as the Eighth Amendment standard.").

**1. Excessive Force Claims Against Defendants Davis, Still and Nicolette**

**\*4** Plaintiff alleges that on August 8, 2011, Defendant Davis entered Plaintiff's dorm room at CNYPC and "viciously attacked and brutally assaulted and battered" him. (Dkt. No. 1 at 4.) During the course of this assault, Defendant Sill is alleged to have entered Plaintiff's room and "jump[ed] on the plaintiff's legs holding and pinning them as Defendant Davis [continued to beat Plaintiff]." (*Id.*) As alleged in the Complaint, although Defendant Nicolette knew in advance that this assault was planned, he "remained in the Nurses Station" and "did nothing to interceed [sic] or stop the brutal attack on the plaintiff." (*Id.* at 5.)

To validly assert a violation of the Eighth Amendment through the use of excessive force, an inmate must allege the following: (1) subjectively, that the defendants acted wantonly and in bad faith; and (2) objectively, that the defendants' actions violated "contemporary standards of decency." *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotation marks omitted) (citing *Hudson v. McMillian,* 503 U.S. 1, 8 [1992] ).

Here, construing the factual allegations of Plaintiff's Complaint with special leniency, the Court finds that Plaintiff appears to have alleged facts plausibly suggesting that he was subjected to excessive force by Defendants Davis and Sill. In addition, by alleging that Defendants Davis, Sill and Nicolette discussed the assault in advance of it occurring, and that Nicolette was in the vicinity of Plaintiff's room and had an opportunity to intervene to prevent it, the Complaint sufficiently alleges that Defendant Nicolette was personally involved and/or failed to protect Plaintiff from the assault. *See Bhuiyan v. Wright,* 06–CV–0409, 2009 WL 3123484, at *7 (N.D.N.Y. Sept.29, 2009) (Scullin, J.) ("The fact that defendant Davis was not in the room, but was acting as a 'lookout' so that no one came into the room while plaintiff was being beaten, would not absolve him from liability for the assault. An officer's failure to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

intervene during another officer's use of excessive force can itself constitute an Eighth Amendment violation unless the assault is "sudden and brief," and the defendant had no real opportunity to prevent it."); *Jeffreys v. Rossi,* 275 F.Supp.2d 463, 474 (S.D.N.Y.2003) (holding that an officer may be personally involved in the use of excessive force if he either directly participates in the assault or if he was present during the assault, yet failed to intervene on behalf of the victim, even though the officer had a reasonable opportunity to do so).

As a result, a response to these claims is required from Defendants David, Sill, and Nicolette. In so ruling, the Court expresses no opinion as to whether Plaintiff's claims can withstand a properly filed motion to dismiss or for summary judgment.

## 2. Deliberate Indifference Claims Against Defendants Bill, Carver and DeBroize

Plaintiff alleges that on August 9, 2011, the day after the alleged assault, he attempted to "discuss the incident and what transpired" with Defendants Bill and Carver. (Dkt. No. 1 at 5.) Plaintiff alleges that Defendant Bill told him, "I don't want to discuss this Mr. Groves, we're too busy for your foolishness and the matter is being investigated." (*Id.*) Plaintiff's effort to explain that he was frightened by the incident was rebuffed by Defendant Bill, who told Plaintiff to "grow up." (*Id.* at 5–6.) The following day, Plaintiff attempted to discuss the incident with Defendant Carver, his primary therapist, again without success. A further attempt at discussion later that day was met with Defendant Carver "stating to the plaintiff in a snotty tone 'grow the hell up!' " (*Id.* at 6.) On August 10, 2011, Plaintiff attempted to discuss the incident "and his current fears and feelings," during his Monday afternoon "Process Group," which is facilitated by Defendant DeBroize. As alleged, Defendant DeBroize told Plaintiff and the other group members that the matter was under investigation "so no one could discuss the incident with anyone." (*Id.* at 6.)

**\*5** To state a claim of deliberate indifference to a serious medical and/or mental health need under the Eighth Amendment, a plaintiff must first allege facts plausibly suggesting that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06). The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154, 115 S.Ct. 1108, 130 L.Ed.2d 1074 (1995). "First, the alleged deprivation must be, in objective terms, 'sufficiently serious.' " *Id.* (citations omitted). Second, the defendant "must act with a sufficiently culpable state of mind." *Id.*

With regard to the first element, generally, to be sufficiently serious for purposes of the Constitution, a medical condition must be "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Nance v. Kelly,* 912 F.2d 605, 607 (2d Cir.1990) (Pratt, J. dissenting) [citations omitted], *accord, Hathaway,* 37 F.3d at 66; *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998).).[FN8] Under the subjective component, a plaintiff must also allege facts plausibly suggesting that the defendant acted with "a sufficiently culpable state of mind." *Hathaway,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). A physician's negligence in treating or failing to treat a prisoner's medical condition does not implicate the Eighth Amendment and is not properly the subject of a Section 1983 action. *Estelle,* 429 U.S. at 105–06; *Chance,* 143 F.3d at 703.[FN9]

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
(Cite as: 2012 WL 651919 (N.D.N.Y.))

FN8. Relevant factors informing this determination include whether the plaintiff suffers from an injury that a "reasonable doctor or patient would find important and worthy of comment or treatment," a condition that "significantly affects" a prisoner's daily activities, or "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

FN9. Thus, a physician who "delay[s] ... treatment based on a bad diagnosis or erroneous calculus of risks and costs" does not exhibit the mental state necessary for deliberate indifference. *Harrison,* 219 F.3d at 139. Likewise, an inmate who disagrees with the physician over the appropriate course of treatment has no claim under Section 1983 if the treatment provided is "adequate." *Chance,* 143 F.3d at 703. The word "adequate" reflects the reality that "[p]rison officials are not obligated to provide inmates with whatever care the inmates desire. Rather, prison officials fulfill their obligations under the Eighth Amendment when the care provided is 'reasonable.' " *Jones v. Westchester Cnty. Dept. of Corr.,* 557 F.Supp.2d 408, 413 (S.D.N.Y.2008). In addition, "disagreements over medications, diagnostic techniques (e .g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention are not adequate grounds for a section 1983 claim." *Sonds v. St. Barnabas Hosp. Corr. Health Servs.,* 151 F.Supp.2d 303, 312 (S.D.N.Y.2001). However, if prison officials consciously delay or otherwise fail to treat an inmate's serious medical condition "as punishment or for other invalid reasons," such conduct constitutes deliberate indifference. *Harrison,* 219 F.3d at 138.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting that Defendants Bill, Carver, and DeBroize acted with deliberate indifference to Plaintiff's serious mental health condition when they declined to discuss the incident of August 8, 2011. There is nothing in the Complaint that even remotely suggests that the requested conversations were integral to Plaintiff's treatment as a convicted sex offender involuntarily committed to CNYPC, or that Defendants' refusal to discuss the incident with Plaintiff when he requested to do so caused Plaintiff to suffer any harm or worsening of his condition. In addition, Plaintiff does not allege that any of these Defendants acted with the requisite culpable state of mind.

Moreover, the statements made by Defendants Bill and Carver that he should "grow up," even if construed as verbal harassment, do not give rise to a cognizable claim that may be pursued under Section 1983. Allegations of verbal harassment are insufficient to support a Section 1983 claim. *Johnson v. Eggersdorf,* 8 F. App'x 140, 143 (2d Cir.2001); *see also Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986) ("[A]llegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged .").

**\*6** For these reasons, Plaintiff's deliberate indifference claims against Defendants Bill, Carver, and DeBroize are dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). Moreover, because the Court cannot imagine how Plaintiff might correct this claim through better pleading, he is not granted leave to attempt to do so in an amended pleading.FN10 Rather, this claim is hereby dismissed with prejudice.

FN10. The Court notes that, generally, leave to amend pleadings shall be freely granted when justice so requires. Fed.R.Civ.P. 15(a). However, an opportunity to amend is not required where amendment would be futile. *John Hancock Mut. Life Ins. Co. v. Amerford Int'l Corp.,* 22 F.3d 458, 462 (2d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.1994). *John Hancock Mut. Life Ins. Co.,* 22 F.3d at 462. The Second Circuit has explained that "[w]here it appears that granting leave to amend is unlikely to be productive, ... it is not an abuse of discretion to deny leave to amend." *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir.1993); *see Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) ("The problem with [Plaintiff's] cause of action is substantive; better pleading will not cure it. Repleading would thus be futile. Such a futile request to replead should be denied."). This rule is applicable even to *pro se* plaintiffs. *See, e.g., Cuoco,* 222 F.3d at 103.

### 3. Failure to Supervise Claims Against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan

To prevail on a claim under 42 U.S.C. § 1983, a defendant must be personally involved in the plaintiff's constitutional deprivation. *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977). Generally, for purposes of 42 U.S.C. § 1983, supervisory personnel may be considered "personally involved" only if they (1) directly participated in the violation, (2) failed to remedy that violation after learning of it through a report or appeal, (3) created, or allowed to continue, a policy or custom under which the violation occurred, (4) had been grossly negligent in managing subordinates who caused the violation, or (5) exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that the violation was occurring.[FN11]

> FN11. *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (adding fifth prong); *Wright,* 21 F.3d at 501 (adding fifth prong); *Williams v. Smith,* 781 F.2d 319, 323–324 (2d Cir.1986) (setting forth four prongs).

Holding a position in a hierarchical chain of command, without more, is insufficient to support a showing of personal involvement. *McKinnon,* 568 F.2d at 934. Rather, a plaintiff must demonstrate " 'a tangible connection between the acts of the defendant and the injuries suffered.' " *Austin v. Pappas,* 04–CV–7263, 2008 WL 857528, at *2 (S.D.N.Y. Mar.31, 2008) (quoting *Bass v. Jackson,* 790 F.2d 260, 263 [2d Cir.1986] ) (other citation omitted). An official's failure to respond to grievance letters from inmates, however, "does not establish supervisory liability." *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997).[FN12] Moreover, "the law is clear that inmates do not enjoy a constitutional right to an investigation of any kind by government officials." *Pine v. Seally,* 9–CV–1198, 2011 WL 856426, at *9 (N.D.N.Y. Feb.4, 2011).[FN13]

> FN12. *See also Gillard v. Rosati,* 08–CV–1104, 2011 WL 4402131, at *7 (N.D.N.Y. Aug.22, 2011) (Peebles, J.) ("It is well-established that without more, 'mere receipt of letters from an inmate by a supervisory official regarding a medical claim is insufficient to constitute personal liability." [internal quotation marks and brackets omitted] ); *Greenwaldt v. Coughlin,* 93–CV–6551, 1995 WL 232736, at *4 (S.D.N.Y. Apr.19, 1995) ("it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations."); *Clark v. Coughlin,* 92–CV 0920, 1993 WL 205111, at *5 n. 2 (S.D.N.Y. Jun.10, 1993) ("Courts in this jurisdiction have consistently held that an inmate's single letter does not constitute the requisite personal involvement in an alleged constitutional deprivation to trigger the Commissioner's liability.")

> FN13. *See also Bernstein v. N.Y.,* 591 F.Supp.2d 448, 460 (S.D.N.Y.2008) ("Courts within the Second Circuit have determined

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

that there is no constitutional right to an investigation by government officials." [internal quotation marks, brackets and ellipsis omitted] ).

In his Complaint, Plaintiff alleges in wholly conclusory terms that Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan failed to "adequately train the staff under their supervision and fail[ed] to act within the scope and training of the position and job title they hold." (Dkt. No. 1 at 8.) Plaintiff alleges that he submitted a letter of complaint to Defendant Hogan and wrote to Defendant Nowicki on several occasions expressing concern his complaint had not been responded to, only to be advised that in September, 2011 that an investigation was ongoing. (*Id.* at 6–7.) Plaintiff does not allege that any of these Defendants personally participated in the alleged assault on August 8, 2011.

Here, even when construed with the utmost special liberality, Plaintiff's Complaint fails to allege facts plausibly suggesting any personal involvement by these Defendants in the alleged used of excessive force on August 8, 2011. As a result, Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from this incident are *sua sponte* dismissed pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6). This dismissal is without prejudice to Plaintiff's right to file an Amended Complaint that corrects the above-described pleading defects, and states a viable claim against these Defendants. The Court notes that, at this early stage of the case, Plaintiff has the right—without leave of the Court—to file an Amended Complaint within the time limits established by Fed.R.Civ.P. 15(a)(1)(B). However, if he seeks to file an Amended Complaint after those time limits, he must file a motion for leave to file an Amended Complaint in accordance with Fed.R.Civ.P. 15(a)(2). In either event, Plaintiff is advised that *any Amended Complaint must be a complete pleading that will replace and supersede the original Complaint in its entirety, and that may not incorporate by reference any portion of the original Complaint. See* N.D.N.Y. L.R. 7.1(a) (4).

**\*7** Finally, although Plaintiff names Sgt. Sweet as a Defendant in the caption of the complaint and in the listing of the parties, he has not set forth in the Complaint any allegations of fact regarding the conduct of this Defendant complained of. (*See generally* Dkt. No. 1.) As a result, the Complaint fails to state a claim upon which relief may be granted and Sgt. Sweet is dismissed from this action without prejudice to Plaintiff's right to file an Amended Complaint as set forth above.

### IV. MOTION FOR INJUNCTIVE RELIEF

A preliminary injunction is an "extraordinary remedy that should not be granted as a routine matter." *Patton v. Dole,* 806 F.2d 24, 28 (2d Cir.1986). In most cases, to warrant the issuance of a preliminary injunction, a movant must show (a) irreparable harm and (b) either (1) a likelihood of success on the merits of the claim or (2) sufficiently serious questions going to the merits, and a balance of hardships tipping decidedly in favor of the moving party. *D.D. ex rel. V.D. v. New York City Bd. of Educ.,* 465 F.3d 503, 510 (2d Cir.2006) (quotation omitted). "The purpose of issuing a preliminary injunction is to 'preserve the status quo and prevent irreparable harm until the court has an opportunity to rule on the ... merits.' " *Candelaria v. Baker,* 00–CV–912, 2006 WL 618576, at *3 (W.D.N.Y. Mar.10, 2006) (quoting *Devose v. Herrington,* 42 F.3d 470, 471 [8th Cir.1994] ). Preliminary injunctive relief " 'should not be granted unless the movant, by a clear showing, carries the burden of persuasion.' " *Moore v. Consolidated Edison Co. of New York, Inc.,* 409 F.3d 506, 510 (2d Cir.2005) (quoting *Mazurek v. Armstrong,* 520 U.S. 968, 972 [1997] ). "Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances." *Moore,* 409 F.3d at 510 (citing *Morales v. Trans World Airlines, Inc.,* 504 U.S. 374, 381, 112 S.Ct.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

2031, 119 L.Ed.2d 157 (1992). The same standards govern consideration of an application for a temporary restraining order. *Perri v. Bloomberg,* 06–CV–0403, 2008 WL 2944642, at *2 (E.D.N.Y. Jul.31, 2008) [citation omitted]. The district court has broad discretion in determining whether to grant a preliminary injunction. *Moore,* 409 F.3d at 511.

"The Second Circuit has defined 'irreparable harm' as 'certain and imminent harm for which a monetary award does not adequately compensate,' noting that 'only harm shown to be non-compensable in terms of money damages provides the basis for awarding injunctive relief.' " *Perri,* 2008 WL 2944642, at *2 (citing *Wisdom Import Sales Co., L.L.C. v. Labatt Brewing Co., Ltd.,* 339 F.3d 101, 113–14 [2d Cir.2003] ); *see also Kamerling v. Massanari,* 295 F.3d 206, 214 (2d Cir.2002) ("To establish irreparable harm, a party seeking preliminary injunctive relief must show that there is a continuing harm which cannot be adequately redressed by final relief on the merits and for which money damages cannot provide adequate compensation.") (internal quotation omitted). Speculative, remote or future injury is not the province of injunctive relief. *Los Angeles v. Lyons,* 461 U.S. 95, 111–12, 103 S.Ct. 1660, 75 L.Ed.2d 675 (1983); *see also Hooks v. Howard,* 07–CV–0724, 2008 WL 2705371, at *2 (N.D.N.Y. Jul.3, 2008) (citation omitted) ("Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages.").

**\*8** Plaintiff has submitted a document entitled "Order to Show Cause for Preliminary Injunction and Tempor[ary] Restraining Order." (Dkt. No. 3.) Construed liberally, Plaintiff's submission seeks a temporary restraining order and injunctive relief enjoining Defendants from "submitting and filing false and untrue statements and reports" regarding the August 11, 2011 incident, and to "stop all retaliatory actions against the plaintiff ...." (*Id.* at 1.) Plaintiff also seeks an "Order of Seperation [sic]" directing that Defend-

ants Davis, Sill, Nicolette, Bill, Carver and DeBroize be "restrained from being within 100 feet from the plaintiff in any form or matter." (*Id.* at 2.)

The Court has reviewed Plaintiff's motion papers thoroughly and considered the claims asserted therein in the light most favorable to Plaintiff, as a *pro se* litigant. Based upon that review, the Court finds that the harm Plaintiff alleges is purely speculative and, therefore, not "irreparable." Plaintiff's motion is supported only by a recitation of the alleged assault in August, 2011. (*Id.* at 1–4.) Plaintiff has not supported the claims of ongoing misconduct set forth in his motion papers with any factual allegations, such as the dates on which the misconduct occurred, the nature of the injuries he claims to have suffered, the identities of the persons responsible for the conduct he seeks to enjoin, or the relationship between those actions and the claims asserted in his Complaint. Simply stated, Plaintiff's alleged fear of future wrongdoing by the Defendants is not sufficient to warrant the extraordinary remedy of preliminary injunctive relief.

The Court further notes that the requested injunctive relief cannot be granted unless there is also proof that Plaintiff has a likelihood of succeeding on the merits of his claim, or evidence that establishes sufficiently serious questions going to the merits of his claim and a balance of hardships tipping decidedly toward him. *See Covino v. Patrissi,* 967 F.2d 73, 77 (2d Cir.1992). Plaintiff has failed to submit *proof or evidence* that meets this standard. Plaintiff's allegations, standing alone, are not sufficient to entitle him to preliminary injunctive relief. *See Ivy Mar Co. v. C.R. Seasons Ltd.,* 907 F.Supp. 547, 561 (E.D.N.Y.1995) ("[B]are allegations, without more, are insufficient for the issuance of a preliminary injunction."); *Hancock v. Essential Resources, Inc.,* 792 F.Supp. 924, 928 (S.D.N.Y.1992) ("Preliminary injunctive relief cannot rest on mere hypotheticals."). Without evidence to support his claims that he is in danger from the actions of anyone at CNYPC, the Court will not credit Plaintiff's conclusory allegations

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

that he will be retaliated against or harmed in the future.

Plaintiff has failed to establish either of the two requisite elements discussed above. As a result, Plaintiff's request for a temporary restraining order and/or injunctive relief is denied.

## V. MOTION FOR APPOINTMENT OF COUNSEL

**\*9** Courts cannot utilize a bright-line test in determining whether counsel should be appointed on behalf of an indigent party. *Hendricks v. Coughlin,* 114 F.3d 390, 392–93 (2d Cir.1997). Instead, a number of factors must be carefully considered by the court in ruling upon such a motion:

[T]he district judge should first determine whether the indigent's position seems likely to be of substance. If the claim meets this threshold requirement, the court should then consider the indigent's ability to investigate the crucial facts, whether conflicting evidence implicating the need for cross examination will be the major proof presented to the fact finder, the indigent's ability to present the case, the complexity of the legal issues and any special reason in that case why appointment of counsel would be more likely to lead to a just determination.

*Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994) (quoting *Hodge v. Police Officers,* 802 F.2d 58, 61 [2d Cir.1986] ). This is not to say that all, or indeed any, of these factors are controlling in a particular case.[FN14] Rather, each case must be decided on its own facts. *Velasquez v. O'Keefe,* 899 F.Supp. 972, 974 (N.D.N.Y.1995) (McAvoy, C.J.) (citing *Hodge,* 802 F.2d at 61).

FN14. For example, a plaintiff's motion for counsel must always be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private

sector, and such a motion may be denied solely on the failure of the plaintiff to provide such documentation. *See Terminate Control Corp. v. Horowitz,* 28 F.3d 1335, 1341 (2d Cir.1994); *Cooper v. Sargenti Co., Inc.,* 877 F.2d 170, 172, 174 (2d Cir.1989) [citation omitted].

Upon due consideration, the Court finds that the relevant factors weigh decidedly against granting Plaintiff's motion at this time. For example, the Court finds as follows: (1) the case does not present novel or complex issues; (2) it appears to the Court as though, to date, Plaintiff has been able to effectively litigate this action; (3) while it is possible that there will be conflicting evidence implicating the need for cross-examination at the time of the trial, as is the case in many actions brought under 42 U.S.C. § 1983 by *pro se* litigants, "this factor alone is not determinative of a motion for appointment of counsel," *Velasquez,* 899 F.Supp. at 974; (4) if this case survives any dispositive motions filed by Defendants, *it is highly probable that this Court will appoint trial counsel at the final pretrial conference;* (5) this Court is unaware of any special reasons why appointment of counsel at this time would be more likely to lead to a just determination of this litigation; and (6) Plaintiff's motion for counsel is not accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

For these reasons, Plaintiff's motion for the appointment of counsel is denied without prejudice. After the Defendants have responded to the allegations in the Complaint which survive *sua sponte* review, and the parties have undertaken discovery, Plaintiff may file a second motion for the appointment of counsel, at which time the Court may be better able to determine whether such appointment is warranted in this case. Plaintiff is advised that any second motion for appointment of counsel must be accompanied by documentation that substantiates his efforts to obtain counsel from the public and private sector.

**\*10 ACCORDINGLY,** it is

**ORDERED** that Plaintiff's motion to proceed *in forma pauperis* (Dkt. No. 2) is **GRANTED;**[FN15] and it is further

> [FN15]. Plaintiff should note that he will still be required to pay fees that he may incur in this action, including but not limited to copying and/or witness fees.

**ORDERED** that Plaintiff's motion for injunctive relief (Dkt. No. 3) is **DENIED;** and it is further

**ORDERED** that Plaintiff's motion for appointment of counsel (Dkt. No. 4) is **DENIED without prejudice;** and it is further

**ORDERED** that Plaintiff's claims of deliberate indifference against Defendants Bill, Carver and DeBroize are *sua sponte* **DISMISSED** **with prejudice** pursuant to 28 U.S.C. § 1915(e)(2) (B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's claims against Defendants Bill, Carver, DeBroize, Nowicki, Maxymillian, and Hogan arising from their alleged personal involvement in the August 8, 2011 incident are *sua sponte* **DISMISSED without prejudice and with leave to amend** in this action in accordance with Fed.R.Civ.P. 15 (as described above in Part III.B.3. of this Decision and Order), pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Defendant Sweet is *sua sponte* **DISMISSED without prejudice and with leave to be reinstated** as a Defendant in this action in accordance with Fed.R.Civ.P. 15, pursuant to 28 U.S.C. § 1915(e)(2)(B)(ii) and Fed.R.Civ.P. 12(b)(6); and it is further

**ORDERED** that Plaintiff's Complaint (Dkt. No. 1) is otherwise accepted for filing (i.e., as to the claims against Defendants Davis, Sill, and Nicolette arising from the August 8, 2011 incident); and it is further

**ORDERED** that Plaintiff provide a summons, USM–285 form and a copy of the complaint for Defendant Davis, Sill and Nicollette for service, and upon receipt from Plaintiff of the documents required for service of process, the Clerk shall (1) issue summonses and forward them, along with copies of the Complaint to the United States Marshal for service upon the remaining Defendants, and (2) forward a copy of the summons and Complaint by mail to the Office of the New York State Attorney General, together with a copy of this Decision and Order; and it is further

**ORDERED** that, after service of process on Defendants, a response to the Complaint shall be filed by the Defendants or their counsel as provided for in the Federal Rules of Civil Procedure; and it is further

**ORDERED** that all pleadings, motions and other documents relating to this action be filed with the Clerk of the United States District Court, Northern District of New York, 7th Floor, Federal Building, 100 S. Clinton St., Syracuse, New York 13261–7367. **Any paper sent by a party to the Court or the Clerk must be accompanied by a certificate showing that a true and correct copy of it was mailed to all opposing parties or their counsel. Any document received by the Clerk or the Court which does not include a certificate of service showing that a copy was served upon all opposing parties or their attorneys will be stricken from the docket .** Plaintiff must comply with any requests by the Clerk's Office for any documents that are necessary to maintain this action. All parties must comply with Local Rule 7.1 of the Northern District of New York in filing motions. **Plaintiff is also required to promptly notify, in**

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)
**(Cite as: 2012 WL 651919 (N.D.N.Y.))**

**writing, the Clerk's Office and all parties or their counsel of any change in Plaintiff's address; his failure to so may result in the dismissal of this action.** All motions will be decided on submitted papers without oral argument unless otherwise ordered by the Court.

N.D.N.Y.,2012.
Groves v. Davis
Not Reported in F.Supp.2d, 2012 WL 651919 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Edward KOEHL,
v.
Dr. Fredrick BERNSTEIN, et al., Defendants.

No. 10 Civ. 3808(SHS)(GWG).
June 17, 2011.

*REPORT AND RECOMMENDATION*
GABRIEL W. GORENSTEIN, United States Magistrate Judge.

**\*1** Plaintiff Edward Koehl, proceeding *pro se,* brings this action pursuant to 42 U.S.C. § 1983, alleging that various defendants, including employees of the New York State Department of Correctional Services ("DOCS") and the New York State Division of Parole ("DOP"), violated his constitutional rights during his incarceration at DOCS' Green Haven Correctional Facility ("Green Haven"). Defendants have now moved to dismiss the complaint pursuant to Fed R. Civ. P. 12(b)(6). For the reasons stated below, the motion to dismiss should be granted in part and denied in part.

I. *BACKGROUND*

A. *Facts Alleged by Koehl*

For purposes of deciding the defendants' motion to dismiss, the Court assumes the allegations in plaintiff's complaint are true and draws all reasonable inferences from those facts in favor of the plaintiff. *See, e.g., Global Network Commc'ns, Inc. v. City of New York,* 458 F.3d 150, 154 (2d Cir.2006). In light of Koehl's *pro se* status, the Court in some instances has considered factual allegations contained in his memorandum submitted in opposition to the defendants' motion where they amplify claims made in the complaint. *See, e.g., Woods v. Goord,* 2002 WL 731691, at \*1 n. 2 (S.D.N.Y. Apr. 23, 2002) (considering *pro se* prisoner's factual allegations in briefs as supplementing the complaint); *Burgess v. Goord,* 1999 WL 33458, at \* 1 n. 1 (S.D.N.Y. Jan. 26, 1999) ("In general, 'a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of pro se litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum.' ") (quoting *Gadson v. Goord,* 1997 WL 714878, at \*1 n. 2 (S.D.N.Y. Nov. 17, 1997)) (additional citations omitted).

In October 2008, Koehl was transferred to Green Haven. *See* Amended Complaint, filed July 16, 2010 (Docket # 6) at 10 ¶ 1 ("Am.Compl."). At Green Haven, defendant Robert E. Ercole, who was a warden in the facility at the time, "callously and deliberately assigned [him] to a double bunk cell, top bunk, third floor." *Id.* at 10 ¶ 2. Koehl "was forced to carry [his] property to the third floor, [which] aggravated [his] previously complained of conditions." *Id.* As a result of this incident, Koehl spent three days in the hospital. *Id.* Upon release from the hospital, Koehl was again placed into a double bunk, and his "bunk mates (2 out of 3), were chain smokers, who smoked all day and night in the cell." *Id.* at 10 ¶ 3. Koehl filed grievances about the bunk problems, but Ercole falsified records, stating that Koehl had signed a waiver agreeing to double bunk in order to be transferred to Green Haven. *Id.* Koehl spent 60 days in a double bunk, during which time his counselor demanded that he sign a waiver agreeing to remain in the double bunk and, when Koehl refused, defendant Deputy Superintendent Richard Cunningham signed an order in retalia-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

tion requesting that Koehl be transferred to a facility seven hours away from his family. *Id.* at 1, 10 ¶ 3.

**\*2** Defendant Dr. Weinstein conducted an electromyography ("EMG") of Koehl in October or November 2008 as a result of Koehl's complaints to his assigned facility doctor, Dr. J. Fein, regarding "extreme pain, numbness and weakness in [his] arms, hands, legs, neck and back." *Id.* at 10 ¶ 4. Dr. Weinstein informed Koehl that "nothing [wa]s wrong with [him]," at which point Koehl called Dr. Weinstein "a liar" and produced a previous EMG, conducted on March 18, 2008, which showed results different from the October or November EMG. *Id.* Dr. Weinstein agreed to conduct an MRI after Koehl stated that he was going to have his family file a complaint with the DOCS Central Office. *Id.* Between June 2007 and October 2008, Koehl repeatedly complained of extreme pain and weakness, but defendants DOCS Commissioner Brian Fischer and DOCS Chief Medical Officer Dr. Lester Wright, *id.* at 2 ¶¶ 14–15, denied him "proper testing," including an MRI of the spine, a CT scan, and neuro imaging, "[c]ontrary to numerous recommendations via the Clinton [Correctional Facility] medical staff and outside providers," *id.* at 10–11 ¶ 4.

Defendant Dr. Fredrick Bernstein, the facility Medical Director, deliberately scheduled Koehl's MRI for December 30, 2008, a date on which Bernstein knew Koehl's family would be visiting from Staten Island. *Id.* at 1, 11 ¶ 5. Dr. Bernstein "orchestrated this conflict so [that] he [could] later state that [Koehl had] refused treatment." *Id.* On February 9, 2009, Koehl was administered an MRI which indicated he suffered from "degenerative disk disease." *Id.* at 11 ¶ 6. Neurosurgeons at Albany Medical Center ("the neurosurgeons") informed him that if he had "seen them several years" before, when he had "first complained of the symptoms, [his] prognosis would be much better." *Id.* The neurosurgeons told Koehl that surgery could only stop the condition from worsening and would not cure the disease. *Id.* On July 6, 2009, Koehl

had surgery, *id.,* and several weeks later he met with Dr. Fein who scheduled Koehl for another appointment with the neurosurgeons, *id.* at 11 ¶ 7. In September 2009, the neurosurgeons "ordered steroids, xrays," "an EMG, and a new neck brace" for Koehl. *Id.* at 11 ¶ 7. The new brace "kept popping off" which "exacerbated Koehl's condition," and Dr. Bernstein "deliberately refused to order a new neck brace until" January 2010, after Koehl had filed a grievance, and "callously changed the type of xrays" that were ordered. *Id.* at 11 ¶ 7. In November 2009, Dr. Weinstein conducted an EMG and reported "that nothing was wrong." *Id.* However, Dr. Weinstein's "report and conclusions were knowingly false." *Id.* In a subsequent appointment with the neurosurgeons, Koehl was informed that his condition had "progressed for the worse," and the neurosurgeons ordered an MRI and CT scan to be conducted. *Id.* In order to save costs, Dr. Bernstein, Dr. Wright, and Fischer "callously and deliberately ignored the orders of the neurosurgeons and canceled the MRI." *Id.* at 11–12 ¶ 7. The CT scan, which was performed on December 10, 2009, "proved inconclusive" because it was conducted while Koehl was "still and facing front." *Id.* at 12 ¶ 7. On January 19, 2010, X-rays were taken at Putnam Hospital which indicated that some of Koehl's vertebrae had not fused and that the rods, clamps, and screws had come loose, pinching his spinal cord. *Id.* at 12 ¶ 8. On February 11, 2010, Koehl was again seen by the neurosurgeons. *Id.* Koehl informed these doctors that Dr. "Bernstein, [Dr.] Wright and Fischer [had] callously changed and/or ignored their orders." *Id* .

**\*3** Since he arrived at Green Haven, Koehl's "chronic and life threatening lung diseases have grown progressively worse" because he is "constantly ... exposed to unconstitutional levels of second hand tobacco smoke." *Id.* at 12 ¶ 10. Koehl complained to Dr. Fein, Dr. Bernstein, Cunningham, Ercole, and William Lee, Ercole's successor at Green Haven, *id.* at 1, who stated "that since prisoners are prohibited from smoking indoors, there are no [environmental tobacco smoke] problems in the housing blocks," *id.* at 12 ¶ 10.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

The low number of misbehavior reports issued at Green Haven for smoking in unauthorized areas demonstrates these defendants' callous and deliberate refusal to enforce the indoor smoking ban. *Id.* at 13 ¶ 10. Koehl has also repeatedly been denied access to his assigned pulmonary specialist and has been "denied proper testing and access to a qualified specialist." *Id.* at 13 ¶ 11. When he was allowed a pulmonary function analysis on February 27, 2009, it "showed a significant drop in [his] lung capacity." *Id.*

Koehl wears dentures. *Id.* at 13 ¶ 12. Because he has "no bottom ridge line, denture adhesive is a medical necessity." *Id.* Fischer and Dr. Wright will not provide Koehl with denture adhesive or with an implant and he is only able to obtain the adhesive by purchasing it in the facility commissary. *Id.*

Additionally, Fischer, Ercole, and Lee have denied Koehl appropriate clothing to wear during his daily period of outdoor recreation. *Id.* at 14 ¶ 13. In order for Koehl to obtain "life saving" clothing items he would have to pay for them. *Id.* Thus, he "cannot go outside for recreation without endangering [his] life." *Id.*

Cunningham, Ercole, and Lee have subjected Koehl to cruel and unusual punishment by ignoring medical orders and forcing him to "pack up all [of his] property and carry it from cell to cell." *Id.* at 10 ¶ 2; *id.* at 14 ¶ 14(a). On December 11, 2008, Koehl was moved from a double bunk cell to a single cell, *id* . at 14 ¶ 14(a); on December 24, 2008, he was moved from the first floor to the second floor, *id.* at 14 ¶ 14(a)(i); on April 16, 2009, he was moved to a cell on the third floor that contained "lead paint rust dust," *id.* at 14 ¶ 14(a)(ii); and between April 24, 2009 and February 2, 2010, he was moved to four different cells, *id.* at 14 ¶¶ 14(a)(iii)-(vi).

Cunningham and DOP employees Lester Edwards, Andrea Evans, Francis Herman, and Terrence X. Tracy "conspired to sabotage [Koehl's] application for Commutation of Sentence ... in retaliation for ... redress of grievances, reversals of false misbehavior reports, and civil awards alleging abuse." *Id.* at 1, 2 ¶¶ 6–8; *id.* at 15 ¶ 14(b). When Koehl asked Cunningham why the legal mail he sent was always returned, Cunningham told him that because of all of Koehl's "past complaints and winning law suits against DOCS employees," Cunningham would "do whatever he [could] to stop [Koehl's] mail from leaving the facility." *Id.* While more than ten letters were sent in with the application from both Koehl's family and his DOCS spiritual advisor, the DOP only received one of these letters. *Id.* Tracy told Koehl that the DOP had "no record of ... receiving any letters." *Id.* In October 2009, Koehl submitted a FOIL request which confirmed that each letter had been received and sent to the DOP for processing. *Id.* Koehl's family subsequently submitted letters to the Governor and Evans, complaining about the non-receipt of the letters, but the Governor did not respond and Edwards, answering for Evans, "purposely refused to address the actual wording in the submitted complaints." *Id.* at 15–16 ¶ 14(b). On January 16, 2010, the DOP notified Koehl that his application for a commutation of sentence had been denied. *Id.* at 16 ¶ 14(b).

**\*4** Defendants Fischer, I. Russo, Andrew Harvey, and Joseph Brennan "conspired to issue [Koehl] a tier III misbehavior report in retaliation for redressing [his] grievances and so [he] could be transferred out of the jail to preclude [him] from substantiating [his] claims in a pending matter." *Id.* at 2 ¶¶ 9–11; *id.* at 16 ¶ 14(c). Russo issued this report, which stated that on October 9, 2006, Koehl had harassed Brennan. *Id.* at 16 ¶ 14(c). Koehl was denied the ability to view, obtain, or comment on any of the evidence presented to the committee reviewing the report and was found guilty of the allegations on March 7, 2007. *Id.* Koehl was assessed a sentence of 90 days in "the Box (SHU)" and his appeal was denied in June 2007. *Id.* at 17 ¶ 14(c).

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

At about the same time, defendants R. Hilliar and D. Sawyer "callously and deliberately advance[d] knowingly false and unsubstantiated charges via a tier II misbehavior report in retaliation for redressing grievances." *Id.* at 2 ¶¶ 12–13; *id.* at 17 ¶ 14(c). The report, issued by Hilliar, alleged that Koehl had harassed her. *Id.* Koehl "was not allowed access to any of [his] property and exculpatory evidence." *Id.* at 17 ¶ 14(c). On March 8, 2007, Sawyer conducted a hearing and Koehl was found guilty of the allegations in the tier II report. He was assessed a "30 days keep-locked" penalty and "30 days loss of phones, package[s] and commissary to run consecutive in SHU with the" 90–day sentence, "totaling 120 days in SHU." *Id.* His appeal was denied on March 22, 2007, and on July 7, 2007, the "guilty verdict was reversed and ordered expunged from [his] records." *Id.*

## B. *Procedural History*

The original complaint in this action was filed on May 10, 2010, *see* Complaint, filed May 10, 2010 (Docket # 2) ("Compl."), and an amended complaint was filed on July 16, 2010, *see* Am. Compl. On November 1, 2010, defendants filed the instant motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6). *See* Notice of Motion to Dismiss, filed Nov. 1, 2010 (Docket # 25); Memorandum of Law in Support of Defendants' Motion to Dismiss the Complaint, filed Nov. 1, 2010 (Docket # 26) ("Def.Mem."); Declaration of Counsel, filed Nov. 1, 2010 (Docket # 27); Notice to Pro Se Litigant Who Opposes a Rule 12 Motion Supported by Matters Outside the Pleadings, filed Nov. 1, 2010 (Docket # 28). Koehl filed a memorandum in opposition to this motion, *see* Plaintiff's Verified Memorandum of Law in Opposition to Defendants' Motion to Dismiss the Complaint Pursuant to F.R.C.P. Rule 12(b)(6) or (c), filed Dec. 29, 2010 (Docket # 46) ("Pl.Mem."); and defendants filed a reply brief, *see* Reply Memorandum of Law in Further Support of Defendants' Motion to Dismiss the Complaint, filed Jan. 26, 2011 (Docket # 50) ("Def.Reply").

## II. *LAW GOVERNING MOTIONS TO DISMISS*

A party may move for judgment pursuant to Federal Rule of Civil Procedure 12(b)(6) where the opposing party has "fail[ed] to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b) (6). Separately, Federal Rule of Civil Procedure 8(a)(2) requires that a pleading contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). Under this rule, a complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Kassner v. 2nd Ave. Delicatessen Inc.,* 496 F.3d 229, 237 (2d Cir.2007) (quoting *Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 512 (2002)).

**\*5** Nonetheless, the Supreme Court has held that "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level ...." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citations, internal quotation marks, and brackets omitted); *see also id.* at 557 (pleading must "possess enough heft to show that the pleader is entitled to relief") (internal quotation marks and brackets omitted). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009) (citation and internal quotation marks omitted); *accord Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007) ("a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion") (citations omitted).

In the case of *pro se* plaintiffs, "[a] document filed *pro se* is to be liberally construed, and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

by lawyers." *Erickson v. Pardus,* 551 U.S. 89, 94 (2007) (citations and internal quotation marks omitted); *accord In re Sims,* 534 F.3d 117, 133 (2d Cir.2008); *McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (a *pro se* party's pleadings should be construed liberally and interpreted "to raise the strongest arguments that they suggest") (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)).

III. *DISCUSSION*

Koehl's amended complaint does not clearly identify the claims it purports to assert. In moving to dismiss the amended complaint in its entirety, the defendants have categorized the claims in the amended complaint and have made arguments seeking dismissal with respect to each. In his opposition papers, Koehl has not argued that any claims exist beyond those identified in the defendant's moving papers. Nor does the Court discern any such claims. Accordingly, we address each of the claims as identified in the defendants' moving papers.

A. *Eleventh Amendment*

Defendants have moved to dismiss Koehl's claims against the State of New York and the individual defendants in their official capacities based on the Eleventh Amendment. The Eleventh Amendment bars lawsuits by a citizen of a state against that state or its agencies, absent the state's consent or a statutory waiver of immunity. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 99–100 (1984). It is well settled that Congress did not intend to abrogate state sovereign immunity when it enacted 42 U.S.C. § 1983. *See Quern v. Jordan,* 440 U.S. 332, 343–44 (1979). Koehl's complaint does not state whether he seeks damages against the individual defendants in their official or individual capacities. To the extent it seeks damages against any of the defendants in their official capacities, however, it would be barred by the Eleventh Amendment. *See, e.g., Ford v. Reynolds,* 316 F.3d 351, 354 (2d Cir.2003) ("The Eleventh Amendment bars the award of money damages against state officials in their official capacities."); *Eng v.*

*Coughlin,* 858 F.2d 889, 894 (2d Cir.1988) ("Eleventh Amendment immunity protects state officials sued for damages in their official capacity."). Accordingly, all claims against the State of New York for damages must be dismissed as well as any claims for damages against other defendants brought in their official capacities.

**\*6** We now consider Koehl's claims insofar as they are brought against defendants in their individual capacities.

B. *Fourteenth Amendment Due Process Claims*

Koehl alleges certain claims regarding discipline that was meted out to him. Koehl asserts that Harvey "callously and deliberately denied [him] all due process rights ... by refusing to allow [him] ... to view, obtain or comment on any of the" evidence used to find him "guilty" of the allegations outlined in the tier III misbehavior report. *See* Am. Compl. at 16 ¶ 14(c). Koehl further asserts that "instead of finding [him] guilty of the allegedly harassing passage stated in the misbehavior report, he [was] ... found guilty of an uncharged passage that appeared in the provided letter." *Id.* at 17 ¶ 14(c). He was sentenced to 90 days in the SHU and denied leave to appeal. *Id.*

Separately, Koehl alleges that Hilliar filed a false tier II misbehavior report against him and that he was wrongly convicted of the charge listed in that report. *Id.* He states that he "was not allowed access to any of [his] property and exculpatory evidence" and that the hearing officer informed him that he would be found guilty "no matter what." *Id.* Koehl was found guilty and assessed a "30 days keep-locked" penalty and "30 days loss of phones, package[s] and commissary." *Id.* Koehl alleges that he commenced an Article 78 proceeding and that a judge of the New York State Supreme Court reversed the guilty verdict. *Id.* In his memorandum of law, Koehl asserts that after the tier II disposition, he was transferred to "Upstate CF," at which point he was informed that the 90 day SHU assessment and the 30 day keep-lock assessment were

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

to "be added together" and that Koehl was to spend the entire 120 period in the SHU. Pl. Mem. at 24.

Koehl also contends that he endured a number of hardships in the SHU during this time, including the loss of three toenails and denial of his yarmulke and prayer book. *Id.* at 24–25. Defendants argue that Koehl fails to establish a deprivation of a Fourteenth Amendment right to due process in the context of these prison disciplinary hearings as "he must establish that the confinement imposed on him created an atypical and significant hardship relative to ordinary incidents of prison life." Def. Mem. at 9 (citing *Sandin v. Conner,* 515 U.S. 472, 484 (1995)).

1. *Law Governing Disciplinary Proceedings*

A party asserting a due process claim " 'must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin,* 515 U.S. at 484); *accord Davis v. Barrett,* 576 F.3d 129, 133 (2d Cir.2009). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (citing *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)); *accord Davis,* 576 F.3d at 133.

**\*7** In *Sealey v. Giltner,* 197 F.3d 578 (2d Cir.1999), the Second Circuit suggested that consecutive sentences resulting from separate hearings adjudicating different misbehavior reports should be aggregated for the purpose of determining whether the confinement constitutes atypicality. *See id.* at 587–88. *Sealey* aggregated the 18 and 83–day periods the plaintiff was kept in the SHU on the ground that "[w]herever the point is beyond which confinement in harsh conditions constitutes atypicality, a prison official must not be permitted to extend such confinement beyond that point without according procedural due process." *Id.* at 587. It noted that "if conditions were of sufficient harshness that confinement for 365 days constituted atypicality, an official who held a hearing for a prisoner already confined in such conditions for 364 days would normally have to accord procedural due process before continuing the confinement beyond an aggregate interval of 365 days." *Id.* at 587 n. 7; *see also Sims v. Artuz,* 230 F.3d 14, 23 (2d Cir.2000) (noting that it was "possible that some or all of [plaintiff's sentences] should be aggregated for purposes of the *Sandin* inquiry") (citation omitted). Other cases have similarly aggregated sentences based on separate violations. *See, e.g., Bunting v. Nagy,* 452 F.Supp.2d 447, 457 (S.D.N.Y.2006); *Charles v. Maleh,* 2006 WL 581206, at *12 (D.Conn. Mar. 8, 2006). Thus, for purposes of this motion we will aggregate Koehl's sentences and treat the time spent in the SHU as 120 days.

"The Second Circuit has not established a bright-line rule as to how lengthy a term of disciplinary confinement (i.e., either 'keeplock' or SHU confinement) will be considered atypical and significant." *Bunting,* 452 F.Supp.2d at 455. Nevertheless, the Second Circuit has established "guidelines for use by district courts in determining whether a prisoner's liberty interest was infringed." *Palmer,* 364 F.3d at 64. Among these guidelines is that for confinements of "an intermediate duration—between 101 and 305 days—'development of a detailed record' of the conditions of the confinement relative to ordinary prison conditions is required." *Id.* at 65 (citations omitted)

As noted, Koehl has alleged that he spent 120 days in the SHU, thus placing him within the guideline

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

governing intermediate durations of confinement. For such a duration of confinement, the fact-finding required by the Second Circuit to determine whether this intermediate sentence constitutes an atypical and significant hardship cannot occur on a motion to dismiss. *Gonzalez–Cifuentes v.. Torres,* 2007 WL 499620, at *3 (N.D.N.Y. Feb. 13, 2007); *accord Thomas v. Calero,* 2011 WL 1532058, at *8 (S.D.N.Y. Mar. 17, 2011) (finding that while plaintiff had "not alleged that the conditions of his confinement differed from normal SHU circumstances," his "confinement in SHU for 291 days [wa]s sufficient, for pleading purposes, to implicate a liberty interest") (291–day confinement); *Smart v. Goord,* 441 F.Supp.2d 631, 641 (S.D.N.Y.2006) ( "[Plaintiff] has not alleged that the conditions of her confinement were more severe than normal SHU conditions .... However, such detailed factual allegations are not necessary to withstand a motion to dismiss.") (70–day confinement); *Harris v. McGinnis,* 2004 WL 2187137, at *4 (S.D.N.Y. Sept. 30, 2004) (denying motion to dismiss even though "[t]he Complaint makes no representation as to the parameters of 'normal' conditions of confinement, and it is thus impossible to determine on the face of the Complaint that the keeplock conditions to which Plaintiff was subjected were not atypical within the meaning of *Sandin"* ) (151–days in keeplock). Even if it could be said that a prisoner has some obligation to describe his conditions of confinement in order to make out a due process claim, here Koehl alleges that his confinement was in fact "atypical" and constituted a "significant hardship" because he was not allowed to attend his grandmother's funeral and was not allowed to communicate with his family. Am. Compl. at 17 ¶ 14(c). Accordingly, his pleading cannot be dismissed for failure to describe in detail the conditions of his confinement.

### 2. *Statute of Limitations*

**\*8** In New York, pursuant to New York Civil Practice Law and Rules § 214(5), a three year statute of limitations governs a section 1983 action. *Okure v. Owens,* 816 F.2d 45, 49 (2d Cir.1987), *aff'd,* 488 U.S.

235 (1989); *see Harris v. City of New York,* 186 F.3d 243 (2d Cir.1999). Defendants argue that any claim against Fischer, Russo, Harvey and Brennan based on the tier III report should be dismissed because the allegedly retaliatory report was issued in October 2006, outside the three year statute of limitations for section 1983 actions. *See* Def. Mem. at 14. In fact, although the incident on which the report was based occurred on October 9, 2006, the complaint alleges that the misbehavior report was not issued until February 21, 2007, and that Koehl was found guilty of the charges in this report on March 7, 2007. *See* Am. Compl. at 16 ¶ 14(c). It would thus appear that the hearing took place on March 7, 2007, and the resulting sentence was issued on that date. Koehl's original complaint in this action is dated March 3 and March 5, 2010. *See* Compl. at 18, 20. Under the rule that the complaint in a *pro se* prisoner case is deemed filed on the date it is delivered to prison officials for mailing, *see Dory v. Ryan,* 999 F.2d 679, 682 (2d. Cir.1993), any claim would had to have accrued by March 5, 2007, at the latest. Accordingly, the question arises whether the limitations period arose when the allegedly false report was issued—in which case the complaint would be untimely—or when Koehl was found guilty of the charges.

While the analysis will be different to the extent a claim of retaliation is made—an issue we discuss in section III.C below—we conclude that because the due process claim arises out of the punishment that was meted out on the hearing date, any due process claim began to accrue on that date, and not on the date the misbehavior report was issued. Accordingly, we reject defendants' argument that Koehl's due process claim is untimely.

### 3. *Personal Involvement*

Defendants do not argue that Koehl's due process claim should be dismissed because he received sufficient process at the administrative hearings, and thus we do not address this prong of the due process analysis. Instead, their remaining defense is that the claims

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

against Fischer, Russo, Brennan, and Hilliar should be dismissed because the complaint does not allege that they were personally involved in the due process violation. *See* Def. Mem. at 10. [FN1]

> FN1. Defendants have not moved to dismiss the due process claims against Harvey and Sawyer on the ground of lack of personal involvement. *See* Def. Mem. at 10; Am. Compl. at 16–17 ¶ 14(c).

"It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (internal quotation marks and citation omitted). In addition, personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior. See, e.g., Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ("supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior"* ) (citation omitted), *cert. denied,* 543 U.S. 1093 (2005); *accord Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). According to the Second Circuit, personal involvement can be shown by

**\*9** evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference ... by failing to act on information indicating that unconstitutional acts were occurring

*Back v. Hastings on Hudson Union Free Sch. Dist.,* 365 F.3d 107, 127 (2d Cir.2004) (quoting *Colon*

*v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). More recently, the Supreme Court held in *Ashcroft v. Iqbal,* 129 S.Ct. 1937 (2009), that "[b]ecause vicarious liability is inapplicable to ... [section] 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution." *Id.* at 1948. The Supreme Court explicitly rejected the argument that, "a supervisor's mere knowledge of his subordinate's discriminatory purpose amounts to the supervisor's violating the Constitution." *Id.* at 1949. Thus, "[a]bsent vicarious liability, each Government official, his or her title notwithstanding, is only liable for his or her own misconduct." *Id. Iqbal* has caused some courts to question whether all five of the personal involvement categories survive that decision. *See generally D'Olimpio v. Crisafi,* 718 F.Supp.2d 340, 347 (S.D.N.Y.2010) (citing cases and concluding that the five categories were not necessarily preempted by *Iqbal* ).

With regard to the tier III report, Koehl alleges that Russo, Brennan, and Fischer "conspired to issue [him this report] ... in retaliation for redressing [his] grievances and so [he] could be transferred out of the jail." Am. Compl. at 16 ¶ 14(c). He states that Russo authored the report, which was contrary to the record, and that he refused to allow Koehl to view, obtain, or comment on any of the evidence that was used to find him guilty of the charges. *Id.* He states that this report stemmed from an alleged grievance letter he sent to Brennan, which was "deemed harassment," and that Brennan swore and signed a complaint demanding Koehl be charged for the alleged letter. *Id.* In his memorandum in opposition, Koehl states that he appealed the hearing officer's decision with regard to this report to Fischer, and that Fischer stated that the entire file was classified. *See* Pl. Mem. at 23. Fischer affirmed the sentence on April 27, 2007. *See id.*

The complaint's allegations against Russo are sufficient to show personal involvement as Koehl has alleged that Russo directly participated in the alleged

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

violation. Specifically, Koehl asserts that Russo denied him his due process rights by refusing to allow him to view, obtain, or comment on the evidence used to find Koehl guilty of the charge in the tier III report. *See* Am. Compl. at 16 ¶ 14(c).

**\*10** On the other hand, the allegations against Brennan are not sufficient to show personal involvement. Brennan, who is "Chairperson, Committee on Professional Standards, Third Judicial Department," apparently received a letter that was traced to Koehl through handwriting analysis and other means—a letter that Koehl denies he wrote. *Id.* The complaint alleges Brennan demanded that Koehl be charged for writing this letter and that he was so charged. But there is no claim that Brennan had any involvement in the adjudication of the report. Thus, there are no facts sufficient to support a finding that Brennan was personally involved in violating Koehl's due process rights. *See Williams v. Smith,* 781 F.2d 319, 324 (2d Cir.1986) ("The filing of a false report does not, of itself, implicate the guard who filed it in constitutional violations which occur at a subsequent disciplinary hearing.") (citing *Sommer v. Dixon,* 709 F.2d 173, 174–75 (2d Cir.), *cert. denied,* 464 U.S. 857 (1983)); *Anderson v. Banks,* 2008 WL 3285917, at *2 (N.D.N.Y. Aug. 7, 2008) (writing of false misbehavior reports is "not sufficient to state a due process claim"); *Muhammad v. Pico,* 2003 WL 21792158, at *16 (S.D.N.Y. Aug. 5, 2003) (filing of an allegedly false report did not personally involve the sergeant who filed it in the due process violations alleged because " 'but for causation' ... is not the standard for Section 1983 liability") (citations omitted); *see generally Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) ("prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report") (citing *Freeman v.. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)).

As to Fischer, once the hearing on the tier III report was over and the decision was issued, the due process violation was completed. The only opportunity that Fischer had to rectify this violation was through the appeal process itself. To be sure, one of the methods recognized by the Second Circuit to show personal involvement is that the defendant, "after being informed of the violation through [an appeal], failed to remedy the wrong." *Colon,* 58 F.3d at 873. But this category does not apply to Fischer because—as has been held in a related context—"affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) (citing, *inter alia, Foreman v. Goord,* 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement.")). As was noted in *Thompson v. New York,* 2001 WL 636432 (S.D.N.Y. Mar. 15, 2001), "[w]ere it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent." *Id.* at *7 (citations omitted). "The reference in case law to an official who fails to remedy a violation logically applies only to ongoing, and therefore correctable, constitutional violations—not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded." *See Odom v. Calero,* 2008 WL 2735868, at *7 (S.D.N.Y. July 10, 2008) (internal quotation marks omitted); *Harnett v. Barr,* 538 F.Supp.2d 511, 524 (N.D.N.Y.2008) ("If the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation."). Accordingly, the mere allegation that Fischer failed to grant Koehl's appeal is insufficient to show that he was "personally involved" in committing the alleged due process violation.

**\*11** Koehl alleges that defendant Hilliar issued

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

him an allegedly false tier II report stating that he had harassed her. *See* Am. Compl. at 17 ¶ 14(c). However, for the same reasons already stated with respect to Koehl's allegations against Brennan, such allegations are not enough to show personal involvement by Hilliar. *See Williams,* 781 F.2d at 324; *Anderson,* 2008 WL 3285917, at *2.

C. *Retaliation Claims*

It is well established that the First Amendment protects prisoners from retaliation for engaging in protected speech, which includes submitting grievances regarding prison conditions. *See Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996); *Jones v. Coughlin,* 45 F.3d 677, 679–80 (2d Cir.1995); *Franco v. Kelly,* 854 F.2d 584, 589 (2d Cir.1988). To establish a *prima facie* case of retaliation, an inmate must show: (1) that his speech or conduct was constitutionally protected; (2) that the defendant took adverse action against the plaintiff; and (3) that a causal connection exists between the protected speech and the adverse action. *Scott v. Coughlin,* 344 F.3d 282, 287 (2d Cir.2003) (citing *Morales v. Mackalm,* 278 F.3d 126, 131 (2d Cir.2002)). However, "[o]nly retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising his or her constitutional rights constitutes an adverse action for a claim of retaliation." *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003) (internal quotation marks and citations omitted); *accord Rivera v. Goord,* 253 F.Supp.2d 735, 749 (S.D.N.Y.2003). "In making this determination, the court's inquiry must be tailored to the different circumstances in which retaliation claims arise, bearing in mind that prisoners may be required to tolerate more than average citizens before a retaliatory action taken against them is considered adverse." *Davis,* 320 F.3d at 353 (internal punctuation and citation omitted). Because of the ease with which claims of retaliation can be invoked, the Second Circuit has directed courts to examine such claims "with skepticism and particular care." *Colon,* 58 F.3d at 872 (citation omitted); *see Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) ("[V]irtually any adverse ac-

tion taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.") (citations omitted).

1. *Facility Transfer*

Here, Koehl asserts that defendant Cunningham retaliated against him for filing grievances by transferring him to the "5 Points" facility. *See* Am. Compl. at 10 ¶ 3. Defendants argue that Koehl's claim should be dismissed because: (1) Koehl "has no liberty interest in a particular location," Def. Mem. at 11; Def. Reply at 6; (2) "the facility transfer claim is moot because plaintiff was not transferred out of Green Haven by the time he filed the complaint," Def. Mem. at 11; Def. Reply at 6; and (3) "the complaint does not explain why the transfers were retaliatory," Def. Mem. at 12; Def. Reply at 6. [FN2]

> FN2. Defendants also cite to the section of their brief discussing Koehl's Eighth Amendment claim in support of their argument that Koehl has not stated a retaliation claim. *See* Def. Mem. at 12 (citing arguments set forth in Point IVa). As this claim is analyzed under a different legal standard than the retaliation claim, and as defendants have not explained their citation to this section, we do not consider this citation to constitute an additional argument in support of dismissal of Koehl's retaliation claim.

**\*12** Defendants' first argument must fail because, although prisoners have no liberty interest in remaining at a particular facility, prison officials may not transfer inmates in retaliation for exercising their constitutional rights. *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998) ("[a] prisoner has no liberty interest in remaining at a particular correctional facility, but prison authorities may not transfer an inmate in retaliation for the exercise of constitutionally protected rights") (citations omitted). Because it is well estab-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

lished that the filing of grievances is constitutionally protected activity, prison officials may not transfer inmates in retaliation for such activity. *See Morales, 278 F.3d at 131.* The Court would normally accept defendants' second and third arguments, but inasmuch as Koehl alleges that he was transferred to the "5 Points" facility on June 10, 2010, *see* Pl. Mem. at 20, and that the allegedly retaliatory action taken by defendants was the result of Koehl's filing of "grievances and complaints," Pl. Mem. at 19, we will deem these allegations to amend his complaint. *See Woods, 2002 WL 731691, at *1 n. 2.*[FN3]

> [FN3]. Defendants also argue in a footnote that Koehl's allegations against Cunningham with regard to this claim are "speculative." *See* Def. Mem. at 12 n. 3. Koehl specifically alleges, however, that he filed complaints in writing with Cunningham about his cell conditions and that Cunningham subsequently signed the retaliatory request that Koehl be transferred to "5 Points" Correctional Facility. *See* Am. Compl. at 10 ¶ 3; Pl. Mem. at 19.

2. *Executive Clemency Application*

Defendants argue that Koehl has failed to state a claim for retaliation with regard to the sabotage of his executive clemency application by Cunningham, Edwards, Evans, Herman, and Tracy. *See* Def. Mem. at 12–13. Koehl alleges that these defendants sabotaged his application in retaliation for the "redress of grievances, reversals of false misbehavior reports, and civil awards alleging abuse." Am. Compl. at 15–16 ¶ 14(b). In addition to grievances, the filing of civil lawsuits comprises constitutionally protected activity. *See Espinal v. Goord, 554 F.3d 216, 227 (2d Cir.2009)* (holding plaintiff's earlier federal lawsuit was a protected activity) (citation omitted). Thus, Koehl has sufficiently alleged that his speech or conduct was constitutionally protected.

In the prison context, the adverse action element of a retaliation claim is satisfied if the plaintiff alleges facts sufficient to demonstrate that the retaliatory conduct by defendants "would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill v. Pidlypchak, 389 F.3d 379, 381 (2d Cir.2004)* (internal quotation marks and citations omitted). A reasonable jury could find that a deliberate effort by a prison official to sabotage an application for clemency fits within this category.

With respect to the personal involvement of the defendants in this activity, we agree with defendants that Koehl does not allege adverse action on the part of Evans, Edwards, Herman, and Tracy. *See* Def. Mem. at 13. The only allegations Koehl makes regarding Evans and Edwards are that these defendants responded to his questions about the DOP's receipt of letters sent as part of the executive clemency application. *See* Am. Compl. at 15 ¶ 14(b); Pl. Mem. at 25–28. Herman is only mentioned as part of Koehl's discussion of the Department's review of applications for executive clemency. *See* Pl. Mem. at 25–26. No specific allegations are made against him. With respect to Tracy, Koehl states in the complaint that, "[o]n appeal, Defendant Tracy, callously and deliberately falsified official records to continue the conspiracy." Am. Compl. at 15 ¶ 14(b). The problem with this allegation is that it is far too vague and conclusory to identify Tracy's involvement in the scheme.

**\*13** As for Cunningham, defendants argue that Koehl "does not allege a single actual adverse measure by Cunningham." Def. Mem. at 13. Koehl, however, alleges that Cunningham informed him that "because of [his] past complaints and winning law suits against DOCS employees," he would "submit an unfavorable recommendation to the Division of Parole regarding [Koehl's] pending application for Commutation of Sentence," that he would "do whatever he [could] to stop [Koehl's] mail from leaving the facility," and that he would "call in every favor ... to sabotage [the] application." Am. Compl. at 15 ¶ 14(b). This is sufficient to show Cunningham's personal involvement. It

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

is also sufficient to show a causal connection between the protected speech and the adverse action since Koehl alleges that Cunningham specifically stated that he was taking the adverse action because of Koehl's protected activities.

### 3. Misbehavior Reports

As was true for the due process claims, defendants argue that the retaliation claims against Fischer, Russo, Harvey, and Brennan—based on the tier III misbehavior report—should be dismissed on statute of limitations grounds. Def. Mem. at 14. As noted in section III.B.2 above, this argument raises the question of whether the claim accrued when the allegedly false report was issued—in which case the complaint would be untimely—or when Koehl was found guilty of the charges alleged.

We believe the answer to this question lies in the specific claim made against a defendant. To the extent a defendant's retaliatory act is the issuance of a false misbehavior report itself, the claim is untimely. *See, e.g., Davidson v. Pearson,* 2007 WL 952047, at *2 (W.D.N.Y. Mar. 28, 2007) ("[p]laintiff's claims initially accrued on December 27, 1998, the date the alleged false misbehavior report was issued"). To the extent a claim against a defendant is that he took some retaliatory action at the hearing on March 7, 2007, the claim would be timely.

Thus, we examine each potential defendant separately. Fischer's role is not alleged at all in the description of this incident, Am. Compl. at 16–17 ¶ 14(c), and thus the claim must be dismissed as to him. With respect to Brennan, as noted in section III.B.3 above, there is no allegation regarding his involvement in the adjudication of the report and thus no claim can survive as to him. The allegations against Russo are somewhat unclear, but it appears that Koehl is alleging that Russo denied him documents both before and after the hearing date, Am. Compl. at 16–17 ¶ 14(c), and thus we will assume that some of his conduct may fall within the limitations period.

Harvey is alleged to be the hearing officer, and thus any claim against him would be timely.

Turning to the merits, the allegations are sufficient to show Russo and Harvey's personal involvement in that both are alleged to have personally committed acts of retaliation. They are also sufficient to allege a causal connection between their actions and Koehl's protected activities. *See* Am. Compl. at 16 ¶ 14(c) (defendants actions were done "in retaliation for redressing [Koehl's] grievances and so [Koehl] could be transferred out of the jail to preclude [him] from substantiating [his] claims in a pending matter"). Accordingly, the retaliation claim against Russo and Harvey survives.

**\*14** With respect to the claim regarding the tier II report, this claim is not time-barred but must be dismissed as against defendant Sawyer because there are no facts alleged that he had any personal involvement in the issuance of this misbehavior report, let alone that his involvement in the matter arose because of his desire to retaliate. As discussed above, "personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell,* 449 F.3d at 484 (internal quotation marks and citation omitted). Here, Koehl alleges that Sawyer was the hearing officer in the adjudication of the tier II report, *see* Am. Compl. at 17 ¶ 14(c); Pl. Mem. at 24. While Koehl alleges that he was wrongly denied access to certain evidence during the tier II hearing, he does not allege any facts reflecting that Sawyer was aware that the misbehavior report had been allegedly issued in retaliation for the filing of grievances. Thus, the allegations against Sawyer with regard to the tier II misbehavior report must be dismissed.

With respect to Hilliar, defendants make no argument that she should be dismissed from this claim. *See* Def. Mem. at 14. And the complaint contains sufficient allegations reflecting that her involvement in the issuance of the report arose from her desire to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
(Cite as: 2011 WL 2436817 (S.D.N.Y.))

retaliate against Koehl's appeal of grievances. *See* Am. Compl. ¶ 14(c) at 17.

### D. *Eighth Amendment Claims*

The Supreme Court has held that "the Constitution 'does not mandate comfortable prisons,' but neither does it permit inhumane ones." *Farmer v. Brennan,* 511 U.S. 825, 832 (1994) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 349 (1981)). The Eighth Amendment imposes an obligation on prison officials to provide "humane conditions of confinement," including "adequate food, clothing, shelter, and medical care." *Farmer,* 511 U.S. at 832. To establish a violation of the Eighth Amendment on the basis of inhumane prison conditions, a plaintiff must show that the deprivation is sufficiently serious as to result in a denial of " 'the minimal civilized measure of life's necessities,' " *Wilson v.. Seiter,* 501 U.S. 294, 298 (1991) (quoting *Rhodes,* 452 U.S. at 347), and that the prison officials acted with "a sufficiently culpable state of mind," *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) (citation omitted). In the context of conditions of confinement, the requisite mental state is "deliberate indifference ." *Wilson,* 501 U.S. at 302–03.

### 1. *Exposure to Environmental Tobacco Smoke*

Defendants have moved to dismiss Koehl's claim that his exposure to environmental tobacco smoke ("ETS"), including the 60 days he spent in a double bunk cell with inmates who smoked, constituted cruel and unusual punishment. Defendants argue "that DOCS' practice of double-cell housing does not violate the Eighth Amendment," *see* Def. Mem. at 15 (citing *Jones v. Goord,* 435 F.Supp.2d 221, 257 (S.D.N.Y.2006)), and that DOCS not only has an indoor smoking ban, but that DOCS personnel were actively enforcing this ban, *see* Def. Reply at 5.

**\*15** In *Rhodes v. Chapman,* 452 U.S. 337 (1981), the Supreme Court held that "double celling" is generally permissible under the Eighth and Fourteenth Amendments. *Id.* at 347–48, 352. Nevertheless, when combined with other adverse conditions, double

bunking may constitute cruel and unusual punishment. *See Bolton v.. Goord,* 992 F.Supp. 604, 626 (S.D.N.Y.1998). Thus,"[e]xposure to secondhand smoke can give rise to an Eighth Amendment violation." *Jones v. Goord,* 435 F.Supp.2d at 249 (citation omitted). Of course, "[a]s with all claims relating to conditions of confinement, an Eighth Amendment claim based on exposure to secondhand smoke must show that the exposure created an 'unreasonable risk of serious damage' to inmates' future health, and that prison officials were deliberately indifferent to that risk." *Id.* (citing *Helling v. McKinney,* 509 U.S. 25, 35 (1993)).

We will address the 60 days Koehl spent in a double cell in October through December 2008 separately from Koehl's general claim that his exposure to ETS at Green Haven constituted a violation of the Eighth Amendment. Koehl alleges that in October 2008, Ercole assigned him to a double bunk cell in which two out of three of his cell mates "were chain smokers, who smoked all day and night in the cell." *See* Am. Compl. at 10 ¶ 3. With regard to this 60 day assignment, Koehl has alleged facts from which it could be inferred that his exposure to secondhand smoke created an unreasonable risk of serious danger to his health and that defendant Ercole was deliberately indifferent to this risk. Koehl alleges that following his transfer to Green Haven he has had difficulty breathing, his lung disease has progressively worsened, his "heart valves [have] started leaking," and his "fingernails have turned yellow." Pl. Mem. at 8–9, 12, 15. Thus, Koehl has satisfied the objective prong of the Eighth Amendment analysis.

Liberally reading the complaint, Koehl also alleges that he complained about both the conditions in the cell and the impact of these conditions on his lung disease to Ercole and Cunningham in person and in writing and that they refused to enforce the smoking ban and ignored his complaints. *See* Am. Compl. at 10 ¶ 3; *id.* at 12–13 ¶ 10. Koehl alleges that it was defendant Ercole who assigned him to this cell and that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

Ercole "deliberately and repeatedly falsified records" and ordered Koehl's counselor to demand that Koehl sign a waiver so that he would remain in the double bunk cell. *Id.* at 10 ¶ 3. Thus, Koehl's allegations are sufficient to allow the conclusion that Ercole was aware of the risk Koehl faced and that he deliberately disregarded this risk. *See Farmer,* 511 U.S. at 847 (deliberate indifference exists where an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"); *Weaver v. Clarke,* 45 F.3d 1253, 1256 (8th Cir.1995) (finding deliberate indifference alleged where the complaint portrayed the prison officials as "consistently unwilling to enforce the smoking ban in [plaintiff's room] and repeatedly unresponsive to any of [plaintiff's] requests and protests"). [FN4] Accordingly, Koehl has stated a claim that his 60 day assignment by Ercole to double bunk in a cell with "chain smokers" constituted cruel and unusual punishment.

> FN4. Defendants argue that Koehl's complaint "acknowledges that DOCS has prohibited indoor smoking, and, in fact, was actively enforcing it." Def. Mem. at 21 (citation omitted). While Koehl does acknowledge that there is an indoor smoking ban, *see* Am. Compl. at 13 ¶ 10, he also alleges that his cell mates "smoked all day and night in the cell," *id.* at 10 ¶ 3, in contravention of the ban, and that Ercole was aware of this noncompliance, *id.* There are no allegations in the complaint that the ban was "actively enforc[e]d" during this particular time period. *See* footnote 5 below and accompanying text.

**\*16** As to defendant Cunningham, Koehl has not alleged that he was personally involved in the alleged deprivation of his Eighth Amendment rights with regard to this 60 day cell assignment. Here, Koehl alleges that it was Ercole who assigned him to this cell, and that Cunningham merely disregarded his complaints, Am. Compl. at 10 ¶ 3, and refused to allow an investigative report into Koehl's medical concerns with regard to his cell assignments, *see* Pl. Mem. at 19. Because "it is well-established that an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations," *Greenwaldt v. Coughlin,* 1995 WL 232736, at *4 (S.D.N.Y. Apr. 19, 1995), Koehl has failed to allege that Cunningham had any personal involvement in his exposure to ETS.

In addition, Koehl does not state an Eighth Amendment claim with regard to his general allegation that defendants Fischer, Ercole, Lee, Cunningham, and Dr. Bernstein refused to enforce the New York ban on smoking in prisons. *See* Am. Compl. at 13 ¶ 10. Koehl has failed to allege facts from which it could be inferred that defendants Fischer, Lee, Cunningham, and Bernstein were at any time deliberately indifferent to the risk created by Koehl's alleged exposure to secondhand smoke, or that Ercole was deliberately indifferent other than with regard to the 60 days Koehl spent in a double bunk cell with "chain smokers" in October through December 2008. While Koehl makes the broad allegation that Fischer, Ercole, Lee, Cunningham, and Bernstein "callously and deliberately refused to enforce the state's indoor smoking ban," *id.,* this statement is conclusory and unsupported by any allegations regarding either the objective harm to Koehl (outside of the 60 days he spent with the "chain smokers") or these defendants' subjective knowledge of the harm it was causing to Koehl. The complaint's reference to Bernstein's refusal to administer a "cotinine level test," and Ercole, Lee, and Cunningham's failure to install carbon monoxide detectors, Am. Compl. at 12 ¶ 10, does not show deliberate indifference to Koehl's health.

Notably, "[w]hether a prison has a non-smoking policy bears heavily on the question of deliberate indifference," *Enigwe v. Zenk,* 2007 WL 2713849, at *6 (E.D.N.Y. Sept. 14, 2007) (citing *Helling,* 509 U.S. at 36), and "imperfect enforcement of the policy alone

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

may not support a finding of deliberate indifference," *Enigwe,* 2007 WL 2713849, at *6 (citing *Scott v. District of Columbia,* 139 F.3d 940, 942–43, 944 (D.C.Cir.1998) (dismissing claims where inmates alleged smoking in housing units but failed to present any evidence in support of claims)). As noted in the exhibits provided by Koehl, attached to his memorandum in opposition, Green Haven policy prohibits smoking in all buildings, and permits it only in restricted outdoor areas. *See* Green Haven Correctional Facility Complaint Investigation, dated May 28, 2009 (annexed as Ex. 23 to Verified Exhibits (annexed to Pl. Mem.) ("Verified Exs.")) ("May 2009 Compl. Invest.") at 1–2. Additionally, these exhibits demonstrate that Green Haven personnel, including defendants Cunningham and Lee, personally investigated Koehl's complaints regarding indoor smoking. *See id.* at 1; Emails from Lee and Devine, dated Mar. 2010 (annexed as Ex. 24 to Verified Exs.) ("Lee Emails") at 2–3. For example, Cunningham was present at the investigation of Koehl's May 6, 2009 complaint and he issued a memo to all Green Haven staff on June 10, 2009, regarding the facility's smoking policy. *See* May 2009 Compl. Invest. at 1; Lee Emails at 2. When Lee became aware of Koehl's complaints and the subsequent report, he issued memos to both staff and inmates regarding the smoking ban and he "directed that security supervisors ensure that staff are enforcing the prohibition." Lee Emails at 2.[FN5] Thus, while Koehl alleges that the non-smoking policy was not enforced and that defendants were deliberately indifferent to smoking by prisoners, the exhibits provided by Koehl show that at least some efforts were taken to enforce the ban.[FN6]

FN5. We note that these exhibits do not affect our finding that Ercole's assignment of Koehl to a double bunk cell with "chain smokers" in October through December 2008 constituted a violation of the Eighth Amendment, as these exhibits involve action taken only in 2009 and 2010 and do not involve enforcement of the smoking ban by

defendant Ercole.

FN6. As defendants note, Def. Reply at 6 n. 1, Koehl references his treatment and conditions at DOCS' Auburn Correctional Facility for the first time in his opposition brief. *See* Pl. Mem. at 14, 16, 17, 20. As Koehl was not transferred to the Auburn facility until after he filed the complaint in this action, we do not consider statements in Koehl's memoranda of law regarding the conditions at the Auburn facility.

### 2. Cell Transfers and Assignments

**\*17** Koehl claims that the conditions he endured while he was being transferred between cells constituted cruel and unusual punishment because he was forced to carry his belongings from cell to cell which "aggravated [his] previously complained of [medical] conditions." Am. Compl. at 10 ¶ 2; *id.* at 14 ¶ 14. He alleges that his assignment to non-first floor cells, double bunk cells, and a cell which contained "air-borne, lead paint rust dust" constituted a violation of the Eighth Amendment. *Id.*

However, other than Koehl's allegations regarding the 60 days he spent in a double bunk cell with smokers, discussed above, Koehl fails to allege facts from which it could be inferred that his specific cell assignments or physical transfer between cells constituted a violation of the Eighth Amendment. Koehl alleges that when he first arrived at Green Haven—before Ercole assigned him to spend 60 days in a double bunk cell with "chain smokers"—Ercole assigned him to a double bunk cell on the third floor of the facility. *See* Am. Compl. at 10 ¶ 2. Beyond the conclusory allegation that Ercole "callously and deliberately assigned" him to this cell, *id.,* Koehl alleges no facts from which it could be inferred that Ercole was deliberately indifferent to the risk this assignment allegedly caused Koehl. Koehl does not allege that he made Ercole aware of his medical conditions or that Ercole otherwise knew about them. *See Farmer,* 511

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

U.S. at 847 (deliberate indifference exists where an official "knows that inmates face a substantial risk of serious harm and disregards that risk by failing to take reasonable measures to abate it"). Thus, Koehl alleges no facts from which it could be inferred that Ercole knew that Koehl faced a substantial risk of serious harm with regard to this cell assignment.

Other than the cell assignments discussed in paragraphs 2 and 3 of the complaint, Koehl does not allege facts from which it could be inferred that defendant Ercole was personally involved in his cell assignments or transfers. Nor does Koehl allege that defendants Cunningham or Lee were personally involved in his assignments and transfers. He merely states that Cunningham, Ercole, and Lee "physically harmed [him] and deliberately ignored medical orders." Am. Compl. ¶ 14(a). This broad statement cannot, however, support a deliberate indifference claim and Koehl does not allege any facts supporting the inference that these defendants were involved in the cell assignments and transfers discussed in paragraph 14 of the amended complaint. *See Iqbal,* 129 S.Ct. at 1949 (federal pleading standard requires "more than an unadorned, the-defendant-unlawfully-harmed-me accusation," and a pleading fails if it "offers labels and conclusions" or "tenders naked assertion[s] devoid of further factual enhancement") (internal quotation marks and citations omitted); *Joseph v. Fischer,* 2009 WL 3805590, at *2 (W.D.N.Y. Nov. 6, 2009) ("conclusory allegations that defendants ha[d] 'personal knowledge' of the events complained of" was insufficient to allege personal involvement). Thus, Koehl's Eighth Amendment claim regarding cell assignments and transfers cannot be sustained on this ground.

**\*18** Koehl's claim that he was under threat of transfer if he did not agree to double bunking, *see* Am. Compl. at 10 ¶ 3, should be dismissed because threats alone do not deprive a plaintiff of any constitutional rights. *See Lamar v. Steele,* 698 F.2d 1286, 1286 (5th Cir.) (per curiam), *cert. denied,* 464 U.S. 821 (1983);

*see also Gaut v. Sunn,* 810 F.2d 923, 925 (9th Cir.1987) (threats to deter prisoner from "pursuing legal redress" insufficient to state a claim under § 1983 unless the prisoner was actually deprived access to the court) (internal quotation marks omitted); *Grant v. Fernandez,* 1997 WL 118257, at *2 (N.D.Cal. Mar. 5, 1997) ("[O]nly harassment and threats coupled with conduct implicating the Eighth Amendment's proscription against cruel and unusual punishment ... may present a claim under § 1983.") (citation omitted).

3. *Weather Appropriate Clothing*

Koehl claims that Fischer, Ercole, and Lee denied him appropriate clothing for outside recreation in violation of the Eighth Amendment. *See* Am. Compl. at 14 ¶ 13. Koehl alleges that "most of the winter [he] cannot go outside for recreation without endangering [his] life." *Id.* Prison officials "may be held liable ... for failure to provide adequate clothing, if (1) the inadequacy is 'sufficiently serious' *and* (2) the official's failure is the result of his 'sufficiently culpable state of mind'—i.e., his 'deliberate indifference' to the inmate's health." *Shaffer v. Coombe,* 1995 WL 495067, at *1 (W.D.N.Y. Aug. 10, 1995) (quoting *Farmer,* 511 U.S. at 833). "Deliberate indifference to an inmate's health equates to 'recklessly disregarding' a risk to such, and the recklessness *vel non* of the official is judged subjectively." *Shaffer,* 1995 WL 495067, at *1 (quoting *Farmer,* 511 U.S. at 835, 839). We note that this is not a case where Koehl alleges he was confined to a cold cell without the minimal clothing necessary to keep warm. *See, e.g., Corselli v. Coughlin,* 842 F.2d 23, 27 (2d Cir.1988) (claim allowed where prisoner had been deliberately exposed to bitter cold in his cell block for three months).

First, this claim cannot survive in light of the fact that Koehl had a mechanism to stay warm in winter by staying indoors; any time he chose to spend outdoors in the cold was not prolonged, and no substantial harm has been alleged. *See, e.g., Tafari v. McCarthy,* 714 F.Supp.4d 317, 358 (N.D.N.Y.2010) (no Eighth Amendment violation where prisoner was "on many

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
(Cite as: 2011 WL 2436817 (S.D.N.Y.))

occasions" exposed to "below zero weather for an hour at a time during recreation period") (internal quotation marks and citation omitted); *Davis v. Buffardi,* 2005 WL 1174088, at *2 (N.D.N.Y. May 4, 2005) (denying claim under Fourteenth Amendment where pretrial detainees failed to submit any evidence that "the temperature in [the prison] was so cold that Plaintiffs experienced substantial harm"); *Brown v. McElroy,* 160 F.Supp.2d 699, 706 (S.D.N.Y.2001) (where prisoner alleged his cell was "extremely cold" and guard would not allow him to enter the hallway for warmth even when prisoner complained about being sick from the low temperatures, claim was dismissed because allegations were "not sufficiently serious" and prisoner could "get warm with some blankets").

**\*19** In addition, the claim fails because Koehl makes only a conclusory allegation that Fischer, Ercole, and Lee "created and enforced unconstitutional customs and policies that ... continually denied [him] adequate clothing for the weather." Pl. Mem. at 28. While personal involvement of a supervisor may be established by showing that he created a policy or custom under which the violation occurred, *Back,* 365 F.3d at 127 (citing *Colon,* 58 F.3d at 873), conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement. *See, e.g .,  Green v. Wright,* 2010 WL 3474973, at *2 (W.D.N.Y. Sept. 1, 2010) ("Here, the Court is concerned about the conclusory nature of plaintiff's assertion that defendant was personally involved in his treatment.... Without at least some kind of factual assertion about an unconstitutional policy, not even the liberal standards for assessing *pro se* pleadings can save plaintiff's claim in its current form."); *Joseph v. Fischer,* 2009 WL 3805590, at *2 (W.D .N.Y. Nov. 6, 2009) ("conclusory allegations that defendants ha[d] 'personal knowledge' of the events complained of" was insufficient to allege personal involvement); *Davis v. City of New York,* 2000 WL 1877045, at *9 (S.D.N.Y. Dec. 27, 2000) (merely asserting that

"[defendant] was actively involved in" an incident is conclusory and insufficient to establish defendant's personal involvement in the allegedly unconstitutional custom or policy) (internal quotation marks and citations omitted); *Funches v. Reish,* 1998 WL 695904, at *4–5 (S.D.N.Y. Oct. 5, 1998) (dismissing deliberate indifference to medical care claim against warden of prison facility based upon conclusory allegation that warden created "custom" of denying medical care); *Reid v. Artuz,* 984 F.Supp. 191, 195 (S.D.N.Y.1997) (dismissing an asthmatic prisoner's section 1983 claim against a supervisory official when the plaintiff "fail[ed] to allege, let alone establish, any factual basis upon which a fact finder could reasonably conclude personal involvement by the supervisory official defendant ... [—] that [defendant] created or continued a policy or custom which allowed the violation to occur"); *Shaffer,* 1995 WL 495067, at *1 (to satisfy the "deliberate indifference" prong of the Eighth Amendment analysis, "there must be allegations that at least suggest that the defendants were aware of the harm the plaintiff alleges") (citing *Farmer,* 511 U.S. 841). Here, Koehl has failed to allege with the requisite specificity that these supervisory defendants had any personal involvement in the alleged constitutional deprivations. Other than the conclusory statement of their involvement in the unconstitutional policy, Koehl makes no further allegations against them with regard to this claim. Thus, absent from the complaint are any facts suggesting that these defendants knew of, let alone approved, any alleged misconduct with regard to Koehl's clothing. *See Iqbal,* 129 S.Ct. at 1949 (federal pleading standard requires "more than an unadorned,      the-defendant-unlawfully-harmed-me accusation," and a pleading fails if it "offers labels and conclusions" or "tenders naked assertion[s] devoid of further factual enhancement") (internal quotation marks and citations omitted). Accordingly, this claim should be dismissed.

### 4. *Medical Treatment*

**\*20** To establish a violation of the Eighth Amendment arising out of inadequate medical treat-

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

ment, a prisoner is required to prove "deliberate indifference to [his] serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 106 (1976). The deliberate indifference standard consists of both a subjective prong and an objective prong. *See Hathaway v. Coughlin,* 37 F.3d 63, 66 (2d Cir.1994), *cert. denied,* 513 U.S. 1154 (1995). Under the subjective component, the prisoner must show that the defendant officials acted with a "sufficiently culpable state of mind" in depriving the prisoner of adequate medical treatment. *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). The "subjective element of deliberate indifference 'entails something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result.' " *Id.* (quoting *Farmer,* 511 U.S. at 835) (alterations in original); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (likening the necessary state of mind to "the equivalent of criminal recklessness") (internal quotation marks and citation omitted), *cert. denied,* 543 U.S. 1093 (2005); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) (per curiam) (same). In order to be found "sufficiently culpable," the official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Farmer,* 511 U.S. at 834, 837 (internal quotation marks and citation omitted); *accord Caiozzo v. Koreman,* 581 F.3d 63, 72 (2d Cir.2009). As already noted, "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim." *Chance v. Armstrong,* 143 F.3d 698, 703 (2d Cir.1998).

Under the objective prong, the alleged medical need must be "sufficiently serious." *Hathaway,* 37 F.3d at 66 (internal quotation marks and citations omitted). A "sufficiently serious" medical need is "a condition of urgency, one that may produce death, degeneration, or extreme pain." *Id.* (internal quotation marks and citation omitted). "Factors that have been

considered include '[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citations omitted) (alteration in original).

a. *Dental Care*

With respect to Koehl's claim that he has been denied denture adhesive or an implant, *see* Am. Compl. at 13–14 ¶ 12, defendants argue that the claim should be dismissed because the fact that a prisoner may prefer a different course of medical treatment does not give rise to an Eighth Amendment violation, *see* Def. Mem. at 18–19 (citing *Chance,* 143 F.3d at 703; *Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)).

**\*21** In order to state a claim for deliberate indifference under the Eighth Amendment, Koehl "must allege facts indicating that a substantial risk of serious harm would arise from the denial of the requested dental care ... and that the defendants perceived this risk and chose not to provide the requested treatment." *Partee v.. Grood,* 2007 WL 2164529, at \*5 (S.D.N.Y. July 25, 2007), *aff'd,* 335 F. App'x 85 (2d Cir.2009). "[I]nsufficient dental treatment may rise to the level of a Constitutional violation if it leads to extreme pain, deterioration of the teeth, and an inability to eat properly." *Id.* at \*5 (citing *Chance,* 143 F.3d at 703). However, "[s]o long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *Chance,* 143 F.3d at 703 (citing *Dean,* 804 F.2d at 215).

Assuming *arguendo* that Koehl has alleged facts indicating that a substantial risk of harm arose from his lack of dental care, he has failed to allege that either Fischer or Wright were personally involved in the deprivation of treatment. *See* Am. Compl. at 12–13 ¶ 12; Def. Reply at 2–3. Koehl merely alleges that he

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

was denied dental care pursuant to "Fischer and Wright's policies and customs," Am. Compl. at 13 ¶ 12. Koehl does not, however, allege what these policies are. Nor are there allegations from which it could be inferred that either Fischer or Wright knew of, let alone were involved in, the failure to provide him with dental adhesives or implants. As already noted, conclusory allegations that a defendant was involved in the creation and enforcement of unconstitutional policies cannot sustain a claim of personal involvement. *See Joseph,* 2009 WL 3805590, at *2 ("Plaintiff's complaint contains many conclusory allegations and, therefore, it is not possible to determine if there is personal involvement for each defendant.... Plaintiff needs to describe the events in sufficient detail to allow for a determination of defendants' personal involvement in the alleged incidents.").

b. *Cervical Spine and Back Injuries*

With respect to Koehl's claim regarding the medical treatment he received for his back, defendants argue that Koehl has failed to allege the subjective component of a deliberate indifference claim. *See* Def. Mem. at 19.

Turning first to the conduct of Dr. Weinstein, Koehl has not alleged facts giving rise to the inference that Dr. Weinstein acted with a "sufficiently culpable state of mind." Koehl alleges that in late 2008, Weinstein conducted an EMG, which Koehl believed contradicted the results of a previous EMG. *See* Am. Compl. at 10 ¶ 4. After Koehl called Dr. Weinstein "a liar," Dr. Weinstein agreed to order an MRI. *Id.* Koehl also alleges that in late 2009, Dr. Weinstein conducted another EMG "and stated that nothing was wrong." *See id.* at 11 ¶ 7. Koehl states that "[l]ater testing revealed that [Dr.] Weinstein's report and conclusions were knowingly false." *Id.* Apart from the conclusory allegation that Dr. Weinstein's conclusions were "knowingly" false, these allegations do not support the claim that Dr. Weinstein was deliberately indifferent to Koehl's medical problems. Instead, they constitute allegations that Dr. Weinstein did not give Koehl's

condition proper treatment—allegations that are insufficient to show a constitutional violation. *See Perkins v. Kansas Dep't of Corr.,* 165 F.3d 803, 811 (10th Cir.1999) ("a prisoner who merely disagrees with a diagnosis or a prescribed course of treatment does not state a constitutional violation"); *Troy v. Kuhlmann,* 1999 WL 825622, at *6 (S.D.N.Y. Oct. 15, 1999) ("[A] prisoner's disagreement with the diagnostic techniques or forms of treatment employed by medical personnel does not itself give rise to an Eighth Amendment claim.") (citation omitted).

**\*22** With regard to Fischer and Drs. Wright and Bernstein, however, Koehl has alleged facts creating the inference that these defendants acted with a "sufficiently culpable state of mind," thus satisfying the subjective prong of the deliberate indifference analysis. While defendants argue that Koehl's medical care was "attentive" and that Koehl's claims against Fischer and Drs. Wright and Bernstein regarding his denial of proper diagnostic testing "lack [ ] merit in light of the extensive testing plaintiff received," Def. Mem. at 20, Koehl specifically alleges that, "as a cost saving measure," Fischer and Drs. Wright and Bernstein "callously and deliberately ignored the orders of the neurosurgeons" by canceling Koehl's MRI, changing the type of x-rays ordered, and refusing to order Koehl a new neck brace, Am. Compl. at 11–12 ¶¶ 7, 8. He states that despite his complaints of "extreme pain and weakness in [his] arms, hands, legs, neck and back," Fischer and Dr. Wright repeatedly denied Koehl proper testing for his medical condition. *Id.* at 10–11 ¶ 4. Koehl also alleges that Dr. Bernstein deliberately scheduled Koehl's MRI on the date when Koehl's parents were visiting so that he could later claim that Koehl had refused treatment. *See id.* at 11 ¶ 5. The Second Circuit has held that the "allegation of ulterior motives, if proven true, would show that the defendants had a culpable state of mind and that their choice of treatment was intentionally wrong and did not derive from sound medical judgment." *Chance,* 143 F.3d at 704. Because Koehl has alleged ulterior motives, including monetary incentives, on the part of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

Fischer and Drs. Wright and Bernstein, he has alleged facts that create the inference that these defendants had a sufficiently culpable state of mind.

Defendants argue that because Fischer is not a doctor and was not involved in Koehl's medical treatment, that he was entitled to rely on the treatment of medical staff. *See* Def. Reply at 4–5 (citing *Cuoco v. Moritsugu,* 222 F.3d 99, 111 (2d Cir.2000)). This argument fails, however, because Koehl does not merely allege that Fischer deferred to the treatment articulated by Koehl's doctors. Instead, he alleges that Fischer directly interfered with Koehl's treatment "as a cost saving measure." Am. Compl. at 11–12 ¶¶ 7, 8.

Defendants also argue that the claims against Dr. Bernstein should be dismissed because they are, "at most, negligence claims." Def. Mem. at 20. While it is true that "negligence, even if it constitutes medical malpractice, does not, without more, engender a constitutional claim," *Chance,* 143 F.3d at 703 (citing *Estelle,* 429 U.S. at 105–06), "[i]n certain instances, a physician may be deliberately indifferent if he or she consciously chooses 'an easier and less efficacious' treatment plan," *Chance,* 143 F.3d at 703 (citing *Waldrop v. Evans,* 871 F.2d 1030, 1035 (11th Cir.1989) ("choice of an easier but less efficacious course of treatment can constitute deliberate indifference"); *Williams v. Vincent,* 508 F.2d 541, 544 (2d Cir.1974)). Here, Koehl claims Dr. Bernstein ignored the orders of his doctors not on the basis of his own medical view, but because of monetary incentives, and that he deliberately interfered with Koehl's treatment in order to make it appear as though Koehl had refused treatment. Accordingly, Koehl has alleged that Dr. Bernstein was more than merely negligent.

### c. *Lung Disease*

**\*23** Koehl alleges that his "chronic and life threatening lung diseases have grown progressively worse" because of his exposure to ETS and that defendants have denied him proper medical treatment for his worsening condition. *See* Am. Compl. at 12–13

¶¶ 10–11. Specifically, Koehl states that Dr. Bernstein refused to administer a "cotinine level test," that "Ercole, Lee and Cunningham denied the installation of detectors," *id.* at 12 ¶ 10, and that Fischer and Drs. Bernstein and Wright denied him access to a pulmonary specialist, *id.* at 13 ¶ 11. He states that he complained both verbally and in writing to Dr. Fein, Dr. Bernstein, Cunningham, Ercole, and Lee regarding his medical problems, but that his complaints were "ignored and/or brushed under the rug." *Id.* at 12 ¶ 10.

These allegations are insufficient because the complaint does not allege facts satisfying the subjective prong of the deliberate indifference analysis. Koehl has not alleged facts showing that these defendants consciously disregarded a risk of serious harm. Nor does Koehl state that defendants had an ulterior motive for their actions. *See* Am. Compl. at 12–13 ¶¶ 10–11. While Koehl alleges that he should have been allowed to see a pulmonary specialist, *id.* at 13 ¶ 11, he also alleges that he was given multiple CT scans and a pulmonary function analysis, *id.* And in the exhibits attached to Koehl's opposition memorandum, he includes a letter from Dr. Hosannah, a cardiothoracic surgeon at Albany Medical Center, stating that on January 29, 2008, Koehl "underwent a successful bronchoscopy and mediastinoscopy." Letter from Dr. Hosannah to Dr. Weissman, dated Apr. 9, 2008 (annexed as Ex. 15 to Verified Exs.). Thus, while Koehl alleges he was "denied proper testing," Am. Compl. at 13 ¶ 11, the complaint and attached papers cannot plausibly be read to suggest that Koehl was not examined, treated, or administered medically-indicated tests for his lung disease—situations that case law has found to constitute deliberate indifference. *See, e.g., Abraham v. DiGuglielmo,* 2010 WL 2136600, at \*9 (E.D.Pa. May 25, 2010) (doctor's "decision to prescribe antibiotics without examining plaintiff or administering tests to confirm the diagnosis" was found to constitute deliberate indifference); *see also Verley v. Goord,* 2004 WL 526740, at \* 13 (S.D.N.Y. Jan. 23, 2004) ("Because, in his Complaint, [plaintiff] alleged no facts indicating that [the doctor]

purposely failed to treat his medical condition or that the diagnosis was contrary to accepted medical standards, [plaintiff's] allegations of a failure to diagnose and treat his back ailment, as stated in the Complaint, are insufficient to state a claim."). The mere allegation that Koehl had a painful lung disease that was not alleviated by treatment does not by itself reflect that the defendants acted with deliberate indifference, inasmuch as "there exist many medical conditions that do not respond to treatment." *Bryant v. Wright,* 2010 WL 3629443, at *9 (S.D.N.Y. Aug. 31, 2010), *adopted by* 2010 WL 3629426 (S.D.N.Y. Sept. 15, 2010).

E. *Qualified Immunity*

**\*24** The doctrine of qualified immunity precludes civil liability where prison officials performing discretionary functions "did not violate clearly established law," or where "it was objectively reasonable for the defendant[s] to believe that [their] action[s] did not violate such law." *Anderson v. Recore,* 317 F.3d 194, 197 (2d Cir.2003) (internal quotation marks and citation omitted); *accord Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (qualified immunity ensures that defendants have "fair notice" that their conduct is unlawful before being exposed to liability and that "[f]or a constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right' ") (quoting *Anderson v.. Creighton,* 483 U.S. 635, 640 (1987)) (additional citations omitted). A qualified immunity defense may be asserted as part of a motion under Fed.R.Civ.P. 12(b)(6) if it is based on facts appearing on the face of the complaint, though defendants asserting the defense at this stage face a "formidable hurdle." *McKenna v. Wright,* 386 F.3d 432, 434 (2d Cir.2004).

While defendants' memorandum of law contains a brief section asserting that the doctrine of qualified immunity shields defendants from liability, they argue the applicability of the qualified immunity defense only in the vaguest and most general terms. *See* Def. Mem. at 21–23. Significantly, they do not discuss any of the substantive constitutional rights raised, do not provide any explanation as to what specific right was not "clearly established," and do not discuss why defendants would have been reasonable in believing that their alleged conduct was constitutional for any of Koehl's specific claims. Accordingly, there is no basis on which to conclude that the defendants against which Koehl has sufficiently alleged constitutional claims are entitled to qualified immunity.

IV. *CONCLUSION*

For the foregoing reasons, defendants' motion to dismiss (Docket # 25) should be granted in part and denied in part. Specifically, the following claims should be dismissed: (1) all claims against the State of New York for damages and against the defendants brought in their official capacities; (2) Fourteenth Amendment Due Process claims against Brennan, Fischer, and Hilliar based on disciplinary proceedings; (3) First Amendment retaliation claims (a) against Evans, Edwards, Herman, and Tracy with regard to Koehl's executive clemency application, and (b) against Fischer and Brennan with regard to the tier III misbehavior report and against Sawyer with regard to the tier II misbehavior report; (4) Eighth Amendment claims (a) against Cunningham for his involvement in Koehl's 60 day assignment to a cell with "chain smokers," (b) against Fischer, Ercole, Lee, Cunningham, and Dr. Bernstein for their failure to enforce the New York ban on smoking in prisons, (c) against Ercole, Cunningham, and Lee with regard to Koehl's cell assignments and transfers generally, (d) against Fischer, Ercole, and Lee for their failure to provide Koehl with weather appropriate clothing, (e) against Fischer and Wright for their failure to provide Koehl with dental care, (f) against Dr. Weinstein for his failure to treat Koehl's cervical spine and back injuries, and (g) against Dr. Bernstein, Dr. Fein, Dr. Wright, Ercole, Lee, Cunningham, and Fischer for their failure to treat Koehl's lung disease.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)
**(Cite as: 2011 WL 2436817 (S.D.N.Y.))**

**\*25** Thus, the following claims remain: (1) Fourteenth Amendment Due Process claims against Harvey, Sawyer, and Russo based on disciplinary proceedings; (2) First Amendment retaliation claims (a) against Cunningham with regard to Koehl's facility transfer, (b) against Cunningham with regard to Koehl's executive clemency application, and (c) against Russo and Harvey with regard to Koehl's tier III misbehavior report and against Hilliar with regard to the tier II misbehavior report; (3) Eighth Amendment claims (a) against Ercole for his involvement in Koehl's 60 day assignment to a cell with "chain smokers," and (b) against Fischer, Dr. Wright, and Dr. Bernstein for their failure to treat Koehl's cervical spine and back injuries

*PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION*

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have fourteen (14) days including weekends and holidays from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Sidney H. Stein, and to the undersigned, at 500 Pearl Street, New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Stein. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See Thomas v. Arn,* 474 U.S. 140 (1985); *Wagner & Wagner, LLP v. Atkinson, Haskins, Nellis, Brittingham, Gladd & Carwile, P.C.,* 596 F.3d 84, 92 (2d Cir.2010).

S.D.N.Y.,2011.
Koehl v. Bernstein
Not Reported in F.Supp.2d, 2011 WL 2436817 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2002 WL 313796 (S.D.N.Y.)
**(Cite as: 2002 WL 313796 (S.D.N.Y.))**

Only the Westlaw citation is currently available.

United States District Court, S.D. New York.
Hilden MENDEZ, Plaintiff,
v.
C. ARTUZ, Superintendent of Green Haven Correctional Facility, et al., Defendants.

No. 01 CIV. 4157(GEL).
Feb. 27, 2002.

OPINION AND ORDER

LYNCH, District J.

**\*1** In this action pursuant to 42 U.S.C. § 1983, Hilden Mendez, a New York State prisoner, sues several correctional officers he claims used unnecessary and excessive force against him, or failed to intervene to protect him during the beating, as well as higher-level prison supervisors whose personal involvement in the incident in question is obscure or non-existent. Defendants move to dismiss on the ground that Mendez has failed to exhaust his administrative remedies within the New York State Department of Correctional Services ("DOCS"). Mendez argues that the exhaustion requirement does not apply to this case, and that if it does, he has satisfied it.

I

42 U.S.C. § 1997e(a) provides that:

No action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

This is a sensible requirement. Prisoners often resort to federal court to challenge prison rules, practices and regulations. But state prison systems typically provide grievance procedures that offer a forum for prisoner complaints about conditions of confinement. Requiring prisoners to resort first to such procedures has several advantages: If the prison authorities respond favorably to the complaint, the prisoner receives prompt relief, the parties and the courts are spared the burden of litigation, and the strains on federalism of federal court intrusion into state prison administration are avoided. Moreover, federal constitutional constraints on the policy choices of state prison administrators are quite limited, and prisoners may well obtain relief that would be unavailable in federal court by persuading wardens of the merits of their proposals. If the prison authorities reject the grievance, the state's official position on the prisoner's complaint will often be authoritatively clarified by the administrative proceeding.

It may seem strange to apply this provision to the present lawsuit. Mendez does not question any policy, procedure or regulation of DOCS that affects his or other prisoners' daily life in confinement, nor does he claim that being beaten by guards is a routine or condoned part of regular prison life. In normal English usage, the claim that a guard on a single occasion used excessive force—in violation not only of constitutional commands but of DOCS' own regulations—is not a complaint about "prison conditions" but about a particular isolated incident.

Considerations such as these prompted the Court of Appeals for this Circuit to hold that the exhaustion requirement of § 1997e(a) does not apply to excessive force suits. *Nussle v. Willette,* 224 F.3d 95, 106 (2d Cir.2000). The Supreme Court, however, has taken a different view, reversing *Nussle* and holding that the requirement does indeed apply to suits such as this.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2002 WL 313796 (S.D.N.Y.)
**(Cite as: 2002 WL 313796 (S.D.N.Y.))**

*Porter v. Nussle,* No. 00–853, 2002 WL 261683 at *10 (Feb. 26, 2002). It is not for this Court to judge the persuasiveness of the Supreme Court's reasoning, but only to follow what the Supreme Court says is the command of the statute. This lawsuit, therefore, can only proceed after Mendez has exhausted any available administrative remedies.

## II

**\*2** Mendez claims, however, that he has satisfied this requirement, pointing out that he filed a grievance through the appropriate channels, and appealed the adverse finding. But the exhaustion requirement is not satisfied until the administrative process has reached a final result. The documents Mendez submits demonstrate that he has filed an appeal, and that through "administrative oversight" the appeal was not initially processed. (P. Mem.Ex. E.) The documents go on to state that the appeal has now been "forwarded to Central Office Review Committee (CORC)" for "final disposition" and is "pending review by CORC." (P. Mem.Ex. D, E.) Thus, as far as the record before this Court shows, at the time the complaint was filed, administrative review had not been completed, and the requirements of § 1997e(a) had not yet been met.

Of course, in the time that this matter has been pending, administrative remedies might well have been finally exhausted. In that event, it might seem efficient simply to find out what had happened to plaintiff's appeal, and proceed accordingly. However, the Court of Appeals has ruled that from the broader perspective of Congress and appellate judges, the greater good forbids allowing a case to proceed where administrative remedies have been exhausted while the complaint is pending, and requires in such a case dismissal of the complaint, to be re-filed, if the plaintiff wishes, with the addition of paragraphs explaining how administrative remedies have been exhausted. *Neal v. Goord,* 267 F.3d 116, 123 (2d Cir.2001).

Thus, the complaint must be dismissed. When these hurdles have all been cleared, and the adminis-

trative remedies duly exhausted, assuming that the *plaintiff* is not by then exhausted, he will most likely re-file essentially the same lawsuit. If it is meritorious, much time will have been wasted; if it is meritless, no court time will be saved, as the Court will still be faced with the same case to adjudicate. And the interests of efficient judicial administration will thus presumably have been served.

Accordingly, the complaint is dismissed.

SO ORDERED:

S.D.N.Y.,2002.
Mendez v. Artuz
Not Reported in F.Supp.2d, 2002 WL 313796 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

C
Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Daniel K. MONKO, Plaintiff,
v.
Robert CUSACK, Corrections Officer, Shawangunk
Correctional Facility; and Gerald Gardner, Correc-
tions Lieutenant, Shawangunk Correctional Facility,
Defendants.

No. 9:11–CV–1218 GTS/TWD.
Sept. 27, 2013.

Daniel K. Monko, pro se.

Hon. Eric T. Schneiderman, Attorney General for the
State of New York, Kevin P. Hickey, Esq., Assistant
Attorney General, Albany, NY, for Defendant.

### DECISION and ORDER
GLENN T. SUDDABY, District Judge.

**\*1** Currently before the Court in this *pro se*
prisoner civil rights action, filed by Daniel K. Monko
("Plaintiff") against the two above-captioned New
York State correctional employees ("Defendants"),
are (1) Defendants' motion for summary judgment, (2)
United States Magistrate Judge Therese Wiley
Dancks' Report–Recommendation recommending that
Defendants' motion be granted, (3) Plaintiff's Objec-
tion to the Report–Recommendation, and (4) De-
fendants' Objection to the Report–Recommendation
(requesting that the Report–Recommendation be
adopted based, in the alternative, on Defendants'
causation argument). (Dkt.Nos.28, 36, 38, 39.) For the
reasons set forth below, Plaintiff's Objection is re-
jected; Defendants' Objection is accepted; the Re-

port–Recommendation is accepted and adopted; De-
fendants' motion is granted for the reasons stated in the
Report–Recommendation as well as in Defendants'
Objection; and Plaintiff's Complaint is dismissed in its
entirety.

## I. RELEVANT BACKGROUND

### A. Plaintiff's Amended Complaint

Generally, in his Amended Complaint, Plaintiff
asserts the following claims: (1) a claim that De-
fendant Cusack retaliated against Plaintiff in violation
of the First Amendment by filing two false misbe-
havior reports against him in response to his com-
plaints to Defendant Cusack's supervisor (Corrections
Sergeant Lutz) that he (Plaintiff) was not provided
with contraband receipts when Defendant Cusack
confiscated food items from his cell; (2) a claim that
Defendant Gardner similarly retaliated against Plain-
tiff in violation of the First Amendment by failing to
take steps (as a supervisor and hearing officer) to
rectify Defendant Cusask's issuance of false misbe-
havior reports and by finding him guilty at the disci-
plinary hearings despite the clear and convincing
evidence of his innocence; and (3) a claim that
Defendant Gardner denied Plaintiff due process under
the Fourteenth Amendment by finding him guilty of
both misbehavior charges despite the clear and con-
vincing evidence of his innocence and the misbeha-
vior reports' retaliatory nature. (Dkt. No. 12.) Famili-
arity with the factual allegations supporting these
claims in the Amended Complaint is assumed in this
Decision and Order, which is intended primarily for
the review of the parties. (*Id.*)

### B. Parties' Briefing of Defendants' Motion for
### Summary Judgment

Because the parties have demonstrated an accu-
rate understanding of their arguments on Defendants'

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

motion for summary judgment, the Court will not repeat those arguments in this Decision and Order, which (again) is intended primarily for the review of the parties.

**C.    Magistrate    Judge    Dancks'    Report–Recommendation**

Generally, in her Report–Recommendation, Magistrate Judge Dancks recommends that Defendants' motion be granted and Plaintiff's Complaint be dismissed for the following reasons: (1) Plaintiff has failed to adduce admissible record evidence from which a rational fact finder could conclude that he experienced a sufficiently serious adverse action to support a retaliation claim against either Defendant, because the loss of privileges for thirty-six days is *de minimus;* and (2) Plaintiff has failed to adduce admissible record evidence from which a rational fact finder could conclude that he possessed a protected liberty or property interest to support a procedural due process claim against Defendant Gardner, because the loss of privileges for thirty-six days is not an atypical and significant hardship in relation to the ordinary incidents of prison life. (Dkt. No. 36.) Familiarity with the particular findings and conclusions supporting these recommendations is assumed in this Decision and Order, which (again) is intended primarily for the review of the parties. (*Id.*)

**D.    Parties'    Objections    to    the    Report–Recommendation**

**\*2** Generally, in his Objection to the Report–Recommendation, Plaintiff asserts the following two arguments: (1) Plaintiff has established a retaliation claim under the First Amendment, because a similarly situated individual of ordinary firmness would be deterred from exercising his constitutional rights by (a) the mere *threat* of receiving a false misbehavior report and/of (b) a resulting loss of privileges for thirty-six days (as evidenced by the affidavit of Plaintiff's fellow inmate in the Special Housing Unit, Timothy Vail); and (2) contrary to Magistrate Judge Danck's characterization of Plaintiff's due process

claim as being procedural in nature, it is actually substantive in nature, as evidenced by the word "substantive" in his Amended Complaint. (Dkt. No. 38.)

Generally, in their Objection to the Report–Recommendation, Defendants argue that, while the Report–Recommendation properly recommends that Defendants' motion be granted (for the reasons stated therein), the Report–Recommendation neglects to address, and endorse, Defendants' alternative argument for dismissal of Plaintiff's retaliation claim: that Plaintiff has failed to adduce admissible record evidence from which a rational fact finder could conclude that there was a causal connection between the protected speech and the adverse action. (Dkt. No. 39.) Defendants argue that Plaintiff's conduct would have resulted in the issuance of a misbehavior report regardless of whether Plaintiff complained to the area supervisor. (*Id.*)

**II. APPLICABLE LEGAL STANDARDS**

**A.    Standard    Governing    Review    of    a    Report–Recommendation**

When a *specific* objection is made to a portion of a magistrate judge's reportrecommendation, the Court subjects that portion of the report-recommendation to a *de novo* review. Fed.R.Civ.P. 72(b)(2); 28 U.S.C. § 636(b)(1)(C). To be "specific," the objection must, with particularity, "identify [1] the portions of the proposed findings, recommendations, or report to which it has an objection and [2] the basis for the objection." N.D.N.Y. L.R. 72.1(c).FN1 When performing such a *de novo* review, "[t]he judge may ... receive further evidence...." 28 U.S.C. § 636(b)(1). However, a district court will ordinarily refuse to consider evidentiary material that could have been, but was not, presented to the magistrate judge in the first instance.FN2 Similarly, a district court will ordinarily refuse to consider argument that could have been, but was not, presented to the magistrate judge in the first

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

instance.[FN3]

FN1. *See also Mario v. P & C Food Markets, Inc.,* 313 F.3d 758, 766 (2d Cir.2002) ("Although Mario filed objections to the magistrate's report and recommendation, the statement with respect to his Title VII claim was not specific enough to preserve this claim for review. The only reference made to the Title VII claim was one sentence on the last page of his objections, where he stated that it was error to deny his motion on the Title VII claim '[f]or the reasons set forth in Plaintiff's Memorandum of Law in Support of Motion for Partial Summary Judgment.' This bare statement, devoid of any reference to specific findings or recommendations to which he objected and why, and unsupported by legal authority, was not sufficient to preserve the Title VII claim.").

FN2. *See Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137–38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40, n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *cf. U.S. v. Raddatz,* 447 U.S. 667, 676, n. 3, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980) ("We conclude that to construe § 636(b)(1) to require the district court to conduct a second hearing whenever either party objected to the magistrate's credibility findings would largely frustrate the plain

objective of Congress to alleviate the increasing congestion of litigation in the district courts."); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition ("The term 'de novo' does not indicate that a secondary evidentiary hearing is required.").

FN3. *See Zhao v. State Univ. of N.Y.,* 04–CV–0210, 2011 WL 3610717, at * 1 (E.D.N.Y. Aug.15, 2011) ("[I]t is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted); *Hubbard v. Kelley,* 752 F.Supp.2d 311, 312–13 (W.D.N.Y.2009) ( "In this circuit, it is established law that a district judge will not consider new arguments raised in objections to a magistrate judge's report and recommendation that could have been raised before the magistrate but were not.") (internal quotation marks and citation omitted).

When only a *general* objection is made to a portion of a magistrate judge's report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b)(2),(3); Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition.[FN4] Similarly, when an objection merely reiterates the *same arguments* made by the objecting party in its original papers submitted to the magistrate judge, the Court subjects that portion of the report-recommendation challenged by those arguments to only a *clear error* review.[FN5] Finally, when *no* objection is made to a portion of a report-recommendation, the Court subjects that portion of the report-recommendation to only a *clear error* review. Fed.R.Civ.P. 72(b), Advisory Committee Notes: 1983 Addition. When performing such a "clear error" review, "the court need only satisfy itself that there is no clear error on the face

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

of the record in order to accept the recommendation." *Id.* FN6

> FN4. *See also Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *2–3 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) [collecting cases], *aff'd without opinion,* 175 F.3d 1007 (2d Cir.1999).

> FN5. *See Mario,* 313 F.3d at 766 ("Merely referring the court to previously filed papers or arguments does not constitute an adequate objection under either Fed.R.Civ.P. 72(b) or Local Civil Rule 72.3(a)(3)."); *Camardo v. Gen. Motors Hourly–Rate Emp. Pension Plan,* 806 F.Supp. 380, 382 (W.D.N.Y.1992) (explaining that court need not consider objections that merely constitute a "rehashing" of the same arguments and positions taken in original papers submitted to the magistrate judge); *accord, Praileau v. Cnty. of Schenectady,* 09–CV–0924, 2010 WL 3761902, at *1, n. 1 (N.D.N.Y. Sept.20, 2010) (McAvoy, J.); *Hickman ex rel. M.A.H. v. Astrue,* 07–CV–1077, 2010 WL 2985968, at *3 & n. 3 (N.D.N.Y. July 27, 2010) (Mordue, C.J.); *Almonte v. N.Y.S. Div. of Parole,* 04–CV–0484, 2006 WL 149049, at *4 (N.D.N.Y. Jan.18, 2006) (Sharpe, J.).

> FN6. *See also Batista v. Walker,* 94–CV–2826, 1995 WL 453299, at *1 (S.D.N.Y. July 31, 1995) (Sotomayor, J.) ("I am permitted to adopt those sections of [a magistrate judge's] report to which no specific objection is made, so long as those sections are not facially erroneous.") (internal quotation marks and citations omitted).

**\*3** After conducing the appropriate review, the Court may "accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b) (1)(C).

**B. Standard Governing a Motion for Summary Judgment**

Magistrate Judge Dancks correctly recited the legal standard governing a motion for summary judgment. (Dkt. No. 36, at Part III.A.) As a result, this standard is incorporated by reference in this Decision and Order.

**III. ANALYSIS**

After carefully reviewing all of the papers in this action (including Magistrate Judge Dancks' Report–Recommendation, and Plaintiff's objection thereto), the Court concludes that the Report–Recommendation is free of error: Magistrate Judge Dancks employed the proper standards, accurately recited the facts, and reasonably applied the law to those facts. (Dkt. No. 36.) As a result, the Court accepts and adopts the Report–Recommendation for the reasons stated therein. (*Id.*) The Court would only add the following two points.

First, regarding the causation argument asserted by Defendants in their Objection, the Court agrees with Defendants that, based on the current record evidence, there is no genuine dispute that Plaintiff's continuation and escalation of his conduct would have resulted in the issuance of misbehavior reports regardless of whether Plaintiff complained to the area supervisor. (Dkt. No. 39, at 2.) Indeed, Plaintiff expressly invited the misbehavior reports as a way of forcing Defendant Cusack to identify the disciplinary rule(s) that he believed Plaintiff was violating by keeping food items in his cell. (Dkt. No. 35, at ¶ 24.)

Second, regarding the substantive due process argument asserted by Plaintiff in his Objection, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

due process, must be the guide for analyzing these claims." *Albright v. Oliver,* 510 U.S. 266, 272–73, 114 S.Ct. 807, 127 L.Ed.2d 114 (1994). Here, because Plaintiff's substantive due process claim overlaps both his procedural due process claim and his retaliation claim, it must be dismissed. *See Rother v. NYS Dept. of Corr. and Cmty. Supervision,* 12–CV–0397, 2013 WL 4774484, at * 14 (N.D.N.Y. Sept.4, 2013) (Kahn, J.) ("Plaintiff's substantive-due-process claim overlaps entirely with her procedural-due-process claim-they both seek to remedy the same harm and challenge the same conduct.... Moreover, the harm and conduct challenged by the substantive-due-process, First Amendment, and equal-protection claims significantly overlap. Because the claim for substantive due process is subsumed by Plaintiff's other constitutional claims, it must be dismissed."); *Velez v. Levy,* 274 F.Supp.2d 444, 454 (S.D.N.Y.2003) ("[T]o the extent that the plaintiff's substantive due process claim is based on the same allegations that give rise to the plaintiff's Fourteenth Amendment procedural due process claims, the underlying allegations must be analyzed under the relevant standards for a procedural due process claim, ... rather than standards that govern a claim for substantive due process."), *aff'd in part,* 401 F.3d 75 (2d Cir.2005).[FN7]

> FN7. The Court notes that, even if it were to assume that Plaintiff had asserted an independent substantive due process claim, the Court is unable to find admissible record evidence establishing that the state action was arbitrary in the constitutional sense.

**\*4 ACCORDINGLY,** it is

**ORDERED** that Magistrate Judge Dancks' Report–Recommendation (Dkt. No. 36) is **ACCEPTED** and **ADOPTED;** and it is further

**ORDERED** that Defendants' motion for summary judgment (Dkt. No. 28) is **GRANTED;** and it is

further

**ORDERED** that Plaintiff's Amended Complaint (Dkt. No. 12) is **DISMISSED** in its entirety. The Clerk is directed to enter judgment in favor of the defendants and close this case.

*REPORT–RECOMMENDATION AND ORDER*

THÉRSE WILEY DANCKS, United States Magistrate Judge.

This *pro se* prisoner civil rights action, commenced pursuant to 42 U.S.C. § 1983, has been referred to me for Report and Recommendation pursuant to 28 U.S.C. § 636(b) and N.D.N.Y. L.R. 72.3(c).[FN1] Plaintiff alleges in his Amended Complaint that Defendant Robert Cusack ("Cusack"), a Corrections Officer at Shawangunk Correctional Facility ("Shawangunk"), violated his First and Fourteenth Amendment rights by filing two false misbehavior reports against him in retaliation for Plaintiff's verbal complaint to regular area supervisor, Corrections Sergeant Lutz ("Lutz"), that he was not being given contraband receipts when food items were removed from his cell. (Dkt. No. 28–3 at 41–43 .) Defendant Gerald Gardner ("Gardner"), a Corrections Lieutenant at Shawangunk and hearing officer at the disciplinary proceedings on the two misbehavior reports, is alleged to have found Plaintiff guilty despite the clear and compelling nature of Plaintiff's defense, and to have imposed sanctions against him. (Dkt. Nos. 12 at ¶¶ 57–62; 12–2 at 21–22, 33–34.) Plaintiff has asserted claims against Gardner for both retaliation and for violation of his Fourteenth Amendment right to due process in finding Plaintiff guilty of the charges in the allegedly false misbehavior reports. (Dkt. No. 12 at ¶¶ 83–84, 87–88.)

FN1. *See* Text Entry of October 29, 2012.

Currently pending before the Court is Defendants' motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 28.)

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

Plaintiff has opposed the motion. (Dkt. No. 35.) For the reasons that follow, I recommend that Defendants' motion be granted.

# I. BACKGROUND

## A. Daily Cell Searches and Confiscation of Food Without Issuing Contraband Receipts

Plaintiff has been incarcerated within the Department of Corrections and Community Supervision ("DOCCS") system since September of 1985. (Dkt. No. 28–3 at 13.) During the late summer and early fall of 2010, the time period relevant to Plaintiff's claims, he was confined at Shawangunk. *Id.* at 14, 16. Plaintiff had been at Shawangunk since 2001. *Id.* at 14.

Plaintiff was placed in the Special Housing Unit ("SHU") at Shawangunk in early August of 2010 for a contraband-related infraction. *Id.* at 26; Dkt. No. 28–4 at ¶ 7. He was housed with twelve or so other inmates when corrections officer David Degraff ("Degraff") moved from the night shift to the day shift. (Dkt. No. 28–3 at 16.) During the months of July and August of 2010, every time one particular inmate left his cell for a shower or his hour of recreation, Degraff went into his cell and took out food items. *Id.;* Dkt. No. 12 at ¶ 22. When that inmate began writing grievances complaining that Degraff was singling him out, Degraff started going into all of the inmate's cells and removing, among other things, food items that inmates had saved from breakfast to consume later in the day. (Dkt. No. 12 at ¶ 23.) Degraff told inmates who complained that they could blame the inmate who had filed the grievances. (Dkt. No. 28–3 at 18–19.) On September 10, 2010, when it became clear to Plaintiff that Degraff was trying to pit one inmate against another, Plaintiff complained verbally to Lutz about DeGraff's conduct and also wrote to the DOCCS Inspector Generals Office. (Dkt. No. 12 at ¶ 22.) Plaintiff told both Lutz and the Inspector Generals Office that Degraff was the only corrections officer performing the daily searches and removing food items. *Id.* at ¶ 29.

**\*5** Plaintiff initially believed that Lutz would instruct Degraff to stop the searches. (Dkt. No 12 at ¶ 31.) Instead, beginning in September of 2010, all of the corrections officers, including Defendant Cusack, began going into the SHU inmates' cells and removing the inmates' things, including food items, on a daily basis, without leaving contraband receipts. (Dkt. No. 28–3 at 21–23, 28.) According to Plaintiff, because contraband receipts were not being issued, there was no record of the cell searches and inspections. (Dkt. No. 12 at ¶ 32.)

Plaintiff filed a grievance on October 10, 2010, complaining that contraband receipts were not being left when food items were removed from his cell. (Dkt. Nos. 12 at ¶ 33;12–2 at 13–14.) Lutz submitted an October 16, 2010, memorandum to the Inmate Grievance Program Supervisor responsive to the grievance. (Dkt. No. 12–2 at 15.) The memorandum stated that on or about September 10, 2010, Lutz had instructed the floor officers that he expected them to conduct daily cell inspections in addition to daily cell searches and, as had been the practice, to confiscate contraband, including but not limited to "food, food containers, and drag lines," in plain view.[FN2] *Id.;* Dkt. No. 28–4 at ¶ 12. Lutz explained in the memorandum that visual inspections "are a good security practice to minimize the introduction of contraband in the Special Housing Unit." (Dkt. No. 12–2 at 15.) Lutz also disclosed in the memorandum that he had instructed the officers to give inmates contraband receipts for any items taken from their cells. *Id.* On October 20, 2010, the Inmate Grievance Review Committee concluded that contraband receipts should be given for items taken out of inmates' cells. *Id.* at 16.

FN2. Cusack explained in his Affidavit that "[a]lthough food is generally harmless in its original form, it can be altered or changed into may improper forms [e.g., fruit can be

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

fermented into prison wine] if not properly controlled." (Dkt. No. 28–4 at ¶ 6.)

Prior to the determination of Plaintiff's grievance, on October 12, 2010, Cusack performed a regular scheduled search of Plaintiff's cell.[FN3] (Dkt. No. 28–3 at 28, 30–31.) During the search, Cusack confiscated state food, an extra state towel, and a fishing pole from Plaintiff's cell and left a contraband receipt.[FN4] (Dkt. No. 28–7 at 1.) According to Cusack, contraband receipts are required whenever a cell search is conducted whether or not contraband is found. (Dkt. No. 28–4 at ¶ 16.) Plaintiff had no complaint with the regular cell search, except for his belief that there was no rule in effect prohibiting inmates from keeping food in their cells at the time. (Dkt. No. 28–3 at 30–31.) Cusack, on the other hand, believed that all of the items confiscated from Plaintiff's cell were contraband and violated SITU policy. (Dkt. No. 28–4 at ¶ 17.) While Cusack believed that the items warranted confiscation, he did not issue a misbehavior report because it appeared to be an isolated incident. *Id.* In addition, it was Cusack's understanding from his training and experience that misbehavior reports are issued at the discretion of the corrections officer depending on the circumstances, and at that time Cusack believed discarding the items would resolve the issue. *Id.* at ¶ 18.

> FN3. Plaintiff described the scheduled cell search as one done when an inmate's name comes up on the computer, and a thorough search of the inmate's property is conducted. (Dkt. No. 28–3 at 28.)

> FN4. A fishing pole is a drag line crafted by prisoners and used as a tool to pass and retrieve items between inmates. (Dkt. Nos. 28–3 at 23; 28–4 at ¶ 15.) It is considered contraband. *Id.*

**\*6** The following day, October 13, 2010, while Plaintiff was in the yard, Cusack conducted a visual inspection of Plaintiff's cell and confiscated a container of milk and four slices of bread that were in a paper bag in his cell.[FN5] (Dkt. No. 28–3 at 31–33.) Cusack, believing that contraband receipts were not required for items found in a visual cell inspection, did not give Plaintiff a contraband receipt. (Dkt. Nos. 12 at ¶ 37; 28–4 at ¶ 22.) Cusack claims to have warned Plaintiff that he was not allowed to keep food items in his cell. (Dkt. No. 28–4 at ¶ 21.) Plaintiff contends that Cusack never gave him a direct order or any sort of direction on whether he could have food in his cell. (Dkt. No. 35 at p. 10, ¶ 23.)

> FN5. Plaintiff, who converted to Judaism in 2005, received the Kosher cold alternative diet, which contained substantially more unprepared foods, including fruits and vegetables, than the regular meals served to the majority of inmates. (Dkt. No. 12 at ¶¶ 21–22, 34.) Because it was difficult to consume an entire meal in the short time allotted, Plaintiff was in the habit of saving his fresh fruits and vegetables to be consumed during the day. *Id.* at ¶ 34. Plaintiff had also been given authorization to keep the containers of milk given to him with breakfast when the milk was frozen. (Dkt. No. 28–3 at 32–33.)

The morning of October 14, 2010, Plaintiff made a verbal complaint to Lutz regarding Cusack's failure to give Plaintiff a contraband receipt for the food items he had confiscated the day before. (Dkt. Nos. 28–3 at 33–34; 12 at ¶ 38.) Fifteen or twenty minutes later, Cusack and another corrections officer escorted Plaintiff to the yard for his recreation period. *Id.* at ¶ 40. According to Plaintiff, as they were walking towards the yard, Cusack said "So you want me to give you a contraband receipt for the food items I removed from your cell yesterday?"[FN6] Plaintiff replied, "If you are saying that the food items are contraband, then yes I want a contraband receipt." Cusack then asked Plaintiff, "Do you want the misbehavior report that's

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

gonna come with it?" [FN7] Plaintiff replied "If you are saying I broke a rule, then yes, I'll take that as well." Plaintiff then said "There is no rule saying we can't keep food in our cells." Cusack responded "we'll see." (Dkt. No. 35 at ¶ 24.) When Plaintiff returned to his cell after recreation, he noticed that Cusack had removed an apple, a banana, and half of a cucumber and had left contraband receipts for the food taken on October 13th and 14th. (Dkt. Nos. 12 at ¶ 41; 35 at ¶ 25.)

> FN6. Cusack claims to have asked Plaintiff "in words or substance, whether he truly wanted to received contraband receipts for food items [Cusack] felt constituted illegal contraband." (Dkt. No. 28–4 at ¶ 2 1.)

> FN7. According to Cusack, he asked Plaintiff "in words or substance, whether he also wanted the misbehavior report that would result from his disregard for SHU rules." (Dkt. No. 28–4 at ¶ 28 .)

**B. Misbehavior Reports and Plaintiff's Disciplinary Hearings**

The following day, Plaintiff was given two Tier II misbehavior reports written by Cusack. (Dkt. No. 12 at ¶ 42.) The first misbehavior report involved Cusack's October 13, 2010 visual inspection of Plaintiff's cell and confiscation of Plaintiff's milk and bread. (Dkt. No. 12–2 at 20.) Cusack indicated in the misbehavior report that Plaintiff "has been previously told that he can not keep food items in his cell." *Id.* Plaintiff was charged with possession of contraband, having an untidy cell or person, refusing a direct order, and property damage or loss. (Dkt. No. 28–15 at 1.) The second misbehavior report, which involved the confiscation of the banana, apple, and half a cucumber from Plaintiff's cell on October 14, 2010, included the same charges as the first. (Dkt. No. 12–2 at 32.) The misbehavior reports were endorsed by Lutz. (Dkt. Nos. 28–11 at 9; 28–13; 28–14.)

Defendant Gardner, as hearing officer, made a determination to hold a separate disciplinary hearing for each of the misbehavior reports. (Dkt. Nos. 28–11 at 1, 3; 28–12 at 1.) The disciplinary hearings were held on October 19th and 20th of 2010.[FN8] (Dkt. No. 28–11 at 1.) Plaintiff pleaded not guilty to the charges at both hearings. (Dkt. Nos. 28–11 at 2; 28–12 at 3.) Plaintiff argued that there was no rule prohibiting him from saving food given to him at meals, and that neither Cusack nor any other corrections officer or sergeant had given him a direct order that he could not keep food in his cell. (Dkt. Nos. 28–11 at 5–6; 28–12 at 4.) Cusack testified that he had told Plaintiff he could not keep food in his cell prior to writing the misbehavior reports. (Dkt. No. 28–11 at 15–17.) When asked if he had given Plaintiff a "direct order" to that effect, Cusack testified that while he had not used the words "direct order," when he makes a statement to an inmate, the statement constitutes a direct order whether he uses the word "direct order" or not. [FN9] *Id.* at 16–17.

> FN8. The transcripts from the hearings, submitted by Defendants in support of their motion for summary judgment, contain a substantial number of gaps in the testimony. (Dkt. Nos. 28–11 and 28–12.)

> FN9. Lutz testified that when Cusack told Plaintiff he could not keep food in his cell, it constituted a "direct order." (Dkt. No. 28–12 at 10.)

**\*7** In their testimony at the hearings, Lutz and Cusack both identified Section 2.401, subsection 5, of the SHU rulebook as the source of the rule prohibiting inmates from keeping food in their cells.[FN10] (Dkt. Nos. 28–11 at 14; 28–12 at 8, 13.) The rule provides:

> FN10. The referenced SHU rulebook is SHU/PC/IPC Guidelines & Regulations No.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

2.401. (Dkt. No. 28–8.) The provision at is-
sue is subsection 6 of part V. Disciplinary
Special Housing Rules (Directive 4933), not
subsection 5. (Dkt. No. 28–8.)

Inmates will receive their meals in a food tray (un-
less on a restricted diet) and are expected to return
both parts of that tray, utensils, and all other
foods/liquid containers at the completion of each
meal. Failure to do so will be considered a violation
of Standards of Inmate Behavior Rule 116.10 and
will result in a Tier III misbehavior report and
pre-hearing restricted diet. Damage to the trays will
be considered a violation of Standards of Inmate
Behavior Rule 116.10 and may result in the re-
quirement that monetary restitution be made.
(Dkt. No. 28–8 at 1.) Plaintiff argued that the pro-
vision applied only to containers, not food. (Dkt.
No. 28–12 at 4.) Cusack testified that he considered
food in inmates cells to be contraband according to
the Rulebook provision. *Id.* at 12–13; *see also* Dkt.
No. 28–4 at ¶¶ 19–20.

Lutz acknowledged telling Plaintiff on October
14, 2010, that he was supposed to have been given a
contraband receipt for the food taken from his cell on
October 13, 2010. *Id.* at 9. Lutz also testified that he
had told Cusack to give Plaintiff a receipt. *Id* . Gard-
ner, over Plaintiff's objection and without explanation,
refused to ask Lutz whether he had instructed Cusack
to write the misbehavior report or Cusack had done it
on his own. *Id.* at 10–11. However, Cusack testified
that Lutz did not direct him to write the misbehavior
reports. (Dkt. No. 28–11 at 13.)

Cusack testified at the hearings that if Plaintiff
had not asked for contraband receipts, he would not
have written the two misbehavior reports. (Dkt. Nos.
28–11 at 14; 28–12 at 11–13.) When asked why he had
written the misbehavior reports, Cusack testified that
because once Plaintiff asked for the contraband re-
ceipts, Cusack wanted to make it official—have ev-
erything on record. (Dkt. No. 28–12 at 15.)

Gardner found Plaintiff guilty of having contra-
band in his cell and refusing a direct order at the end of
the disciplinary hearings on the two misbehavior re-
ports and not guilty of untidy cell or person and
property damage or loss. (Dkt. Nos. 28–15 at 1; 28–16
at 1.) The only penalty imposed on Plaintiff in con-
nection with the guilty finding on the misbehavior
report dealing with the October 13, 2010 contraband
incident was counseling and reprimand. (Dkt. No.
28–15 at 1.) The penalty imposed in connection with
the guilty finding on the misbehavior report for the
October 14, 2010 contraband incident was thirty days
keeplock and thirty days loss of packages, commis-
sary, and phone. (Dkt. No. 28–16 at 1.) According to
Plaintiff, he lost his postadjustment privileges—extra
benefits such as headphones, extra clothing and per-
sonal property—for approximately a month as a result
of the misbehavior reports. (Dkt. No. 28–3 at 45–46.)

**C. Reversal of the Guilty Findings and Revision of
the SHU Rulebook**

**\*8** Plaintiff appealed the two determinations of
guilt to Shawangunk Superintendent Joseph T. Smith,
who designated Deputy Superintendent John Maly
("Maly") to handle the appeals. (Dkt. Nos. 12 at ¶¶
63–65; 12–2 at 24–29, 36–39.) On February 9, 2011,
Maly reversed both of the disciplinary hearing deter-
minations and directed that all records of the hearings
be expunged. (Dkt. No. 12–2 at 29–30, 39–40.) As a
result of the expungement, the thirty days of keeplock
was never imposed on Plaintiff. (Dkt. No. 28–3 at 46.)
The same day the determinations were reversed, Maly
issued a memorandum effective immediately prohib-
iting inmates in SHU from possessing unconsumed
food and requiring unconsumed food to be returned
with the feeding utensils at the end of each meal.[FN11]
(Dkt. No. 28–19 .) The memorandum stated that un-
consumed food items retained by inmates after the
meal period is over would be considered contraband.
*Id.* The SHU rulebook section relied upon by Lutz and
Cusack at Plaintiff's disciplinary hearings was revised
on February 14, 2011, to add subsection 7, which

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

provides that "Inmates must consume all meals at the time served. Inmates are not allowed to store food in their cell." (Dkt. No. 28–20.)

> FN11. Cusack understands that the guilty findings were expunged because the rule on which he and Lutz had relied in deciding that inmates were not allowed to keep food in their cells was deemed ambiguous. (Dkt. No. 28–4 at ¶ 53.)

**II. PROCEDURAL HISTORY**

Plaintiff commenced this action on October 11, 2011. (Dkt. No. 1 .) His application to proceed *in forma pauperis* was granted on November 11, 2011. (Dkt.Nos.2, 4.) On December 12, 2011, Plaintiff filed an Amended Complaint, which was accepted as the operative pleading in this lawsuit by Order dated December 14, 2011. (Dkt.Nos .12, 13.)

Defendants filed their Answer to Plaintiff's Amended Complaint on January 19, 2011 (Dkt. No. 14,) and a day later, Plaintiff filed a motion for partial summary judgment on liability and for an order directing Defendants to produce certified copies of the transcripts from the two disciplinary hearings at issue in the lawsuit. (Dkt. No. 16.) Defendants moved for denial of Plaintiff's motion for partial summary judgment without prejudice on the grounds that it was premature. (Dkt. No. 17.) In response, Plaintiff requested that he be allowed to withdraw the motion as premature. (Dkt. No. 18.) Plaintiff's request was granted by Text Order dated January 1, 2012.

Following discovery, Defendants filed the motion for summary judgment now before me for report and recommendation. (Dkt. No. 28.) Plaintiff thereafter filed papers in opposition to the motion. (Dkt. No. 35.)

**III. APPLICABLE LEGAL STANDARDS**

Summary judgment may be granted only if the submissions of the parties taken together "show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The party moving for summary judgment bears the initial burden of showing, through the production of admissible evidence, that no genuine issue of material fact exists. *Salahuddin v. Goord,* 467 F.3d 263, 272–73 (2d Cir.2006). A dispute of fact is "genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson,* 477 U.S. at 248.

**\*9** Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist.[FN12] *Salahuddin,* 467 F.3d at 272–73. The nonmoving party must do more than "rest upon the mere allegations ... of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 585–86, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). "Conclusory allegations, conjecture and speculation ... are insufficient to create a genuine issue of fact. *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998).

> FN12. Only admissible evidence need be considered by a court in ruling on a motion for summary judgment, and the court has "broad discretion in choosing whether to admit evidence." *Presbyterian Church of Sudan v. Talisman Energy, Inc.,* 582 F.3d 244, 264 (2d Cir.2009). Because Plaintiff's Amended Complaint (Dkt. No. 12) is verified, it will be treated as an affidavit in opposition to Defendants' summary judgment motion. *See Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). The Affirmation submitted by Plaintiff in opposition to Defendants' motion (Dkt. No. 35 at 5–14) is unsworn and was not signed under penalty of perjury. *See* 28 U.S.C. § 1746 (authorizing the use of

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

declarations made under penalty of perjury when an affidavit is required or permitted to be used); *see also* 1 0B Charles A. Wright, Arthur R. Miller & Mary Kay Kane, *Federal Practice and Procedure* § 2738, at 362–63 (Civil 3d ed.1998) (affidavits submitted for or in opposition to a motion for summary judgment need not be notarized when they are made under penalty of perjury, but un-sworn statements will be rejected). However, on summary judgment motions involving *pro se* plaintiffs, courts have been known to consider papers that did not constitute affi-davits or declarations. *See, e.g., Robles v. Khahaifa,* No. 09CV718, 2012 WL 2401574, at *7, 2012 U.S. Dist. LEXIS 87834, at *20–22 (W.D.N.Y. June 25, 2012).* In light of Plaintiff's *pro se* status, and because: (1) Plaintiff explained in his Affirmation that he was unable to submit a sworn affidavit be-cause notary service was unavailable (alt-hough he presumably could have signed the Affirmation under penalty of perjury); (2) Defendants have not objected to considera-tion of the Affirmation; and (3) the Affirma-tion is generally consistent with the allega-tions in Plaintiff's Amended Complaint and his deposition testimony submitted as an Exhibit by Defendants, I have considered the Affirmation in opposition to Defendants' motion.

In determining whether a genuine issue of mate-rial fact exists, the court must resolve all ambiguities and draw all reasonable inferences against the moving party. *Major League Baseball Props., Inc. v. Salvino, Inc.,* 542 F.3d 290, 309 (2d Cir.2008). Where a party is proceeding *pro se,* the court is obliged to "read [the *pro se* party's] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994). However, "a *pro se* party's 'bald asser-tion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* No. 93 Civ. 5981(WHP)(JCF), 1999 WL 983876 at *3, 1999 U.S. Dist. LEXIS 16767 at *8 (S.D.N.Y. Oct. 28, 1999) [FN13] (citing *Carey v. Crescenzi,* 923 F.2d 18, 21 (2d Cir.1991)).

> FN13. Copies of unpublished decisions cited herein will be provided to Plaintiff by the Clerk.

## IV. ANALYSIS

### A. Retaliation Claim Against Cusack

Plaintiff claims that Defendant Cusack filed two false misbehavior reports against him in retaliation for Plaintiff going over his head and complaining to Lutz that corrections officers, including Cusack, were con-fiscating food from inmates' cells without giving the inmates a contraband receipt. (Dkt. No. 28–3 at 41–43.) "[A] prison inmate has no general constitu-tional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schneider,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 (2d Cir.1986)). False accusations contained in a misbehavior report can, however, rise to the level of a constitutional violation when there has been more, such as "retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862.

Claims of retaliation find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380–81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions that would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Pidlypchak,* 389 F.3d at 381–83. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such re-taliation claims with particular care. *See Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

Second Circuit has noted,

**\*10** [t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), *overruled on other grounds, Swierkiewicz v. Sorema, N.A.,* 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002).

To prevail on a retaliation claim under § 1983, a plaintiff must prove that: (1) the speech or conduct at issue was "protected;" (2) the defendants took "adverse action" against the plaintiff; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); *Pidlypchak,* 389 F.3d at 380 (citing *Dawes,* 239 F.3d at 492).

Adverse action, used in the prison context, is defined objectively as "retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising ... constitutional rights." *Gill,* 389 F.3d at 381, 383 (quoting *Davis v. Goord,* 320 F.3d 346, 353 (2d Cir.2003)). In evaluating what constitutes adverse action for purposes of a retaliation claim, a court should be mindful that "[p]risoners may be required to tolerate more than public employees, who may be required to tolerate more than average

citizens, before a [retaliatory] action taken against them is considered adverse." *Dawes,* 239 F.3d at 493.

Several factors may be considered in determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions. *Baskerville v. Blot,* 224 F.Supp.2d 723, 732 (S.D.N.Y.2002) (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)). Those factors include: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing on the matter; and (iv) statements by the defendant concerning his or her motivation. *Id.* (citing *Colon,* 58 F.3d at 872–73). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." *Id.*

The protected First Amendment conduct on which Plaintiff relies in his retaliation claim is his complaint to Lutz that corrections officers were confiscating food from inmates' cells without giving the inmates contraband receipts. (Dkt. No. 28–3 at 41–43.) An inmate's verbal complaint to a corrections officer might serve as the basis for a § 1983 retaliation claim. *Smith v. Woods,* No. 9:03–CV–480, 2006 WL 1133247, at \*10, 2006 U.S. Dist. LEXIS at 29745 at \*46 (N.D.N.Y. April 24, 2006) (finding that oral complaints made to corrections officers may have First Amendment protection for purposes of a retaliation claim), *aff'd,* 219 F. App'x 110 (2d Cir.2007); *Brewer v. Kamas,* 533 F.Supp.2d 318, 328 (W.D.N.Y.2008) (same). Therefore, the evidence may support a finding that Plaintiff was engaging in protected conduct when he complained to Lutz.

**\*11** However, the evidence does not support a finding of adverse action. Defendant Gardner imposed a penalty of only counseling and reprimand upon finding Plaintiff guilty after the hearing on the first misbehavior report. (Dkt. No. 28–15 at 1.) Gardner imposed a penalty of thirty days in keeplock, and

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

thirty days loss of packages, commissary, and phones on the second. (Dkt. No. 28–16.) However, Plaintiff, by his own admission, did not spend any time in keeplock and testified at his deposition that his damages as a result of the finding of guilt were limited to a thirty-six day loss of post-adjustment privileges, including things like radio, headphones, and personal photographs. (Dkt. No. 28–3 at 46–48.) "The filing of misbehavior reports that result in a temporary loss of various privileges such as permission to visit the commissary [does] not constitute adverse action because they are *de minimis." Gantt v. Lape,* No. 9:10–CV–0083 (GTS/GHL), 2012 WL 4033729, at *8, 2012 U.S. Dist. LEXIS 130052, at *24–25 (N.D.N.Y. July 31, 2012); *see also Bartley v. Collins,* No. 95–CV–10161(RJH), 2006 WL 1289256, *7, 2006 U.S. Dist. LEXIS 28285, at *21 (S.D.N.Y. May 10, 2006)* ("Bates' misbehavior report against plaintiff and Collin's first report, which both resulted in plaintiff's temporary loss of various privileges such as permission to visit the commissary ... do not constitute adverse action because they were too *de minimis;* they do not constitute penalties that would deter a similarly situated prisoner of ordinary firmness from exercising his constitutional rights."); *Shaheen v. McIntyre,* No. 9:05–CV–0173 (TJM/GHL), 2007 WL 3274835, at *9, 2007 U.S. Dist. LEXIS 81895 (N.D.N.Y. Nov. 5, 2007)* ("allegations of lost privileges, standing alone, would be too *de minimis* to constitute 'adverse action' ").

Even giving due consideration to Plaintiff's argument that because SHU inmates have so few privileges, losing what they do have is a significant loss (Dkt. No. 35 at 31), I find that Plaintiff's temporary loss of post-adjustment privileges in this case is too *de minimis* to constitute adverse action for purposes of his retaliation claim against Cusack.[FN14] Therefore, I recommend that the Court grant Defendant Cusack's motion for summary judgment.

FN14. While it is not entirely clear from the summary judgment record whether the thirty

day loss of privileges imposed on Plaintiff by Gardner on the second misbehavior report was also carried out, even if it were, the penalty would be too *de minimis* to constitute adverse action.

**B. Retaliation and Due Process Claims Against Gardner**

*1. Retaliation*

Plaintiff claims that Gardner retaliated against him by failing to take steps in his supervisory capacity to rectify Cusack's issuance of false misbehavior reports and by finding him guilty at the disciplinary hearings despite the clear and convincing evidence of his innocence. (Dkt. Nos. 12 at ¶¶ 83–84, 28–3 at 70–72.) As discussed above with regard to Plaintiff's retaliation claim against Cusack, the temporary loss of privileges such as the post-adjustment privileges lost by Plaintiff for thirty-six days are *de minimis* and do not constitute adverse action for purposes of a retaliation claim. *See Bartley v. Collins,* 2006 WL 1289256, at *7. Therefore, I recommend that Gardner be granted summary judgment dismissing Plaintiff's retaliation claim against him.

*2. Due Process*

**\*12** Plaintiff claims that Gardner denied his Fourteenth Amendment right to due process by finding him guilty of the charges of possessing contraband and refusing a direct order in each of the two misbehavior reports filed by Cusack, despite clear and compelling evidence at the hearings that the charges were false and without merit, and the misbehavior reports had been written in direct retaliation for Plaintiff's verbal grievance to Lutz. (Dkt. Nos. 12 at ¶¶ 84, 88; 28–15 at 1; 28–16 at 1.)

To prevail on a § 1983 claim for denial of Fourteenth Amendment procedural due process rights, a plaintiff must demonstrate that he possessed a pro-

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

tected property or liberty interest, and that he was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 280 F.3d 69, 79–80 (2d Cir.2000). Due process generally requires that "some kind of hearing" be provided to an individual by the state prior to depriving them of a property or liberty interest. *DiBlasio v. Novello,* 344 F.3d 292, 302 (2d Cir.2003).

An inmate can show deprivation of a liberty interest under the due process clause when a prison condition imposes an "atypical and significant hardship ... in relation to the ordinary incidents of prison life." *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995); *see also Luna v. Pico,* 356 F.3d 481, 487 (2d Cir.2004) (same). There is no evidence that counseling and reprimand constitutes an atypical and significant hardship. (Dkt. No. 28–15 at 1.) Furthermore, Plaintiff did not serve any of the thirty days in keeplock, and it appears that the penalty of thirty day loss of packages, commissary, and phone may not have been carried out either. (Dkt. No. 28–16 at 1.) At most, the evidence shows that Plaintiff lost his post-adjustment privileges—extra benefits such as headphones, extra clothing and personal property—for thirty-six days. *Id.* at 45–46.

"[T]he loss of phones, packages, and commissary privileges does not give rise to a protected liberty interest under New York law." *Smart v. Goord,* 441 F.Supp.2d 631, 640 (S.D.N.Y.2006); *see also Husbands v. McClellan,* 990 F.Supp. 214, 217 (W.D.N.Y.1998) (holding temporary loss of various privileges—telephone, package, commissary and recreation—did "not represent the type of deprivation which could reasonably be viewed as imposing an atypical and significant hardship on an inmate"); *Johnson v. Enu,* No. 08–CV–158 (FJS/DRH), 2011 WL 3439179, at *12, 2011 U.S. Dist. LEXIS 86831, at *34–35 (N.D.N.Y. July 13, 2011) (suspension of recreation, commissary, and phone privileges did not give rise to a protected liberty interest); *Edelkind v. Killian,* No. 09 Civ. 5835(SHS) (MHD), 2011 WL

10599973, at *16, 2011 U.S. Dist. LEXIS 157207, at *46 (S.D.N.Y. Aug. 31, 2011) ("loss of telephone privileges is plainly a common incident of prison life and hence does not itself reflect a circumstance that implicates the loss of a liberty interest.").

**\*13** I find that Plaintiff's thirty-six day loss of post-adjustment privileges, and a thirty day loss of telephone, commissary, and recreation, if those losses in fact occurred, do not give rise to a protected liberty interest. Therefore, I recommend that Defendant Gardner also be granted summary judgment dismissing Plaintiff's claim against him for denial of Plaintiff's Fourteenth Amendment due process rights in connection with the hearings on the misbehavior reports written by Defendant Cusack.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 28) be **GRANTED** and that the Court enter judgment in Defendants' favor; and it is

**ORDERED** that the Clerk provide Plaintiff with copies of all of the unpublished decisions cited herein.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. ***FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.*** *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993) (citing *Small v. Sec 'y of Health and Human Servs.,* 892 F.2d 15 (2d Cir.1989)); 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72, 6(a).

N.D.N.Y.,2013.
Monko v. Cusack
Slip Copy, 2013 WL 5441724 (N.D.N.Y.)

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Slip Copy, 2013 WL 5441724 (N.D.N.Y.)
**(Cite as: 2013 WL 5441724 (N.D.N.Y.))**

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Jonathan ODOM, Plaintiff,
v.
Ana E. CALERO, et al., Defendants.

No. 06 Civ. 15527(LAK)(GWG).
July 10, 2008.

*REPORT AND RECOMMENDATION*

GABRIEL W. GORENSTEIN, United States Magistrate Judge.

**\*1** Jonathan Odom, currently an inmate at the Auburn Correctional Facility, brings this suit *pro se* under 42 U.S.C. §§ 1983 and 1985 against employees of the New York State Department of Correctional Services ("DOCS"). After the defendants filed a motion to dismiss, the undersigned issued a Report and Recommendation recommending that the motion be granted. Following objections by plaintiff, the district judge granted the defendants' motion to dismiss some of the claims but sustained Odom's objection to dismissing two of the claims on statute of limitations grounds. Thus, the instant Report and Recommendation addresses the alternative grounds raised in the motion to dismiss with respect to the remaining two claims.

In the remaining causes of action, Odom alleges that, in retaliation for testifying in 2001 regarding the assault of a fellow inmate at the Sing Sing Correctional Facility ("Sing Sing"), Correction Officers W. Perez and Brian McCoy filed false misbehavior reports against him, and that Hearing Officer Ana E. Calero violated his right to due process through her

conduct at his disciplinary hearings. Following the hearings, Odom was sentenced to various amounts of time in the Special Housing Unit ("SHU") at Sing Sing. Odom further alleges that Brian Fischer, the Superintendent of Sing Sing, and Donald Selsky, the Director of the Special Housing/Inmate Disciplinary Program, violated his right to due process by affirming the decisions made at those hearings.

Defendants Perez and McCoy have never been served. Defendants Calero, Fischer, and Selsky move to dismiss Odom's claims for failure to state a claim and on qualified immunity and Eleventh Amendment immunity grounds. For the reasons stated below, the defendants' motion should be granted in part and denied in part.

*I. BACKGROUND*

A. *Facts*

On this motion to dismiss, the Court assumes that the facts alleged in Odom's complaint, amended complaint, and affirmation in opposition to the motion are true. *See, e.g., Burgess v. Goord,* 1999 WL 33458, at \*1 n.1 (S.D.N.Y. Jan. 26, 1999) (" 'the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum' " (quoting *Gadson v. Goord,* 1997 WL 714878, at \*1 n.2 (S.D.N.Y. Nov. 17, 1997))); *accord Torrico v. IBM Corp.,* 213 F.Supp.2d 390, 400 n.4 (S.D.N.Y.2002). In addition, "[d]ocuments that are attached to the complaint or incorporated in it by reference are deemed part of the pleading and may be considered." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007).

Odom's allegations stem from an incident on May 27, 2001, in which he alleges that he witnessed Perez

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

and "other[ ] prison officials" assault another inmate. *See* Amended Complaint, filed May 24, 2007 (Docket # 10) ("Am.Compl."), ¶ 12. Odom was issued approximately ten misbehavior reports both before and after he testified at the other inmate's disciplinary hearing. *Id.* ¶ 16; *see id.* ¶¶ 24-25, 43-44. All of the charges against Odom were dismissed at disciplinary hearings or on appeal before Selsky, except for the charges considered at disciplinary hearings held on June 7, 2001 and July 16, 2001. *Id.* ¶ 17. Those charges resulted in Odom being sentenced to 455 days in the SHU. *Id.* ¶ 18. The charges considered at these hearings were ultimately dismissed on June 17, 2005, and December 30, 2005. *Id.* ¶ 17; *see* Exs. A, F to Am. Compl.

**\*2** In his first and second causes of action, Odom alleges violations of his due process rights. *Id.* ¶ 27; *see id.* ¶¶ 38; 56. Two Correction Officers, Perez and McCoy, filed misbehavior reports in retaliation for Odom's testifying about the assault of a fellow inmate in 2001. *See id.* ¶¶ 24-25, 44-45. Fischer caused Odom to be subjected to misbehavior reports and unfair disciplinary hearings, and he also assigned Calero as the hearing officer in order to violate Odom's due process rights. *Id.* ¶¶ 14, 28, 43, 46. Calero undertook "to act as [his] inmate assistant, and then did nothing to help assist [him]," *id.* ¶ 29; *see id.* ¶ 47; asked prison officials leading questions and "then provided most of their answers," *id.* ¶ 30; *see id.* ¶ 48; and "refused to allow [Odom] to call witnesses and precluded [him] from presenting a defense, resulting in him being found guilty with no evidence to support the charges," *id.* ¶ 31; *see id.* ¶ 49; Affirmation in Opposition to Defendants' Motion to Dismiss, filed Sept. 7, 2007 (Docket # 25) ("Pl.Aff."), ¶ 9 (Calero failed "to obtain the testimony of the witnesses requested by the plaintiff during his June 7, 2001 and July 16, 2001 disciplinary hearings"). Following one of the hearings, Calero told plaintiff to "mind his business next time." Am. Compl. ¶ 14.

Odom filed appeals with Fischer and Selsky after

the disciplinary hearings. *Id.* ¶ 15. While neither Fischer nor Selsky "commit[ted] the due process violations," *id.* ¶ 32, 50, Fischer and Selsky "both became responsible for them[ ] when they ... failed to correct them in the course of their supervisory responsibilities," *id.* ¶ 32; *see id.* ¶ 50. They "refus[ed] to overturn [his] disciplinary conviction and expunge it, despite their knowledge of the ... due process violations." *Id.* ¶ 34; *accord id.* ¶¶ 50-52.

**B.** *Procedural History*

The original complaint was received by the Pro Se Office on June 27, 2006, and was filed on December 29, 2006. (Docket # 1). After submitting a "Supplemental Complaint" (filed May 4, 2007 (Docket # 7)), Odom filed the Amended Complaint on May 24, 2007, *see* Am. Compl.

Defendants Calero, Fischer, and Selsky filed their motion to dismiss and supporting papers on August 22, 2007. *See* Notice of Motion, filed Aug. 22, 2007 (Docket # 20) ("Def.Not."); Memorandum of Law in Support of Defendants' Motion to Dismiss, filed Aug. 22, 2007 (Docket # 21) ("Def.Mem."); Declaration of Jeb Harben, filed Aug. 22, 2007 (Docket # 22). Odom responded with an affirmation, *see* Pl. Aff., and the defendants filed a reply brief, *see* Reply Memorandum of Law in Support of Defendants' Motion to Dismiss, filed Sept. 21, 2007 (Docket # 28) ("Def.Reply").

On February 19, 2008, the undersigned issued a Report and Recommendation recommending that all claims be dismissed. *Odom v. Calero,* 2008 WL 449677 (S.D.N.Y. Feb. 19, 2008). The district judge granted the defendants motion to dismiss claims three, four, five and six in the Amended Complaint, sustained Odom's objection to the dismissal of claims one and two on statute of limitations grounds, and referred the motion back to the undersigned to address the alternative grounds in defendants' motion to dismiss. *See* Order, filed Mar. 25, 2008 (Docket # 40). Odom responded to this order, *see* Affirmation in Reply to Judge Lewis A. Kaplan's March 27, 2008 Court Order,

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

dated April 14, 2008 (Docket # 51), and defendants filed a motion for reconsideration, *see* Motion for Reconsideration, filed Apr. 9, 2008 (Docket # 42), which was denied, *see* Order, filed Apr. 15, 2008 (Docket # 45).

**\*3** Shortly before the denial of the motion for reconsideration, Odom submitted a motion for summary judgment. *See* Notice of Motion for Summary Judgment, dated April 14, 2008 (Docket # 48) ("S.J.Motion"); Plaintiff's Affirmation in Opposition to Defendants' Motion for Reconsideration and in Support of the Plaintiff's Motion for Summary Judgment, dated April 14, 2008 (Docket # 49); Brief in Support of Plaintiff's Motion for Summary Judgment, dated April 14, 2008 (Docket # 50); Statement of Undisputed Facts, dated April 14, 2008 (Docket # 52). As discussed below, the summary judgment motion should be denied for procedural reasons. Nonetheless, we have considered Odom's submissions in support of the summary judgment motion to the extent they are relevant to his opposition to the defendants' motion to dismiss.

In addition to arguing for dismissal on statute of limitations grounds, Calero, Fischer, and Selsky moved to dismiss the complaint for failure to state a claim or "insufficient pleadings," qualified immunity, failure to allege a conspiracy, and Eleventh Amendment immunity. Def. Mem. at 5-17.

## II. *DISCUSSION*

### A. *Law Governing a Motion to Dismiss for Failure to State a Claim*

Under Fed.R.Civ.P. 8(a)(2), a pleading is required to contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Thus, a complaint "must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.' " *Kassner v. 2nd Ave. Delicatessen*

*Inc.,* 496 F.3d 229, 237 (2d Cir.2007) (quoting *Conley v. Gibson,* 355 U.S. 41, 47 (1957)) (some internal quotation marks and citation omitted). On a motion to dismiss for failure to state a claim, all factual allegations in the complaint are accepted as true. *See Swierkiewicz v. Sorema N. A.,* 534 U.S. 506, 508 n.1 (2002).

Nonetheless, "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do .... Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atl. Corp. v. Twombly,* 127 S.Ct. 1955, 1964-65 (2007) (internal quotation marks, citations, and brackets omitted); *see also id.* at 1966 (pleading must "possess enough heft to show that the pleader is entitled to relief") (internal quotation marks, citation, and brackets omitted). Thus, "a complaint must allege facts that are not merely consistent with the conclusion that the defendant violated the law, but which actively and plausibly suggest that conclusion." *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.,* 507 F.3d 117, 121 (2d Cir.2007).

For purposes of deciding a motion to dismiss, "[a] document filed *pro se* is to be liberally construed and a *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus,* 127 S.Ct. 2197, 2200 (2007) (per curiam) (internal quotation marks and citations omitted); *accord Boykin v. Key-Corp,* 521 F.3d 202, 213-14 (2d Cir.2008).

**\*4** Calero, Fischer, and Selsky argue that Odom has failed to "allege sufficient specific facts to support the stated causes of action," Def. Mem. at 7, by which they apparently mean to argue that he has failed to state a claim under Fed.R.Civ.P. 12(b)(6), *see* Def. Mem. at 4-5, 7 (citing *Bell Atl. Corp.*), 9-11; Def. Not. We now consider whether Odom's Amended Complaint states a claim against any of these defendants.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

B. *Section 1983 Claims*

To assert a claim under 42 U.S.C. § 1983, a plaintiff must show that he has been deprived of a right secured by the Constitution or federal law by a defendant acting under the color of state law. 42 U.S.C. § 1983; *see West v. Atkins,* 487 U.S. 42, 48 (1988). Section 1983 does not grant any substantive rights, but rather "provides only a procedure for redress for the deprivation of rights established elsewhere," *Thomas v. Roach,* 165 F.3d 137, 142 (2d Cir.1999) (citations omitted), namely in the Constitution or federal statutes. Here it is undisputed that the defendants were acting under color of law. The only question is whether plaintiff has shown that they committed a violation of plaintiff's federal rights. In this case, the only violations that the complaint may be fairly read to assert are violations of the Due Process clause of the Fourteenth Amendment.

A party asserting a due process claim " 'must establish (1) that he possessed a liberty interest and (2) that the defendant(s) deprived him of that interest as a result of insufficient process.' " *Ortiz v. McBride,* 380 F.3d 649, 654 (2d Cir.2004) (quoting *Giano v. Selsky,* 238 F.3d 223, 225 (2d Cir.2001)), *cert. denied,* 543 U.S. 1187 (2005). Prisoners subject to disciplinary proceedings can show a liberty interest only if "disciplinary punishment 'imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.' " *Hanrahan v. Doling,* 331 F.3d 93, 97 (2d Cir.2003) (per curiam) (quoting *Sandin v. Conner,* 515 U.S. 472, 484 (1995)). "Factors relevant to determining whether the plaintiff endured an 'atypical and significant hardship' include 'the extent to which the conditions of the disciplinary segregation differ from other routine prison conditions' and 'the duration of the disciplinary segregation imposed compared to discretionary confinement.' " *Palmer v. Richards,* 364 F.3d 60, 64 (2d Cir.2004) (quoting *Wright v. Coughlin,* 132 F.3d 133, 136 (2d Cir.1998)).

"Segregation of longer than 305 days in standard SHU conditions is sufficiently atypical to require procedural due process protection under *Sandin.*" *Iqbal v. Hasty,* 490 F.3d 143, 161 (2d Cir.2007). Odom alleges that he was sentenced to 455 days in the SHU as a result of the disciplinary hearings on June 7, 2001 and July 16, 2001, Am. Compl. ¶ 18, and defendants do not contest that Odom's confinement implicates a liberty interest. Thus, for the purposes of this motion we assume that Odom's sentence of confinement in the SHU implicates a liberty interest.

**\*5** We next address each defendant's arguments regarding whether Odom was deprived of his liberty through insufficient process.

1. *Calero*

As previously noted, Odom alleges that Calero violated his due process rights by the manner in which she conducted disciplinary hearings with respect to misbehavior reports on June 7, 2001 and July 16, 2001. *See* Am. Compl. ¶¶ 4, 17, 27-31, 46-49. Specifically, he alleges that "Calero ... violated the plaintiff's due process rights by failing (without rational explanation) to obtain the testimony of the witnesses requested by the plaintiff during his June 7, 2001 and July 16, 2001 disciplinary hearings." Pl. Aff. ¶ 9; *see* Am. Compl. ¶ 31 (Calero "refused to allow plaintiff to call witnesses and precluded the plaintiff from presenting a defense"); *accord id.* ¶ 49. Odom asserts that in one of the hearings he requested that Calero call "several inmates as witnesses" for him and "provided their cell locations," Declaration in Support of Plaintiff's Motion for Summary Judgment, dated Apr. 14, 2008 (attached to S.J. Motion), ¶ 3, but that she refused to call them on the ground that "staff reports gave a 'full picture' of the incident," *id.* ¶ 4. "The evidence at the hearing consisted solely of the written report of defendant Perez, inmate Hurt's and my neighbor W16 cell and my testimony" [sic]. *Id.* ¶ 5.

In addition, Odom alleges that he was not afforded "the right to a fair and impartial hearing of-

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

ficer" in his disciplinary hearings. Am. Compl. ¶ 27; *accord id.* ¶ 48. Specifically, he alleges that Calero asked prison officials leading questions and provided "most of their answers." *Id.* ¶ 30; *accord id.* ¶ 48.

According to the Second Circuit:

The due process protections afforded a prison inmate do not equate to "the full panoply of rights" due to a defendant in a criminal prosecution. *Wolff v. McDonnell,* 418 U.S. at 556, 94 S.Ct. 2963. Notably, there is no right to counsel or to confrontation at prison disciplinary hearings. *See id.* at 567-70, 94 S.Ct. 2963. Nevertheless, an inmate is entitled to advance written notice of the charges against him; a hearing affording him a reasonable opportunity to call witnesses and present documentary evidence; a fair and impartial hearing officer; and a written statement of the disposition, including the evidence relied upon and the reasons for the disciplinary actions taken. *See id.* at 563-67, 94 S.Ct. 2963; *accord Luna v. Pico,* 356 F.3d at 487; *Kalwasinski v. Morse,* 201 F.3d at 108.

*Sira v. Morton,* 380 F.3d 57, 69 (2d Cir.2004).

Construing the complaint in the manner most favorable to plaintiff, Odom's allegations that he was not given a reasonable opportunity to call witnesses and that Calero "provided answers" to questions asked at the hearings are sufficient to state a claim for violation of his due process rights. The defendants' argue that the allegations are infirm because Odom does not give sufficient factual details such as the names of witnesses that he would have called or the evidence he would have presented. Def. Mem. at 7. At this stage of the litigation, however, when only a "short and plain statement" of a claim is required by Fed.R.Civ.P. 8(a)(2), and where the plaintiff is proceeding *pro se,* such factual detail is not required in the complaint.

**\*6** The defendants also argue that Odom has

failed to state a claim because there was some evidence on which Calero could have reasonably relied in making her decisions at the disciplinary hearings. Def. Mem. at 10; Def. Reply at 4. Certainly, a hearing decision will be upheld if there is "any evidence" in the record to support it. *Friedl v. City of New York,* 210 F.3d 79, 85 (2d Cir.2000) (emphasis omitted). But this argument fails for two reasons. First, it requires the Court to look outside the record on a motion to dismiss. Second, it does not address the question of whether Calero committed a due process violation. By asking the Court to judge the decision based on the record that Calero allowed to be created, the defendants ignore the allegations that Odom was not given a reasonable opportunity to call witnesses in order to create a proper record in the first place.

### 2. *Fischer and Selsky*

The defendants argue that Odom has failed to allege the personal involvement of Fischer and Selsky in any constitutional violation. Def. Mem. at 9. "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006) (internal quotation marks and citation omitted). In addition, personal liability under section 1983 cannot be imposed upon a state official based on a theory of *respondeat superior. See, e.g., Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) ( "supervisor liability in a § 1983 action depends on a showing of some personal responsibility, and cannot rest on *respondeat superior"* ), *cert. denied,* 543 U.S. 1093 (2005); *accord Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996). According to the Second Circuit,

The personal involvement of a supervisor may be established by showing that he (1) directly participated in the violation, (2) failed to remedy the violation after being informed of it by report or appeal, (3) created a policy or custom under which the violation occurred, (4) was grossly negligent in supervising subordinates who committed the viola-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

tion, or (5) was deliberately indifferent to the rights of others by failing to act on information that constitutional rights were being violated.

*Iqbal,* 490 F.3d at 152-53 (citing *Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995)).

Odom's central allegation is that Fischer and Selsky violated his rights by not overturning Calero's decisions when he appealed the disciplinary hearing decisions to them. Odom argues that Fischer and Selsky "both became responsible" for the due process violations committed at the hearings "when they ... failed to correct [the violations] in the course of their supervisory responsibilities." Am. Compl. ¶¶ 32, 50. He alleges that they "refus[ed] to overturn [his] disciplinary conviction and expunge it, despite their knowledge of the ... due process violations." *Id.* ¶ 34; *accord id.* ¶¶ 50-52. While the source of that knowledge is not identified, the context of allegations make clear that it could only have been derived from their review of Odom's assertions as part of the appeal process itself. Indeed, in another submission, Odom asserts that he "identified the due process violations in his discretionary appeal and direct appeal letters," and that as a result "Fischer and Selsky both knew just what to look for." Pl. Aff. ¶ 12.

**\*7** These allegations are insufficient to show personal involvement in the due process violation alleged to have been committed by Calero. Odom concedes that neither Fischer nor Selsky "commit[ted] the due process violations" themselves. Am. Compl. ¶¶ 32, 50. Rather, Calero is alleged to have committed the alleged due process violation. Once the hearing was over and her decision was issued, the due process violation was completed. The only opportunity that Fischer or Selsky had to rectify this violation was through the appeal process itself.

The only method outlined by the Second Circuit by which personal involvement may be shown poten-

tially relevant here is that Fischer and Selsky, "after being informed of the violation through [the appeals], failed to remedy the wrong." *Colon,* 58 F.3d at 873. This method does not apply here, however, because-as has been noted in a related context-"affirming the administrative denial of a prison inmate's grievance by a high-level official is insufficient to establish personal involvement under section 1983." *Manley v. Mazzuca,* 2007 WL 162476, at *10 (S.D.N.Y. Jan. 19, 2007) (citing, *inter alia, Foreman v. Goord,* 2004 WL 1886928, at *7 (S.D.N.Y. Aug. 23, 2004) ("The fact that [the prison superintendent] affirmed the denial of plaintiff's grievances is insufficient to establish personal involvement.")). As was noted in *Thompson v. New York,* 2001 WL 636432 (S.D.N.Y. Mar. 15, 2001), "[w]ere it otherwise, virtually every prison inmate who sues for constitutional torts by prison guards could name the Superintendent as a defendant since the plaintiff must pursue his prison remedies and invariably the plaintiff's grievance will have been passed upon by the Superintendent." *Id.* at *7 (internal citations omitted). The reference in case law to an official who "fails to remedy" a violation logically applies only to ongoing, and therefore correctable, constitutional violations-not to a specific event that is later subject to formal review by designated officials once the constitutional violation has already concluded. As was held in *Harnett v. Barr,* 538 F.Supp.2d 511 (N.D.N.Y.2008), "[i]f the official is confronted with a violation that has already occurred and is not ongoing, then the official will not be found personally responsible for failing to 'remedy' a violation." *Id.* at 524; *accord Thompson,* 2001 WL 636432, at *7 ("The Second Circuit's reference to the failure by a supervisor to remedy a known wrong seems to have a different focus. As worded, it appears to address cases involving continuing unconstitutional prison conditions that the warden may be proven or assumed to know about, and a refusal by the warden to correct those conditions."). In this case, any constitutional violation allegedly committed by Calero was concluded by the time Fischer and Selsky were called upon to review it. Accordingly, they were not "per-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

sonally involved" in committing the alleged due process violations.[FN1]

> FN1. Odom has made other allegations against Fischer that are too vague and conclusory to state a claim for a due process violation, such as the assertion that Fischer "subjected" Odom to four of the misbehavior reports after Odom testified at the other inmate's disciplinary hearing. Am. Compl. ¶ 43. Another assertion-that Fischer intentionally assigned Calero as the hearing officer at both hearings in order to violate Odom's due process rights, *id.* ¶¶ 14, 28, 46-is insufficient to show personal involvement inasmuch as it was Calero's responsibility to act as an impartial hearing officer. To fault Fischer, as a supervisory official, for giving her his assignment is tantamount to arguing that he failed in his supervisory responsibilities. *See Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985) (per curiam) (a mere "linkage in the prison chain of command" is not sufficient to demonstrate personal involvement for purposes of section 1983).

### C. *Qualified Immunity*

**\*8** The defendants assert that they are entitled to qualified immunity. Def. Mem. at 11. The doctrine of qualified immunity precludes civil liability where prison officials performing discretionary functions " 'did not violate clearly established rights or if it would have been objectively reasonable for the official[s] to believe [their] conduct did not violate plaintiff's rights.' " *Reuland v. Hynes,* 460 F.3d 409, 419 (2d Cir.2006) (quoting *Mandell v. County of Suffolk,* 316 F.3d 368, 385 (2d Cir.2003)), *cert. denied,* 128 S.Ct. 119 (2007); *accord Ford v. McGinnis,* 352 F.3d 582, 596 (2d Cir.2003) (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982)); *see also Hope v. Pelzer,* 536 U.S. 730, 739 (2002) (qualified immunity ensures that defendants have "fair notice" that their conduct is unlawful before being exposed to liability, and "[f]or a

constitutional right to be clearly established, its contours 'must be sufficiently clear that a reasonable official would understand that what he is doing violates that right' " (quoting *Anderson v. Creighton,* 483 U.S. 635, 640 (1987))). A qualified immunity defense may be asserted as part of a motion under Fed.R.Civ.P. 12(b)(6) if it is based on facts appearing on the face of the complaint, though defendants asserting the defense at this stage face a "formidable hurdle." *McKenna v. Wright,* 386 F.3d 432, 434-35 (2d Cir.2004).

With respect to Calero, the defendants' brief makes no argument that the rights of a prisoner to due process at a disciplinary hearing under the standard set forth in *Wolff v. McDonnell,* 418 U.S. 539 (1974), were not clearly established at the time of Odom's hearings. *See* Def. Mem. at 11-12. Instead, they seem to argue that Calero's actions were objectively reasonable. *Id.* But their only support for this argument is material outside the record, *see id.* at 11, and their claim that the decision on the disciplinary hearings must have been justified by the evidence presented at the hearing. As noted previously, however, the issue is whether the complaint alleges that Calero committed a due process violation-not whether the decision was justified by record.

"In analyzing whether the defense of qualified immunity may be successfully invoked on a motion to dismiss, the court need look no further than the complaint's allegations regarding the specific procedural protections allegedly denied the plaintiff. If the entitlement to those protections was 'clearly established' at the time of the administrative hearing ... then the defense is unavailable." *Wright v. Dee,* 54 F.Supp.2d 199, 207 (S.D.N.Y.1999). Calero does not contest that it was clearly established at the time of Odom's hearings that he was entitled to call witnesses on his behalf, *see, e. g., Sira,* 380 F.3d at 69, and that he was entitled to an impartial hearing officer, *see, e.g., Allen v. Cuomo,* 100 F.3d 253, 259 (1996). Odom alleges that these procedural protections were denied him.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

Thus, Calero has not shown that the complaint establishes that she is entitled to qualified immunity for Odom's due process claims.[FN2]

> **FN2.** While it is clear in the Amended Complaint that Odom is alleging that Perez and McCoy filed the misbehavior reports in retaliation for Odom's testifying at another inmate's disciplinary hearing, Am. Compl. ¶¶ 24-25, 44-45, no retaliation claim has been asserted against Calero. To the extent the complaint could be construed as making such a claim against Calero, it would have to be dismissed because it is not clearly established in this Circuit that a prisoner has a constitutional right to testify in a disciplinary hearing of another inmate. *See Pettus v. McGinnis,* 533 F.Supp.2d 337, 340 (W.D.N.Y.2008) ("This Court has found no authority ... that even today clearly establishes within this circuit whether an inmate's testimony on behalf of another inmate at the other inmate's disciplinary hearing is constitutionally protected.") (dismissing claim of retaliation) (emphasis omitted).

**D.** *Claims Under* *42 U.S.C. § 1985*

**\*9** Odom also purports to assert conspiracy claims under 42 U.S.C. § 1985. *See* Am. Compl. at 1. "To state a conspiracy claim under 42 U.S.C. § 1985, plaintiff must allege (1) some racial or other class-based discriminatory animus underlying the defendants' actions, and (2) that the conspiracy was aimed at interfering with the plaintiff's protected rights." *Porter v. Selsky,* 287 F.Supp.2d 180, 187 (W.D.N.Y.2003) (citing *Bray v. Alexandria Women's Health Clinic,* 506 U.S. 263, 268 (1993); *Gagliardi v. Village of Pawling,* 18 F.3d 188, 194 (2d Cir.1994)), *aff'd on other grounds,* 421 F.3d 141 (2d Cir.2005). There are no explicit allegations of conspiracy in the Amended Complaint, however. When this issue was raised by defendants in their motion, Odom's response, *see* Pl. Aff. ¶ 46, pointed to scattered allega-

tions in the Amended Complaint that particular defendants "acted alone and/or in conjunction with another named defendant." *See, e.g.,* Am. Compl. ¶¶ 28, 31, 32, 46, 50. Nothing in Odom's allegations, however, shows that the elements of a section 1985 claim, quoted above, have been met.

**E.** *Eleventh Amendment*

The defendants argue that "[i]f claims are being made against defendants in their positions of authority within DOCS, those claims are essentially claims against DOCS or the State of New York and are barred." Def. Mem. at 17. Odom does not address this argument.

The Eleventh Amendment provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. amend. XI. While the language of the Eleventh Amendment is not literally applicable to suits brought by citizens of the state being sued, the Supreme Court has long held that it bars such suits as well. *See, e.g., Employees of Dep't of Pub. Health and Welfare v. Dep't of Pub. Health and Welfare,* 411 U .S. 279, 280 (1973). Thus, "[i]t is clear ... that in the absence of consent a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the Eleventh Amendment." *Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 100 (1984) (citations omitted). The Supreme Court has also explicitly held that 42 U.S.C. § 1983 is not a statute that abrogates the States' sovereign immunity. *See Quern v. Jordan,* 440 U.S. 332, 340-45 (1979).

The bar imposed by the Eleventh Amendment "remains in effect when State officials are sued for damages in their official capacity ." *Kentucky v. Graham,* 473 U.S. 159, 169 (1985). Thus, the Eleventh Amendment bars suits against individual employees of the State who are named as defendants in

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)
**(Cite as: 2008 WL 2735868 (S.D.N.Y.))**

their official capacities. *See, e.g.,* Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir.2003); Eng v. Coughlin, 858 F.2d 889, 894 (2d Cir.1988). Accordingly, to the extent that Odom intends to state claims for money damages against Calero or any other defendant in their official capacities, such claims must be dismissed.

E. *Odom's April 14, 2008 Motion for Summary Judgment*

**\*10** Odom recently filed a motion for summary judgment (Docket # 48). This motion should be denied for two reasons. First, its statement of material facts (Docket # 52) violates Local Civil Rule 56.1(d) inasmuch as none of the statements are "followed by citation to evidence which would be admissible, set forth as required by Federal Rule of Civil Procedure 56(e)." Second, discovery has not yet begun in this case. Thus, a motion for summary judgment is premature and would merely result in a denial pursuant to Fed.R.Civ.P. 56(f). Odom previously filed a motion for summary judgment and it was denied for precisely this reason. *See* Order, filed Nov. 30, 2007 (Docket # 36) (available at: *Odom v. Calero,* 2007 WL 4191752 (S.D.N.Y. Nov. 28, 2007)).

*Conclusion*

For the foregoing reasons, the defendants' motion to dismiss the first and second causes of action (Docket # 20) should be granted in part and denied in part, with the only claim to proceed being the due process claim against Calero. Odom's motion for summary judgment (Docket # 48) should be denied.

**PROCEDURE FOR FILING OBJECTIONS TO THIS REPORT AND RECOMMENDATION**

Pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure, the parties have ten (10) days from service of this Report and Recommendation to serve and file any objections. *See also* Fed.R.Civ.P. 6(a), (b), (d). Such objections (and any responses to objections) shall be filed with the Clerk of the Court, with copies sent to the Hon. Lewis A. Kaplan, and to the undersigned, at 500 Pearl Street,

New York, New York 10007. Any request for an extension of time to file objections must be directed to Judge Kaplan. If a party fails to file timely objections, that party will not be permitted to raise any objections to this Report and Recommendation on appeal. *See* *Thomas v. Arn,* 474 U.S. 140 (1985).

S.D.N.Y.,2008.
Odom v. Calero
Not Reported in F.Supp.2d, 2008 WL 2735868 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Kenneth J. PHELAN, Plaintiff,
v.
HERSH, C.O., Mt. McGregor Corr. Facility; M. Scott,
C.O., Mt. McGregor Corr. Facility; Pam Ramond,
Civilian Library Clerk, Mt. McGregor Corr. Facility;
Goodman, Lieutenant, Mt. McGregor Corr. Facility;
Fletcher, Civilian Employee, Mt. McGregor Corr.
Facility; J. Micheals, Sergeant, Mt. McGregor Corr.
Facility; Cambell, Sergeant, Mt. McGregor Corr.
Facility; W. Haggett, Superintendent, Mt. McGregor
Corr. Facility; Gregory Kadien, Superintendent,
Gowanda Corr. Facility; P.Millson, Mental Health
Director, Gowanda Corr. Facility; Brian Fischer,
Commissioner of Department of Corr.; James Mor-
gan, Associate Director of the Office of Mental
Health; R. Regan, Corr. Officer, Gowanda Corr. Fa-
cility; Acosta–Ortiz, Corr. Officer, Gowanda Corr.
Facility; B. Pawelczak, Civilian Hearing Officer,
Gowanda Corr. Facility; Stachewiez, Lieutenant,
Gowanda Corr. Facility; Thompson, Deputy Super-
intendent, Collins Corr. Facility; R. Thomas, Corr.
Officer, Mt. McGregor Corr. Facility, a/k/a "Fat Boy",
Defendants.

Civ. No. 9:10–CV–0011 (GLS/RFT).
Sept. 13, 2011.

Kenneth J. Phelan, Comstock, NY, pro se.

Hon. Eric T. Schneiderman, New York State Attorney
General, Department of Law, The Capitol, Adrienne J.
Kerwin, Esq., Assistant Attorney General, of Counsel,
Albany, NY, for Defendants.

ORDER

RANDOLPH F. TREECE, United States Magistrate
Judge.

**\*1** Kenneth J. Phelan, a New York state prison
inmate proceeding *pro se* and *in forma pauperis,*
commenced this action pursuant to 42 U.S.C. § 1983,
alleging, *inter alia,* in forty-three causes of action, that
Defendants retaliated against him for filing grievanc-
es, denied him due process of the law, denied him
adequate mental health treatment in deliberate indif-
ference to his medical needs, subjected him to cruel
and unusual punishment, and generally harassed and
discriminated against him on account of his disability.
Dkt. No. 1, Compl. Defendants now move for dis-
missal of the Complaint pursuant to Federal Rule of
Civil Procedure 12(b)(6). Dkt. No. 55. Plaintiff op-
poses the Motion. Dkt. No. 60. For the reasons that
follow, we recommend that Defendants' Motion be
**granted** in part and **denied** in part.

**I. BACKGROUND**
**A. Facts**

The following facts are derived from the Com-
plaint, which, in accordance with the standard of re-
view on a motion to dismiss, must be taken as true. *See
infra* Part II.A.

On or about March 25, 2009, Plaintiff, while
housed at Mt. McGregor Correctional Facility, re-
quested mental health treatment from "sick call,"
where a nurse told him he would be notified when
treatment becomes available. Compl. at ¶ 6. On April
2, 2009, Plaintiff asked Defendant Hersh if he could
go to the "grievance building" to file an administrative
grievance complaining about the lack of mental health
treatment, to which Hersh replied that he could. *Id.* at ¶
7. At the grievance building, Defendant Scott "im-
mediately started yelling at [Plaintiff] and demanded
to know why [he] wanted to file [a grievance]." *Id.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

Scott called Plaintiff a "fucking retard" and that "[w]e don't allow fucking inmates to file grievances. If you got a problem we'll just beat the shit out of you. You really got a problem?" *Id.* Plaintiff feared for his life, and responded "no, ma['a]m" and returned to his housing unit without filing a grievance. *Id.* at ¶ 8. Twenty minutes after returning, Defendant Thomas, Defendant Hersh, and an unidentified Correctional Officer searched Plaintiff's cell, throwing his "neatly folded and ironed laundry ... on the floor shaking them out." *Id.* at ¶ 9. Defendant Thomas also read Plaintiff's legal mail and "stomped on his legal papers and mail," while Hersh told him they "don't allowed retards to file grievances" and threatened to fight him. *Id.* Thomas told Plaintiff that "[t]his is how we deal with grievances here retard." *Id.* Plaintiff received two disciplinary "write ups" from the incident, alleging, among other things, that Plaintiff refused direct orders and had gang material in his locker. *Id.* at ¶¶ 10–11.

On or about April 7, 2009, Plaintiff requested mental health treatment from Correctional Officer Collins, who is not a named Defendant in this action and who arranged for "a nurse at medical" to speak with Plaintiff. *Id.* at ¶ 12. The nurse told Plaintiff that someone from mental health would be coming in a few days and asked if Plaintiff wanted to go to the infirmary until mental health assistance arrived, to which Plaintiff said no, because "that won't solve anything." *Id.*

**\*2** On April 14, 2009, Plaintiff went to the law library, where the clerk, Defendant Raymond, told Plaintiff, "[o]h, you are that retard the C/Os told me about.... I can do whatever I want to you retard.... Get the hell out of my library retard." *Id.* at ¶ 13. Plaintiff received a disciplinary ticket for this incident. *Id.* When he returned to his housing, Plaintiff was confronted by Defendants Cambell and Micheals, who yelled at Plaintiff, saying "[y]ou are a fucking retard and a scumbag, you know that[?] ... Stop l[y]ing about a disability and take your fucking medicine like a man;" they then asked Plaintiff for his "side of the

story" regarding the incident in the library. *Id.* at ¶ 15. Apparently not satisfied with Plaintiff's synopsis, Defendant Micheals "came up beside [Plaintiff] and hit[ ] [Plaintiff] in the head several times, aggravating [his] Tra[u]matic Brain Injury." *Id.*

In April 2009, three disciplinary hearings for Plaintiff commenced. Two of the hearings, which started on April 9 and April 17, addressed disciplinary tickets Plaintiff received from Defendant Thomas and Defendant Ramond, respectively, and were presided over by Defendant Fletcher. *Id.* at ¶¶ 16 & 19. The other disciplinary hearing, presided over by Defendant Goodman, regarded a ticket from Defendant Scott and commenced on April 14. *Id.* at ¶ 17. Both Defendants Fletcher and Goodman stayed their hearings to undertake mental health assessments after Plaintiff told the hearing officers he had a mental disability. *Id.* at ¶¶ 16–17. Plaintiff claims that the proceedings restarted with no mental health assessment ever being undertaken. *Id.* at ¶¶ 18–21. Plaintiff complains that in Defendant Fletcher's disciplinary hearings, Fletcher interviewed witnesses outside Plaintiff's presence and investigated witnesses suitability for the hearing without Plaintiff's involvement, which "was b[ia]sed." *Id.* at ¶¶ 19 & 21.

Pursuant to the disciplinary ticket issued by Defendant Thomas, Plaintiff plead not guilty "to the gangs charge" and guilty to the other charges, wherefore Defendant Fletcher found Plaintiff guilty of all charges and sentenced him three months in a Special Housing Unit ("SHU"), three months loss of packages, commissary, and phone privileges, and a five-dollar surcharge. *Id.* at ¶ 18. Defendant Fletcher also sentenced Plaintiff to the same punishment with regard to the disciplinary ticket from Defendant Ramond. *Id.* at ¶ 21.[FN1] Defendant Goodman sentenced Plaintiff to thirty days "keepblock, suspended 30 days and deferred for 90 days," a five-dollar surcharge, and took away Plaintiff's yard, packages, commissary, and phone privileges for thirty days. *Id.* at ¶ 20. Plaintiff appealed the disciplinary hearing determinations from

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

Defendants Thomas's and Ramond's tickets; all convictions were affirmed except "the gang charge," which was reversed on May 26, 2009 "by the Commissioner." *Id.* at ¶¶ 22–23.

> FN1. It is unclear by Plaintiff's Complaint whether these two sentences were to run concurrently or consecutively.

**\*3** On or about May 14, 2009, Plaintiff was transferred to Downstate Correctional Facility for an overnight stay. *Id.* at ¶ 24. Plaintiff was "sha[c]kled and cuffed to waist chains for about 4 hours, even though [he has] a mental illness." *Id.* The next day, Plaintiff was strip-searched and handcuffed and restrained again in order to be transferred to Lakeview Shock Correctional Facility, which was "about a 12 hour drive;" the drive made Plaintiff's shoulder muscles "very sore." *Id.* Plaintiff was not given a hot meal that day, but "was only given another dry boloney sandwich." *Id.* Plaintiff does not attribute these acts to any specific Defendants. Around July 19, 2009, Plaintiff was transferred to Gowanda Correctional Facility. *Id.* at ¶ 25.

On or about July 21, 2009, Plaintiff had a medical doctor appointment with Dr. Bangsil,[FN2] who was concerned with Plaintiff's history of suicide attempts and put in a referral for Plaintiff "to see someone in mental health." *Id.* at ¶ 26. However, Plaintiff did not see someone from mental health until September 8, 2009; in the interim, he placed upwards of seven requests to "see M.H." *Id.* at ¶¶ 27–34 & 37. He also received a disciplinary ticket from Defendant Regan for smoking—"even though Plaintiff is a non-smoker and allergic to cigarette smoke—and Regan told him that, "I heard about you retard, you want treatment, I will throw you in the SHU." *Id.* at ¶¶ 35–36. When Plaintiff saw Defendant Millson, a psychologist from mental health who reviewed Plaintiff's medical history, Millson denied Plaintiff's specific request to see a psychiatrist. *Id.* at ¶¶ 32, 34, & 37.

> FN2. Dr. Bangsil is not a named Defendant in this action.

On September 15, 2009, Plaintiff's hearing for the smoking disciplinary ticket commenced, presided over by Lieutenant Kolpack,[FN3] where Plaintiff again "was not allowed to see a psychiatrist." *Id.* at ¶ 38. On September 14, Plaintiff had a doctor appointment with Dr. Bangsil and Nurse Amborlosi,[FN4] who both called the Plaintiff "retard" and told him to "get out of here," to which Plaintiff responded he would "see them in court." *Id.* at ¶ 39. Plaintiff was then written up on September 16 by Defendant Acosta–Ortiz, who called Plaintiff "pea brain," "retard," and "scumbag." *Id.* at ¶ 40. Plaintiff's disciplinary hearing for this ticket occurred on September 21, where hearing officer Defendant Pawelczak "force[d] Plaintiff to enter a plea" even though "[Plaintiff has] M.H. issues and can't proceed;" at the hearing Plaintiff claimed that Defendant Millson's evaluation of Plaintiff's mental health should be disregarded because he "is not competent to evaluate Plaintiff's M.H. condition because he is not a psychiatrist." *Id.* at ¶ 41. Plaintiff had another disciplinary hearing before Defendant Stachewiez, who Plaintiff claimed did not interview employee witnesses on the record. *Id.* at ¶ 43. Plaintiff was found guilty at all the above-mentioned hearings and lost all appeals, at least some of which were denied by Defendants Kadien and Fischer. *Id.* at ¶¶ 38 & 41–43.

> FN3. Lieutenant Kolpack is not a named Defendant in this action.

> FN4. Nurse Amborlosi is not a named Defendant in this action.

**\*4** Plaintiff characterizes himself as someone suffering from Traumatic Brain Injury, who is slow to process information and has outbursts of temper and impulsive behavior. *Id.* at ¶ 46. He outlines his claims

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

against the multiple Defendants in forty-three various causes of action. *See id.* at ¶ 47 [hereinafter "Causes of Action"]. He is currently housed at Collins Correctional Facility. *Id.* at ¶ 2.

### B. Procedural History

Plaintiff filed his civil rights Complaint on January 5, 2010, along with a Motion to Proceed *In Forma Pauperis* ("IFP"). Dkt. Nos. 1 & 2. On January 20, 2010, the Honorable Gary L. Sharpe, United States District Judge, reviewed those filings and granted Plaintiff permission to proceed with this mater IFP. Dkt. No. 5. However, citing various inadequacies with Plaintiff's pleading, Judge Sharpe dismissed Defendants R. Regan and Pam Ramond from this action, dismissed all of Plaintiff's claims of "harassment," and denied Plaintiff's motion for injunctive relief. *See generally id.*

On February 2, 2010, Plaintiff filed a Motion for Reconsideration of Judge Sharpe's Decision and Order. Dkt. 10. In an almost identical filing on the same day, Plaintiff also brought a Notice of Appeal to the Second Circuit Court of Appeals from the January Order. Dkt. 11. In a Decision and Order issued on July 20, 2010,[FN5] Judge Sharpe re-instated Defendants Pam Ramond and R. Regan and denied Plaintiff's request to be appointed counsel. Dkt. No. 22. Finally, pursuant to Plaintiff's representations that he wished to "waive [his] challenge to loss of good time," *see* Dkt. No. 23, Judge Sharpe dismissed all claims set forth in the Complaint relating to the loss of good time credits in disciplinary hearings, as well as directed the Clerk of the Court to strike Plaintiff's submitted Amended Complaint as duplicative. Dkt. No. 27.[FN6]

FN5. "[I]f a notice of appeal is filed after a motion for reconsideration, the district court retains jurisdiction over the motion for reconsideration." *Rich v. Associated Brands, Inc.,* 2009 WL 236055, at *1 (W.D.N.Y. Jan.30, 2009) (citing *Basciano v. Lindsay,* 2008 WL 1700442, at *1 (E.D.N.Y. April 9,

2008)).

FN6. Judge Sharpe noted that the only difference between Plaintiff's Complaint and his proposed Amended Complaint was an additional claim against Defendant Haggett related to the conditions of Plaintiff's confinement. This exact same claim is asserted in another action now pending in this District. *See Phelan v. Durniak,* 9:10–cv–666 (FJS/RFT). This Court also notes that Plaintiff has filed a virtually identical complaint to this instant action in this District, with the exact same factual assertions, but bringing claims against the defendants pursuant to the Americans with Disabilities Act ("ADA"). *See Phelan v. Thomas et al.,* 9:10–cv–012 (DNH/RFT). Because of the existence of this pending action, we will not address any claims Plaintiff makes in his instant Complaint seeking relief from Defendants under the ADA. *See, e.g., Curtis v. Citibank, N.A.,* 226 F.3d 133, 138 (2d Cir.2000) ("As a part of its general power to administer its docket, a district court may stay or dismiss a suit that is duplicative of another federal court suit.").

### II. DISCUSSION
### A. Standard of Review

On a motion to dismiss, the allegations of the complaint must be accepted as true. *See Cruz v. Beto,* 405 U.S. 319, 322, 92 S.Ct. 1079, 31 L.Ed.2d 263 (1972). The trial court's function "is merely to assess the legal feasability of the complaint, not to assay the weight of the evidence which might be offered in support thereof." *Geisler v. Petrocelli,* 616 F.2d 636, 639 (2d Cir.1980). "The issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974) (*overruled on other grounds by Davis v. Scherer,* 468 U.S. 183, 104 S.Ct. 3012, 82 L.Ed.2d 139 (1984)).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

"Generally, in determining a 12(b)(6) motion, the court may only consider those matters alleged in the complaint, documents attached to the complaint, and matters to which the court may take judicial notice." *Spence v. Senkowski,* 1997 WL 394667, at *2 (N.D.N.Y. July 3, 1997) (citing *Kramer v. Time Warner Inc.,* 937 F.2d 767, 773 (2d Cir.1991)). Moreover, "even if not attached or incorporated by reference, a document 'upon which [the complaint] solely *relies and which is* integral to the complaint' may be considered by the court in ruling on such a motion." *Roth v. Jennings,* 489 F.3d 499, 509 (2d Cir.2007) (emphasis in original) (quoting *Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 47 (2d Cir.1991)).

**\*5** The court is bound to give the plaintiff the benefit of every reasonable inference to be drawn from the "well-pleaded" allegations of the complaint. *See Retail Clerks Intern. Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 373 U.S. 746, 754 n. 6, 83 S.Ct. 1461, 10 L.Ed.2d 678 (1963); *see also Arar v. Ashcroft,* 532 F.3d 157, 168 (2d Cir.2008). Nevertheless, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937, 1949, 173 L.Ed.2d 868 (2009). Therefore, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citation omitted).

A motion to dismiss pursuant to Rule 12(b)(6) may not be granted so long as the plaintiff's complaint includes "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007); *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1960, 173 L.Ed.2d 868 (citing *Twombly* ).[FN7] "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1949, 173 L.Ed.2d 868. This plausibility standard "is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* Thus, in spite of the deference the court is bound to give to the plaintiff's allegations, it is not proper for the court to assume that "the [plaintiff] can prove facts [which he or she] has not alleged, or that the defendants have violated the ... laws in ways that have not been alleged." *Assoc. Gen. Contractors of California, Inc. v. California State Council of Carpenters,* 459 U.S. 519, 526, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983). The process of determining whether a plaintiff has "nudged [his] claims ... across the line from conceivable to plausible," entails a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. at 1950–51, 173 L.Ed.2d 868.

> FN7. By its opinion in *Bell Atl. Corp. v. Twombly* and then again in *Ashcroft v. Iqbal,* the Supreme Court abrogated the often-cited language of *Conley v. Gibson* "that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Bell Atl. Corp. v. Twombly,* 550 U.S. 561 (2007) (quoting *Conley,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)). In so doing, the Court found that *Conley* "described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.* at 563.

**B. Deference Given to *Pro Se* Litigants**

Plaintiff herein is proceeding with this action *pro se.* "[A] pro se complaint, 'however inartfully pleaded,' must be held to 'less stringent standards than formal pleadings drafted by lawyers.' " *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

251 (1976) (citing, *inter alia*, *Haines v. Kerner*, 404 U.S. 519, 520–21, 92 S.Ct. 594, 30 L.Ed.2d 652) (other internal citations and quotation marks omitted). However, the Second Circuit has stated that there are circumstances where an overly litigious inmate, "who is quite familiar with the legal system and with pleading requirements," may not be afforded such special solicitude. *Davidson v. Flynn*, 32 F.3d 27, 31 (2d Cir.1994) (declining to afford an "extremely litigious inmate" the benefit of lenient treatment normally afforded *pro se* litigants and thus denying the opportunity to amend a claim where he failed to properly plead a cause of action); *see also Davidson v. Dean*, 204 F.R.D. 251, 257 (S.D.N.Y.2001) (citing *Davidson v. Flynn*, 32 F.3d at 31, and refusing to accord deference to same plaintiff); *Santiago v. C.O. Campisi Shield No. 4592*, 92 F.Supp.2d 665, 670 (S.D.N.Y.2000) (applying *Davison v. Flynn* to *pro se* plaintiff who had ten suits pending in district); *Brown v. McClellan*, 1996 WL 328209, at *1 n. 3 (W.D.N.Y. Jun.11, 1996) (stating that plaintiff's "litigious nature," notwithstanding his *pro se* status, "weighs somewhat against the leniency that is normally accorded"); *Brown v. Selsky*, 1995 WL 13263, at *8 n. 1 (W.D.N.Y. Jan.10, 1995) (denying special solicitude to *pro se* plaintiff who had seven cases pending in district).

**\*6** It is patently clear that Kenneth J. Phelan, the instant Plaintiff, is no stranger to the courts.[FN8] In light of Plaintiff's experience in federal court, we find that the special solicitude afforded *pro se* litigants shall not be accorded herein.

FN8. Since June 2010, Phelan has filed nineteen (19) lawsuits in this district alone:

(1) *Phelan v. Sullivan et al.,* 10–cv–724 (DNH/ATB) (currently pending)

(2) *Phelan v. Thomas et al.,* 10–cv–011 (GLS/RFT) (currently pending; the instant case herein)

(3) *Phelan v. Thomas et al.,* 10–cv–012 (DNH/RFT) (currently stayed pending appeal)

(4) *Phelan v. Eckert et al.,* 10–cv–325 (TJM/GHL) (transferred to W.D.N.Y. on Apr. 8, 2010)

(5) *Phelan v. Cambell et al.,* 10–cv–540 (NAM/RFT) (currently pending)

(6) *Phelan v. Chin et al.,* 10–cv–601 (DNH/RFT) (transferred to W.D.N.Y. on June 23, 2010)

(7) *Phelan v. Durniak et al.,* 10–cv–666 (FJS/RFT) (currently pending)

(8) *Phelan v. Wolczye et al.,* 10–cv–1061 (GTS/DEP) (currently pending)

(9) *Phelan v. Lempke,* 10–cv–1108 (GTS) (closed on Sept. 28, 2010—habeas corpus petition dismissed without prejudice to Petitioner filing an action pursuant to 42 U.S.C. § 1983)

(10) *Phelan v. Zenzen et al.,* 10–cv–1178 (LEK/DEP) (transferred to W.D.N.Y. on Dec. 17, 2010)

(11) *Phelan v. Lempke,* 10–cv–1324 (TJM) (transferred to W.D.N.Y. on Nov. 4, 2010)

(12) *Phelan v. Bezio,* 11–cv–272 (GTS/GHL) (transferred to W.D.N.Y. on Mar. 15, 2011)

(13) *Phelan v. Bezio,* 11–cv–288 (DNH)

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

(currently pending)

(14) *Phelan v. Fischer et al.,* 11–cv–289 (TJM/ATB) (currently pending)

(15) *Phelan v. Delnegro,* 11–cv–313 (GTS/DRH) (currently pending)

(16) *Phelan v. Quinn et al.,* 11–cv–314 (DNH/DRH) (currently pending)

(17) *Phelan v. Lichva et al.,* 11–cv–315 (GLS/GHL) (currently pending)

(18) *Phelan v. Bezio,* 11–cv–416 (GLS) (currently pending)

(19) *Phelan v. Karandy et al.,* 11–cv–636 (NAM/RFT) (currently pending).

**C. First Amendment Claims**

*1. Retaliation*

Plaintiff claims that Defendants Thomas, Hersh, and Scott retaliated against him for attempting to file grievances. *See* Compl. at Causes of Action 3, 4, & 5.

In order to state a valid retaliation claim, a plaintiff must allege that "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." *Espinal v. Goord,* 558 F.3d 119, 128 (2d Cir.2009) (quoting *Gill v. Pidlypchak,* 389 F.3d 379, 380 (2d Cir.2004)). The required causal connection means, "in other words, that the protected conduct was a 'substantial or motivating factor' in the defendants' decision to take action against the plaintiff." *Tafari v. McCarthy,* 714 F.Supp.2d 317, 347 (N.D.N.Y.2010) (quoting *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977)).

Plaintiff alleges that Correctional Officers Thomas and Hersh searched Plaintiff's self and cell on April 2, 2009, seemingly in retaliation for Plaintiff attempting to file a grievance earlier that day about not getting appropriate mental health treatment. *See* Compl. at ¶¶ 8–9. Further, Plaintiff alleges the Defendants Thomas and Scott "wrote [Plaintiff] up" for various infractions relating to that cell search, such as refusing a direct order, and having "gang material"—all of which Plaintiff claims were fabricated and done in retaliation for his filing of a grievance. *Id.* at ¶¶ 10–11.

The Second Circuit has made clear that an inmate has a right not to be subjected to retaliation for the exercise of a constitutional right, such as petitioning the government for redress of grievances as guaranteed under the First and Fourteenth Amendments. *See, e.g .,* *Graham v. Henderson,* 89 F.3d 75, 80 (2d Cir.1996) (cited in *Dorsey v. Fisher,* 2010 WL 2008966, at *12 (N.D.N.Y. May 19, 2010)); *see also* *Colon v. Coughlin,* 58 F.3d 865, 972 (2d Cir.1995) ("Prisoners, like non-prisoners, have a constitutional right of access to the courts and to petition the government for the redress of grievances, and prison officials may not retaliate against prisoners for the exercise of that right."). Thus, there is no question that Plaintiff's conduct, filing a grievance, is protected by the Constitution and satisfies the first prong of a retaliation claim.

Plaintiff's allegations—again, taken as true for the purposes of this Motion—also establish that the Defendants took "adverse action" sufficient to state a valid retaliation claim under section 1983. Initially, we note that while many of the District Courts in this Circuit have found that a "search of an inmate's cell, even if performed with a retaliatory motive, does not give rise to a constitutional claim for retaliation," *see, e.g., Keesh v. Goord,* 2007 WL 2903682, at *8 (W.D.N.Y. Oct.1, 2007) (citing *Hudson v. Palmer,* 468 U.S. 517, 527, 104 S.Ct. 3194, 82 L.Ed.2d 393

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

(1984)),[FN9] the Second Circuit is silent on this matter. We decline to similarly draw such a hard-nosed line, and find that cell searches, if accompanied by more, can implicate a retaliation claim under section 1983. *See Shariff v. Poole,* 689 F.Supp.2d 470, 481 (W.D.N.Y.2010) ("Although a cell search is not considered to be actionable under § 1983, regardless of any retaliatory motives, there exists here a suggestive chronology of grievances, threats, and cell searches, the combination of which would likely 'chill a person of ordinary firmness from continuing to engage' in the protected activity at issue here—the filing of grievances.") (internal quotation omitted). Plaintiff states that Defendants Hersh and Thomas did more than just search his cell, but rather "tore up" his cell and locker, manipulated and damaged his legal papers, and threatened to fight Plaintiff. Finally, there was a causal connection between this cell search and the protected conduct of filing grievances. The search happened only twenty minutes after Plaintiff attempted to file a grievance, and Defendant Thomas explicitly told Plaintiff that "[t]his is how we deal with grievances here retard. Next time it will be worse." Compl. at ¶ 9. Therefore, Plaintiff's assertions are enough to state a valid retaliation claim.

> FN9. That an inmate has no constitutionally protected right of privacy in their prison cells, and that a search of that cell cannot give rise to a retaliation claim, has been found in all four District Courts of New York. *See Bumpus v. Canfield,* 495 F.Supp.2d 316, 327 (W.D.N.Y.2007) ("It is well settled ... that plaintiff cannot base a retaliation claim ... based on a cell search."); *Battice v. Phillip,* 2006 WL 2190565, at *7 (E.D.N.Y. Aug.2, 2006) (noting that "a prisoner has no reasonable expectation of privacy in his or her prison cell; therefore, a search of an inmate's cell, even for retaliatory reasons, therefore does not implicate a constitutional right"); *Gadson v. Goord,* 1997 WL 714878, at *7 (S.D.N.Y. Nov.17, 1997) (holding that

"searches of cells implicate no protected constitutional rights, even if the search is arbitrary or retaliatory in nature"); *Payne v. Axelrod,* 871 F.Supp. 1551, 1556 (N.D.N.Y.1995) ("*Hudson v. Palmer* [ ] permits even arbitrary cell searches in prison."). The cases cited herein that find these types of retaliation claims untenable collect their support in the case law noting that an inmate has no expectation of privacy in his cell, and therefore a cell search by itself is not actionable under the Fourth Amendment. Here, however, Plaintiff's claims and underlying facts allege more than a mere cell search under the Fourth Amendment, but rather state a claim of retaliation for exercising other protected constitutional rights.

**\*7** Furthermore, Plaintiff claims that he was unjustly written up by Defendants Thomas and Scott, in connection with the cell search. Plaintiff states that Defendants Thomas issued a report against Plaintiff for having gang material, harassment, and for "violating messhall proce[ ]dures," and that Defendant Scott issued one for "harassment, refusing a direct order, and [for being] out of place." Compl. at ¶¶ 10–11.

While a "prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report," *see Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997), a misbehavior report issued in retaliation to the exercise of a constitutional right constitutes an "adverse action." *See Reid v. Bezio,* 2011 WL 1577761, at *4 (N.D.N.Y. Mar.30, 2011) ("[T]here is little doubt that a misbehavior report would constitute an adverse action.") (internal quotations omitted); *Lewis v. Blazejewski,* 2007 WL 542117, at *5 (W.D.N.Y. Feb.16, 2007) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983.") (quoting *Gayle v.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

*Gonyea,* 313 F.3d 677 (2d Cir.2002)). This Court is keenly aware that "retaliation claims by prisoners are 'prone to abuse' since prisoners can claim retaliation for every decision they dislike." *Williams v. Hupkowicz,* 2004 WL 1197354, at *3 (W.D.N.Y. June 1, 2004) (citing *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995) ("Because we recognize both the near inevitability of decisions and actions by prison officials to which prisoners will take exception and the ease with which claims of retaliation may be fabricated, we examine prisoner's claims of retaliation with skepticism and particular care.")). However, these purportedly fabricated misbehavior reports clearly were in the same chain of events as the cell search, and thus, taking Plaintiff's claims as true, are likewise causally connected to Plaintiff's attempt to file a grievance.[FN10]

> **FN10.** Implicit through the Plaintiff's narrative, though not always stated, is that the alleged retaliation was a result of his attempt to file grievances. *See* Compl. at ¶ 9. This is supported in his statements in his Causes of Action section. *See id.* at ¶ 47 ("Causes of Action" 4) ("Defendants C/O Thomas and C/O Scott retaliated against Plaintiff for trying to file a grievance ..."). Accordingly, we interpreted Plaintiff's constitutionally protected speech or conduct to be his attempt to file grievances. Plaintiff makes numerous claims, however, scattered variously throughout his forty-one-page Complaint, that Defendants violated his rights because of his disability. It is thus no surprise to see him also claim that the misbehavior reports were issued in retaliation "against [his] disability." *See id.* at ¶ 11; *see also id.* at Causes of Action 4 & 5. However, having a mental handicap or disability clearly is not protected "speech or conduct." When possible, this Court interprets any claims of such to be claims of retaliation against Plaintiff's attempt to file a grievance.

Accordingly, Plaintiff's allegations relating to Defendants Thomas and Hersh's cell search and his allegations that he received false misbehavior reports from Defendants Thomas and Scott, all in retaliation to his attempt to file a grievance, states a claim sufficient to survive Defendants' Motion to Dismiss.[FN11]

> **FN11.** Plaintiff also seems to indicate something akin to a retaliation claim regarding Defendant Regan, who gave Plaintiff "a write up (ticket) for smoking, even though Plaintiff is a non-smoker and allergic to cigarette smoke." Compl. at ¶¶ 35 & 36. However, Plaintiff's Complaint alleges, if anything, that this misbehavior report was premised on harassing Plaintiff because of his mental handicap alone. These allegations of harassment and discrimination based on Plaintiff's disability are examined later in this Court's Report and Recommendation, *see infra* Part III.F, but, again, adverse action for having a mental disability alone does not state a valid First Amendment retaliation claim. *See supra* Note 11.

**2. Access to the Courts**

Phelan asserts that Defendant Ramond prevented him from using the law library on April 14, 2009, that Defendant Thomas damaged his legal work during a cell search, and that Defendant Thompson prevented him from making copies on October 15 and December 18, both in 2009. Compl. at ¶¶ 9, 13, & 47. We interpret these facts to allege a violation of his right to access the courts.

The Supreme Court has held that the constitutional right of access to courts entitles plaintiffs to "adequate law libraries or adequate assistance from persons trained in the law." *Bounds v. Smith,* 430 U.S. 817, 828, 97 S.Ct. 1491, 52 L.Ed.2d 72 (1977). To establish a *Bounds* violation, a plaintiff must show

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

"actual injury," as *"Bounds did not create an abstract, freestanding right to a law library or legal assistance."* *Lewis v. Casey,* 518 U.S. 343, 349 & 351, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). Thus, to establish a claim of inadequate access to the courts under *Bounds,* a plaintiff must show " 'that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim'—for example, by demonstrating that he has been unable to file a complaint or has had a complaint dismissed for failure to observe a technicality." *Benjamin v. Fraser,* 264 F.3d 175, 184 (2d Cir.2001) (citing *Lewis v. Casey,* 518 U.S. at 351).

**\*8** Plaintiff fails to allege any prejudice or injury from Defendants' actions, and we find none in what has been presented to the Court. Without a demonstration that a "nonfrivolous legal claim had been frustrated or was being impeded," there is no basis to conclude Plaintiff's First Amendment right of access to the courts has been violated. *Lewis v. Casey,* 518 U.S. at 353. We recommend that this claim be **dismissed.**

### D. Due Process Claims

Plaintiff asserts in no fewer than eleven different claims that his Due Process rights were violated due to various deficiencies in his administrative disciplinary hearings and appeals thereto. Specifically, Plaintiff claims that the officers presiding over his disciplinary proceedings did not properly account for his mental disabilities; either interviewed witnesses outside Plaintiff's presence or did not interview them; and that his due process rights were violated because other Defendants denied his appeal. Compl. at ¶¶ 16–23 & Causes of Action 11, 12, 16, 21, 22, 31, 32, 33, 34, 38 & 39. We address these due process claims in turn.

As an initial matter, in order to state a due process claim under § 1983, an inmate must first establish that he enjoys a protected liberty interest. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109

S.Ct. 1904, 104 L.Ed.2d 506 (1989)). Plaintiff brings his due process claims against four separate hearing officers who presided over separate misbehavior report hearings. Plaintiff states that he received a punishment of at least three months of confinement in the SHU and three months loss of privileges, such as packages and phones, from the hearings Defendant Fletcher presided over. Compl. at ¶¶ 18 & 21. He states that he also received thirty days "keepblock, suspended 30 days and deferred for 90 days," and a loss of yard, packages, commissary, and phone privilege for thirty days from the hearing Defendant Goodman presided over. *Id.* at ¶ 20. However, Plaintiff fails to allege any liberty interest that was at stake from the hearings related to Defendants Pawelczak or Stachewiez. *See id.* at ¶¶ 42 & 43. Thus, because Plaintiff does not allege any liberty interest by which he was entitled to some measure of due process before being deprived therewith, his due process claims against Defendants Pawelczak and Stachewiez should be **dismissed.** *See Sandin v. Connor,* 515 U.S. 472, 484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995) (noting that a prisoner is not entitled to due process protections unless the resulting restricting confinement subjected the prisoner to "atypical and significant hardship ... in relation to the ordinary incidents of prison life").

Turning back to Defendants Fletcher and Goodman, a prisoner asserting that he was denied due process in connection with segregated confinement or a loss of privileges must make a threshold showing that the deprivation of which he complains imposed the requisite atypical and significant hardship. Whether the conditions of the segregation amounted to atypical and significant hardship "turns on the duration of the segregation and a comparison with the conditions in the general population and in other categories of segregation." *Arce v. Walker,* 139 F.3d at 336 (citations omitted). However, the Second Circuit has cautioned that "there is no bright-line rule regarding the length or type of sanction" that meets the above-stated *Sandin* standard. *Jenkins v. Haubert,* 179

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

F.3d 19, 28 (2d Cir.1999); *see also* Ayers v. Ryan, 152 F.3d 77, 83 (2d Cir.1998) ("Whether or not a period of disciplinary confinement amounts to an atypical and significant hardship is a factintensive inquiry[.]"). The Second Circuit has suggested that confinement for a period of less than 101 days would not constitute an atypical and significant hardship. *See Colon v. Howard,* 215 F.3d 227, 231–32 (2d Cir.2000). Comparatively, the segregative sentences of 125–288 days are deemed to be "relatively long" and therefore necessitate "specific articulation of fact findings before the district court could properly term the confinement atypical or insignificant." *Sims v. Artuz,* 230 F.3d 14, 22 (2d Cir.2000). In reviewing the duration and conditions of Phelan's special confinement as a result of the misbehavior hearings at issue, we do not find his confinement alone to be atypical and significant. In any event, we find that even if Plaintiff identified a valid liberty interest, he failed to allege facts supporting the notion that he was denied due process in his misbehavior hearings. Plaintiff states that Defendants Fletcher and Goodman each failed to adequately consider his mental disability in their respective disciplinary proceedings. Compl. at ¶¶ 16–19 & Causes of Action 11, 12, 18, & 19. While rules exist that govern the procedure hearing officers must follow when an inmate's mental health is an issue, *see* N.Y. COMP.CODES R. & REGS. tit. 7, § 254.6(b), there are no allegations in the Complaint that allege sufficient facts to state a claim that Plaintiff's constitutional rights were violated. For example, it appears from Plaintiff's Complaint that both Fletcher and Goodman stopped the proceedings to consider Plaintiff's mental health. Compl. at ¶¶ 16–17. In fact, with the same breath that Plaintiff claims his mental disability was not adequately considered in these disciplinary hearings, he claims Goodman "discriminated against Plaintiff's disability ... by unlawfully asking Plaintiff what his disability is and to describe [it] in detail." *Id.* at Causes of Action 17. Plaintiff's allegations that the disciplinary hearings were eventually continued and not excused altogether, without more, does not state a constitutional violation. Thus, Plaintiff's complaint

that his disciplinary hearings proceeded despite his mental handicap fails to state a claim and should be **dismissed.**

**\*9** Plaintiff also claims his due process rights were violated by Defendant Fletcher when he failed to interview witnesses in Plaintiff's presence on the record and investigated witnesses on his own; Plaintiff further asserts that Defendant Fletcher "was biased." *Id.* at ¶¶ 19, 21 & Causes of Action 12, 16, & 21. The Supreme Court has held that due process entitles inmates to call witnesses and present documentary evidence, subject to legitimate safety and correctional goals of the institution. *Wolff v. McDonnell,* 418 U.S. 539, 566, 94 S.Ct. 2963, 41 L.Ed.2d 935 (1974); *see also McCann v. Coughlin,* 698 F.2d 112, 121–22 (2d Cir.1983). However, "it is not a violation of due process at a disciplinary hearing to take the testimony of a witness outside the presence of an inmate." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999) (internal citations omitted); *see also Silva v. Casey,* 992 F.2d 20, 22 (2d Cir.1993) (noting an inmate does not have a constitutional right of confrontation in disciplinary hearings). Additionally, "the mere involvement of a hearing officer in related investigations or proceedings does not evidence bias." *Rodriguez v. Selsky,* 2011 WL 1086001, at \* 11 (N.D.N.Y. Jan.25, 2011) (citing *Vega v. Artus,* 610 F.Supp.2d 185, 200 (N.D.N.Y.2009). Defendant Fletcher's investigation into the witnesses Plaintiff wanted to call does not make him biased in his role as a hearing officer.[FN12] Rather, an impartial hearing officer is one who "does not prejudge the evidence and who cannot say ... how he would assess evidence he has not yet seen." *Patterson v. Coughlin,* 905 F.2d 564, 570 (2d Cir.1990). Plaintiff's unsupported and conclusory allegation of bias does not plausibly state a claim upon which relief can be granted, and thus, his due process complaints against Defendant Fletcher should be **denied.**

> FN12. Though not explicit in the Complaint, to the extent Plaintiff may be complaining

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

that Defendant Fletcher did not call witnesses Plaintiff requested be called, "a hearing officer does not violate due process by excluding irrelevant or unnecessary testimony." *Kalwasinski v. Morse,* 201 F.3d 103, 109 (2d Cir.1999).

Lastly, Plaintiff claims his due process rights were violated because his appeals of the determinations of his disciplinary hearings were denied. Compl. at ¶¶ 23 & Cause of Action 22. This conclusory statement clearly does not state a due process violation—Plaintiff sets forth no facts that the determinations of his disciplinary hearings deserved reversal, let alone that a failure to reverse the results of the hearings would constitute a due process violation. Therefore, this claim should be summarily **denied.**

Because Plaintiff states no valid due process violations upon which relief may be granted, this Court recommends that his due process claims be **dismissed** in their entirety.

### E. Eighth Amendment Claims

In his expansive and lengthy Complaint, Plaintiff alleges two distinct Eighth Amendment claims: deliberate indifference to his serious medical needs and cruel and unusual punishment. We address these allegations *seriatim.*

#### 1. Deliberate Indifference to Serious Medical Needs

Plaintiff claims that he was denied mental health treatment and services, specifically naming Defendants P. Millson, James Morgan, Gregory Kadien, W. Hagget, Cambell, and J. Michaels as the culprits. Compl. at ¶¶ 7, 26–34, 37, 39, 40, 44, & 45.[FN13] To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the

conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly,* 784 F.Supp. 35, 44 (W.D.N.Y.), *aff'd,* 970 F.2d 896 (2d Cir.1992) (quoting *Estelle v. Gamble,* 429 U.S. at 102, 105–06).

FN13. Though discussed in multiple occasions in his forty-one-page Complaint, Plaintiff does not name Dr. Bangsil nor Nurse Amborlosi as Defendants in this action. They are named, however, in his almost identical complaint brought in this District under the ADA. *See supra* Note 3.

**\*10** The "deliberate indifference standard embodies both an objective and a subjective prong," both of which the plaintiff must establish. *Hathaway v. Coughlin ("Hathaway I"* ), 37 F.3d 63, 66 (2d Cir.1994). Under the objective prong, the alleged medical need must be "sufficiently serious." *Id.; Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong,* 143 F.3d at 702 (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individuals daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith,* 974 F.2d 1050, 1059–60 (9th Cir.1992)). Under the subjective component, the plaintiff must demonstrate that the defendant acted with "a sufficiently culpable state of mind." *Hathaway I,* 37 F.3d at 66. The requisite culpable mental state is similar to that of criminal recklessness. *Wilson v. Seiter,* 501 U.S. 294, 301–03, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991).

In his Complaint, Phelan claims that he suffers from a traumatic brain injury dating back to when he

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

was an infant, resulting in him being "slower to pro-cess information," and having "impulsive behavior." Compl. at ¶ 46(A) & (B). He also claims to suffer from attention deficit disorder and depression. *Id.* at ¶ 46(C). He states that despite his consistent requests, he did not receive adequate mental health care in prison, and as such, Plaintiff "adjusted poorly and received a lot of write ups, and spent more time in SHU th[a]n in general population." *See generally id.; see* Compl. at ¶ 46(F).

Here, Plaintiff does not provide facts by which this Court could assess the objective seriousness of his medical needs, other than injecting conclusory state-ments that his mental handicap, if left untreated, leads him to act out and receive misbehavior reports. Fur-thermore, Plaintiff does not sufficiently aver that De-fendants acted with the requisite culpable state of mind. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan,* 511 U.S. 825, 836, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994). This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst,* 101 F.3d 845, 856 (2d Cir.1996) (citing *Farmer* ). Plaintiff states that, pursuant to his requests for a mental health examination, Defendant P. Millson received Plaintiff's mental health history and met with and examined Plaintiff in person. Compl. at ¶¶ 32 & 37. In that meeting, Defendant Millson, who is a psychologist, did not grant Plaintiff permission to see a psychiatrist, saying "we don't have to let you see one." *Id.* at ¶ 37. These facts do not support a finding that this De-fendant was subjectively deliberately indifferent to Plaintiff's medical needs, or that Defendant Millson bore Plaintiff any ill will at all. Mere disagreement over the prescribed course of treatment does not evi-dence deliberate indifference. *See Brown v. Eagen,* 2009 WL 815724, at *9 (N.D.N.Y. Mar.26, 2009) (stating that the prison officials have broad discretion to determine the nature and character of the medical

treatment afforded to inmates, as "[a]n inmate does not have the right to treatment of his choice") (citing, *inter alia, Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986)).[FN14] Likewise, Plaintiff's allegation against Defendant Morgan—that he wrote a letter in response to Plaintiff's requests for mental health care, stating that he is denying that request—without more, fails to allege the requisite culpable state of mind needed to state a claim for deliberate indifference.

> FN14. Additionally, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the mal-practice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a sub-stantial risk of serious harm.' " *Chance v. Armstrong,* 143 F.3d at 702 (quoting *Hath-away v. Coughlin ("Hathaway II"),* 99 F.3d 550, 553 (2d Cir.1996)); *see also Hernandez v. Keane,* 341 F.3d 137, 144 (2d Cir.2003) (citations omitted).

**\*11** Lastly, Plaintiff's conclusory statements that Defendants Gregory Kadien and W. Hagget "are re-sponsible for and required by law to provide mental health care by a psychiatrist on a full time basis [and] failed to do this," as well as his claims that Cambell and J. Michaels yelled at him and told him to "stop l[y]ing about a disability and [to] take your fucking medicine like a man [,]" do not allege any facts by which this Court could engage in an Eighth Amend-ment examination or which would meet the *Iqbal* standard. *See* Compl. at ¶¶ 15 & 45. Plaintiff further does not allege personal involvement by Defendants Kadien and Hagget, who are the Superintendents at Gowanda and Mt. McGregor correctional facilities, respectively. *See Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (providing the test for personal in-volvement of a supervisory defendant); *see also Black v. Coughlin,* 76 F.3d 72, 74 (2d Cir.1996) (stating that a defendant may not be liable for damages simply by virtue of holding a supervisory position).

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

Therefore, Plaintiff does not allege a valid Eighth Amendment claim that the Defendants were deliberately indifferent to his serious medical needs. Rather, as stated in his Complaint, Plaintiff was seen by medical personnel at Mt. McGregor upon his request on March 25, 2009, and then again on April 7, 2009, where he was offered the option of staying in the infirmary until someone from the mental health division could check on Plaintiff, but he refused, saying "that won't solve anything, so no." *Id.* at ¶¶ 6 & 12. He also appears to have had an appointment with Doctor Bangsil and Nurse Amborlosi to discuss his medical issues, but these appointments apparently did not end well and Plaintiff told them "he would see them in court." *Id.* at ¶ 39. Considering all of the above allegations, we recommend that Plaintiff's claims of deliberate indifference be **dismissed** for failure to state a claim.

### 2. Cruel and Unusual Punishment

The Eighth Amendment also prohibits the infliction of cruel and unusual punishment. *Robinson v. California,* 370 U.S. 660, 666–67, 82 S.Ct. 1417, 8 L.Ed.2d 758 (1962) (cited in *Tramell v. Keane,* 338 F.3d 155, 161 (2d Cir.2003)). Plaintiff appears to bring three claims under this umbrella: that the punishments he received from hearing officers concerning misbehavior reports were cruel and unusual; that he was subject to excessive physical force; and that he suffered cruel and unusual punishment resulting from his general conditions of confinement.

First, Plaintiff complains that punishments he received from disciplinary hearings, assigned from Defendants Fletcher and Goodman, violated his rights because they are cruel and unusual considering his mental illness. "Restraints on an inmate do not violate the [Eighth] [A]mendment unless they are 'totally without penological justification,' 'grossly disproportionate,' or 'involve the unnecessary and wanton infliction of pain.' " *Smith v. Coughlin,* 748 F.2d 783, 787 (2d Cir.1984) (quoting *Rhodes v. Chapman,* 452 U.S. 337, 346, 101 S.Ct. 2392, 69 L.Ed.2d 59 (1981)). Plaintiff provides no facts by which this Court could evaluate this claim. Sentencing an inmate with diminished mental capacity to special or solitary confinement does not constitute a *per se* violation of the Eighth Amendment. *See Horne v. Coughlin,* 155 F.3d 26, 31 (2d Cir.1998). Plaintiff's claim accordingly should be **denied.**

**\*12** Secondly, to determine whether an Eighth Amendment violation occurred where "prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry is ... whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." *Hudson v. McMillian,* 503 U.S. 1, 6–7, 112 S.Ct. 995, 117 L.Ed.2d 156 (1992) (quoted in *Davidson v. Flynn,* 32 F.3d 27, 29 (2d Cir.1994)). To validly assert an Eighth Amendment violation through the use of excessive force, an inmate must prove (1) objectively, that the defendant's actions violated "contemporary standards of decency," and (2) subjectively, that the defendant acted wantonly and in bad faith. *Blyden v. Mancusi,* 186 F.3d 252, 262–63 (2d Cir.1999) (internal quotations and citations omitted).

Plaintiff asserts that on May 14, 2009, when he was transferred "to a S-block [in] Downstate Correction Facility," he was handcuffed and shackled for "about [four] hours, even though [he has] a mental illness." Compl. at ¶ 24. The next day, Plaintiff was "strip[ ] searched again and shackled and cuffed with waist chains again to be transfer[re]d to Lakeview Shock Correctional Facility.... This was about a [twelve] hour drive." *Id.* He alleges this made his "shoulder muscles very sore." Plaintiff seems to associate this blame to Defendant Fischer, the Commissioner of DOCCS, but this fact is not made clear in Plaintiff's Complaint. *See* Cause of Action 23. Regardless of the assured lack of personal involvement, these facts do not give rise to a claim of cruel and unusual punishment. The facts fail to state that the use

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

of handcuffs and shackles during transport was not done "in a good-faith effort to maintain or restore discipline," but rather as a form of punishment or to constitute a wanton infliction of pain. Therefore, Plaintiff's claim that he suffered excessive force relating to his transports should be **denied.**

Plaintiff also states that Defendant Micheals struck him in the head several times while asking Plaintiff questions in connection to the disciplinary ticket he received from his incident in the library. *See* Compl. at ¶ 13 & 15. While Plaintiff does not explicitly raise an accusation of excessive force against Micheals in his forty-three causes of action, Plaintiff's statement of facts clearly indicates the Eighth Amendment. Here, though Plaintiff provides sparse details of the incident, his claim suggests that Defendants Micheals hit him maliciously, multiple times, and without the good-faith effort to maintain discipline. This is enough to validly state an excessive force claim, and, accordingly, we recommend that this claim against Defendant Micheals survive Defendants' Motion to Dismiss.

Lastly, to the extent that Plaintiff claims his conditions of confinement constituted an Eighth Amendment violation—specifically, because he did not receive a hot meal for one day, when he was being transported to another correctional facility, but instead received a "dry boloney sandwich"—this complaint does not state a cause of action. There is no constitutional right to have a hot meal every day, but only that inmates be provided nutritionally adequate food prepared under safe conditions. *See Robles v. Coughlin,* 725 F.2d 12, 15 (2d Cir.1983) (cited in *Quintana v. McCoy,* 2006 WL 2827673, at *6 (N.D.N.Y. Sept.29, 2006)). Furthermore, Plaintiff does not allocate personal involvement by any Defendant in this matter. Thus, Plaintiff does not state a valid Eighth Amendment claim here, and his allegation of such should be **denied.**

### F. Other Claims

**\*13** Throughout Plaintiff's Complaint, he accuses the majority of the Defendants of harassing him, chiefly through name-calling, specifically "retard." *See generally* Compl. As Judge Sharpe ruled in his January Order, allegations of verbal harassment are insufficient to support a § 1983 claim. *See* Dkt. No. 5 at pp. 5–6 (citing *Johnson v. Eggersdorf,* 8 Fed. Appx. 140, 143 (2d Cir.2001) ("allegations of verbal harassment are insufficient to base a § 1983 claim if no specific injury is alleged") (citing *Purcell v. Coughlin,* 790 F.2d 263, 265 (2d Cir.1986))). In accord with that Order and the law of the case doctrine,[FN15] Plaintiff's claims of harassment should be **dismissed.**

> FN15. The law of the case doctrine " 'posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.' " *Pescatore v. Pan Am. World Airways, Inc.,* 97 F.3d 1, 7–8 (2d Cir.1996) (quoting *Dilaura v. Power Auth.,* 982 F.2d 73, 76 (2d Cir.1992)).

Also throughout the Complaint, Plaintiff makes wholly-conclusory allegations that Defendants either discriminated against, harassed, or otherwise treated Plaintiff poorly because of Plaintiff's mental disability. While this issue of "whether disability discrimination gives rise to a section 1983 claim 'is not a settled question of law in this circuit,' " *Petrosky v. New York State Dept. of Motor Vehicles,* 72 F.Supp.2d 39, 61 (N.D.N.Y.1999) (citing *Campbell v. City Univ. Constr. Fund,* 1999 WL 435132, at *5 (S.D.N.Y. June 25, 1999)), the courts who use the Equal Protection Clause of the Fourteenth Amendment alone as the vehicle by which to seek relief note that "[t]he basic command of the Equal Protection Clause is that similarly situated persons be treated equally," *City of Cleburne, Tex. v. Cleburne Living Ctr.,* 473 U.S. 432, 439, 105 S.Ct. 3249, 87 L.Ed.2d 313 (1985). To establish an Equal Protection violation, plaintiff must show purposeful discrimination directed to an identifiable class. *Giano v. Senkowski,* 54 F.3d 1050, 1057

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

(2d Cir.1995) (cited in *Greco v. County of Nassau,* 146 F.Supp.2d 232, 248 (E.D.N.Y.2001)). Plaintiff fails to alert this Court to any specific fact by which we could conclude that Plaintiff was treated differently because of his mental illness; instead, he merely repeats conclusory statements that he was "discriminated against." These statements cannot withstand the required pleading standard set out in *Iqbal,* and thus, this Court recommends that the claims Plaintiff brings pursuant to the Equal Protection Clause be **dismissed.** To the extent Plaintiff is stating a claim of disability discrimination under Title II of the ADA, we refer the reader to Plaintiff's identical complaint brought in this District pursuant to the ADA. *See supra* note 3.

Lastly, Plaintiff complains that Defendants Hersh, Scott, and Thomas did not allow Plaintiff to file a grievance. *See* Compl. at Causes of Action 2. To the extent this claim overlaps with Plaintiff's retaliation claims, we refer to our above disposition of that issue. *See supra* Part III.C.i. We pause to note that although Plaintiff "has a constitutional right to access the courts, participation in an inmate grievance process is not a constitutionally protected right." *Davis v. Buffardi,* 2005 WL 1174088, at *3 (N.D.N.Y. May 4, 2005) (internal citations omitted); *see also Rhodes v. Hoy,* 2007 WL 1343649, at *2 n. 2 (N.D.N.Y. May 5, 2007) (citing cases, including *Shell v. Brzezniak,* 365 F.Supp.2d 362, 369–70 (W.D.N.Y.2005) (holding that "inmate grievance programs created by state law are not required by the Constitution and consequently allegations that prison officials violated those procedures does [sic] not give rise to a cognizable § 1983 claim")). Notwithstanding, Plaintiff states no sufficient facts for us to find that Defendant Hersh, who allowed Plaintiff to go to the "grievance building" when Plaintiff requested, *see* Compl. at ¶ 7, or Defendant Thomas are liable for preventing Plaintiff from filing grievances; thus, this claim must be **dismissed** in its entirety for failing to state a claim.[FN16]

FN16. We note that a plaintiff's lack of exhaustion of administrative remedies, as prescribed by the Prison Litigation Reform Act ("PLRA"), is an affirmative defense, but one that is not raised by Defendants in this action. *See Arce v. Keane,* 2004 WL 439428, at *2–3 (S.D.N.Y. Mar.9, 2004) (describing PLRA's exhaustion requirement).

### III. CONCLUSION

**\*14** For the reasons stated herein, it is hereby

**RECOMMENDED,** that Defendants' Motion to Dismiss (Dkt No. 55) be **granted in part and denied in part** as follows:

1. To the extent asserted, retaliation claims against Defendants Hersh and Thomas, relating to their cell search on April 2, 2009, and Defendants Thomas and Scott, relating to misbehavior reports issued pursuant to that cell search, should survive Defendants' Motion and proceed to discovery;

2. To the extent asserted, Eighth Amendment excessive force claims against Defendant Micheals, relating to striking Plaintiff in the head several times, should survive Defendants' Motion and proceed to discovery;

3. All other asserted claims against Defendants be **dismissed** for failure to state a claim; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report–Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. *FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW. Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6031940 (N.D.N.Y.)
**(Cite as: 2011 WL 6031940 (N.D.N.Y.))**

*Human Servs. .,* 892 F.2d 15 (2d Cir.1989)); *see also*
28 U.S.C. § 636(b) (1); FED. R. CIV. P. 72 & 6(a).

N.D.N.Y.,2011.
Phelan v. Hersh
Not Reported in F.Supp.2d, 2011 WL 6031940
(N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.


Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

C

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Raymond ROBLES, Plaintiff,
v.
K. BLEAU, Correctional Officer, Riverview C.F.;
Peacock, Correctional Sergeant, Riverview C.F.; R.
Varkiar, Senior Counsel, Riverview C.F.; and New
York State Dep't of Corr. Servs., Defendants.

No. 9:07-CV-0464.
Oct. 22, 2008.

Raymond Robles, Cape Vincent, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General for the
State of New York, David L. Cochran, Esq., of
Counsel, New York, NY, for Defendants.

**DECISION & ORDER**

THOMAS J. McAVOY, Senior District Judge.

**\*1** This *pro se* civil rights action, brought pur-
suant to 42 U.S.C. § 1983, was referred to the Hon.
George H. Lowe, United States Magistrate Judge, for
a Report-Recommendation pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c).

The Report-Recommendation dated September
12, 2008 recommended that Defendants motion to
dismiss be granted in part and denied in part. Specif-
ically, Judge Lowe recommended that Plaintiff's
Fourteenth Amendment procedural due process claim
against Defendant Varkiar regarding his disciplinary
hearing be dismissed if, within thirty (30) days from
the filing of this Final Order, Plaintiff does not file an
Amended Complaint that successfully states a Four-

teenth Amendment procedural due process claim. It
was recommended that Plaintiff's remaining claims be
dismissed with prejudice.

Plaintiff filed objections to the Re-
port-Recommendation, essentially raising the same
arguments presented to the Magistrate Judge.

When objections to a magistrate judge's Re-
port-Recommendation are lodged, the Court makes a
*"de novo* determination of those portions of the report
or specified proposed findings or recommendations to
which objection is made." *See* 28 U.S.C. § 636(b)(1).
After such a review, the Court may "accept, reject, or
modify, in whole or in part, the findings or recom-
mendations made by the magistrate judge. The judge
may also receive further evidence or recommit the
matter to the magistrate judge with instructions." *Id.*

Having reviewed the record *de novo* and having
considered the issues raised in the Plaintiff's objec-
tions, this Court has determined to accept and adopt
the recommendation of Magistrate Judge Lowe for the
reasons stated in the Report-Recommendation.

It is therefore

**ORDERED** that Defendants motion to dismiss
be **GRANTED** in part and **DENIED** in part.

**IT IS SO ORDERED.**

*REPORT-RECOMMENDATION*

GEORGE H. LOWE, United States Magistrate Judge.

This *pro se* prisoner civil rights action, com-
menced pursuant to 42 U.S.C. § 1983, has been re-
ferred to me by the Honorable Thomas J. McAvoy,
Senior United States District Judge, for Report and
Recommendation with regard to any dispositive mo-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

tions filed, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c). Generally, in his Complaint, Raymond Robles ("Plaintiff") alleges that three employees of the New York State Department of Correctional Services ("DOCS"), as well as DOCS itself, violated his rights under the Eighth and Fourteenth Amendments when they (1) required him to submit to a random urinalysis test when they knew he was taking a medication that would prevent him from providing a urine sample, and (2) charged, convicted, and punished him with eighty-seven days in a Special Housing Unit for refusing to provide a urine sample. (*See generally* Dkt. No. 1 [Plf.'s Compl.].) Currently pending before the Court is Defendants' motion to dismiss for failure to state a claim pursuant to Fed.R.Civ.P. 12(b)(6). (Dkt. No. 16.) For the reasons that follow, I recommend that Defendants' motion be granted in part and denied in part.

## I. BACKGROUND

### A. Summary of Plaintiff's Complaint

**\*2** As Defendants correctly observe in their Memorandum of Law, Plaintiff's Complaint-which describes the events giving rise to his claims in two brief paragraphs without identifying any role played by Defendants in those events-is hardly a model of *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.].) However, as explained below in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN1] Here, I find that the factual allegations contained in Plaintiff's Response Affidavit are consistent with the factual allegations of his Complaint. As a result, in construing Plaintiff's Complaint, I will consider his Response Affidavit as effectively amending the factual allegations of his Complaint.

Thus construed, Plaintiff's Complaint alleges as follows:

1. On November 6, 2006, at about 7:28 a.m., Plaintiff was directed to report to the drug testing center at Riverview C.F.;[FN2]

2. Upon arriving at the drug testing center, Plaintiff was informed by Correctional Officer K. Bleau ("Defendant Bleau") that he had been randomly selected to submit to urinalysis drug testing;[FN3]

3. Defendant Bleau asked Plaintiff if he would provide a urine sample, and Plaintiff responded yes;[FN4]

4. Defendant Bleau then asked Plaintiff if he was taking any medications, and Plaintiff explained that (1) yes, he was taking Flomax and Omeprazole due to a prostate condition and a stomach problem, and (2) "d[ue] to the medication [s]" and the fact that he had used the bathroom at approximately 7:10 a.m. that morning, he would need more water in order to urinate;[FN5]

5. As Plaintiff was explaining these facts to Defendant Bleau, Defendant Bleau became upset and walked away from Plaintiff;[FN6]

6. When he returned, Defendant Bleau then informed Plaintiff that, pursuant to DOCS Directive 4937, Plaintiff had three hours provide a urine sample or he would be considered to be refusing to provide the urine sample;[FN7]

7. Defendant Bleau then gave Plaintiff a cup of water at approximately 7:30 a.m., and a second cup of water at approximately 9:30 a.m., but did not give him a third cup of water at approximately 8:30 a.m., as required by Part D.4. of DOCS Directive 4937;[FN8]

8. At approximately 10:30 a.m., Plaintiff was still

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

unable to provide a urine sample; [FN9]

9. At that time, Defendant Bleau notified Correctional Sergeant Peacock ("Defendant Peacock") that Plaintiff was refusing a direct order to provide a urine sample; [FN10]

10. When Plaintiff tried to explain to Defendant Peacock that his medical condition prevented him from providing the urine sample, Defendant Peacock responded, "Shut up and put [your] hands behind [your] back"; [FN11]

**\*3** 11. Both Defendants Bleau and Peacock failed to investigate or inquire as to why Plaintiff had been prescribed Flomax and Omeprazole, or what the potential side effects of those drugs were, although that information was readily obtainable from medical staff at Riverview C.F.; [FN12]

12. Instead, Defendants Bleau and/or Peacock escorted Plaintiff to the Riverview C.F. Special Housing Unit ("S.H.U."); [FN13]

13. On November 7, 2006, at about 8:55 a.m., while Plaintiff was in S.H.U., he was served with a copy of a misbehavior report authored by Defendant Bleau, charging him with (1) failing to comply with the urinalysis testing procedure, and (2) refusing a direct order to provide a urine sample; [FN14]

14. On November 10, 2006, Senior Correctional Counselor R. Varkiar conducted Plaintiff's disciplinary hearing on the misbehavior report; [FN15]

15. At the hearing, when Plaintiff entered a plea of "Not guilty, with an explanation," Defendant Varkiar gave Plaintiff "an opportunity to explain [him] self"; [FN16]

16. Plaintiff explained that he had a medical condition that prevented him from providing a urine

sample, that he had attempted to inform Defendant Bleau of this medical condition (but Defendant Bleau walked away from Plaintiff), and that he had attempted to inform Defendant Peacock of this medical condition (but Defendant Peacock told Plaintiff to "[s]hut up"); [FN17]

17. Defendant Varkiar then made a telephone call; when he was done with the call, he told Plaintiff that (1) he had called the medical unit at Riverview C.F. to ask whether or not the medication that Plaintiff was taking would prevent him from urinating, and (2) someone in the medical unit had responded that no, the medication should not prevent Plaintiff from urinating; [FN18]

18. Plaintiff then attempted to explain to Defendant Varkiar *why* he was taking one of the medications, specifically, to remedy a prostate problem that itself interfered with his ability to urinate; [FN19]

19. However, Defendant Varkiar failed to call back the person in the medical unit at Riverview C.F. and request that he or she again answer the question he had posed before, taking into account Plaintiff's prostate condition as shown by his medical records; [FN20]

20. As a result, Defendant Varkiar found Plaintiff guilty of both disciplinary charges, and sentenced him to ninety (90) days in S.H.U ., with a corresponding loss of privileges; [FN21]

21. At the conclusion of the hearing, Plaintiff received a written copy of the hearing disposition, which stated that the evidence relied on included (1) the statements in the written misbehavior report of Defendant Bleau (which Defendant Varkiar stated were credible), and (2) Plaintiff's own hearing testimony (which Defendant Varkiar stated was not credible); [FN22]

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

22. On November 27, 2006, Plaintiff appealed his conviction to DOCS Director of Special Housing, Donald Selsky, who reversed the conviction on January 19, 2007;[FN23] and

**\*4** 23. On February 1, 2007, Plaintiff was finally released from S.H.U., after spending eighty-seven (87) days there.[FN24]

It should be noted that, in addition to asserting constitutional claims against Defendants Bleau, Peacock, and Varkiar in their individual or personal capacities, Plaintiff's Complaint asserts a constitutional claim also against DOCS itself. It should also be noted that, as relief for Defendants' actions, Plaintiff requests money damages but no injunctive relief.[FN25]

**B. Summary of Grounds in Support of Defendants' Motion**

Generally, Defendants' motion to dismiss for failure to state a claim is premised on two grounds: (1) Plaintiff's claim against DOCS is barred by the Eleventh Amendment; and (2) the allegations of Plaintiff's Complaint are too lacking in detail to give Defendants *fair notice* under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 2-5 [Defs.' Memo. of Law].)

**II. LEGAL STANDARD GOVERNING MOTIONS TO DISMISS FOR FAILURE TO STATE A CLAIM**

Under Fed.R.Civ.P. 12(b)(6), a defendant may move to dismiss a complaint for "failure to state a claim upon which relief can be granted." Fed.R.Civ.P. 12(b)(6). It has long been understood that a defendant may base such a motion on either or both of two grounds: (1) a challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2);[FN26] or (2) a challenge to the legal cognizability of the claim.[FN27]

Rule 8(a)(2) requires that a pleading contain "a short and plain statement of the claim *showing* that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2)

[emphasis added]. By requiring this "showing," Fed.R.Civ.P. 8(a)(2) requires that the pleading contain a short and plain statement that "give[s] the defendant *fair notice* of what the plaintiff's claim is and the grounds upon which it rests."[FN28] The main purpose of this rule is to "facilitate a proper decision on the merits."[FN29] A complaint that fails to comply with this rule "presents far too heavy a burden in terms of defendants' duty to shape a comprehensive defense and provides no meaningful basis for the Court to assess the sufficiency of [plaintiff's] claims."[FN30]

The Supreme Court has long characterized this pleading requirement under Fed.R.Civ.P. 8(a)(2) as "simplified" and "liberal," and has repeatedly rejected judicially established pleading requirements that exceed this liberal requirement.[FN31] However, it is well established that even this liberal notice pleading standard "has its limits."[FN32] As a result, several Supreme Court decisions, and Second Circuit decisions, exist holding that a pleading has failed to meet this liberal notice pleading standard.[FN33]

Most notably, in the recent decision of *Bell Atlantic Corporation v. Twombly,* the Supreme Court, in reversing an appellate decision holding that a complaint had stated an actionable antitrust claim under 15 U.S.C. § 1, "retire[d]" the famous statement by the Court in *Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957), that "a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1968-69, 167 L.Ed.2d 929 (2007).[FN34] Rather than turning on the *conceivability* of an actionable claim, the Court clarified, the Fed.R.Civ.P. 8 "fair notice" standard turns on the *plausibility* of an actionable claim. *Id.* at 1965-74.

**\*5** More specifically, the Court reasoned that, by requiring that a pleading "show[ ] that the pleader is entitled to relief," Fed.R.Civ.P. 8(a)(2) requires that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

the pleading give the defendant "fair notice" of (1) the nature of the claim and (2) the "grounds" on which the claim rests. *Id.* at 1965, n. 3 [citation omitted]. While this does not mean that a pleading need "set out in detail the facts upon which [the claim is based]," it does mean that the pleading contain at least "some factual allegation[s]." *Id.* [citations omitted]. More specifically, the "[f]actual allegations must be enough to raise a right to relief above the speculative level [to a plausible level]" assuming, of course, that all the allegations in the complaint are true. *Id.* at 1965 [citations omitted]. What this means, on a practical level, is that there must be "plausible grounds to infer [actionable conduct]," or, in other words, "enough fact to raise a reasonable expectation that discovery will reveal evidence of [actionable conduct]." *Id.*

As have other Circuits, the Second Circuit has repeatedly recognized that the clarified plausibility standard that was articulated by the Supreme Court in *Twombly* governs *all* claims, not merely antitrust claims brought under 15 U.S.C. § 1 (as were the claims in *Twombly* ).[FN35] The Second Circuit has also recognized that this *plausibility* standard governs claims brought even by *pro se* litigants (although the plausibility of those claims is be assessed generously, in light of the special solicitude normally afforded *pro se* litigants).[FN36]

It should be emphasized that Fed.R.Civ.P. 8's plausibly standard, explained in *Twombly,* was in no way retracted or diminished by the Supreme Court's decision (two weeks later) in *Erickson v. Pardus,* in which the Court stated, "Specific facts are not necessary" to successfully state a claim under Fed.R.Civ.P. 8(a)(2). *Erickson v. Pardus,* 551 U.S. 89, ----, 127 S.Ct. 2197, 2200, 167 L.Ed.2d 1081 (2007) [citation omitted]. That statement was merely an abbreviation of the often-repeated point of law-first offered in *Conley* and repeated in *Twombly*-that a pleading need not "set out in detail the facts upon which [the claim is based]" in order to successfully state a claim. *Twombly,* 127 S.Ct. 1965, n. 3 (citing *Conley v. Gib-*

*son,* 355 U.S. 41, 47 [1957] ). That statement in no way meant that all pleadings may achieve the requirement of giving a defendant "fair notice" of the nature of the claim and the "grounds" on which the claim rests without ever having to allege any facts whatsoever.[FN37] There must still be enough fact alleged to raise a right to relief above the speculative level to a plausible level, so that the defendant may know what the claims are and the grounds on which they rest (in order to shape a defense).

Having said all of that, it should also be emphasized that, "[i]n reviewing a complaint for dismissal under Fed.R.Civ.P. 12(b)(6), the court must accept the material facts alleged in the complaint as true and construe all reasonable inferences in the plaintiff's favor." [FN38] "This standard is applied with even greater force where the plaintiff alleges civil rights violations or where the complaint is submitted *pro se.* "[FN39] In other words, as stated above, while all pleadings are to be construed liberally under Fed.R.Civ.P. 8(e), *pro se* civil rights pleadings are to be construed with an *extra* degree of liberality .[FN40]

**\*6** For example, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN41] Moreover, "courts must construe *pro se* pleadings broadly, and interpret them to raise the strongest arguments that they suggest." [FN42] Furthermore, when addressing a *pro se* complaint, generally a district court "should not dismiss without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." [FN43] Of course, an opportunity to amend is not required where "the problem with [plaintiff's] causes of action is substantive" such that "[b]etter pleading will not cure it." [FN44] In addition, granting a *pro se* plaintiff an opportunity to amend is not required where the plaintiff

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

has already been given a chance to amend his pleading.[FN45]

However, while this special leniency may somewhat loosen the procedural rules governing the form of pleadings (as the Second Circuit very recently observed),[FN46] it does not completely relieve a *pro se* plaintiff of the duty to satisfy the pleading standards set forth in Fed.R.Civ.P. 8, 10 and 12.[FN47] Rather, as both the Supreme Court and Second Circuit have repeatedly recognized, the requirements set forth in Fed.R.Civ.P. 8, 10 and 12 are procedural rules that even *pro se* civil rights plaintiffs must follow.[FN48] Stated more plainly, when a plaintiff is proceeding *pro se,* "all normal rules of pleading are not absolutely suspended."[FN49]

## III. ANALYSIS

## A. Whether Plaintiff's Claim Against DOCS is Barred by the Eleventh Amendment

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's constitutional claims against Defendant DOCS are barred by the Eleventh Amendment to the United States Constitution. (Dkt. No. 16, Part 2, at 2-3 [Defs.' Mem. of Law].) In the interest of brevity, I will not repeat the well-established points of law that they correctly cite in support of their argument. Instead, I will only add three points that Defendants do *not* make in their succinct argument: (1) where it has been successfully demonstrated that a defendant is entitled to sovereign immunity under the Eleventh Amendment, the federal court lacks subject matter jurisdiction over the case (or claim), and "the case [or claim] *must* be stricken from the docket";[FN50] (2) Plaintiff's civil rights claims against Defendant DOCS (an entity) are barred also by the express language of 42 U.S.C. § 1983, which confers liability upon only any *"person* who ... subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights,

privileges, or immunities secured by the Constitution and laws .... "[FN51]; and (3) because the defect with this claim is substantive rather than merely formal, better pleading will not cure it, and thus it should be dismissed with prejudice.[FN52]

*7 For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's claims against Defendant DOCS.

It should be noted that, in addition to barring Plaintiff's constitutional claims against Defendant DOCS, the Eleventh Amendment would also bar any claim by Plaintiff against Defendants Bleau, Peacock and Varkiar in their official capacities.[FN53] However, because I do not even liberally construe Plaintiff's Complaint (and Response Affidavit) as asserting such claims, no need exists to recommend the dismissal of those claims. (*See generally* Dkt. No 1, 17.)

## B. Whether the Allegations of Plaintiff's Complaint Are Too Lacking in Detail to Give Defendants *Fair Notice* under Fed.R.Civ.P. 8(a)(2)

For the reasons offered by Defendants in their Memorandum of Law, I agree with them that Plaintiff's Complaint-when considered alone-is too lacking in detail to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). (Dkt. No. 16, Part 2, at 3-5 [Defs.' Mem. of Law].) However, as explained above in Part II of this Report-Recommendation, the mandate to read the papers of *pro se* civil rights litigants generously makes it appropriate to consider a plaintiff's papers in opposition to a defendant's motion to dismiss as effectively amending the allegations of the plaintiff's complaint, to the extent that those factual assertions are consistent with the allegations of the plaintiff's complaint.[FN54] Here, when construing Plaintiff's Complaint together with his Response Affidavit, I find that Plaintiff's allegations *are* detailed enough to give Defendants the fair notice that is required under Fed.R.Civ.P. 8(a)(2). *See, supra,* Part I.A. of this Report-Recommendation.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

However, this does not end the Court's analysis of Plaintiff's Complaint because, even where a defendant has not advanced a certain argument on a motion to dismiss in a *pro se* prisoner civil rights case, a district court may (and, indeed, has a duty to) *sua sponte* address whether the pleading in such a case has successfully stated a claim upon which relief may be granted.[FN55] Here, Plaintiff's Complaint is plagued by several defects (some substantive and some formal)[FN56] that simply cannot be overlooked.

**C. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau, Peacock and Varkiar Arising Out of Plaintiff's Being Required to Provide a Urine Sample Given Their Knowledge of His Medications and/or Medical Condition**

Among Plaintiff's claims is a claim that "[i]t is neither lawful nor [ ] reasonable to expect an Inmate to perform a bodily function on command when you know or should know that his medical condition and prescribed treatment plan indicate that when he urinates[,] and when he [can] not[,] can be beyond his control." (Dkt. No. 17, at 5 [Plf.'s Response Affid.].) I liberally construe this claim as one of harassment or perhaps inadequate-prison-conditions under the Eighth Amendment. (To the extent that this allegation is also used to support a procedural due process claim under the Fourteenth Amendment, I address that claim below in Parts III.D. and III.E. of this Report-Recommendation.)

**\*8** The problem with Plaintiff's Eighth Amendment claim is that the rather detailed facts alleged by him in support of that claim do not suggest in any way that any of the three individual Defendants were acting with the sort of mental state that is required for them to incur liability under the Eighth Amendment, namely, *deliberate indifference.* Deliberate indifference is a state of mind akin to *criminal recklessness,* which involves *knowing* of and disregarding an excessive risk to inmate health or safety.[FN57] Here, Plaintiff himself alleges that the three individual Defendants

did not in fact *understand* that he could not urinate due to his prostate condition. Indeed, as he was trying to explain his medical condition to Defendants, (1) Defendant Bleau became angry and "walked away" from Plaintiff, (2) Defendant Peacock told Plaintiff to "[s]hut up," and (3) Defendant Varkiar failed to call back the person in the medical unit of Riverview C.F. and ask him or her to report (to Varkiar) the impact of Plaintiff's prostate condition on his ability to urinate. *See, supra,* Part I.A. of this Report-Recommendation.[FN58]

At its heart, Plaintiff's Eighth Amendment claim alleges that the three individual Defendants *should have known* that he could not urinate during the time in question due to his enlarged prostate, but that they did not know that fact because they *failed to investigate* the nature and effects of his prostate condition. In other words, his Eighth Amendment claim is one of *negligence.* Such a claim is simply not actionable under the Eighth Amendment (or any constitutional provision). As is often observed, "[D]eliberate indifference describes a state of mind more blameworthy than negligence."[FN59] Finally, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it.[FN60]

For all of these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Eighth Amendment claim.

**D. Whether Plaintiff Has Stated an Actionable Claim Against Defendants Bleau and Peacock Arising Out of His Receipt of an Erroneous or False Misbehavior Report**

It is well established that "a prison inmate has no general constitutional right to be free from being falsely accused in a misbehavior report." *Boddie v. Schnieder,* 105 F.3d 857, 862 (2d Cir.1997) (citing *Freeman v. Rideout,* 808 F.2d 949, 951 [2d Cir.1986] ).[FN61] Rather, the only way that false accusations contained in a misbehavior report can rise to the level of a constitutional violation is when there is "more,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

such as retaliation against the prisoner for exercising a constitutional right." *Boddie,* 105 F.3d at 862; *accord, Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *26, 2007 WL 965345 (N.D.N.Y. March 5, 2007)* (Treece, M.J.) [citations omitted].

Here, Plaintiff alleges no actionable conduct regarding his being issued the misbehavior report in question, such as retaliation against him for exercising a constitutional right. *See, supra,* Part I.A. of this Report-Recommendation. Moreover, because the defect with this detailed claim is substantive rather than merely formal, I find that better pleading will not cure it.[FN62]

**\*9** For these reasons, I recommend that the Court dismiss with prejudice Plaintiff's Fourteenth Amendment false-misbehavior-report claim.

**E. Whether Plaintiff Has Stated an Actionable Claim Against Defendant Varkiar Arising Out of Plaintiff's Erroneous or Unjustified Disciplinary Conviction**

"[Courts] examine procedural due process questions in two steps: the first asks whether there exists a liberty or property interest which has been interfered with by the State ...; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient .... " *Kentucky Dept. of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 104 L.Ed.2d 506 (1989). With regard to the first question, in 1995, the Supreme Court held in *Sandin v. Connor* that liberty interests protected by the Fourteenth Amendment's Due Process Clause will not arise from the use of mandatory language of a particular state law or regulation, but "will generally be limited to freedom from restraint which ... imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin v. Connor,* 515 U.S. 472, 483-484, 115 S.Ct. 2293, 132 L.Ed.2d 418 (1995).

Here, Plaintiff alleges that the disciplinary hearing conducted by Defendant Varkiar resulted in a sentence of eighty-seven (87) days in the Riverview C.F. S.H.U. with a corresponding loss of privileges. *See, supra,* Part I.A. of this Report-Recommendation. Numerous district courts in this Circuit have issued well-reasoned decisions finding no atypical and significant hardship experienced by inmates who served sentences in S.H.U. of far more than the eighty-seven (87) days alleged here-even where the conditions of confinement in the S.H.U. were, to varying degrees, more restrictive than those in the prison's general population.[FN63] As a result, I find that Plaintiff has not alleged facts plausibly suggesting that he possessed, during the disciplinary hearing, a liberty interest that was protected by the Fourteenth Amendment.

However, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice. This is because it is conceivable to me that Plaintiff's Complaint and Response Affidavit-which are silent with regard to the conditions of confinement he experienced in the Riverview C.F. S.H.U.-may be amended so as to allege facts plausibly suggesting that those conditions were so restrictive as to impose on Plaintiff an *atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life* (thus conferring on him a protected liberty interest under the Fourteenth Amendment).

I should also point out that, even assuming (for the sake of argument) that Plaintiff possessed a protected liberty interest with regard to his disciplinary hearing, I find that he has alleged facts plausibly suggesting that he was, in fact, given all the process that he was due under the circumstances. Specifically, Plaintiff alleges that he was given the following: (1) timely notice of the misbehavior report: (2) an "opportunity to explain [him]self" at his disciplinary hearing; (3) a written disciplinary hearing disposition; (4) a disciplinary hearing disposition that was based on at least some evidence (e.g., his own hearing testimony, which Defendant Varkiar found to be not

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

credible); and (5) an opportunity to appeal the disciplinary hearing disposition (which he did so successfully). *See, supra,* Part I.A. of this Report-Recommendation.

**\*10** Of course, the defect that Plaintiff alleges occurred at his disciplinary hearing was Defendant Varkiar's failure to use the telephone to call back the person in the medical unit at Riverview C .F. and request that he or she again answer the question of whether Plaintiff was physically unable to urinate, taking into account his prostate condition as shown by his medical records. *Id.* Generally, it is not the duty of an impartial hearing officer to conduct an investigation of the merit of the disciplinary charges against an inmate; rather, the duty of a hearing officer is merely to review the evidence presented to him at the disciplinary hearing, and in *certain circumstances* identify defense witnesses for the inmate.[FN64] Here, I find that Plaintiff has alleged no circumstances conferring on Defendant Varkiar a duty to call back the person at Riverview C.F. For example, I find that Plaintiff's Complaint and Response Affidavit are devoid of any allegation that, at his disciplinary hearing, he requested and was denied an adjournment of the hearing so that, with the help of a legal assistant, he could obtain his medical records and call as a witness a member of the medical unit, in order that he himself could introduce testimony that his prostate condition prevented him from urinating during the time in question. *See, supra,* Part I.A. of this Report-Recommendation. However, again, such a finding leads only to a recommendation that this claim be dismissed *without* prejudice, because it is conceivable to me that Plaintiff's Complaint and Response Affidavit may be amended to allege facts plausibly suggesting that, at his disciplinary hearing, he made, and was denied, such a request.

For these reasons, I recommend that the Court dismiss Plaintiff's Fourteenth Amendment procedural due process claim regarding his disciplinary hearing if, within thirty (30) days from the date of the Court's

final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing.

Finally, two points bear mentioning. First, to the extent that Plaintiff is attempting to allege that his procedural due process rights were violated at his disciplinary hearing also because Defendant Bleau violated Part D.4. of DOCS Directive 4937 by giving Plaintiff only two cups of water during the three-hour period in question, that allegation is not actionable under the circumstances. Section 1983 provides, in pertinent part, "Every person who ... subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by *the Constitution and laws,* shall be liable to the party injured ...." 42 U.S.C. § 1983 [emphasis added]. The term "the Constitution and laws" refers to the United States Constitution and *federal* laws.[FN65] A violation of a state law or regulation, *in and of itself,* does not give rise to liability under 42 U.S.C. § 1983.[FN66] Furthermore, the violation of a DOCS Directive, alone, is not even a violation of New York State law or regulation;[FN67] this is because a DOCS Directive is "merely a system the [DOCS] Commissioner has established to assist him in exercising his discretion," which he retains, despite any violation of that Directive.[FN68]

**\*11** Second, in making the above recommendation (that Plaintiff be required to file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing, upon penalty of dismissal), I am in no way "issuing specific instructions [to Plaintiff] mandating the content and format of the putative amended complaint"-instructions that the Second Circuit recently found erroneous in the case of *Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at \*6 (2d Cir. Aug.12, 2008). Rather, I am merely reporting my finding that Plaintiff's current

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Fourteenth Amendment procedural due process claim regarding his disciplinary hearing fails to state a claim upon which relief might be granted, as pleaded.

**ACCORDINGLY,** it is

**RECOMMENDED** that Defendants' motion to dismiss for failure to state a claim (Dkt. No. 16) be **GRANTED in part** and **DENIED in part** in the following respects:

(1) Plaintiff's Fourteenth Amendment procedural due process claim against Defendant Varkiar regarding his disciplinary hearing be **DISMISSED** if, within thirty (30) days from the date of the Court's final Order on this Report-Recommendation, Plaintiff does not file an Amended Complaint that successfully states a Fourteenth Amendment procedural due process claim regarding his disciplinary hearing; and

(2) The other claims asserted in Plaintiff's Complaint (as effectively amended by his Response Affidavit) be **DISMISSED** with prejudice, and without condition.

**ANY OBJECTIONS to this Report-Recommendation must be filed with the Clerk of this Court within TEN (10) WORKING DAYS, PLUS THREE (3) CALENDAR DAYS from the date of this Report-Recommendation (unless the third calendar day is a legal holiday, in which case add a fourth calendar day).** *See* 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 72(b); N.D.N.Y. L.R. 72.1(c); Fed.R.Civ.P. 6(a)(2), (d).

**BE ADVISED that the District Court, on** *de novo* **review, will ordinarily refuse to consider arguments, case law and/or evidentiary material that could have been, but was not, presented to the Magistrate Judge in the first instance.** FN69

**BE ALSO ADVISED that the failure to file**

**timely objections to this Report-Recommendation will PRECLUDE LATER APPELLATE REVIEW of any Order of judgment that will be entered.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of H.H.S.,* 892 F.2d 15 [2d Cir.1989] ).

FN30. *Gonzales v. Wing,* 167 F.R.D. 352, 355 (N.D.N.Y.1996) (McAvoy, J.), *aff'd,* 113 F.3d 1229 (2d Cir.1997) (unpublished table opinion), *accord, Hudson v. Artuz,* 95-CV-4768, 1998 WL 832708, at *2 (S.D.N.Y. Nov.30, 1998), *Flores v. Bessereau,* 98-CV-0293, 1998 WL 315087, at *1 (N.D.N.Y. June 8, 1998) (Pooler, J .). Consistent with the Second Circuit's application of § 0.23 of the Rules of the U.S. Court of Appeals for the Second Circuit, I cite this unpublished table opinion, not as precedential authority, but merely to show the case's subsequent history. *See, e.g., Photopaint Technol., LLC v. Smartlens Corp.,* 335 F.3d 152, 156 (2d Cir.2003) (citing, for similar purpose, unpublished table opinion of *Gronager v. Gilmore Sec. & Co.,* 104 F.3d 355 [2d Cir.1996] ).

FN1. *See, infra,* note 41 of this Report-Recommendation (citing cases).

FN2. (Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

FN3. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.].)

FN4. (Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"].)

FN5. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 8 [Ex. 1 to Plf.'s Response Affid., attaching completed form entitled, "Request for Urinalysis Test"]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

FN6. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 14 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

FN7. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid ., attaching page from DOCS Directive 4937].)

FN8. (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 10 [Ex. 3 to Plf.'s Response Affid., attaching page from DOCS Directive 4937].)

FN9. (Dkt. No. 1, ¶¶ 6-7 [Plf.'s Compl.]; Dkt. No. 17, at 4 [Plf .'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

FN10. (Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid., attaching Inmate Misbehavior Report].)

FN11. (Dkt. No. 17, at 5 [Plf.'s Response Affid.].)

FN12. (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 4, 5 [Plf.'s Response Affid.]; Dkt. No. 17, at 9 [Ex. 2 to Plf.'s Response Affid., attaching page of his Ambulatory Health Record].)

FN13. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt.

No. 17, at 5 [Plf.'s Response Affid.].)

FN14. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 11 [Ex. 4 to Plf.'s Response Affid ., attaching Inmate Misbehavior Report].)

FN15. (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

FN16. (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

FN17. (*Id.*)

FN18. (Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006].)

FN19. (Dkt. No. 17, at 2-3 [Plf.'s Response Affid.]; Dkt. No. 17, at 14-15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid., attaching page of information about Flomax].)

FN20. (Dkt. No. 1, ¶ 7 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No. 17, at 17 [Ex. 6 to Plf.'s Response Affid ., attaching page of information about Flomax].)

FN21. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3 [Plf.'s Response Affid.]; Dkt. No.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition].)

FN22. (Dkt. No. 17, at 12-13 [Ex. 5 to Plf.'s Response Affid., attaching Superintendent Hearing Disposition]; Dkt. No. 17, at 3 [Plf.'s Response Affid.].)

FN23. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 3-4 [Plf.'s Response Affid.]; Dkt. No. 17, at 15 [Ex. 7 to Plf.'s Response Affid., attaching Plaintiff's letter of appeal, dated November 27, 2006]; Dkt. No. 17, at 16 [Ex. 8 to Plf.'s Response Affid., attaching Donald Selsky's Review of Superintendent's Hearing, issued on January 19, 2007].)

FN24. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.]; Dkt. No. 17, at 2 [Plf.'s Response Affid.].)

FN25. (Dkt. No. 1, ¶ 6 [Plf.'s Compl.].)

FN26. *See* 5C Wright & Miller, *Federal Practice and Procedure* § 1363 at 112 (3d ed. 2004) ("A motion to dismiss for failure to state a claim for relief under Rule 12(b)(6) goes to the sufficiency of the pleading under Rule 8(a)(2).") [citations omitted]; *Princeton Indus., Inc. v. Rem,* 39 B.R. 140, 143 (Bankr.S.D.N.Y.1984) ("The motion under F.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint as to whether the plaintiff has conformed to F.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement' that the pleader is entitled to relief."); *Bush v. Masiello,* 55 F.R.D. 72, 74 (S.D.N.Y.1972) ("This motion under Fed.R.Civ.P. 12(b)(6) tests the formal legal sufficiency of the complaint, determining whether the complaint has conformed to Fed.R.Civ.P. 8(a)(2) which calls for a 'short and plain statement

that the pleader is entitled to relief.' ").

FN27. *See Swierkiewicz v. Sorema N.A.,* 534 U.S. 506, 514, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002) ("These allegations give respondent fair notice of what petitioner's claims are and the grounds upon which they rest.... In addition, they state claims upon which relief could be granted under Title VII and the ADEA."); *Wynder v. McMahon,* 360 F.3d 73, 80 (2d Cir.2004) ("There is a critical distinction between the notice requirements of Rule 8(a) and the requirement, under Rule 12(b)(6), that a plaintiff state a claim upon which relief can be granted."); *Phelps v. Kapnolas,* 308 F.3d 180, 187 (2d Cir.2002) ("Of course, none of this is to say that a court should hesitate to dismiss a complaint when the plaintiff's allegation ... fails as a matter of law.") [citation omitted]; *Kittay v. Kornstein,* 230 F.3d 531, 541 (2d Cir.2000) (distinguishing between a failure to meet Rule 12[b][6]'s requirement of stating a cognizable claim and Rule 8[a]'s requirement of disclosing sufficient information to put defendant on fair notice); *In re Methyl Tertiary Butyl Ether Prods. Liab. Litig.,* 379 F.Supp.2d 348, 370 (S.D.N.Y.2005) ( "Although Rule 8 does not require plaintiffs to plead a theory of causation, it does not protect a legally insufficient claim [under Rule 12(b)(6) ].") [citation omitted]; *Util. Metal Research & Generac Power Sys.,* 02-CV-6205, 2004 U.S. Dist. LEXIS 23314, at *4-5, 2004 WL 2613993 (E.D.N.Y. Nov. 18, 2004) (distinguishing between the legal sufficiency of the cause of action under Rule 12[b][6] and the sufficiency of the complaint under Rule 8[a] ); *accord, Straker v. Metro Trans. Auth.,* 331 F.Supp.2d 91, 101-102 (E.D.N.Y.2004); *Tangorre v. Mako's, Inc.,* 01-CV-4430, 2002 U.S. Dist. LEXIS 1658, at *6-7, 2002 WL 313156 (S.D.N.Y. Jan. 30,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

2002) (identifying two sorts of arguments made on a Rule 12[b] [6] motion-one aimed at the sufficiency of the pleadings under Rule 8 [a], and the other aimed at the legal sufficiency of the claims).

FN28. *Dura Pharmaceuticals, Inc. v. Broudo,* 544 U.S. 336, 125 S.Ct. 1627, 1634, 161 L.Ed.2d 577 (2005) (holding that the complaint failed to meet this test) [citation omitted; emphasis added]; *see also Swierkiewicz,* 534 U .S. at 512 [citation omitted]; *Leatherman v. Tarrant County Narcotics Intelligence and Coordination Unit,* 507 U.S. 163, 168, 113 S.Ct. 1160, 122 L.Ed.2d 517 (1993) [citation omitted].

FN29. *Swierkiewicz,* 534 U.S. at 514 (quoting *Conley,* 355 U.S. at 48); *see also Simmons v. Abruzzo,* 49 F.3d 83, 86 (2d Cir.1995) ("Fair notice is that which will enable the adverse party to answer and prepare for trial, allow the application of res judicata, and identify the nature of the case so it may be assigned the proper form of trial.") [citation omitted]; *Salahuddin v. Cuomo,* 861 F.2d 40, 42 (2d Cir.1988) ("[T]he principle function of pleadings under the Federal Rules is to give the adverse party fair notice of the claim asserted so as to enable him to answer and prepare for trial.") [citations omitted].

FN31. *See, e.g., Swierkiewicz,* 534 U.S. at 513-514 (noting that "Rule 8(a)(2)'s simplified pleading standard applies to all civil actions, with limited exceptions [including] averments of fraud or mistake.").

FN32. 2 *Moore's Federal Practice* § 12.34[1][b] at 12-61 (3d ed.2003).

FN33. *See, e.g., Bell Atlantic Corp. v.*

*Twombly,* 550 U.S. 544, ---- - ----, 127 S.Ct. 1955, 1964-1974, 167 L.Ed.2d 929 (2007) (pleading did not meet Rule 8[a][2]'s liberal requirement), *accord, Dura Pharmaceuticals,* 125 S.Ct. at 1634-1635, *Christopher v. Harbury,* 536 U.S. 403, 416-422, 122 S.Ct. 2179, 153 L.Ed.2d 413 (2002), *Freedom Holdings, Inc. v. Spitzer,* 357 F.3d 205, 234-235 (2d Cir.2004), *Gmurzynska v. Hutton,* 355 F.3d 206, 208-209 (2d Cir.2004). Several unpublished decisions exist from the Second Circuit affirming the Rule 8(a)(2) dismissal of a complaint after *Swierkiewicz. See, e.g., Salvador v. Adirondack Park Agency of the State of N.Y.,* No. 01-7539, 2002 WL 741835, at *5 (2d Cir. Apr.26, 2002) (affirming pre-*Swierkiewicz* decision from Northern District of New York interpreting Rule 8[a][2] ). Although these decisions are not themselves precedential authority, *see* Rules of the U.S. Court of Appeals for the Second Circuit, § 0.23, they appear to acknowledge the continued precedential effect, after *Swierkiewicz,* of certain cases from within the Second Circuit interpreting Rule 8(a)(2). *See Khan v. Ashcroft,* 352 F.3d 521, 525 (2d Cir.2003) (relying on summary affirmances because "they clearly acknowledge the continued precedential effect" of *Domond v. INS,* 244 F.3d 81 [2d Cir.2001], after that case was "implicitly overruled by the Supreme Court" in *INS v. St. Cyr,* 533 U.S. 289 [2001] ).

FN34. The Court in *Twombly* further explained: "The phrase is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been adequately stated, it may be supported by showing any set of facts consistent with the allegations in the complaint.... *Conley,* then, described the breadth of opportunity to prove what an adequate complaint claims, not the

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

minimum standard of adequate pleading to govern a complaint's survival." *Twombly,* 127 S.Ct. at 1969.

FN35. *See, e.g., Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (in civil rights action, stating that "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted]; *Goldstein v. Pataki,* 07-CV-2537, 2008 U.S.App. LEXIS 2241, at *14, 2008 WL 269100 (2d Cir. Feb. 1, 2008) (in civil rights action, stating that "*Twombly* requires ... that the complaint's '[f]actual allegations be enough to raise a right to relief above the speculative level ....' ") [internal citation omitted]; *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98, n. 2 (2d Cir.2007) ("We have declined to read Twombly's flexible 'plausibility standard' as relating only to antitrust cases.") [citation omitted]; *Iqbal v. Hasty,* 490 F.3d 143, 157-58 (2d Cir.2007) (in prisoner civil rights action, stating, "[W]e believe the [Supreme] Court [in *Bell Atlantic Corp. v. Twombly* ] is ... requiring a flexible 'plausibility standard,' which obliges a pleader to amplify a claim with some factual allegations in those contexts where such amplification is needed to render the claim *plausible."* ) [emphasis in original].

FN36. *See, e.g., Jacobs v. Mostow,* 281 F. App'x 85, 87 (2d Cir. March 27, 2008) (in pro se action, stating, "To survive a motion to dismiss, a complaint must plead 'enough facts to state a claim up relief that is plausible on its face.' ") [citation omitted] (summary order, cited in accordance with Local Rule 32.1[c][1] ); *Boykin v. KeyCorp.,* 521 F.3d 202, 215-16 (2d Cir.2008) (finding that borrower's *pro se* complaint sufficiently pre-

sented a *"plausible* claim of disparate treatment," under Fair Housing Act, to give lenders fair notice of her discrimination claim based on lenders' denial of her home equity loan application) [emphasis added].

FN37. For example, in *Erickson,* a district court had dismissed a *pro se* prisoner's civil rights complaint because, although the complaint was otherwise factually specific as to how the prisoner's hepatis C medication had been wrongfully terminated by prison officials for a period of approximately 18 months, the complaint (according to the district court) failed to allege facts plausibly suggesting that the termination caused the prisoner "substantial harm." 127 S.Ct. at 2199. The Supreme Court vacated and remanded the case because (1) under Fed.R.Civ.P. 8 and *Twombly,* all that is required is a "a short and plain statement of the claim" sufficient to "give the defendant fair notice" of the claim and "the grounds upon which it rests," and (2) the plaintiff had alleged that the termination of his hepatitis C medication for 18 months was "endangering [his] life" and that he was "still in need of treatment for [the] disease." *Id.* at 2200. While *Erickson* does not elaborate much further on its rationale, a careful reading of the decision (and the dissent by Justice Thomas) reveals a point that is perhaps so obvious that it did not need mentioning in the short decision: a claim of deliberate indifference to a serious medical need under the Eighth Amendment involves two elements, i.e., the existence of a sufficiently serious medical need possessed by the plaintiff, and the existence of a deliberately indifferent mental state possessed by prison officials with regard to that sufficiently serious medical need. The *Erickson* decision had to do with only the first element, not the second

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

element. *Id.* at 2199-2200. In particular, the decision was merely recognizing that an allegation by a plaintiff that, during the relevant time period, he suffered from hepatis C is, in and of itself, a factual allegation plausibly suggesting that he possessed a sufficiently serious medical need; the plaintiff need not *also* allege that he suffered an independent and "substantial injury" as a result of the termination of his hepatis C medication. *Id.* This point of law is hardly a novel one. For example, numerous decisions, from district courts within the Second Circuit alone, have found that suffering from hepatitis C constitutes having a serious medical need for purposes of the Eighth Amendment. *See, e .g., Rose v. Alvees,* 01-CV-0648, 2004 WL 2026481, at *6 (W.D.N.Y. Sept.9, 2004); *Verley v. Goord,* 02-CV-1182, 2004 WL 526740, at *10 n. 11 (S.D.N.Y. Jan.23, 2004); *Johnson v. Wright,* 234 F.Supp.2d 352, 360 (S.D.N.Y.2002); *McKenna v. Wright,* 01-CV-6571, 2002 WL 338375, at *6 (S.D.N.Y. March 4, 2002); *Carbonell v. Goord,* 99-CV-3208, 2000 WL 760751, at *9 (S.D.N.Y. June 13, 2000).

FN38. *Hernandez v. Coughlin,* 18 F.3d 133, 136 (2d Cir.1994) (affirming grant of motion to dismiss) [citation omitted]; *Sheppard v. Beerman,* 18 F.3d 147, 150 (2d Cir.1994).

FN39. *Hernandez,* 18 F.3d at 136 [citation omitted]; *Deravin v. Kerik,* 335 F.3d 195, 200 (2d Cir.2003) [citations omitted]; *Vital v. Interfaith Med. Ctr.,* 168 F.3d 615, 619 (2d Cir.1999) [citation omitted].

FN40. *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] *pro se* complaint ... must be held to less stringent standards than formal pleadings drafted by lawyers ....") [internal quotation

marks and citation omitted]; *McEachin v. McGinnis,* 357 F.3d 197, 200 (2d Cir.2004) ("[W]hen the plaintiff proceeds pro se, ... a court is obliged to construe his pleadings liberally, particularly when they allege civil rights violations.") [citation omitted].

FN41. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his opposition memorandum." *Gadson v. Goord,* 96-CV-7544, 1997 WL 714879, at *1, n. 2 (S.D.N.Y. Nov.17, 1997) (citing, *inter alia, Gil v. Mooney,* 824 F.2d 192, 195 [2d Cir.1987] [considering plaintiff's response affidavit on motion to dismiss] ). Stated another way, "in cases where a pro se plaintiff is faced with a motion to dismiss, it is appropriate for the court to consider materials outside the complaint to the extent they 'are consistent with the allegations in the complaint.' " *Donhauser v. Goord,* 314 F.Supp.2d 119, 212 (N.D.N.Y.2004) (considering factual allegations contained in plaintiff's opposition papers) [citations omitted], *vacated in part on other grounds,* 317 F.Supp.2d 160 (N.D.N.Y.2004). This authority is premised, not only on case law, but on Rule 15 of the Federal Rules of Civil Procedure, which permits a plaintiff, as a matter of right, to amend his complaint once at any time before the service of a responsive pleading-which a motion to dismiss is not. *See Washington v. James,* 782 F.2d 1134, 1138-39 (2d Cir.1986) (considering subsequent affidavit as amending *pro se* complaint, on motion to dismiss) [citations omitted].

FN42. *Cruz v. Gomez,* 202 F.3d 593, 597 (2d

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Cir.2000) (finding that plaintiff's conclusory allegations of a due process violation were insufficient) [internal quotation and citation omitted].

FN43. *Cuoco v. Moritsugu,* 222 F.3d 99, 112 (2d Cir.2000) [internal quotation and citation omitted]; *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

FN44. *Cuoco,* 222 F.3d at 112 (finding that repleading would be futile) [citation omitted]; *see also Cortec Indus., Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991) ("Of course, where a plaintiff is unable to allege any fact sufficient to support its claim, a complaint should be dismissed with prejudice.") (affirming, in part, dismissal of claim with prejudice) [citation omitted].

FN45. *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2, n. 14 (N.D.N.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5, n. 34 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007) (Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4, n. 30 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Goros v. Cent. Office Review Comm.,* 03-CV-0407, 2006 WL 2794415, at *5, n. 18 (N.D.N.Y. Sept., 26, 2006) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Williams v. Weaver,* 03-CV-0912, 2006 WL 2799417, at *4, n .16 (N.D.N.Y. Sept. 26, 2006) (Kahn, J., adopting re-

port-recommendation of Lowe, M.J.).

FN46. *See Sealed Plaintiff v. Sealed Defendant # 1,* No. 06-1590, 2008 WL 3294864, at *5 (2d Cir. Aug.12, 2008) ("[The obligation to construe the pleadings of *pro se* litigants liberally] entails, at the very least, a permissive application of the rules governing the form of pleadings.") [internal quotation marks and citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) ("[R]easonable allowances to protect *pro se* litigants from inadvertent forfeiture of important rights because of their lack of legal training ... should not be impaired by harsh application of technical rules.") [citation omitted].

FN47. *See Prezzi v. Schelter,* 469 F.2d 691, 692 (2d Cir.1972) (extra liberal pleading standard set forth in *Haines v. Kerner,* 404 U.S. 519 [1972], did not save *pro se* complaint from dismissal for failing to comply with Fed.R.Civ.P. 8] ); *accord, Shoemaker v. State of Cal.,* 101 F.3d 108 (2d Cir.1996) (citing *Prezzi v. Schelter,* 469 F.2d 691) [unpublished disposition cited only to acknowledge the continued precedential effect of *Prezzi v. Schelter,* 469 F.2d 691, within the Second Circuit]; *accord, Praseuth v. Werbe,* 99 F.3d 402 (2d Cir.1995).

FN48. *See McNeil v. U.S.,* 508 U.S. 106, 113, 113 S.Ct. 1980, 124 L.Ed.2d 21 (1993) ("While we have insisted that the pleadings prepared by prisoners who do not have access to counsel be liberally construed ... we have never suggested that procedural rules in ordinary civil litigation should be interpreted so as to excuse mistakes by those who proceed without counsel."); *Faretta v. California,* 422 U.S. 806, 834, n. 46, 95 S.Ct. 2525, 45 L.Ed.2d 562 (1975) ("The right of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

self-representation is not a license ... not to comply with relevant rules of procedural and substantive law."); *Triestman v. Fed. Bureau of Prisons,* 470 F.3d 471, 477 (2d Cir.2006) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *Traguth v. Zuck,* 710 F.2d 90, 95 (2d Cir.1983) (*pro se* status "does not exempt a party from compliance with relevant rules of procedural and substantive law") [citation omitted]; *cf. Phillips v. Girdich,* 408 F.3d 124, 128, 130 (2d Cir.2005) (acknowledging that *pro se* plaintiff's complaint could be dismissed for failing to comply with Rules 8 and 10 if his mistakes either "undermine the purpose of notice pleading [ ]or prejudice the adverse party").

FN49. *Stinson v. Sheriff's Dep't of Sullivan Cty.,* 499 F.Supp. 259, 262 & n. 9 (S.D.N.Y.1980); *accord, Standley v. Dennison,* 05-CV-1033, 2007 WL 2406909, at *6, n. 27 (N.D.N.Y. Aug.21, 2007) (Sharpe, J., adopting report-recommendation of Lowe, M.J.); *Muniz v. Goord,* 04-CV-0479, 2007 WL 2027912, at *2 (N.D.Y.Y. July 11, 2007) (McAvoy, J., adopting report-recommendation of Lowe, M.J.); *DiProjetto v. Morris Protective Serv.,* 489 F.Supp.2d 305, 307 (W.D.N.Y.2007); *Cosby v. City of White Plains,* 04-CV-5829, 2007 WL 853203, at *3 (S.D.N.Y. Feb.9, 2007); *Lopez v. Wright,* 05-CV-1568, 2007 WL 388919, at *3, n. 11 (N.D.N.Y. Jan.31, 2007) (Mordue, C.J., adopting report-recommendation of Lowe, M.J.); *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *5 (N.D.N.Y. Jan.23, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.); *Ariola v. Onondaga County Sheriff's Dept.,* 04-CV-1262, 2007 WL 119453, at *2, n. 13 (N.D.N.Y. Jan.10, 2007)

(Hurd, J., adopting report-recommendation of Lowe, M.J.); *Collins v. Fed. Bur. of Prisons,* 05-CV-0904, 2007 WL 37404, at *4 (N.D.N.Y. Jan.4, 2007) (Kahn, J., adopting report-recommendation of Lowe, M.J.).

FN50. *McGinty v. State of New York,* 251 F.3d 84, 100 (2d Cir.2001) [citation omitted]; *see also* Fed.R.Civ.P. 12(h)(3).

FN51. 42 U.S.C. § 1983 [emphasis added].

FN52. *See, supra,* note 44 of this Report-Recommendation.

FN53. *See Ying Jing Gan v. City of New York,* 996 F.2d 522, 529 (2d Cir.1993) ("The immunity to which a state's official may be entitled in a § 1983 action depends initially on the capacity in which he is sued. To the extent that a state official is sued for damages in his official capacity, such a suit is deemed to be a suit against the state, and the official is entitled to invoke the Eleventh Amendment immunity belonging to the state."); *Severino v. Negron,* 996 F.2d 1439, 1441 (2d Cir.1993) ( "[I]t is clear that the Eleventh Amendment does not permit suit [under Section 1983] for money damages against state officials in their official capacities."); *Farid v. Smith,* 850 F.2d 917, 921 (2d Cir.1988) ("The eleventh amendment bars recovery against an employee who is sued in his official capacity, but does not protect him from personal liability if he is sued in his 'individual' or 'personal' capacity."); *see also Will v. Michigan Dept. of State Police,* 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989) ("Obviously, state officials literally are persons. But a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

against the official's office.... As such, it is no different from a suit against the State itself.... We hold that neither a State nor its officials acting in their official capacities are 'persons' under § 1983."); *Kentucky v. Graham,* 473 U.S. 159, 165-66, 105 S.Ct. 3099, 87 L.Ed.2d 114 (1985) ("As long as the government entity receives notice and an opportunity to respond, an official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. It is not a suit against the official personally, for the real party in interest is the entity."); *see also Holloway v. Selsky,* 05-CV-0501, 2007 WL 433375, at *4 (N.D.N.Y. Feb.6, 2007) (Sharpe, J.) [citing cases].

FN54. *See, infra,* note 41 of this Report-Recommendation (citing cases).

FN55. The authority to conduct this *sua sponte* analysis is derived from two sources: (1) 28 U.S.C. § 1915(e)(2)(B)(ii), which provides that "the court shall dismiss [a] case [brought by a prisoner proceeding *in forma pauperis* ] at any time if the court determines that ... the action ... is frivolous or malicious[,] ... fails to state a claim on which relief may be granted[,] ... or ... seeks monetary relief against a defendant who is immune from such relief"; and (2) 28 U.S.C. § 1915A(b), which provides that, "[o]n review, the court shall ... dismiss the [prisoner's] complaint, or any portion of the complaint, if the complaint ... is frivolous, malicious, or fails to state a claim upon which relief may be granted ...."

FN56. As explained above in Part II of this Report-Recommendation, a dismissal for failure to state a claim may be based not only on a successful challenge to the "sufficiency of the pleading" under Fed.R.Civ.P. 8(a)(2),

but also on a successful challenge to the legal cognizability of the claims asserted in the pleading. *See, supra,* notes 26 and 27 of this Report-Recommendation.

FN57. *Farmer v. Brennan,* 511 U.S. 825, 827, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[S]ubjective recklessness as used in the criminal law is a familiar and workable standard that is consistent with the Cruel and Unusual Punishments Clause as interpreted in our cases, and we adopt it as the test for "deliberate indifference" under the Eighth Amendment."); *Hemmings v. Gorczyk,* 134 F.3d 104, 108 (2d Cir.1998) ("The required state of mind [for a deliberate indifference claim under the Eighth Amendment], equivalent to criminal recklessness, is that the official knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists; and he must also draw the inference.") [internal quotation marks and citations omitted]; *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996) ("The subjective element requires a state of mind that is the equivalent of criminal recklessness ....") [citation omitted]; *accord, Koehl v. Greene,* 06-CV-0478, 2007 WL 2846905, at *17, n. 98 (N.D.N.Y. Sept.26, 2007) (Kahn, J.), *Richards v. Goord,* 04-CV-1433, 2007 WL 201109, at *15, n. 124 (N.D.N.Y. Jan.23, 2007) (Kahn, J.), *Salaam v. Adams,* 03-CV-0517, 2006 WL 2827687, at *10, n. 59 (N.D.N.Y. Sept.29, 2006) (Kahn, J.).

FN58. In addition, it is worth noting that Plaintiff's explanation to Defendant Bleau consisted of a statement that Plaintiff could not urinate because of his prostate *medication,* not because of his prostate *condition.*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

*See, supra,* Part I.A. of this Report-Recommendation. As a result, Defendant Bleau would not have become *aware* of the reason for Plaintiff's inability to urinate (which Plaintiff now alleges was his prostate *condition,* not his prostate *medication* ), even if Defendant Bleau had remained in Plaintiff's presence and listened to his explanation.

FN59. *Farmer v. Brennan,* 511 U.S. 825, 835, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994) ("[D]eliberate indifference [for purposes of an Eighth Amendment claim] describes a state of mind more blameworthy than negligence."); *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976) ("[A] complaint that a physician has been negligent in diagnosing or treating a medical condition does not state a valid claim of medical mistreatment under the Eighth Amendment. Medical malpractice does not become a constitutional violation merely because the victim is a prisoner."); *Murphy v. Grabo,* 94-CV-1684, 1998 WL 166840, at *4 (N.D.N.Y. Apr.9, 1998) (Pooler, J .) ("Deliberate indifference, whether evidenced by [prison] medical staff or by [prison] officials who allegedly disregard the instructions of [prison] medical staff, requires more than negligence.... Disagreement with prescribed treatment does not rise to the level of a constitutional claim.... Additionally, negligence by physicians, even amounting to malpractice, does not become a constitutional violation merely because the plaintiff is an inmate.... Thus, claims of malpractice or disagreement with treatment are not actionable under section 1983.") [citations omitted].").

FN60. *See, supra,* note 44 of this Report-Recommendation.

FN61. *Accord, Lugo v. Van Orden,* 07-CV-0879, 2008 U.S. Dist. LEXIS 56707, at *7, 2008 WL 2884925 (N.D.N.Y. July 23, 2008) (McAvoy, J.); *Darvie v. Countryman,* 08-CV-0715, 2008 U.S. Dist. LEXIS 60931, 2008 WL 3286250 (N.D.N.Y. Aug. 7, 2008) (Sharpe, J.), *adopting* 2008 U.S. Dist. LEXIS 52797, at *18, n. 5, 2008 WL 2725071 (N.D.N.Y. July 10, 2008) (Lowe, M.J.); *Anderson v. Banks,* 06-CV-0625, 2008 U.S. Dist. LEXIS 60896, at *16-17, 2008 WL 3285917 (N.D.N.Y. May 19, 2008) (Homer, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 60932, 2008 WL 3285917 (N.D.N.Y. Aug. 6, 2008) (Sharpe, J.); *Stewartson v. Almstead,* 04-CV-1097, 2008 U.S. Dist. LEXIS 22178, at *7, 2008 WL 783367 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *McEachin v. Goord,* 06-CV-1192, 2008 U.S. Dist. LEXIS 27479, at *12, 2008 WL 1788440 (N.D.N.Y. Feb. 8, 2008) (Treece, M.J.), *adopted by* 2008 U.S. Dist. LEXIS 31879, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J.); *Murray v. Pataki,* 03-CV-1263, 2007 U.S. Dist. LEXIS 26959, at *27, 2007 WL 965345 (N.D.N.Y. March 5, 2007) (Treece, M.J.), *adopted by* 2007 U.S. Dist. LEXIS 23065, 2007 WL 956941 (N.D.N.Y. March 29, 2007) (Kahn, J.); *Madera v. Goord,* 103 F.Supp.2d 536, 542 (N.D.N.Y.2000) (Kahn, J., adopting Report-Recommendation by Di Bianco, M.J.).

FN62. *See, supra,* note 44 of this Report-Recommendation.

FN63. *See, e.g., Spence v. Senkowski,* 91-CV-0955, 1998 WL 214719, at *3 (N.D.N.Y. Apr.17, 1998) (McCurn, J.) (180 days that plaintiff spent in S.H.U., where he was subjected to numerous conditions of confinement that were more restrictive than those in general population, did not constitute atypical and significant hardship in rela-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

tion to ordinary incidents of prison life); *accord, Husbands v. McClellan,* 990 F.Supp. 214, 217-19 (W.D.N.Y.1998) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Warren v. Irvin,* 985 F.Supp. 350, 353-56 (W.D.N.Y.1997) (161 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Ruiz v. Selsky,* 96-CV-2003, 1997 WL 137448, at *4-6 (S.D.N.Y.1997) (192 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Horne v. Coughlin,* 949 F.Supp. 112, 116-17 (N.D.N.Y.1996) (Smith, M.J.) (180 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Nogueras v. Coughlin,* 94-CV-4094, 1996 WL 487951, at *4-5 (S.D.N.Y. Aug.27, 1996) (210 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population); *Carter v. Carriero,* 905 F.Supp. 99, 103-04 (W.D.N.Y.1995) (270 days in S.H.U. under numerous conditions of confinement that were more restrictive than those in general population).

FN64. *Jackson v. Onondaga County,* 05-CV-1393, 2008 U.S. Dist. LEXIS 64930, at *40 & n. 46, 549 F. Supp. 2d 204 (N.D.N.Y. Jan. 8, 2008) (Lowe, M.J.) [citations omitted], *adopted on* de novo *review by* 05-CV-1393, 2008 U.S. Dist. LEXIS 22175, 2008 WL 782655 (N.D.N.Y. March 20, 2008) (McAvoy, J.); *see also Martin v. Mitchell,* 92-CV-0716, 1995 U.S. Dist. LEXIS 19006, at *10-12, 1995 WL 760651 (N.D.N.Y. Nov. 24, 1995) (McAvoy, C.J.) (rejecting plaintiff's assertion that prison

disciplinary hearing officer "had a duty to investigate the identity of [a correction officer identified by the plaintiff merely as] 'Budd' and call him to testify"); *Hampton v. McGinnis,* 89-CV-6344, 1992 U.S. Dist. LEXIS 15696, at *6, 1992 WL 309553 (S.D.N.Y. Oct. 15, 1992) ("[I]t was not [the disciplinary hearing officer's] duty to investigate [the prisoner's assault] claim, and plaintiff was not precluded from offering his own evidence on that subject."); *cf. Kingsley v. Bureau of Prisons,* 937 F.2d 26, 31 (2d Cir.1991) (under circumstances, a hearing officer did have a duty to identify the name of the plaintiff's desired witness because [1] the plaintiff had an "especially compelling" need for the witness, [2] the witness's identity was "readily available" to the hearing officer, [3] the plaintiff had arrived at the prison only five days earlier, [4] fulfilling the request would not have delayed the imposition of "swift discipline," and [5] "no other institutional objective was implicated").

FN65. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 150, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) ("The terms of § 1983 make plain two elements that are necessary for recovery. First, the plaintiff must prove that the defendant has deprived him of a right secured by the 'Constitution and laws' *of the United States."* ) (emphasis added); *Patterson v. Coughlin,* 761 F.2d 886, 890 (2d Cir.1985) ("Recovery under 42 U.S.C. § 1983 ... is premised upon a showing, first, that the defendant has denied the plaintiff a constitutional or *federal* statutory right ....") (citation omitted; emphasis added); *Fluent v. Salamanca Indian Lease Auth.,* 847 F.Supp. 1046, 1056 (W.D.N.Y.1994) ("The initial inquiry in a § 1983 action is whether the Plaintiff has been deprived of a right 'secured by the Constitution and laws' *of the United*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*States."* ) [emphasis added].

FN66. *See Doe v. Conn. Dept. of Child & Youth Servs.,* 911 F.2d 868, 869 (2d Cir.1990) ("[A] violation of state law neither gives [plaintiff] a § 1983 claim nor deprives defendants of the defense of qualified immunity to a proper § 1983 claim."); *Patterson,* 761 F.2d at 891 ("[A] state employee's failure to conform to state law does not in itself violate the Constitution and is not alone actionable under § 1983 ....") (citation omitted); *Murray v. Michael,* 03-CV-1434, 2005 WL 2204985, at * 10 (N.D.N.Y. Sept.7, 2005) (DiBianco, M.J.) ("[A]ny violations of state regulations governing the procedures for disciplinary hearings ... do not rise to the level of constitutional violations.") (citation omitted); *Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) ("[V]iolations of state law procedural requirements do not alone constitute a deprivation of due process since '[f]ederal constitutional standards rather than state law define the requirements of procedural due process.' ") (citing *Russell v. Coughlin,* 910 F.2d 75, 78 n. 1 [2d Cir.1990] ).

FN67. *See Rivera v. Wohlrab,* 232 F.Supp.2d 117, 123 (S.D.N.Y.2002) (citation omitted); *Lopez v. Reynolds,* 998 F.Supp. 252, 259 (W.D.N.Y.1997).

FN68. *See Farinaro v. Coughlin,* 642 F.Supp. 276, 280 (S.D.N.Y.1986).

FN69. *See, e.g., Paddington Partners v. Bouchard,* 34 F.3d 1132, 1137-38 (2d Cir.1994) ("In objecting to a magistrate's report before the district court, a party has no right to present further testimony when it offers no justification for not offering the testimony at the hearing before the magistrate.") [internal quotation marks and citations omitted]; *Pan Am. World Airways, Inc. v. Int'l Bhd. of Teamsters,* 894 F.2d 36, 40 n. 3 (2d Cir.1990) (district court did not abuse its discretion in denying plaintiff's request to present additional testimony where plaintiff "offered no justification for not offering the testimony at the hearing before the magistrate"); *Alexander v. Evans,* 88-CV-5309, 1993 WL 427409, at * 18 n. 8 (S.D.N.Y. Sept.30, 1993) (declining to consider affidavit of expert witness that was not before magistrate) [citation omitted]; s*ee also Murr v. U.S.,* 200 F.3d 895, 902, n. 1 (6th Cir.2000) ("Petitioner's failure to raise this claim before the magistrate constitutes waiver."); *Marshall v. Chater,* 75 F.3d 1421, 1426 (10th Cir.1996) ("Issues raised for the first time in objections to the magistrate judge's recommendations are deemed waived.") [citations omitted]; *Cupit v. Whitley,* 28 F.3d 532, 535 (5th Cir.1994) ("By waiting until after the magistrate judge had issued its findings and recommendations [to raise its procedural default argument] ... Respondent has waived procedural default ... objection [ ].") [citations omitted]; *Greenhow v. Sec'y of Health & Human Servs.,* 863 F.2d 633, 638-39 (9th Cir.1988) ("[A]llowing parties to litigate fully their case before the magistrate and, if unsuccessful, to change their strategy and present a different theory to the district court would frustrate the purpose of the Magistrates Act."), *overruled on other grounds by U.S. v. Hardesty,* 977 F.2d 1347 (9th Cir.1992); *Patterson-Leitch Co. Inc. v. Mass. Mun. Wholesale Elec. Co.,* 840 F.2d 985, 990-91 (1st Cir.1988) ("[A]n unsuccessful party is not entitled as of right to de novo review by the judge of an argument never seasonably raised before the magistrate.") [citation omitted].

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2008 WL 4693153 (N.D.N.Y.)
**(Cite as: 2008 WL 4693153 (N.D.N.Y.))**

N.D.N.Y.,2008.
Robles v. Bleau
Not Reported in F.Supp.2d, 2008 WL 4693153
(N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4044901 (S.D.N.Y.)
**(Cite as: 2012 WL 4044901 (S.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
S.D. New York.
Angel ROSARIO, Plaintiff,
v.
Brian FISCHER, Commissioner, State of New York
Department of Corrections and Community Supervision, et al., Defendants.

No. 11 Civ. 4617(JPO)(FM).
Aug. 28, 2012.

*REPORT AND RECOMMENDATION TO THE
HONORABLE J. PAUL OETKEN*

FRANK MAAS, United States Magistrate Judge.

**\*1** Plaintiff Angel Rosario ("Rosario") brings this *pro se* action, pursuant to 42 U.S.C. § 1983, against employees of the New York State Department of Corrections and Community Supervision ("DOCCS") and the New York City Department of Correction ("DOC"), alleging that they violated his constitutional rights during his detention at the Southport Correctional Facility ("Southport") and the "Rikers Correctional Facility" ("Rikers"). Specifically, Rosario contends that DOCCS Commissioner Brian Fischer ("Fischer"), Southport Deputy Superintendent for Programs A. Bartlett ("Bartlett"), Southport Inmate Record Coordinator Diane Kelly ("Kelly") (collectively, the "State Defendants"), and other unidentified DOCCS employees, damaged and lost his personal property, thereby depriving him of access to the courts and due process. Additionally, Rosario contends that Deputy Warden for Security at the Otis Bantum Correctional Center ("OBCC") Thomas Hall ("Hall") and DOC Commissioner Dora B. Schriro ("Schriro") (together, the "City Defendants"), and other unidentified DOC employees, deprived him of his constitutional rights at Rikers by mishandling his property, confining him to a punitive segregation housing unit without due process, and subjecting him to excessive force. (*See* ECF No. 2 ("Complaint" or "Compl.")).[FN1] Finally, Rosario alleges that the State and City Defendants (together, the "Defendants") infringed his constitutional rights by violating a state court order that he be dressed in civilian clothing and held by DOCS, rather than DOCCS. The Defendants separately have moved to dismiss the Complaint pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. (ECF Nos. 17, 26). For the reasons set forth below, I recommend that both motions be granted, but that Rosario be permitted to file an amended complaint if he can cure the deficiencies noted in this Report and Recommendation.

> FN1. The copy of the Complaint initially filed with the Court was missing several pages. By Order dated May 24, 2012, I directed Rosario to file any missing pages within two weeks. (ECF No. 32). On May 30, 2012, Rosario filed some of the missing pages with the Court, but served complete copies of the missing pages on counsel for the Defendants. Counsel for the City Defendants then submitted those papers to my Chambers. The full Complaint has now been docketed as ECF No. 2.

> Appended to Rosario's form Complaint are several documents, including a "Statement of Claim" ("Stmt."), an "Attachment of Facts" with enumerated paragraphs ("Attach."), and an affidavit from Rosario's mother, Miriam Marrero–Bayron, sworn to on May 23, 2011 ("Marrero–Bayron Aff."). Citations to "Ex." refer to the exhibits that follow these documents.

Not Reported in F.Supp.2d, 2012 WL 4044901 (S.D.N.Y.)
**(Cite as: 2012 WL 4044901 (S.D.N.Y.))**

I. *Background*

A. *Facts*

Unless otherwise indicated, the following facts are either undisputed or set forth in the light most favorable to Rosario.

On July 18, 2006, Rosario was convicted of Sexual Conduct against a Child in the First Degree, Rape in the First and Second Degrees, and Incest in the Third Degree after a jury trial in Supreme Court, New York County, and sentenced to an aggregate prison term of fifteen years. *People v. Rosario,* 892 N.Y.S.2d 338, 339 (1st Dep't 2009), *aff'd,* 17 N.Y.3d 501, 515 (2011). On December 22, 2009, while Rosario was serving that sentence at Southport, a DOCCS facility, the Appellate Division, First Department, reversed his conviction and ordered a new trial. (*Id.;* Attach. ¶ 1). Accordingly, on January 11, 2010, Justice Juan M. Merchan ordered the Superintendent of Southport to "deliver [Rosario], in civilian clothes," to DOC custody, so that he could attend court to be remanded for a new trial. (Ex. AA). Justice Merchan further directed that DOC produce Rosario "in civilian clothes" for a hearing on February 8, 2010, and "keep him available for further court proceedings." (*Id.*). The order specified that DOC was not to return Rosario to State custody unless directed by the court. (*Id.*).

1. *Confinement in DOC Central Punitive Segregation Unit*

**\*2** While he was in DOCCS custody, Rosario was housed in a special housing unit ("SHU") segregated from the general prison population. (*See* Attach. ¶ 2). Following the reversal of his conviction, DOCCS transferred Rosario to Rikers, a DOC facility, on February 4, 2010. (*Id.* ¶ 6). Rosario alleges that DOCCS and DOC had an "agreement" whereby inmates housed in a DOCCS SHU automatically were assigned to a DOC Central Punitive Segregation Unit ("CPSU") upon their transfer. (*See id.* ¶¶ 2, 6). Pursuant to this alleged agreement, Rosario was confined in the CPSU at the OBCC for approximately thirty-four days, even though he had not violated any DOC rules. (*Id.*). Rosario was subject to numerous restrictions due to his assignment to the CPSU. For example, Rosario could not wear civilian clothing and thus had to make court appearances, including attendance at his hearing on February 8, 2010, wearing a prisoner uniform. Rosario also could not attend Catholic Mass, confess, receive communion, or obtain religious reading material. While in the CPSU, Rosario also did not receive meals that were appropriate for a diabetic, as recommended by his medical provider. Additionally, rather than being provided with a personal supply of toilet paper and toothpaste, Rosario was required to request these items as needed. He further was denied such cleaning tools as a toilet brush. (Stmt. at 3; Attach. ¶ 2).

On February 20, 2010, Rosario "submitted a serie[ ]s of letter[ ]s" to Schriro "looking for answers regarding [his] confinement status at 'CPSU.' " (Attach ¶ 8). Subsequently, on March 9, 2010, Rosario mailed a letter to Hall regarding his CPSU confinement. (*Id.* ¶ 11). Rosario submitted numerous other complaints and grievances concerning his assignment to units within DOC. (*Id.* ¶¶ 3, 10, 12).

2. *Uses of Force by DOC Personnel*

While Rosario was in DOC custody, DOC employees used physical force against him on at least three occasions: February 9, March 31, and October 23, 2010. (*Id.* ¶¶ 7, 15, 19, 43).

During the February 9 incident, an officer twisted Rosario's wrist while handcuffing him to transport him from a DOC bus to a court appearance. Rosario, who suffers from rheumatoid arthritis, asked the officer "to be careful with the handcuff, not being [too] tight." The officer then became "upset by the amount of time waiting and inmates pressing him, [and] cost his dis-

Not Reported in F.Supp.2d, 2012 WL 4044901 (S.D.N.Y.)
**(Cite as: 2012 WL 4044901 (S.D.N.Y.))**

play." Rosario visited a clinic after the incident. (Attach.¶ 7).

On March 31, 2010, Rosario was "assaulted" by two correction officers at the CPSU mini-clinic. Rosario has not provided any details regarding the alleged assault other than indicating that "physical abuse" and a "beating" was involved, but he also notes that "nothing serious" occurred. (*Id.* ¶¶ 15, 19).

On October 23, 2010, Rosario's cell was searched as part of a "tactical search operation." (*Id.* ¶ 43). After an officer discovered an expired bottle of medication, Rosario attempted to explain to the captain supervising the search that he took the medication only as needed. Because DOC does not permit prisoners to talk during cell searches, the captain ordered that Rosario be removed from his cell. Rosario then was ordered to face the wall and place his hands behind his back. Rosario turned to face the wall, but requested that his hands be cuffed in front of his body because he uses a cane. Rosario further explained that he had in his pocket a "medical permit" allowing him to use a cane and be front-cuffed. (*Id.; Ex.* T). The captain nonetheless handcuffed Rosario behind his back and ordered him to walk. When Rosario refused, explaining that he had a permit to use a cane to walk, the captain "drag[ged him] thru the hallway." (Attach.¶ 43). In the middle of the hallway, the captain called for a wheelchair and placed Rosario in the chair with his hands still cuffed behind his back. (*Id.*).

3. *Return of Property from Southport*

**\*3** Although Justice Merchan specifically ordered DOC not to return Rosario to DOCCS custody, (Ex. AA), on April 9, 2010, DOC transferred him from Rikers to Southport, where he arrived on April 12, 2010 (Attach.¶ 17). On April 28, 2010, Rosario was returned to DOC custody at Rikers, but some of his personal property remained at Southport. (*See id.* ¶¶ 25, 26; Ex. I). On May 5, 2010, Rosario wrote to Southport requesting that his inmate account funds be forwarded to him at Rikers. (Attach. ¶ 26; Ex. J). By

memorandum dated May 14, 2010, a supervising corrections counselor at Southport advised Rosario that "[u]ntil official documentation is received," DOC would continue to treat his status as "Out to Court" and, "[a]s such, none of [his] property, mail or funds could be forwarded to him." (Ex. J; *see* Attach. ¶¶ 24, 27). Thereafter, on May 25, 2010, Rosario requested that the First Department provide DOCCS with an original certified copy of its decision reversing his conviction. (Attach.¶ 29). On or around June 22, 2010, Rosario wrote a letter to DOCCS in which he indicated that he had received a copy of the decision and requested that DOCCS change his status and that the property held at Southport be returned to him. (*Id.* ¶ 30; Ex. J).

On June 23, 2010, Rosario received a letter advising him that he would be released pursuant to a court order. (Attach. ¶ 31; Ex. A). The letter instructed Rosario to contact the Southport Inmate Records Coordinator to obtain his personal property and funds, but advised that Rosario would be responsible for any shipping costs. (*See* Ex. A). Rosario again contacted Southport requesting that his property be forwarded to him at Rikers. (Attach.¶ 32). On July 9, 2010, Kelly sent Rosario "a partial delivery" of his mail, certain legal documents, and a check for the funds in his Southport inmate account. (*Id.* ¶ 33; Exs. N, P). Kelly shipped four additional boxes of property to Rosario on July 20, 2010, at a cost of $81. (Attach.¶ 34). Personnel at Rikers returned these boxes to Southport, however, without notifying Rosario of their delivery. (*Id.* ¶¶ 35–37, 41).

After Rosario confirmed that the four boxes had been returned to Southport, he asked, by letter dated September 10, 2010, that Bartlett ship the boxes to Rosario's mother in Puerto Rico. (*Id.* ¶¶ 39–40; Ex. R). By memorandum dated September 21, 2010, Bartlett advised Rosario that the cost of shipping the boxes would be $164.53 and instructed Rosario to send a money order for that amount prior to shipment. (Attach. ¶ 41; Ex. V).

Not Reported in F.Supp.2d, 2012 WL 4044901 (S.D.N.Y.)
**(Cite as: 2012 WL 4044901 (S.D.N.Y.))**

When Rosario's mother received the four boxes in September 2010, she found that the letters and legal documents in the boxes were "all over the place (i.e., letter[ ]s out of the envelop[e]s)," and that some documents had been "damage[d] or [were] missing." (Attach. ¶ 41; *see* Marrero–Bayron Aff. ¶ 1). She also found that a television worth $167 was missing from the boxes. (Attach.¶ 41).

**B.** *Procedural History*

**\*4** Rosario's Complaint, dated May 17, 2011, was received by the *Pro Se* Office of this Court on June 20, 2011. (*See* Compl. at 1, 7). On August 30, 2011, Judge Daniels, to whom this case then was assigned, referred the matter to me for general pretrial supervision and a report and recommendation regarding any dispositive motion. (ECF No. 10). The case subsequently was reassigned to Your Honor on October 6, 2011. (ECF No. 12).

On February 17, 2012, the State Defendants moved to dismiss all claims against them. (ECF No. 17). Subsequently, on March 23, 2012, the City Defendants filed their motion to dismiss the Complaint. (ECF No. 26). By memorandum endorsement dated March 30, 2012, Your Honor directed that Rosario serve and file his opposition papers by April 23, 2012. (ECF No. 29). Rosario has yet to file any substantive papers in opposition to the Defendants' motions. He instead merely notes in a letter to Your Honor, dated July 28, 2012, that Rule 8(a) of the FRCP requires only a "short and plain" statement of his claim and, on that basis, requests that the Court deny the Defendants' motions. (ECF No. 33 at 2).

**II.** *Standard of Review*

A motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure "tests the legal sufficiency of plaintiff's claim for relief." *Krasner v. HSH Nordbank AG,* 680 F.Supp.2d 502, 511 (S.D.N.Y.2010) (citing *Patane v. Clark,* 508 F.3d 106,

111–12 (2d Cir.2007)). A district court considering a motion under Rule 12(b)(6) must accept all factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus,* 551 U.S. 89, 93–94 (2007) (*per curiam* ). The complaint need not contain "detailed factual allegations." *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). Nevertheless, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.* (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 555 (2007)).

To survive a motion to dismiss, the Complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Id.* (quoting *Twombly,* 550 U.S. at 570). Determining whether the allegations of a complaint nudge a plaintiff's claims across the line from merely "conceivable to plausible" requires a court to "draw on its judicial experience and common sense." *Id.* at 679–80. In addition to the plaintiff's factual averments, a court may consider any written instrument upon which the plaintiff necessarily relies, whether it is attached to the complaint or incorporated by reference. *See Chambers v. Time Warner, Inc.,* 282 F.3d 147, 152–53 (2d Cir.2002). Legal conclusions masquerading as factual averments, however, may not be taken into account. *Twombly,* 550 U.S. at 555.

Because Rosario is proceeding *pro se,* the Court must read his Complaint "liberally" and interpret it "to raise the strongest arguments" that it may suggest. *Chavis v. Chappius,* 618 F.3d 162, 170 (2d Cir.2010). "Dismissal of a *pro se* complaint is nevertheless appropriate where a plaintiff has clearly failed to meet minimum pleading requirements." *Rodriguez v. Weprin,* 116 F.3d 62, 65 (2d Cir.1997); *accord Carvel v. Ross,* No. 09 Civ. 722(LAK)(JCF), 2011 WL 856283, at *8 (S.D.N.Y. Feb. 16, 2011).

**III.** *Discussion*

**\*5** "To state a claim under § 1983, a plaintiff must allege the violation of a right secured by the Consti-

Not Reported in F.Supp.2d, 2012 WL 4044901 (S.D.N.Y.)
**(Cite as: 2012 WL 4044901 (S.D.N.Y.))**

tution and laws of the United States, and must show that the alleged deprivation was committed by a person acting under color of state law." *West v. Atkins,* 487 U.S. 42, 47 (1988); *accord McKithen v. Brown,* 481 F.3d 89, 99 (2d Cir.2007). To survive a motion to dismiss, a complaint under § 1983 also must allege that a defendant was personally involved in depriving the plaintiff of his rights. *Costello v. City of Burlington,* 632 F.3d 41, 48–49 (2d Cir.2011) (citing *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994)). "It is well settled in this Circuit that personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under § 1983." *Farid v. Ellen,* 593 F.3d 233, 249 (2d Cir.2010) (quoting *Farrell v. Burke,* 449 F.3d 470, 484 (2d Cir.2006)).

In *Colon v. Coughlin,* 58 F.3d 865 (2d Cir.1995), the Second Circuit held that a plaintiff may establish a prison supervisor's personal involvement by showing that the defendant either: (a) "participated directly in the alleged constitutional violation," (b) "failed to remedy" the violation "after being informed of the violation through a report or appeal," (c) "created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom," (d) "was grossly negligent in supervising subordinates who committed the [violation]," or (e) "exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring." *Id.* at 873 (citing *Wright,* 21 F.3d at 501); *accord Mateo v. Fischer,* 682 F.Supp.2d 423, 429–30 (S.D.N.Y.2010). It is unclear whether, and to what extent, the *Colon* categories have survived the Supreme Court's decision in *Iqbal,* 556 U.S. at 662. *See Inesti v. Hicks,* No. 11 Civ. 2596(PAC)(AJP), 2012 WL 2362626, at *11 (S.D.N .Y. June 22, 2012). In any event, merely pleading that a defendant is a high-ranking prison official plainly is insufficient to establish personal involvement. *Bellezza v. Holland,* 730 F.Supp.2d 311, 317 (S.D.N.Y.2010) (citing *Ayers v. Coughlin,* 780 F.2d 205, 210 (2d Cir.1985)). Similarly, "the receipt

of letters or grievances, by itself, does not amount to personal involvement," nor does a *pro forma* response to a letter or grievance. *Mateo,* 682 F.Supp.2d at 430–31 (collecting cases); *cf. Goris v. Breslin,* 402 Fed. App'x 582, 584 (2d Cir.2010) (no personal involvement where prison official merely received two letters and promptly referred them for investigation and response).

In this case, Rosario's Complaint, liberally construed, alleges that the State Defendants deprived him of his rights of meaningful access to the courts and due process by damaging and losing his property. Rosario also claims that the City Defendants unconstitutionally deprived him of a property interest by returning his property to Southport, confined him to the CPSU without due process, and subjected him to excessive force. Finally, Rosario claims that the Defendants violated his constitutional rights by forcing him to wear non-civilian attire and returning him to Southport custody on April 9, 2010, in contravention of Justice Merchan's order. I will consider each of these claims in turn.

A. *Return of Property*

**\*6** Rosario's claims against the State Defendants arise out of his contention that the legal documents and other property sent to him from Southport arrived at his mother's house in a disorderly state, with certain items damaged or missing, due to the "irresponsibility" of the DOCCS administration. (*See* Stmt. at 2). Additionally, Rosario contends that the City Defendants wrongfully returned the four boxes of his personal property that were sent to Rikers from Southport without providing any notice to him. (*Id.*). Liberally construed, these aspects of Rosario's Complaint can be read to allege a federal claim that the Defendants' handling of his documents and property violated his constitutional right of access to the courts and his Fourteenth Amendment right not to be deprived of his property without procedural due process.

1. *Personal Involvement*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4044901 (S.D.N.Y.)
**(Cite as: 2012 WL 4044901 (S.D.N.Y.))**

Turning first to the City Defendants, Rosario alleges that after Southport sent his personal property to Rikers, Rosario sent letters to the "Dep[uty] Warden of Administration at Rikers" and spoke to an unnamed captain at Rikers regarding the status his property. (Attach.¶¶ 34–36, 38). Rosario further alleges that the Riker[ ]s Island Facility, Post Office Trailer" mailed the boxes back to Southport "without [ ] notification [to him] in violation of [DOC] Rules." (*Id.* ¶ 37). Rosario's papers do not suggest, however, that he communicated with either Hall or Schriro regarding his property, that they personally directed that the boxes be returned to Southport, or that they were responsible for the handling of property at the Rikers mail facility. Thus, because Rosario failed to establish that the City Defendants were personally involved in any alleged mishandling of his property, any claims against the City Defendants arising out of the return of his property to Southport must be dismissed.

Rosario's allegations with respect to Fischer are similarly deficient. Although Rosario alleges that Fischer's office sent him a letter informing him that he would be released and should contact the Southport Inmate Records Coordinator to obtain his personal property, (*id.* ¶ 31), that communication appears to be nothing more than a form letter signed by a staff member (*see* Ex. A). Indeed, Fischer's name appears only on the DOCCS letterhead, which identifies him as the DOCCS Commissioner. (*Id.*). There is no indication that Fischer had any knowledge of Rosario's attempts to obtain his property and failed to remedy a wrong, or that Fischer took any action with respect to Rosario's property. Any claims against Fischer in connection with the handling of Rosario's property consequently also must be dismissed.

On the other hand, Rosario has alleged sufficient facts to establish the personal involvement of the two remaining state defendants—Kelly and Bartlett—in the return of his personal property. Rosario's claims against these defendants arising out of the handling of his property nevertheless fail to state a claim that

entitles him to any relief for the reasons set forth below.

### 2. *Right of Access to the Courts*

**\*7** Prisoners have a constitutional right, grounded in multiple constitutional provisions, to "adequate, effective, and meaningful" access to the courts. *Bounds v. Smith,* 430 U.S. 817, 822 (1977); *see Christopher v. Harbury,* 536 U.S. 403, 415 n. 12 (2002), *Bourdon v. Loughren,* 386 F.3d 88, 92–93 (2d Cir.2004). The right of access to the courts further gives rise to a number of derivative rights, including the right to receive legal mail without interference. *Bellezza,* 730 F.Supp.2d at 314. In order to state a claim based on a denial of meaningful access to the courts, a plaintiff must allege "that the defendant's conduct was deliberate and malicious, and that the defendant's actions resulted in an actual injury to the plaintiff." *Collins v. Goord,* 581 F.Supp.2d 563, 573 (S.D.N.Y.2008). To establish an "actual injury," a plaintiff must show that "the defendant's conduct frustrated the plaintiff's efforts to pursue a non-frivolous claim." *Id.* (citing *Lewis v. Casey,* 518 U.S 343, 353 (1996)). The condition that the plaintiff's claim was frustrated generally requires more than a mere delay in accessing the court. *See Davis v. Goord,* 320 F.3d 346, 352 (2d Cir.2003). To satisfy the requirement that the underlying claim not be frivolous, a plaintiff must describe the claim well enough for the court to determine whether the claim had an arguable basis in either law or fact. *See Christopher,* 536 U.S. at 415–16 (requiring pleading of the underlying claim to permit a court to assess its frivolity); *Nietzke v. Williams,* 490 U.S. 319, 325 (1989) ("a complaint ... is frivolous where it lacks an arguable basis either in law or in fact").

Applying these principles, Rosario plainly has failed to plead a claim of interference with his right of meaningful access to the courts. Rosario alleges that the "letters, legal documents, etc." inside the boxes that his mother received from Southport "w[ere] all over the place (i.e., letter[ ]s out of the envelop[e]s),"

Not Reported in F.Supp.2d, 2012 WL 4044901 (S.D.N.Y.)
**(Cite as: 2012 WL 4044901 (S.D.N.Y.))**

and that some were "damage[d] or missing." (Attach.¶ 41). Rosario has failed to allege any facts, however, that plausibly show that he was frustrated or impeded in bringing a legal claim. For example, Rosario has not provided a description of any of the missing or damaged documents or explained how those documents related to his legal claims. Rosario also has failed to identify what his legal claims would have been, much less show that those claims would have been non-frivolous. Without detailing the "arguable basis in law or fact" for any impeded legal claims, Rosario has failed to plead that the State Defendants unconstitutionally interfered with his right of meaningful access to the courts. In short, he has not shown any actual injury.

Moreover, Rosario has failed to allege any facts suggesting that the State Defendants acted deliberately and maliciously in their handling of his documents. Indeed, at Rosario's request, Southport sent the documents to him at Rikers, and after they were returned by Rikers, willingly sent them to his mother in Puerto Rico.

**\*8** For these reasons, to the extent that Rosario's Complaint contends that the State Defendants unconstitutionally interfered with his ability to access the courts, his claim must be dismissed.

3. *Due Process*

The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. Const. Amend. XIV. In a § 1983 suit brought to enforce procedural due process rights, a court first must determine whether the government deprived the plaintiff of a liberty or property interest. *Nnebe v. Daus,* 644 F.3d 147, 158 (2d Cir.2011). If such a deprivation occurred, the court then must consider what process was due for the deprivation and whether it was provided. *Id.*

Rosario alleges that the State Defendants failed to return some of his legal documents and a television, and that some of the letters and legal documents that were returned were damaged. There is no question that Rosario had a property interest in these items, and that the damage or loss of these items constituted a deprivation within the meaning of the Due Process Clause. Therefore, the critical question is what process the Constitution requires in these circumstances. *See id.*

To determine what process satisfies the Due Process Clause, "the Supreme Court has distinguished between (a) claims based on established state procedures and (b) claims based on random, unauthorized acts by state employees." *Rivera–Powell v. N.Y.C. Bd. of Elections,* 470 F.3d 458, 465 (2d Cir.2006) (quoting *Hellenic Am. Neighborhood Action Comm. v. City of N.Y.,* 101 F.3d 877, 880 (2d Cir.1996)); *see Hudson v. Palmer,* 468 U.S. 517, 532 (1984). The availability of post-deprivation relief does not, by itself, satisfy due process when "the deprivation complained of results from the operation of established state procedures." *Butler v. Castro,* 896 F.2d 698, 700 (2d Cir.1990). On the other hand, when a property deprivation is the result of an unauthorized negligent or intentional act by a state employee, the Due Process Clause is satisfied when the state provides an adequate post-deprivation remedy. *Hudson,* 468 U.S. at 533. Moreover, where post-deprivation state-law remedies are adequate, the due process requirement of notice is satisfied as long as the remedies "are established by published, generally available state statutes and case law." *City of W. Covina v. Perkins,* 525 U.S. 234, 241 (1999).

Rosario does not allege that the loss and destruction of his property was pursuant to an established state procedure. Accordingly, the state need only have provided Rosario with a meaningful post-deprivation procedure to recover for his loss. "New York in fact affords an adequate post-deprivation remedy in the form of, *inter alia,* a Court of Claims action." *Jackson*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

*v.. Burke,* 256 F.3d 93, 96 (2d Cir.2001). Thus, after Rosario learned that certain of his documents and other property had been lost or damaged, he could have commenced an action in the Court of Claims against the responsible parties. *See* N.Y. Const., art. VI, § 9 (Court of Claims "shall have jurisdiction to hear and determine claims against the [S]tate"); N.Y. Court of Claims Act § 9(2); N.Y. Comp.Codes R. & Regs. tit. 7, § 1700.3(b)(4). Moreover, the fact that this avenue of relief is available is fully set forth in statutes, regulations, and case law that are public and available. It follows that, because Rosario had a constitutionally adequate post-deprivation remedy of which he should have been aware, he cannot establish that he suffered a due process violation cognizable by this Court. Rosario's claims against the State Defendants arising out of his lost or damaged property therefore must be dismissed for failure to state a claim upon which relief may be granted.

### B. *Remaining Claims against the City Defendants*

**\*9** Rosario further claims that the City Defendants unconstitutionally deprived him of his liberty interests by confining him in the CPSU for more than one month without any legal process and subjected him to excessive force on three separate occasions. These claims also fail because, among other reasons, Rosario has not demonstrated that Hall and Schriro were personally involved in a violation of his constitutional rights.

### 1. *CPSU Confinement*

Rosario alleges that, in contravention of his due process rights, while he awaited a new trial after the reversal of his conviction, he was confined in the CPSU for thirty-four days, pursuant to an "agreement between" DOC and DOCCS, "without a violation of any [DOC] rules." (*See* Stmt. at 2, 3; Attach. ¶ 6). Rosario complains of the conditions to which he was subject in the CPSU, which, in addition to segregation from the general prison population, included denial of the diet recommended by his medical provider for diabetes, restrictions on his ability to practice his

religion, "very limited access" to the law library, being required to wear a prison uniform to court despite a court order directing that he be dressed in civilian clothes, and not being furnished cleaning tools and a personal supply of hygienic products. (Stmt. at 3). The City Defendants contend that Rosario's claim that he was unconstitutionally confined in the CPSU should be dismissed because "the whole of [Rosario's] allegations against Warden Hall and Commissioner Schriro is that they were the intended recipients of [his] letters.... Notably, [Rosario] does not allege that Warden Hall or Commissioner Schriro had any involvement in bringing about the subject matter of these letters, namely, his assignment to a SHU at OBCC." (ECF No. 28 (City Defs.' Mem.) at 7).

Assuming that Rosario sent the letters to which he refers, the Complaint still does not allege that Hall or Schriro acknowledged receipt of his letters, or that they sent Rosario a response. Accordingly, the mere fact that Rosario may have sent such letters to prison supervisors is insufficient to establish the City Defendants' personal involvement—even if they received and ignored the letters. *See Sealey v. Giltner,* 116 F.3d 47, 51 (2d Cir.1997) (DOCS Commissioner had no personal involvement merely because plaintiff wrote him two letters); *Mateo,* 682 F.Supp.2d at 430 ("the receipt of letters or grievances, by itself, does not amount to personal involvement"); *Watson v. McGinnis,* 964 F.Supp. 127, 130 (S.D.N.Y.1997) ("allegations that an official ignored a prisoner's letter are insufficient to establish liability"); *Higgins v. Artuz,* No. 94 Civ. 4810(SS), 1997 WL 466505, at \*7 (S .D.N.Y. Aug. 14, 1997) ("an allegation that an official ignored a prisoner's letter of protest and request for an investigation of allegations made therein is insufficient to hold that official liable for the alleged violations").

Nor has Rosario adequately alleged the City Defendants' personal involvement in his assignment to the CPSU on the theory that they created or fostered an unconstitutional practice. Rosario alleges that he

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

automatically was assigned to the CPSU "as per [an] agreement between 'state' and 'local city' facilit[ies] to confine inmates from 'SHU' to 'CPSU,' " even though they had not committed violations of DOC's rules. (Attach.¶ 2). His conclusory allegation that such an agreement existed is insufficient, however, to establish the personal involvement of Hall or Schriro. Nowhere in his papers does Rosario allege that the City Defendants had knowledge of the agreement or were responsible for the promulgation or implementation of such an agreement with DOCCS. Rosario therefore has not established the City Defendants' personal involvement in his assignment to the CPSU. *See Bellezza,* 730 F.Supp.2d at 317 (merely pleading that a defendant is a high-ranking official is insufficient to establish personal involvement); *see also Scott v. Fischer,* 616 F.3d 100, 110 (2d Cir.2010) (Section 1983 claim could not be sustained under the third *Colon* category because plaintiff failed to allege that the "defendants had any knowledge or control" over the allegedly unconstitutional practice); *cf. McKenna v. Wright,* 386 F.3d 432, 437 (2d Cir.2004) (sufficient personal involvement shown where defendants were "alleged to have had responsibility for enforcing or allowing the continuation of the challenged policies that resulted in" the constitutional violation).[FN2]

> FN2. Among the privations that Rosario allegedly suffered by reason of his placement in the CPSU was lack of access to religious services and reading material. (*See* Stmt. at 3 ¶ 2). Assuming that this states a claim under the First Amendment or the Religious Land Use and Institutionalized Persons Act, 42 U.S.C. § 2000cc, *et seq.,* it nevertheless fails for the same reason as Rosario's unlawful confinement claim—namely, that there has been no showing that either of the City Defendants did anything to deprive Rosario of his right to exercise his religion.

### 2. *Excessive Force*

**\*10** Rosario additionally contends that DOC officers used excessive force against him on three occasions in violation of the Due Process Clause. (*See* Stmt. at 2). This claim fails for at least two reasons.

First, Rosario has failed to allege that defendants Hall and Schriro were personally involved in the alleged use of excessive force, or that they allowed it to happen. Rosario has failed, for example, to plead any facts indicating that either defendant was present when force was applied, or was warned of any specific threat to Rosario. Thus, because Rosario has failed to allege personal involvement by the City Defendants in the alleged use of excessive force, these claims against them must be dismissed. *See Wright v. Dee,* 54 F.Supp.2d 199, 204 (S.D.N.Y.1999); *Adams v. Galletta,* No. 96 Civ. 3750(JGK), 1999 WL 959368, at *7 (S.D.N.Y. Oct. 19, 1999).

Moreover, even if Rosario had adequately alleged the City Defendants' personal involvement, his excessive force claim still would have to be dismissed for failure to state a claim. The Due Process Clause protects pretrial detainees such as Rosario from uses of force that amount to punishment. *See United States v. Walsh,* 194 F.3d 37, 47–49 (2d Cir.1999). To state a due process claim arising out of use of force, a detainee therefore must allege facts satisfying a subjective and an objective condition. *Hudson v. McMillian,* 503 U.S. 1 (1992). The subjective condition requires that force be used "maliciously and sadistically to cause harm," rather than "in a good-faith effort to maintain or restore discipline." *Id.* at 7. Under the objective component, an inmate must show that "the alleged wrongdoing was objectively 'harmful enough' to establish a constitutional violation." *Id.* at 8 (quoting *Wilson v. Seiter,* 501 U.S. 294, 303 (1991)). The victim need not sustain a physical injury, but the force used must be more than *de minimis. Id.* at 9–10.

None of the use of force incidents described in Rosario's Complaint satisfy these conditions. On February 9, 2010, an officer twisted Rosario's wrist while he was hurrying to unload and handcuff a

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2012 WL 4044901 (S.D.N.Y.)
(Cite as: 2012 WL 4044901 (S.D.N.Y.))

busload of prisoners. Rosario may well have experienced some pain due to his rheumatoid arthritis, but he has not alleged that the officer acted with malicious and sadistic intent. Instead, Rosario alleges that the officer twisted his wrist while handcuffing him because he was "upset by the amount of time waiting and inmates pressing him." (Attach.¶ 7). This allegation concerning the officer's motivation does not rise to the level of intent required to satisfy the subjective prong of an excessive use of force claim. Moreover, even if malicious intent were shown, Rosario has not alleged that the force used was anything beyond *de minimis.*

Rosario's allegations regarding the incident on March 31, 2010, fail on the objective prong of the inquiry. Indeed, Rosario concedes that the force used was "nothing serious." (*Id.* ¶ 15). It follows that the incident was not sufficiently serious to constitute "punishment." Likewise, the incident on October 23, 2010, did not cause injury or pain sufficiently serious to rise to the level of punishment. Rosario alleges that on that occasion he was dragged from his cell into a corridor, where he was placed in a wheelchair with his hands cuffed behind his back. (*Id.* ¶ 43). Although the Complaint contains a general allegation of "pain and suffering," (Compl. at 3), Rosario does not allege that he, in fact, suffered any injury or pain during the October 23 incident. There consequently is no basis on which a finder of fact could plausibly conclude that Rosario was subjected to force rising to the level of punishment during this incident.

**\*11** In sum, because Rosario has not plausibly alleged that the uses of force constituted punishment inflicted by the City Defendants, his excessive use of force claim must be dismissed.

C. *Miscellaneous Claims*

In his papers, Rosario presses several other claims. First, Rosario contends that the Defendants forced him to wear prison attire, in violation of Justice Merchan's January 11, 2010 order that he be transferred from DOCCS to DOCS custody in civilian

clothing, and that DOCS produce him in civilian clothes for a scheduled courtroom appearance. (*See* Stmt. at 1; Attach. ¶ 2; Ex. AA). Rosario does not specify the constitutional right he allegedly was deprived of as a result of these actions. It is, of course, ordinarily improper to present a criminal defendant before a jury wearing prison garb. *See Estelle v. Williams,* 425 U.S. 501, 504 (1976) ("Courts have, with few exceptions, determined that an accused should not be compelled to go to trial in prison or jail clothing because of the possible impairment of the presumption [of innocence] so basic to the adversary system."). Here, it appears that the purpose of the directive was to ensure that Rosario would appear before the jury in street clothes. There is no indication, however, that Rosario ever appeared before a jury attired in a manner that affected his constitutional rights. Moreover, even if he had been required to wear prison garb during a jury trial that led to his conviction, his sole remedy would be to file a habeas petition, because the harm for which he seeks a remedy necessarily would impugn his conviction. *See Skinner v. Switzer,* 131 S.Ct. 1289, 1298 (2011) (citing *Heck v. Humphrey,* 512 U.S. 477, 487 (1994)).

Second, Rosario complains that he was returned to State custody in April 2010 despite Justice Merchan's order that Rosario remain in City custody unless otherwise directed by the court. (*See* Stmt. at 1–2; Attach. ¶ 17). In general, absent some allegation of "an expressed intent to punish" on the part of a defendant, a pretrial detainee's transfer between City and State correctional facilities for a limited period of time does not amount to "punishment" under the Fourteenth Amendment. *Robbins v.* Doe, 994 F.Supp. 214, 218 (S.D.N.Y.1998); *Butler v. N.Y. State Corr. Dep't.,* No. 94 Civ. 5054(AGS), 1996 WL 438128, at *5 (S.D.N.Y. Aug. 2, 1996); *Butler v.. Westchester County,* No. 94 Civ. 8216(SHS), 2000 WL 335539, at *4 (S.D.N.Y. Mar. 30, 2000) ("Due process is not implicated when a pretrial detainee is transferred from one facility to another."). Nor do the applicable laws and regulations create a liberty interest against transfer

Not Reported in F.Supp.2d, 2012 WL 4044901 (S.D.N.Y.)
**(Cite as: 2012 WL 4044901 (S.D.N.Y.))**

since New York State regulations do not substantively restrict prison officials' authority to transfer pretrial detainees. *See Butler,* 1996 WL 438128, at *5–6 (citing N.Y. Comp.Codes R. & Regs., tit. 9, § 7002.2(a); N.Y. Correct. Law §§ 23, 92, 93). However, "[o]therwise valid pretrial detention does assume a punitive character, and thus offends the due process clause, when it is significantly prolonged." *United States v. Gallo,* 653 F.Supp. 320, 335 (E.D.N.Y.1986). Here, after Rosario was returned to the City so that he could be retried, he was transferred back to Southport on April 9, 2010, before being returned to City custody on April 28, 2010. The Complaint does not allege any facts that would support an inference that there was a punitive intent behind his transfer to State custody. Absent such an intent, Rosario's mere confinement in a State facility for less than one month plainly does not constitute punishment violative of the Due Process Clause. *Compare Butler,* 1996 WL 438128, at *5–6 (two-week transfer of pretrial detainee from county jail to State facility did not violate a protected liberty interest), *with Robbins,* 994 F.Supp. at 218 (complaint adequately alleged a due process violation based on ten-month confinement in State facility without any rationale).

### IV. *Conclusion*

**\*12** For the foregoing reasons, the Defendants' motions to dismiss (ECF Nos. 17, 26) should be granted, but Rosario should be permitted to submit an amended complaint alleging such additional facts as may be available to enable him to state a legally-sufficient claim against the Defendants.[FN3]

> FN3. In addition to the named Defendants, Rosario's Complaint refers to at least two John Doe defendants who apparently have neither been identified nor served. Pursuant to Rule 4(m) of the Federal Rules of Civil Procedure, Rosario was required to serve these additional defendants within 120 days after the Complaint was filed. That deadline obviously expired almost one year ago. (*See*

Compl. at 1, 7 (establishing that the *Pro Se* Office received Rosario's Complaint on June 20, 2011)). The Complaint therefore should also be dismissed as against the John Doe Defendants on timeliness grounds.

### V. *Notice of Procedure for Filing of Objections to this Report and Recommendation*

The parties shall have fourteen days from service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure. *See also* Fed.R.Civ.P. 6(a), 6(d). Any such objections shall be filed with the Clerk of Court, with courtesy copies delivered to the chambers of the Honorable J. Paul Oetken and to my chambers at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties. *See* § 636(b)(1); Rule 6(a), 6(d), 72(b). Any requests for an extension of time for filing objections must be directed to Judge Oetken. The failure to file timely objections will result in a waiver of those objections for purposes of appeal. *See* § 636(b)(1); Rule 6(a), 6(d), 72(b); *Thomas v. Arn,* 474 U.S. 140 (1985); *Frank v. Johnson,* 968 F.2d 298.300 (2d Cir.1992).

S.D.N.Y.,2012.
Rosario v. Fischer
Not Reported in F.Supp.2d, 2012 WL 4044901 (S.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.



Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

**H**

Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Jeff SMITH, Plaintiff,
v.
Robert K. WOODS, Deputy Superintendent; Joseph
R. Belarge, Captain; G.J. O'Donnell, Sergeant; F.S.A.
Antonelli; and Wayne Holt, Correction Officer, De-
fendants.

No. 9:03-CV-480.
April 24, 2006.

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany,
NY, for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

**\*1** Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Re-
port-Recommendation dated March 17, 2006, the
Honorable George H. Lowe, United States Magistrate
Judge, recommended that defendants' motion for
summary judgment be granted, and that plaintiff's
motion for partial summary judgment be denied.
(Docket No. 51). The plaintiff has filed objections to
the Report-Recommendation. (Docket No. 53).

Based upon a de novo determination of the por-
tions of the report and recommendations to which the
plaintiff has objected, the Report-Recommendation is
accepted and adopted in whole. *See* 28 U .S.C.

636(b)(1). Accordingly, it is ORDERED that

1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accord-
ingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.
**REPORT-RECOMMENDATION**

This matter has been referred to me for Report
and Recommendation by the Honorable David N.
Hurd, United States District Judge, pursuant to 28
U.S.C. § 636(b) and Local Rule 72.3(c) of the Rules of
Practice for this Court. In this *pro se* civil rights action
brought under 42 U.S.C. § 1983, Jeff Smith ("Plain-
tiff") alleges that five employees of Upstate Correc-
tional Facility-Deputy Superintendent Robert K.
Woods, Captain Joseph R. Belarge, Sergeant G.J.
O'Donnel, Food Service Administrator Richard An-
tonelli, and Correction Officer Wayne Holt ("De-
fendants")-violated his rights under the First, Fourth,
Eighth, and Fourteenth Amendments by (1) retaliating
against him for having previously filed a complaint,
(2) subjecting him to an unreasonable search and
seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Fa-
cility Special Housing Unit, and (4) taking away his
"good time" credits without affording him due pro-
cess. (Dkt. No. 5 [Plf.'s Am. Compl.].) FN1

FN1. Given my duty to liberally construe a

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

*pro se* plaintiff's civil rights complaint, I construe Plaintiff's Amended Complaint as including a claim that various Defendants violated Plaintiff's rights under the Fourth Amendment to be free from unreasonable searches and seizures. *See Phillips v. Girdich*, 408 F.3d 124, 130 (2d Cir.2005) ("We leave it for the district court to determine what other claims, if any, [the plaintiff] has raised. In so doing, the court's imagination should be limited only by [the plaintiff's] factual allegations, not by the legal claims set out in his pleadings.") [citations omitted]. *(See also* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment[ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to

establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

**\*2** Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. *See* Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [FN2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving ty. *Schwapp v. Town of Avon,* 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); *Thompson v. Gjivoje,* 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

> FN2. A fact is "material" only if it would have some effect on the outcome of the suit. *Anderson v. Liberty Lobby,* 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 477 U.S. 574, 585-86 (1986); *see also Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is *genuine* if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Ross v. McGinnis,* 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a *pro se* plaintiff's pleadings. "[I]n actions in which one of the parties appears *pro se,* this Court is faced with the ... responsibility of granting significant liberality in how *pro se* pleadings are construed." *Aziz Zarif Shabazz v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146,

148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [FN3] and are not specifically controverted by the plaintiff.[FN4]

> FN3. *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

> FN4. *See* Local Rule 7.1(a)(3) (*"Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically con-*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

*troverted by the opposing party.*").

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [FN5]

> FN5. Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a)(3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a)(3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment).[FN6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [FN7] An affidavit or verified complaint is not based on personal knowledge if, for example, it is based on mere "information and belief" or hearsay.[FN8]

> FN6. *See Patterson v. County of Oneida,* 375 F.2d 206, 219 (2d Cir.2004) ("[A] verified pleading ... has the effect of an affidavit and may be relied upon to oppose summary judgment."); *Fitzgerald v. Henderson,* 251 F.3d 345, 361 (2d Cir.2001) (holding that plaintiff "was entitled to rely on [his verified amended complaint] in opposing summary judgment"), *cert. denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1993) ("A verified complaint is to be treated as an affidavit for summary judgment purposes.") [citations omitted]; Fed.R.Civ.P. 56(c) ("The judgment sought shall be rendered forthwith if the ... affidavits ... show that there is no genuine issue as to any material fact....").

> FN7. Fed.R.Civ.P. 56(e) ("Supporting and opposing affidavits shall be made on personal knowledge, shall set forth such facts as

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

would be admissible in evidence, and shall show affirmatively that the affiant is competent to the matters stated therein."); *see also U.S. v. Private Sanitation Indus. Ass'n of Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995) [citations omitted], *cert. denied sub nom. Ferrante v. U.S.,* 516 U.S. 806 (1995).

FN8. *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s] requirement that affidavits be made on personal knowledge is not satisfied by assertions made 'on information and belief.'... [Furthermore, the Rule's] requirement that the affiant have personal knowledge and be competent to testify to the matters asserted in the affidavits also means that the affidavit's hearsay assertion that would not be admissible at trial if testified to by the affiant is insufficient to create a genuine issue for trial."); *Sellers v. M .C. Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988) ("[Defendant's] affidavit states that it is based on personal knowledge *or* upon information and belief.... Because there is no way to ascertain which portions of [Defendant's] affidavit were based on personal knowledge, as opposed to information and belief, the affidavit is insufficient under Rule 56 to support the motion for summary judgment."); *Applegate v. Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970) (rejecting affidavit made on "suspicion ... rumor and hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp. 649, 664 (W.D.N.Y.1992) (rejecting affidavit made on "secondhand information and hearsay"), *aff'd,* 995 F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must not be conclusory. [FN9] Of course, an affidavit may be conclusory because its assertions are too general.[FN10] However, even where an affidavit's assertions are specific (e.g., with respect to time, place,

persons, events, conversation, etc.), that affidavit may still be deemed conclusory if it is (1) "largely unsubstantiated by any other direct evidence" and (2) "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint." [FN11] Indeed, it has long been the rule in the Second Circuit that "issues of credibility sufficient to defeat a motion for summary judgment are not created if the contradicting or impeaching evidence is too incredible to be believed by reasonable minds." *Price v. Worldvision Enterprises, Inc.,* 455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without opinion,* 603 F.2d 214 (2d Cir.1979).

FN9. *See* Fed.R.Civ.P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson,* 375 F.3d at 219 (2d. Cir.2004) ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory.") [citations omitted]; *Applegate,* 425 F.2d at 97 (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").

FN10. *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452 (2d Cir.1998) (McAvoy, C.J., sitting by designation) ("Statements [for example, those made in affidavits, deposition testimony or trial testimony] that are devoid of any specifics, but replete with conclusions, are insufficient to defeat a properly supported motion for summary judgment.") [citations omitted]; *West-Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d 61, 63 (2d Cir.1996) (rejecting affidavit's conclusory statements that, in essence, asserted merely that there was a dispute between the parties over the amount owed to the plaintiff under a contract); *Meiri v. Dacon,* 759 F.2d 989, 997

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
(Cite as: 2006 WL 1133247 (N.D.N.Y.))

(2d Cir.1985) (plaintiff's allegation that she "heard disparaging remarks about Jews, but, of course, don't ask me to pinpoint people, times or places.... It's all around us" was conclusory and thus insufficient to satisfy the requirements of Rule 56[e] ), *cert. denied,* 474 U.S. 829 (1985); *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided the court [through his affidavit] with the characters and plot line for a novel of intrigue rather than the concrete particulars which would entitle him to a trial.").

FN11. See, e.g., *Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified com-

plaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and ver-

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
(Cite as: 2006 WL 1133247 (N.D.N.Y.))

ified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]."[FN12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials.[FN13]

> **FN12.** (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

> **FN13.** *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same

as the papers ***I have here"];*** Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to ***hold a copy of the complaint"*** in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents ***being in my possession ...*** you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail."[FN14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters.[FN15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail.[FN16]

> **FN14.** (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

> **FN15.** (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

> **FN16.** (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are sup-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

ported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F.").[FN17]

> **FN17.** (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F.[FN18]

> **FN18.** (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198).[FN19]

> **FN19.** (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37,

Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit.[FN20] At the time, Plaintiff was not an inmate law clerk.[FN21]

> **FN20.** (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

> **FN21.** (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer.[FN22]

> **FN22.** (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action.[FN23] In pertinent part, the letter stated,

> **FN23.** (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already told both of you that I am helping him with the filing of his motions, etc....

Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he

should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him.[FN24]

> [FN24] (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center.[FN25]

> [FN25] (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters.[FN26] In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on."[FN27] In addition, the last page of the letter states:

> [FN26] (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

FN27. (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the notary public. Make a copy for your files and send me the *original.*

It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession.[FN28]

FN28. (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters.[FN29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

FN29. (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods.[FN30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in

person at your earliest convenience. Thank you for your professional attention to this request." [FN31]

FN30. (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

FN31. (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods.[FN32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak to you before July 23, 2002. This matter is very important. Thank you for your attention." [FN33]

FN32. (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

FN33. (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." [FN34]

FN34. (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

after July 23, 2003, or that Defendant Woods believed the notes to be "crypic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods.[FN35] The note stated, in pertinent part:

> FN35. (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration cannot take any action against the inmate's family nor myself.[FN36]

> FN36. (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff.[FN37] That memorandum stated, in pertinent part:

> FN37. (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to

Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately.[FN38]

> FN38. (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum.[FN39]

> FN39. (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents.[FN40] Plaintiff denied having such documents.[FN41]

> FN40. (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

> FN41. (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact];

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note.[FN42]

FN42. (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers).[FN43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters).[FN44]

FN43. (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge

had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

FN44. (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that, after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods.[FN45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F.[FN46]

> **FN45.** (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

> **FN46.** (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

### Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002.[FN47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20.[FN48]

> **FN47.** (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

> **FN48.** (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee;[FN49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization;[FN50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate family

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

member without the consent or approval of the Superintendent or his designee.[FN51]

> FN49. (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

> FN50. (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14] [v].

> FN51. (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli.[FN52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits .[FN53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made cer-

tain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube").[FN54]

> FN52. (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

> FN53. (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

> FN54. (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11 [Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5, ¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002.[FN55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint.[FN56]

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
(Cite as: 2006 WL 1133247 (N.D.N.Y.))

FN55. (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

FN56. (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence.FN57 Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days.FN58 However, Plaintiff's good time loss was unaffected by the discretionary review. FN59

FN57. (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

FN58. (Id.)

FN59. (Id.)

Meetings Between Defendants Woods, Belarge and

O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff.FN60 Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff.FN61

FN60. (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

FN61. (Dkt. No. 37, Part 2, ¶ 3 8 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 8 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F.FN62 Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. FN63

FN62. (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

FN63. (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002.[FN64]

FN64. (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU.[FN65]

FN65. (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned.[FN66] Those photographs are made part of the record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood.[FN67] Between September 6, 2002, and February 10, 2005, there was no record of any repairs made to any of the bunk beds that Plaintiff was assigned while in SHU; and between September 6, 2002, and April 22, 2005, there was no record of any repairs made to any of the other bunk beds that Plaintiff suggests he may have been assigned while in SHU.[FN68]

FN66. (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

FN67. (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

Aff.]; Dkt. No. 37, Parts 9-12 [Ex. A to Bel-arge Aff., attaching photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply affidavits and exhibits, attaching photographs].)

FN68. (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, not specifically controverting this fact, and in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No. 37, Parts 13-15, Ex. B [Belarge Aff., attaching work orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit and exhibits, attaching work orders].)

## III. ANALYSIS

### A. Whether Plaintiff Has Failed to Establish (or Even State) a First Amendment Retaliation Claim

**\*9** In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a First Amendment retaliation claim against Defendant Antonelli because (1) he fails to establish that he had been engaging in speech or conduct that is protected by the First Amendment, and (2) in any event, he fails to establish a causal link between that protected activity and any adverse action against him by Defendant Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he had a constitutionally protected liberty right to make an oral and written complaint about Defendant Antontelli's management of the prison mess hall, and (2) as a result of Plaintiff's complaints (and an "encounter" between Plaintiff and Antonelli one week before Plaintiff's disciplinary hearing), Defendant Antonelli retaliated against Plaintiff during Plaintiff's disciplinary hearing by, among other things, depriving Plaintiff of his statutorily protected right to receive "good time" credits

(which would have accelerated Plaintiff's release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s Response].)

Claims of retaliation like those asserted by Plaintiff find their roots in the First Amendment. *See Gill v. Pidlypchak,* 389 F.3d 379, 380-81 (2d Cir.2004). Central to such claims is the notion that in a prison setting, corrections officials may not take actions which would have a chilling effect upon an inmate's exercise of First Amendment rights. *See Gill,* 389 F.3d at 381-383. Because of the relative ease with which claims of retaliation can be incanted, however, courts have scrutinized such retaliation claims with "skepticism and particular care." *Colon v. Coughlin,* 58 F.3d 865, 872 (2d. Cir.1995); *see also Flaherty v. Coughlin,* 713 F.2d 10, 13 (2d Cir.1983). As the Second Circuit has noted,

[t]his is true for several reasons. First, claims of retaliation are difficult to dispose of on the pleadings because they involve questions of intent and are therefore easily fabricated. Second, prisoners' claims of retaliation pose a substantial risk of unwarranted judicial intrusion into matters of general prison administration. This is so because virtually any adverse action taken against a prisoner by a prison official-even those otherwise not rising to the level of a constitutional violation-can be characterized as a constitutionally proscribed retaliatory act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001) (citations omitted), overruled on other grounds, *Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C. § 1983, a Plaintiff must prove by the preponderance of the evidence that: (1) the speech or conduct at issue was "protected"; (2) the defendants took "adverse action" against the plaintiff-namely, action that would deter a similarly situated individual of ordinary firmness from exercising his or her constitu-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
(Cite as: 2006 WL 1133247 (N.D.N.Y.))

tional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers.[FN69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

> FN69. *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at \*7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995)* ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not pro-

tected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing.[FN70] Plaintiff's letter did not mention Defendant Antonelli.[FN71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of Plaintiff's disciplinary hearing.[FN72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing.[FN73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision).[FN74]

> FN70. (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

> FN71. (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
(Cite as: 2006 WL 1133247 (N.D.N.Y.))

complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

FN72. (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

FN73. (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

FN74. (*See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

**B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim**

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction.[FN75]

FN75. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to," i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

anything else in your second cause of action ...” other than a due process claim, and Plaintiff answered, “Not at this point, ma‘am” even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, “You have a constitutional right to be free from search and seizure as an inmate?” and Plaintiff answered, “As an inmate, no, ma‘am”].) *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a “suggestion” to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, “[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action.” Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint.[FN76] Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. [FN77] In pertinent part, that paragraph alleges that on “August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt....”[FN78]

FN76. *(See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt “violat[ed] plaintiff's 4th ... Amendment [ ] rights”], ¶ 15 [alleging that Defendant Belarge “had plaintiff's personal property searched by three officers, one of whom was Holt”]; Dkt. No. 37, Part 23, Ex. A at 14-22,

26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

FN77. (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, “[T]he [F]ourth [A]mendment does not apply to” Plaintiff's first cause of action], 22 [in which defense counsel asked, “Is there anything else in your second cause of action ...” other than a due process claim, and Plaintiff answered, “Not at this point, ma‘am” even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, “Are you alleging that the facts in paragraph 15 give rise to a constitutional claim for search and seizure?” and Plaintiff answered, “Yes, ma‘am”].)

FN78. (Dkt. No. 5, ¶ 14 [Am. Compl.].)

*11 The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or “cube”). “[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell.” *Hudson v. Palmer,* 468 U.S. 517, 526 (1984).[FN79] Nor does the Fourth Amendment proscription apply within the confines of a prison “cube.”[FN80] Indeed, Plaintiff appears to recognize this point of law.[FN81]

FN79. *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at *7 (N.D.N.Y. March 31, 1997) (“Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights.”); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) (“Searches of

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd*, 122 F.3d 1055 (2d Cir.1995).

FN80. *See Freeman v. Goord*, 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at *5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin*, 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

FN81. (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is vague and conclusory.[FN82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar).[FN83] I fail to see how any search and confiscation of such contraband would have vio-

lated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program).[FN84]

FN82. (Dkt. No. 5, ¶ 12 [Am. Compl.].)

FN83. I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

FN84. *See, e.g.*, DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

## C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

**\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 're-strictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an ex-

cessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis" [FN85] in September of 2002 as a result of sleeping on a defective bed.[FN86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for the sake of argument, that the injury constitutes a serious medical need.[FN87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint, [FN88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need.[FN89]

> FN85. "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at \*35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

> FN86. (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff de-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

scribes his injury generally].)

FN87. *See Villante v. N.Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at *4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at *11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at *13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at *4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

FN88. (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

FN89. (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his allegation that he was assigned a bunk bed that was in any way defective.[FN90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after

the time in question.[FN91]

FN90. (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

FN91. *(See, supra,* Statement of Fact No. 29.)

**\*13** More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed,[FN92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002.[FN93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002.[FN94]

FN92. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

FN93. *(Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02]** *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02]** *and* Dkt. No.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02,** or three days after his admission to SHU].)

FN94. (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds. FN95 For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

FN95. *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at *3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at *5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim prem-

ised on complaint that his mattress was uncomfortable).

2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. FN96 More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. FN97 Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antontelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

FN96. (Dkt. No. 5, ¶ 38 [Am. Compl.].)

FN97. *(See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints.[FN98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk.[FN99]

FN98. (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony,

in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

FN99. *(Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace.[FN100]

FN100. (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days).[FN101] Under the cir-

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

cumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

FN101. *(See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a

prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or pre-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

serve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed.[FN102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions, testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question.[FN103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

FN102. (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

FN103. *(See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37,

Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16** Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question.[FN104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable.[FN105]

> FN104. (*See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

> FN105. (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

**2. Estoppel**

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

**3. "Special Circumstances" Justifying Failure to Exhaust**

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's

reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school.[FN106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F.[FN107] Indeed, he had filed grievances immediately before and during this very time period.[FN108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

> FN106. (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

> FN107. (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

> FN108. (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

his Eighth Amendment claim be dismissed.

**E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim**

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S. 477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997) ].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue.[FN109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated.[FN110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated.[FN111]

FN109. *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

FN110. *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at \*7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

FN111. *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not

provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result, I recommend that the Court dismiss Plaintiff's conspiracy claim.

### G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

(1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992).[FN112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness" [FN113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995) (citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

> FN112. *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

> FN113. *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter" regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20** As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or An-

tonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment

Based on the above reasons, I find that Plaintiff's motion for partial summary judgment-which (at best) contains arguments regarding the issues discussed above-is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion.")* [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)
**(Cite as: 2006 WL 1133247 (N.D.N.Y.))**

**FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE AP-PELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

N.D.N.Y.,2006.
Smith v. Woods
Not Reported in F.Supp.2d, 2006 WL 1133247 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Pernorris TAYLOR, Sr., Plaintiff,
v.
Dr. CHALOM, Defendant.

Civil Action No. 9:10–CV–1494 (NAM/DEP).
Dec. 13, 2011.

Pernorris Taylor Sr., Rossevelt, NY, pro se.

Hon. Eric T. Schneiderman, Office of the Attorney General, Charles Quackenbush, Esq., Assistant Attorney General, of Counsel, Albany, NY, for Defendant.

*REPORT AND RECOMMENDATION*
DAVID E. PEEBLES, United States Magistrate Judge.

**\*1** Plaintiff Pernorris Taylor, a former New York State prison inmate who is proceeding *pro so* and *in forma pauperis,* has commenced this action pursuant to 42 U.S.C. § 1983 alleging deprivation of his civil rights. In his complaint, though vague and sparse in terms of factual allegations, Taylor appears to claim that the defendant, a physician employed at the prison in which he was confined at the relevant times, failed to provide him with proper medical care and to exempt him from working in the facility mess hall due to his physical condition, in violation of his rights under the Eighth Amendment to the United States Constitution.

In response to Taylor's complaint, defendant has moved seeking its dismissal on two grounds. Defendant maintains that plaintiff's claims are procedur-ally barred based upon his failure to avail himself of the internal prison system grievance process before commencing suit. Defendant additionally argues that in any event plaintiff's claims lack merit based upon his failure to allege a plausible medical indifference cause of action. For the reasons set forth below, I recommend that plaintiff's complaint be dismissed as both procedurally barred and lacking in substantive merit.

II. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of the case the following recitation is derived from the record now before the court, with all in-ferences drawn and ambiguities resolved in favor of the plaintiff. *Terry v. Ashcroft,* 336 F.3d 128, 137 (2d Cir.2003).

Plaintiff is a former prison inmate recently re-leased from the custody of the New York State De-partment of Corrections and Community Supervision ("DOCCS"); at the times relevant to his claims, Taylor was designated to the Ogdensburg Correctional Fa-cility ("OCF"), located in Ogdensburg, New York. *See generally* Amended Complaint (Dkt. No. 6); *see also* Dkt. Entry dated August 31, 2011. Plaintiff claims to be physically disabled as a result of being struck by a motor vehicle in June of 2008 and suffering resulting back and knee injuries. Amended Complaint (Dkt. No. 6) § II(D). Plaintiff also suffers from a testicular cyst. *Id.* at § III.

Upon his arrival at Ogdensburg, plaintiff was as-signed to work in the facility mess hall. Amended Complaint (Dkt. No. 6) § II(D); Statement of Case (Dkt. No. 18) p. 1. Plaintiff complained to prison officials claiming that he was unable to perform the duties required at the mess hall in light of his limita-tions in bending, lifting, and standing for long periods

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

of time resulting from his physical injuries. *Id.*

Though not clear from his complaint, as amended, it appears that plaintiff's claims go beyond his mess hall assignment to the alleged failure of Dr. M. Chalom, who is a prison physician at Ogdensburg, to provide him with adequate medical treatment, including to order x-rays desired by the plaintiff. Statement of Case (Dkt. No. 18) p. 1. Plaintiff also complains that Dr. Chalom, though aware of his condition from having received medical records of his treatment from Nassau County Medical University Hospital, nonetheless failed to remove him from mess hall duty.[FN2] Statement of Case (Dkt. No. 18) p. 2. Taylor further complains that Dr. Chalom did not provide him with an elastic support for his right knee. *Id.*

> **FN2.** Plaintiff also contends that because he has been exposed to Tuberculosis he should be not have been assigned to work around food. Statement of Case (Dkt. No. 18) p. 2. Because this argument implicates potential danger to other inmates, rather than the plaintiff, Taylor lacks a standing to assert such a claim. *Gladstone, Realtors v. Village of Bellwood,* 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979) (to establish standing for purposes of the constitutional "case or controversy" requirement, a plaintiff "must show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant").

## II. *PROCEDURAL HISTORY*

**\*2** Plaintiff commenced this action on December 10, 2010, and, at the directive of the court, filed an amended complaint on March 8, 2011 providing somewhat greater elaboration regarding his claims. Dkt. Nos. 1, 4, 6. In his complaint plaintiff names Dr. M. Chalom as the sole defendant and appears to assert a deliberate medical indifference claim under the Eighth Amendment, seeking an award of monetary damages. *Id.*

In lieu of answering plaintiff's complaint, defendant has moved to dismiss plaintiff's claims both for failure to state a claim upon which relief may be granted and on the ground that the action is procedurally barred based upon the plaintiff's failure to exhaust available administrative remedies before commencing suit. Dkt. No. 15. That motion, which plaintiff has opposed, *see* Dkt. Nos. 18, 19, is now ripe for determination and has been referred to me for the issuance of a report and recommendation, pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See* Fed.R.Civ.P. 72(b).

## III. *DISCUSSION*

### A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b) (6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* 556 U.S. 129, ——, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atl. Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, 167 L.Ed.2d 929, ——, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Iqbal,* 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974).

In deciding a Rule 12(b)(6) dismissal motion, the court must accept the material facts alleged in the complaint as true and draw all inferences in favor of the non-moving party. *Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1723, 1734 (1964); *Miller v. Wolpoff & Abramson, LLP,* 321 F.3d 292, 300 (2d Cir.2003), cert. denied, 540 U.S. 823, 124 S.Ct. 153, 157 L.Ed.2d 44 (2003); *Burke v. Gregory,* 356 F.Supp.2d 179, 182 (N.D.N.Y.2005) (Kahn, J.). However, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions. *Iqbal,* 129 S.Ct. at 1949. In the wake of *Twombly* and *Iqbal,* the burden undertaken by a party requesting dismissal of a complaint under Rule 12(b)(6) remains substantial; the question presented by such a motion is not whether the plaintiff is likely ultimately to prevail, " 'but whether the claimant is entitled to offer evidence to support the claims.' " *Log On America, Inc. v. Promethean Asset Mgmt. L.L.C.,* 223 F.Supp.2d 435, 441 (S.D.N.Y.2001) (quoting *Gant v. Wallingford Bd. of Educ.,* 69 F.3d 669, 673 (2d Cir.1995)) (citations and quotations omitted).

**\*3** When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson,* 127 S.Ct. at 2200 (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by

lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292, 50 L.Ed.2d 251 (1976) (internal quotations omitted)); *Davis v. Goord,* 320 F.3d 346, 350 (2d Cir.2003) (citation omitted); *Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.). In the event of a perceived deficiency in a *pro se* plaintiff's complaint, a court should not dismiss without granting leave to amend at least once if there is any indication that a valid claim might be stated. *Branum v. Clark,* 927 F.2d 698, 704–05 (2d Cir.1991); *see also* Fed.R.Civ.P. 15(a) (leave to amend "shall be freely given when justice so requires").

B. *Failure to Exhaust*

In his motion defendant Chalom argues that plaintiff's claims are procedurally barred based upon his failure to file and pursue a grievance through the DOCCS internal administrative process prior to commencing this action.

The Prison Litigation Reform Act of 1996 ("PLRA"), Pub.L. No. 104–134, 110 Stat. 1321 (1996), which imposes several restrictions on the ability of prisoners to maintain federal civil rights actions, expressly requires that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see Woodford v. Ngo,* 548 U.S. 81, 84, 126 S.Ct. 2378, 2382, 165 L.Ed.2d 368 (2006); *Hargrove v. Riley,* No. CV–04–4587, 2007 WL 389003, at \*5–6 (E.D.N.Y. Jan.31, 2007).[FN3] "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 992, 152 L.Ed.2d 12 (2002) (citation omitted). In the event a defendant named in such an action establishes that the inmate plaintiff failed properly to exhaust available remedies prior to commencing the action, his or her complaint is

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

subject to dismissal. *See Pettus v. McCoy,* No. 04–CV–0471, 2006 WL 2639369, at *1 (N.D.N.Y. Sept. 13, 2006) (McAvoy, J.); *see also Woodford,* 548 U.S. at 94–95, 126 S.Ct. at 2387–88 (holding that the PLRA requires "proper exhaustion" of available remedies). "Proper exhaustion" requires a plaintiff to procedurally exhaust his or her claims by "compl[ying] with the system's critical procedural rules." *Woodford,* 548 U.S. at 95, 126 S.Ct. at 2388; *see also Macias v. Zenk,* 495 F.3d 37, 43 (2d Cir.2007) (citing *Woodford* ).[FN4]

> FN3. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Attachments of Westlaw case copies deleted for online display.]

> FN4. While placing prison officials on notice of a grievance through less formal channels may constitute claim exhaustion "in a substantive sense", an inmate plaintiff nonetheless must meet the procedural requirement of exhausting his or her available administrative remedies within the appropriate grievance construct in order to satisfy the PLRA. *Macias,* 495 F.3d at 43 (quoting *Johnson v. Testman,* 380 F.3d 691, 697–98 (2d Cir.2004) (emphasis omitted).

**\*4** In a series of decisions rendered since the enactment of the PLRA, the Second Circuit has crafted a three-part test for determining whether dismissal of an inmate plaintiff's complaint is warranted for failure to satisfy the PLRA's exhaustion requirement.[FN5] *Macias,* 495 F.3d at 41; *see Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). Under the prescribed algorithm, a court must first determine whether administrative remedies were available to the plaintiff at the relevant times. *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686. If such a remedy existed and was available, the court must next examine whether the defendant has forfeited the affirmative defense of

non-exhaustion by failing to properly raise or preserve it or whether, through his own actions in preventing the exhaustion of plaintiff's remedies, he should be estopped from asserting special circumstances nonetheless exist and "have been plausibly alleged" to justify the plaintiff's failure to comply with the applicable administrative procedural requirements.[FN6] *Macias,* 495 F.3d at 41; *Hemphill,* 380 F.3d at 686.

> FN5. Whether the *Hemphill* test survives following the Supreme Court's decision in *Woodford,* has been a matter of some speculation. *See, e.g., Newman v. Duncan,* NO. 04–CV–395, 2007 WL 2847304, at *2 n. 4 (N.D.N.Y. Sept. 26, 2007) (McAvoy, S.J. and Homer, M.J.).

> FN6. In practicality these three prongs of the prescribed test, though perhaps intellectually distinct, plainly admit of significant overlap. *See Hargrove,* 2007 WL 389003, at *8 n. 14; *see also Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

Ordinarily, failure to exhaust is an affirmative defense which must be pleaded and established by the defendant. *See Arnold v. Goetz,* No. 01 Civ. 8993, 2003 WL 256777, *2–3 (S.D.N.Y. Feb.4, 2003) (collecting cases); *Torrence v. Pesanti,* 239 F.Supp.2d 230, 231 (D.Conn.2003) (citing *Jenkins v. Haubert,* 179 F.3d 19 (2d Cir.1999)). For this reason, dismissal under Rule 12(b) of the Federal Rules of Civil Procedure for failure to exhaust is not always appropriate. *See Kasiem v. Switz,* 756 F.Supp.2d 570, 574 (S.D.N.Y.2010). Such a dismissal is proper, however, when a plaintiff's failure to exhaust under the PLRA is "readily apparent" or "unambiguously established in the record," provided that the plaintiff has had notice of the argument and an opportunity to respond. *Tor-*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

*rence,* 239 F.Supp.2d at 231–32 (citing *Snider v. Melindez,* 199 F.3d 108, 111–14 (2d Cir.1999)).

New York prison inmates are subject to an Inmate Grievance Program ("IGP") established by the DOCS and recognized as an "available" remedy for purposes of the PLRA. *See Mingues v. Nelson,* No. 96 CV 5396, 2004 WL 324898, at *4 (S.D.N.Y. Feb.20, 2004) (citing *Mojias v. Johnson,* 351 F.3d 606 (2d Cir.2003) and *Snider,* 199 F.3d at 112–13). The IGP consists of a three-step review process. First, a written grievance is submitted to the Inmate Grievance Review Committee ("IGRC") within twenty-one days of the incident.[FN7] 7 N.Y.C.R.R. § 701.5(a). The IGRC, which is comprised of inmates and facility employees, then issues a determination regarding the grievance. *Id.* §§ 701.4(b), 701.5(b). If an appeal is filed, the superintendent of the facility next reviews the IGRC's determination and issues a decision. *Id.* § 701.5(c). The third level of the process affords the inmate the right to appeal the superintendent's ruling to the Central Office Review Committee ("CORC"), which makes the final administrative decision. *Id.* § 701.5(d). Ordinarily, absent the finding of a basis to excuse non-compliance with this prescribed process, only upon exhaustion of these three levels of review may a prisoner seek relief pursuant to section 1983 in a federal court. *Reyes v. Punzal,* 206 F.Supp.2d 431, 432 (W.D.N.Y.2002) (citing, *inter alia, Sulton v. Greiner,* No. 00 Civ. 0727, 2000 WL 1809284, at *3 (S.D.N.Y. Dec.11, 2000)).

> FN7. The IGP supervisor may waive the grievance timeliness requirement due to "mitigating circumstances." 7 N.Y.C.R.R. § 701 .6(g)(1)(i)(a)-(b).

**\*5** In response to the questions posed in the printed form utilized to file his complaint, plaintiff has acknowledged that his claim arose during the course of his confinement, and that there is a grievance procedure available at Ogdensburg, but that he did not file a grievance utilizing that procedure. Amended Complaint (Dkt. No. 6) § IV. Plaintiff notes instead that he

informed his counselor, Mr. M. Stoner, of the claim. *Id.* In his submission in opposition to the motion, plaintiff reiterates having informed his counselor concerning his grievance and states that his counselor did not advise him of the need to file a grievance, instead informing him that he should sign up for sick call to address the issue.[FN8] Statement of Case (Dkt. No. 18) p. 3.

> FN8. In support of his motion defendant Chalom has submitted an affidavit from Jeffrey Hale, the Assistant Director of the DOCS Inmate Grievance Program ("IGP"), in which he states that a search of records of the DOCCS Central Office Review Committee ("CORC") failed to reveal submission of any grievance appeal by Taylor to the CORC during the period of his incarceration at Ogdensburg. *See* Hale Decl. (Dkt. No. 15–2) ¶¶ 1–4. Because this issue is being addressed on a motion to dismiss pursuant to Rule 12(b)(6), I have not considered the Hale affidavit in making my recommendation. *See, e.g., Friedl v. City of New York,* 210 F.3d 79, 83–84 (2d Cir.2000) ("a district court errs when it considers affidavits and exhibits submitted by defendants, or relies on factual allegations contained in legal briefs or memoranda in ruling on a 12(b)(6) motion to dismiss.") (internal quotation marks, citations and alteration omitted).

The second prong of the *Hemphill* analysis focuses upon "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it, or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Hemphill,* 380 F.3d at 686 (citations omitted). In this instance defendant has properly raised the issue, and plaintiff fails to allege any conduct on the part of the defendant that deterred or inhibited his

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

filing of a grievance.

The third, catchall factor to be considered under the Second Circuit's prescribed exhaustion rubric focuses upon whether special circumstances have been plausibly alleged which, if demonstrated, would justify excusing a plaintiff's failure to exhaust administrative remedies. *Hemphill,* 380 F.3d at 689; *see also Giano v. Goord,* 380 F.3d 670, 676–77 (2d Cir.2004); *Hargrove,* 2007 WL 389003, at *10. Among the circumstances potentially qualifying as "special" under this prong of the test include where a plaintiff's reasonable interpretation of applicable regulations regarding the grievance process differs from that of prison officials and leads him or her to conclude that the dispute is not grievable. *Giano,* 380 F.3d at 676–77; *see also Hargrove,* 2007 WL 389003, at *10 (quoting and citing *Giano* ).

Based upon plaintiff's response to the motion, it does not appear that this narrow exception applies in this instance. Taylor states that he made his complaints regarding Dr. Chalom known to his counselor, who nonetheless failed to advise him of a need to file a grievance and instead directed him to sick call to address his issue. *See* Statement of Case (Dkt. No. 18) pp. 3, 5. Plaintiff does not allege that his counselor informed him that his complaint was not grievable, a circumstance which could potentially implicate a recognized exception to the otherwise steadfast statutory requirement of exhaustion. *Brown v. Koenigsmann,* No. 01 Civ 10013(LMM), 2005 WL 1925649, at *1 (S.D.N.Y. Aug. 10, 2005). Similarly, plaintiff cannot claim an estoppel from raising an exhaustion defense since it was not Dr. Chalom, but another prison official who, he intimates, dissuaded him from filing a grievance. *Id.*

**\*6** Under these circumstances, plaintiff's claims are procedurally barred based upon his failure to file and pursue a grievance related to the claims raised in his complaint.

## C. *Deliberate Indifference*

In his motion Dr. Chalom also argues that plaintiff's complaint fails to assert a plausible deliberate medical indifference claim. In support of that contention defendant asserts that the plaintiff has neither pleaded facts demonstrating the existence of a serious medical need, nor has he established a plausible claim of subjective deliberate indifference on the part of Dr. Chalom to any such need.

Claims that prison officials have intentionally disregarded an inmate's medical needs fall under the umbrella of protection from the imposition of cruel and unusual punishment afforded by the Eighth Amendment. *Estelle v. Gamble,* 429 U.S. 97, 102, 104, 97 S.Ct. 285, 290, 291, 50 L.Ed.2d 251 (1976). The Eighth Amendment prohibits punishment that involves the "unnecessary and wanton infliction of pain" and is incompatible with "the evolving standards of decency that mark the progress of a maturing society." *Id.; see also Whitley v. Albers,* 475 U.S. 312, 319, 106 S.Ct. 1078, 1084, 89 L.Ed.2d 251 (1986) (citing, *inter alia, Estelle* ). While the Eighth Amendment does not mandate comfortable prisons, neither does it tolerate inhumane treatment of those in confinement. *Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 1976, 128 L.Ed.2d 811 (1994) (citing *Rhodes v. Chapman,* 452 U.S. 337, 349, 101 S.Ct. 2392, 2400, 69 L.Ed.2d 59 (1981)). To satisfy their obligations under the Eighth Amendment, prison officials must "ensure that inmates receive adequate food, shelter, and medical care, and must take reasonable measures to guarantee the safety of inmates." *Farmer,* 511 U.S. at 832, 114 S.Ct. at 1976 (quoting *Hudson v. Palmer,* 468 U.S. 517, 526–27, 104 S.Ct. 3194, 3200, 82 L.Ed.2d 393 (1984)) (internal quotations omitted).

A claim alleging that prison officials have violated the Eighth Amendment by inflicting cruel and unusual punishment must satisfy both objective and subjective requirements. *Wright v. Goord,* 554 F.3d

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

255, 268 (2d Cir.2009); *Price v. Reilly,* No. 07–CV–2634 (JFB/ARL), 2010 WL 889787, at *7–8 (E.D.N.Y. Mar.8, 2010). Addressing the objective element, to prevail a plaintiff must demonstrate a violation sufficiently serious by objective terms, "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin,* 99 F.3d 550, 553 (2d Cir.1996). With respect to the subjective element, a plaintiff must also demonstrate that the defendant had "the necessary level of culpability, shown by actions characterized by 'wantonness.' " *Blyden v. Mancusi,* 186 F.3d 252, 262 (2d Cir.1999). Claims of medical indifference are subject to analysis utilizing this Eighth Amendment paradigm. *See Salahuddin v. Goord,* 467 F.3d 263, 279–81 (2d Cir.2006).

### 1. *Objective Requirement*

Analysis of the objective, "sufficiently serious," requirement of an Eighth Amendment medical indifference claim begins with an inquiry into "whether the prisoner was actually deprived of adequate medical care ...", and centers upon whether prison officials acted reasonably in treating the plaintiff. *Salahuddin,* 467 F.3d at 279. A second prong of the objective test addresses whether the inadequacy in medical treatment was sufficiently serious. *Id.* at 280. If there is a complete failure to provide treatment, the court must look to the seriousness of the inmate's medical condition. *Smith v. Carpenter,* 316 F.3d 178, 185–86 (2d Cir.2003). If, on the other hand, the complaint alleges that treatment was provided but was inadequate, the seriousness inquiry is more narrowly confined to that alleged inadequacy, rather than focusing upon the seriousness of the prisoner's medical condition. *Salahuddin,* 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in treatment ... [the focus of] the inquiry is on the challenged delay or interruption, rather that the prisoner's underlying medical condition alone." *Id.* (quoting *Smith,* 316 F.3d at 185) (internal quotations omitted). In other words, at the heart of the relevant

inquiry is the seriousness of the medical need, and whether from an objective viewpoint the temporary deprivation was sufficiently harmful to establish a constitutional violation. *Smith,* 316 F.3d at 186. Of course, "when medical treatment is denied for a prolonged period of time, or when a degenerative medical condition is neglected over sufficient time, the alleged deprivation of care can no longer be characterized as 'delayed treatment', but may properly be viewed as a 'refusal' to provide medical treatment." *Id.* at 186, n. 10 (quoting *Harrison v. Barkley,* 219 F.3d 132, 137 (2d Cir.2000)).

**\*7** Since medical conditions vary in severity, a decision to leave a condition untreated may or may not raise constitutional concerns, depending on the circumstances. *Harrison,* 219 F.3d at 136–37 (quoting, *inter alia, Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998)). Relevant factors informing this determination include whether the plaintiff suffers from an injury or condition that a " 'reasonable doctor or patient would find important and worthy of comment or treatment' ", a condition that " 'significantly affects' " a prisoner's daily activities, or " 'the existence of chronic and substantial pain.' " *Chance,* 143 F.3d at 702 (citation omitted); *Lafave v. Clinton County,* No. CIV. 9:00CV774, 2002 WL 31309244, at *3 (N.D.N.Y. Apr.3, 2002) (Sharpe, M.J.) (citation omitted).

Plaintiff's complaint is devoid of specifics regarding his back and knee injuries, or his testicular cyst; rather, he merely alleges in a conclusory fashion that he has pain and soreness in both knees, back pain, and a great deal of "pain and suffering" from his cyst. Plaintiff's complaint does not contain any allegations as to what, if any, treatment he received for those conditions while at Ogdensburg. Instead, while noting that Dr. Chalom retrieved plaintiff's medical records from an outside medical facility where he apparently received treatment for his injuries, he alleges that Dr. Chalom did not arrange for x-rays or provide him with elastic support for his knee, and argues that the de-

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

fendant "had the authority to remove [sic] from the mess hall" implying that he should have but did not do so.[FN9] *See* Plaintiff's Opposition (Dkt. No. 18) p. 2 of 7. These allegations are insufficient to satisfy the objective prong of the deliberate indifference test. Plaintiff's complaint provides no information concerning the alleged inadequacy of treatment received for his medical conditions, and instead appears only to assert plaintiff's disagreement with the course of diagnosis and treatment followed by Dr. Chalom, a matter which is not cognizable under the Eighth Amendment. *See Rosales v. Coughlin,* 10 F.Supp.2d 261, 264 (W.D.N.Y.1998) (citation omitted); *Amaker v. Kelly,* No. 9:01–CV–877, 2009 WL 385413, at *14–16 (N.D.N.Y. Feb.9, 2009) (Scullin, S.D.J. and Peebles, M.J.).

> FN9. While plaintiff alleges that Dr. Chalom did not provide him with an elastic support for his knee, he also asserts that another physician, Dr. Aley, did provide him with the desired support. Plaintiff's Motion Opposition (Dkt. No. 18) p. 2 of 7.

2. *Subjective Element*

The second, subjective, requirement for establishing an Eighth Amendment medical indifference claim mandates a showing of a sufficiently culpable state of mind, or deliberate indifference, on the part of one or more of the defendants. *Salahuddin,* 467 F.3d at 280 (citing *Wilson v. Seiter,* 501 U.S. 294, 300, 111 S.Ct. 2321, 2325, 115 L.Ed.2d 271 (1991)). Deliberate indifference, in a constitutional sense, exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he [or she] must also draw the ence." *Farmer,* 511 U.S. at 837, 114 S.Ct. at 1979; *Leach v. Dufrain,* 103 F.Supp.2d 542, 546 (N.D.N.Y.2000) (Kahn, J.) (citing *Farmer* ); *Waldo v. Goord,* No. 97–CV1385, 1998 WL 713809, at *2 (N.D.N.Y. Oct. 1, 1998) (Kahn, J. and Homer, M.J.)

(same). Deliberate indifference is a mental state equivalent to subjective recklessness as the term is used in criminal law. *Salahuddin,* 467 F.3d at 280 (citing *Farmer,* 511 U.S. at 839–40, 114 S.Ct. 1970, 128 L.Ed.2d 811).

**\*8** Plaintiff's complaint is similarly deficient in that it does not allege facts plausibly demonstrating that Dr. Chalom was deliberately indifferent to Taylor's condition. While the complaint does not specify the nature of actions or inactions by Dr. Chalom forming the basis for plaintiff's claims against him, his submission in opposition to the motion provides some degree of clarification. That document reveals that rather than ignoring plaintiff's medical condition, Dr. Chalom instead made efforts to secure his medical records. Again, while plaintiff asserts his belief that x-rays should have been ordered and that he was in need of surgery to his right knee, these allegations, which allege nothing more than a mere disagreement with the treatment he received, are insufficient to plausibly satisfy the subjective element of the deliberate indifference test. *See Rosales,* 10 F.Supp.2d at 264; *Amaker,* 2009 WL 385413, at *14–16.

IV. *SUMMARY AND RECOMMENDATION*

Plaintiff's complaint, which sets forth a deliberate medical indifference claim in only skeletal form, devoid of factual allegations which would permit the court to assess whether plaintiff has met the objective and subjective prongs necessary to plead a cognizable deliberate medical indifference cause of action, is subject to dismissal on the merits. In addition, because it appears clear from his complaint and submissions in opposition to defendant's motion that he failed to file and pursue to the CORC a grievance concerning his medical complaints, plaintiff is procedurally barred from maintaining this action.

Ordinarily, a *pro se* complaint should not be dismissed without leave to amend unless it appears clear that the plaintiff is unable to set forth any facts that would support a plausible cause of action. *See*

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)
**(Cite as: 2011 WL 6942891 (N.D.N.Y.))**

*Gomez v. USAA Federal Savings Bank,* 171 F.3d 794, 796 (2d Cir.1999); *Brown v. Peters,* 95–CV–1641, 1997 WL 599355, at *1 (N.D.N.Y. Sept.22, 1997) (Pooler, J.) ("[T]he court need not grant leave to amend where it appears that amendment would prove to be unproductive or futile."). In this instance, however, because plaintiff has already amended once, and since it seems clear that he is procedurally barred from raising the claims set forth in his complaint based upon his failure to exhaust available internal administrative remedies, I recommend against permitting further amendment. *See Cortec Indus. Inc. v. Sum Holding L.P.,* 949 F.2d 42, 48 (2d Cir.1991).

It is therefore hereby respectfully

RECOMMENDED that defendant's dismissal motion (Dkt. No. 15) be GRANTED, and that plaintiff's complaint be dismissed in all respects, without leave to replead.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections must be filed with the clerk of the court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*9** It is hereby ORDERED that the clerk of the court serve a copy of this report and recommendation upon the parties in accordance with this court's local rules; and it is further.

N.D.N.Y.,2011.
Taylor v. Chalom
Not Reported in F.Supp.2d, 2011 WL 6942891 (N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 750217 (E.D.N.Y.)
**(Cite as: 2009 WL 750217 (E.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
E.D. New York.
Keith WATERS, pro se, Plaintiff,
v.
Nancy T. SUNSHINE, Chief Clerk, Dennis Al-
movodar, Court Aide, Jane/John Doe, Motion Clerk,
Defendants.

No. 07–CV–4753 (DLI)(LB).
March 19, 2009.

Keith Waters, Coxsackie, NY, pro se.

Roberta Lynne Martin, New York State Office of the
Attorney General, Amy L. Abramowitz, Attorney
General's Office/State of New York, New York, NY,
for Defendants.

### *MEMORANDUM & ORDER*

DORA L. IRIZARRY, District Judge.

**\*1** Plaintiff Keith Waters, appearing *pro se,*
brought this action under 42 U.S.C. § 1983 against
various employees of the New York State Supreme Court,
Kings County including Nancy T. Sunshine, the
County Clerk, Dennis Almovodar, a court aide, and an
unnamed motion clerk. Plaintiff alleges that these
individuals violated his constitutional right to access
the court by failing to: (1) forward his substitution of
counsel application and habeas petition to his attor-
ney; (2) file his habeas petition and substitution of
counsel application; and (3) forward his substitution
of counsel application to a judge for consideration. All
parties moved for summary judgment. For the reasons
set forth more fully below, the court denies Plaintiff's
motion in its entirety and grants Defendants' motion in

its entirety.

Plaintiff cannot survive summary judgment be-
cause even assuming that Defendants engaged in the
alleged misconduct, the undisputed evidence shows
that Plaintiff had available remedies. Furthermore,
there is no evidence suggesting that Defendants acted
with the requisite intent or that Plaintiff suffered actual
injury. Additionally, this Section 1983 suit cannot be
sustained against Sunshine because it is undisputed
that she was not personally involved with any of the
alleged events. Finally, under the principles of feder-
alism and comity, the Eleventh Amendment, and
Section 1983, the court cannot grant the declaratory
relief that Plaintiff seeks.

### I. Background

Plaintiff is currently in state custody at Coxsackie
Correctional Facility following his May 1, 2006 con-
viction by a jury in Kings County Supreme Court for
robbery in the first degree. He was arrested in Sep-
tember 2005 and has been incarcerated since. In De-
cember 2005, the state court appointed Ayisha Amjad
of the Legal Aid Society of Brooklyn to represent him.
Plaintiff claims that, on or about January 28, 2006, he
filed a habeas petition with the Kings County Supreme
Court. (Pl.'s Compl. at ¶ 32.) The return receipt indi-
cates that Almovodar received the petition on behalf
of the court. (*Id.*) According to Plaintiff, the Criminal
Term Motion Department of the Brooklyn Supreme
Court notified him on February 8, 2006 that his habeas
petition had been forwarded to Amjad. (*Id.* at ¶ 33.)
During a hearing held on March 2, 2006, Amjad,
however, denied ever receiving the petition. (*Id.* at ¶
34.) Records from the Criminal Term Motion De-
partment show that it did not forward the petition to
Amjad until April 7, 2006. (Aff. of James Imperatrice
at ¶ 11, Ex. C.)

On March 21, 2006, Plaintiff filed an application

Not Reported in F.Supp.2d, 2009 WL 750217 (E.D.N.Y.)
(Cite as: 2009 WL 750217 (E.D.N.Y.))

to substitute counsel with the Kings County Supreme Court that Almovodar received on or about April 3, 2006. ((Pl.'s Compl. at ¶ 35, Ex. A–1.) Plaintiff alleges that upon receiving the application, the court staff failed to file or otherwise submit the application to the judge for consideration. (*Id.* at ¶ 36.) He also claims that Defendants did not forward his application to his counsel. Defendants submitted documents indicating that the court clerk forwarded the application to Amjad on April 4, 2006. (Aff. of James Imperatrice at ¶ 10, Ex. B.) In the application, Plaintiff alleged that Amjad "failed to properly investigate [,] notify[,] and consult with [him] regularly in the preparation of the defense ... [thus] [r]endering the representation less than meaningful." (Pl.'s Mem. of Law for Summ. J. at Ex. A–1.)

**\*2** The state court did not consider this application until after his conviction when Plaintiff sought to vacate his conviction pursuant to CPL § 440.10. (Aff. of James Imperatrice at ¶ 13, Ex. E.) In this motion, Plaintiff argued that his sentence must be set aside because the trial court failed to consider his *pro se* motion to reassign counsel. (*Id.*) On October 13, 2006, the Kings County Supreme Court denied his motion as meritless noting that his complaints about Amjad were belied by Plaintiff's own correspondence in which he "thanks counsel with [sic] providing him with documents, comments on various documents sent to him by counsel and looks forward to a video conference." (*Id.* at Ex. E. at 3.) The court also found that his "counsel provided meaningful representation at trial" and noted that, other than his April 2, 2006 application, "there is no indication that defendant had any further conflict with counsel or that he attempted to bring his complaints to the court's attention." (*Id.*) The court dismissed Plaintiff's protest regarding the trial court's failure to address his motion by explaining that "even though it would have been better for the motion to have been brought to the [trial] court's attention, had it come before the court, it is clear that it would have been denied." (*Id.*) The Appellate Division, Second Department, denied Plaintiff's appeal of this decision

on January 18, 2007. (*Id.* at ¶ 14, Ex. F.) There is no record that Plaintiff appealed his conviction. (*Id.* at ¶¶ 16–17.)

The Criminal Term Office of the Kings County Supreme Court handles all filings in criminal matters. That office is separate from the County Clerk's Office where Sunshine is employed. (Aff. of Nancy T. Sunshine, at ¶ 7.) According to Sunshine, the only involvement that the County Clerk's office had in Plaintiff's case "was the ministerial duty of stamping the entry date of the document when the document was filed in the Supreme Court, Criminal Term." (*Id.* at ¶ 8.) Furthermore, Sunshine claims that, aside from the current suit, she has had no personal involvement with Plaintiff's filings in his criminal case. (*Id.* at ¶¶ 9–10.)

On November 8, 2007, Plaintiff filed this suit under Section 1983. In it, he complains about Defendants' failures to file and forward his habeas petition and application to substitute counsel. He attributes these failures, at least in part, to the lack of "authorization for court clerks or court aides to forward pro-se applications submitted by a petitioner to attached counsel." (Pl.'s Compl. at ¶¶ 19, 21, 29–31.) Consequently, Plaintiff claims that he was precluded from: (1) applying for a substitution of counsel; (2) proceeding *pro se;* and (3) raising ineffective assistance of counsel claims for his counsel's failure to challenge a search and seizure and to raise *Brady* and *Rosario* violations. (Pl.'s Compl. at ¶¶ 21–25, 27–28.) Plaintiff seeks punitive damages of $3,000 against each defendant as well as declaratory relief including "an order declaring that plaintiff is in custody in violation of the U.S. Constitution." (Pl.'s Compl. at ¶¶ 46–51, Pl.'s Amend. Compl. at ¶ 1–2.)

**II. Discussion**

**\*3** Plaintiff moved for summary judgment. In support of their opposition and cross-motion for summary judgment, Defendants argue that: (1) the suit against Sunshine is improper because Plaintiff failed

Not Reported in F.Supp.2d, 2009 WL 750217 (E.D.N.Y.)
**(Cite as: 2009 WL 750217 (E.D.N.Y.))**

to allege that she had any direct involvement in the alleged conduct; (2) Plaintiff's claims are barred by qualified and quasi-judicial immunity; and (3) there was no violation of the constitutional right of access to the courts.

### a. Summary Judgment Standard

Summary judgment is appropriate when "the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c).[FN1] The court must view all facts in the light most favorable to the nonmoving party, but "only if there is a 'genuine' dispute as to those facts." *Scott v. Harris,* 550 U.S. 372, 127 S.Ct. 1769, 1776, 167 L.Ed.2d 686 (2007). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The nonmoving party, however, may not rely on "[c]onclusory allegations, conjecture, and speculation," *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998), but must affirmatively "set out specific facts showing a genuine issue for trial," Fed.R.Civ.P. 56(e). The nonmoving party must show, by affidavits or as otherwise provided in Rule 56, that there are specific issues that can only be resolved at trial. *Colon v. Coughlin,* 58 F.3d 865, 872 (2d Cir.1995). "When no rational jury could find in favor of the nonmoving party because the evidence to support its case is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." *Gallo v. Prudential Residential Servs., Ltd. P'ship.,* 22 F.3d 1219, 1224 (2d Cir.1994) (citing *Dister v. Cont'l Group, Inc.,* 859 F.2d 1108, 1114 (2d Cir.1988)). An action may also be ripe for summary judgment where an issue presented is solely a matter of law. *Woodard v. Mennella,* 861 F.Supp. 192, 196 (E.D.N.Y.1994).

> FN1. Although Plaintiff did not file a statement of undisputed material facts as required under Local Rule 56.1, Defendants filed a Rule 56.1 "Responding Statement" of undisputed material facts. The court does not rely solely on the statement of undisputed facts contained in Defendants' Rule 56.1 statement. Rather, the court "must be satisfied that the citation to the evidence in the record supports the assertion." *Vt. Teddy Bear Co., Inc. v. 1–800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004). Therefore, the court deems admitted only those facts that are supported by admissible evidence and not controverted by the record. Furthermore, the court liberally reviews *pro se* submissions to raise the strongest arguments that they suggest. *Bennett v. Goord,* 343 F.3d 133, 137 (2d Cir.2003) (internal citations and quotation marks omitted).

### b. Access to the Court Claim Pursuant to Section 1983

Under 42 U.S.C. § 1983, "every person who, under color of any statute ... subjects ... any ... person within the jurisdiction [of the United States] to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress." In order to maintain a Section 1983 action, the injured party must allege (1) "that some person has deprived him of a federal right," and (2) "that the person who has deprived him of that right acted under color of state ... law." *Velez v. Levy,* 401 F.3d 75, 84 (2d Cir.2005) (citing *Gomez v. Toledo,* 446 U.S. 635, 640, 100 S.Ct. 1920, 64 L.Ed.2d 572 (1980)). Action taken under color of state law includes the "misuse of state power" that a wrongdoer "possesses by virtue of state law" and acting while "clothed with the authority of state

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 750217 (E.D.N.Y.)
**(Cite as: 2009 WL 750217 (E.D.N.Y.))**

law." *United States v. Giordano,* 442 F.3d 30, 42–43 (2d Cir.2006) (citations omitted).

**\*4** The constitutional right at issue here is a state inmate's right to access the courts. It is well established that, under the First and Fourteenth Amendments, state prisoners have a constitutional right of access to the courts. *Lewis v. Casey,* 518 U.S. 343, 354, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996). In order to state a valid denial of access claim under Section 1983, the plaintiff must show that the defendant acted deliberately and maliciously to deprive the access, and as a result of such deprivation, the plaintiff suffered actual injury. *Lewis,* 518 U.S. at 349–55; *Morello v. James,* 810 F.2d 344, 347 (2d Cir.1987); *Odom v. Poirier,* 99 Civ. 4933, 2004 WL 2884409, at \*8 (S.D.N.Y.2004) (citations and internal quotation marks omitted).

Actual injury does not refer to the denial of access itself but instead, to the underlying claims that the plaintiff could have brought if he had not been denied access. *See Christopher v. Harbury,* 536 U.S. 413, 415 (2002) (explaining that the right access the courts "is ancillary to the underlying claim, without which a plaintiff cannot have suffered injury by being shut out of court."). The Supreme Court in *Lewis* cautioned that "the [actual] injury requirement is not satisfied by just any type of frustrated legal claim" but requires the claim to be "an arguable" claim and not a "frivolous claim." 518 U.S. at 353, 354 n. 3. Therefore, the plaintiff must describe the underlying cause of action "well enough to apply the nonfrivolous test and show that the arguable nature of the underlying claim is more than hope." *Christopher,* 536 U.S. at 416 (internal quotation marks and footnote omitted). "[T]he complaint should state the underlying claim in accordance with the Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Id.* at 417–18 (footnote omitted).

The plaintiff can only show actual injury by alleging facts demonstrating that the defendant's behavior "materially prejudiced a legal action he sought to pursue." *Smith v. O'Conner,* 901 F.Supp. 644, 649 (S.D.N.Y.1995). Conduct that merely delays a plaintiff's ability to work on a pending cause of action or communicate with the courts does not amount to a violation of the right to access. *Jermosen v. Coughlin,* 89 Civ. 1866, 1995 WL 144155, at \*4 (S.D.N.Y. Mar.30, 1995). Similarly, a plaintiff does not suffer a constitutional deprivation of access if he has other available avenues to bring his grievances before the court. *See Snyder v. Nolen,* 380 F.3d 279, 292–93 (7th Cir.2004) (Easterbrook, J., concurring in part and concurring in the judgment).

**i. Deliberate and Malicious Intent**

Plaintiff has not provided admissible evidence to show that Defendants acted with the required deliberate and malicious intent. Indeed, Plaintiff does not allege anything with respect to the intent of Defendants. His papers merely repeat how Defendants' failures to file, forward, and maintain proper safeguards denied him access to the courts. These facts, without more, show that, at most, Defendants acted negligently in failing to timely file and forward Plaintiff's applications. They do not show that Defendants acted with the intent to deprive Plaintiff of access to the courts. *See Daniels v. Williams,* 474 U.S. 327, 328 (1986) ("We conclude that the Due Process Clause is simply not implicated by a negligent act of an official causing unintended loss of or injury to life, liberty, or property."); *Snyder v. Nolen,* 380 F.3d 279, 291 n. 11 (7th Cir.2004) ("[A]n allegation of simple negligence will not support a claim that an official has denied an individual of access to the courts.") (citations omitted); *Jordan v. Fox, Rothschild, O'Brien & Frankel,* 20 F.3d 1250, 1277 (3d Cir.1994) (same). In fact, there is nothing in any of the submissions that even remotely suggests that any of Defendants had a motive to refuse to process his two motions. This is especially apparent with Sunshine, who prior to this lawsuit, was not involved with Plaintiff's criminal matter.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 750217 (E.D.N.Y.)
**(Cite as: 2009 WL 750217 (E.D.N.Y.))**

**ii. Actual Injury**

**\*5** Plaintiff has not shown that he suffered an actual injury or that Defendants' conduct materially prejudiced a legal action. The undisputed evidence shows that although his trial court did not address his substitution of counsel motion, the Kings County Supreme Court did consider and decide the merits of the application when Plaintiff moved for an order pursuant to CPL § 440.10 to vacate his conviction. (*See* Aff. of James Imperatrice at ¶ 13, Ex. E.) In that motion, Plaintiff argued that his conviction must be vacated because the trial court had failed to inquire into his motion for reassignment of counsel. (*See id.*) The court found the motion to be entirely baseless in light of: (1) Plaintiff's letters indicating his satisfaction with his attorney; (2) Plaintiff's failure to raise any complaints about his attorney outside of the motion despite having other opportunities to do so; and (3) the meaningful representation provided by his counsel. (*Id.*) Responding to Plaintiff's complaint that the trial court should have inquired into his application prior to his conviction, the court held that "even though it would have been better for the motion to have been brought to the court's attention, had it come before the court, it is clear that it would have been denied." (*Id.*) Given that the court considered and decided his substitution motion, it is clear that Plaintiff was not denied access to the court on this underlying claim. Moreover, in light of the court's ruling on the merits of his motion, it is apparent that any interference that might have occurred did not result in material prejudice. *See Hikel v. King,* 6591 F.Supp. 337, 340 (E.D.N.Y.1997).

Plaintiff also claims to have suffered actual injury from the trial court's failure to consider his substitution of counsel application because that deprivation somehow denied him "access to the courts to pursue judicial review of a constitutionally established legal claim of ineffective assistance of counsel ... for failing to challenge search and seizure ... [and] for failing to raise a violation of *Brady* and *Rosario.*" (Pl.'s Compl.

at ¶¶ 23–25.) This is entirely baseless. As far as the court can tell, Plaintiff never raised these ineffective assistance of counsel claims in his application for reassignment of counsel. (*See* Pl.'s Mot. for Summ. J. at Ex. A–1.) In fact, it appears that Plaintiff raised these issues for the first time in his submissions to the court in an effort to buttress his Section 1983 action. This is inappropriate. Plaintiff cannot invent frustrated legal claims for a Section 1983 denial of access suit because the harm suffered must be an "actual injury." *Lewis v. Casey,* 518 U.S. 343, 351–52, 116 S.Ct. 2174, 135 L.Ed.2d 606 (1996).

Even if Defendants did interfere with his ability to bring such claims, Plaintiff has not alleged any facts in his complaint that would allow the court to determine whether the claims are "nonfrivolous." Plaintiff has also not provided the court with any details about his February 8, 2006 habeas petition other than the fact that he made such a petition under state law. As such, the court cannot determine whether those underlying claims pass muster under the *Lewis* requirement that the frustrated claim be "arguable" and not "frivolous."

**iii. Other Available Avenues to Raise Concerns with the Court**

**\*6** Even assuming that Defendants did improperly fail to process Plaintiff's motions, he still would not prevail for another reason: he had other avenues, which he did not take, to remedy the alleged misconduct. *See Cliff v. Brownstein,* 96 CV 1591, 1997 WL 778785, at \*4 (E.D.N.Y. Dec.15, 1997) (finding that, even if the plaintiff was denied access by the court clerk, he still did not suffer actual injury because he had other options to file his writ but chose not to do so); *Snyder,* 380 F.3d at 292 ("A forum that offers an opportunity to be heard before a decision becomes final provides due process of law."). In *Snyder,* the Seventh Circuit thoroughly addressed this very issue involving a state inmate who brought a Section 1983 action against the court clerk for refusing to file his pleadings. *See* 380 F.3d at 292. Although the Seventh Circuit agreed that the clerk wrongly had refused to

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 750217 (E.D.N.Y.)
**(Cite as: 2009 WL 750217 (E.D.N.Y.))**

file the motion, it nonetheless held that there was no constitutional violation. *See id.* at 292–93. Judge Easterbrook explained that "[e]ach litigant's opportunity to protect his interests within the case itself ... means that the clerk's error does not deny anyone access to the courts." *Id.* at 293 (internal quotation marks omitted). Despite the clerk's error, "Snyder could have asked a judge to direct Nolen to file the pleading. That option provides ready access to the courts." *Id.*

Like the plaintiff in *Snyder,* Plaintiff had other options. According to Plaintiff, the failures to file and forward his two motions to his attorney occurred several weeks before his trial. From when he filed his motions to his conviction, Plaintiff could have asked the trial judge to direct the court staff to file and forward his submissions to his attorney. *See, e.g., Hyman v. Hyman,* 56 A.D.2d 337, 339, 392 N.Y.S.2d 455, 457 (1st Dep't 1977) (granting the respondent's motion for an order directing the Clerk of the Court to file her reply papers). During this period, at the very least, he could have sent a letter to the court inquiring about the status of his motions. The undisputed evidence shows that Plaintiff was present for every court appearance from arraignment through trial yet he did not renew his complaints about his attorney or inquire about the status of his motions with the trial judge. (*See* James Imperatrice Aff. at ¶ 15, Ex. E ("Defendant does not claim, and there is no indication in the court file, that he renewed his complaints about counsel during or after the pendency of the hearings and trial.").)

Assuming that Defendants failed to forward his motions to his attorney, Plaintiff has not explained what, if anything, would have prevented him from giving the submissions directly to his attorney at the pretrial hearings or during the trial itself. Even if there was some regulation that prevented him from carrying his papers to court, surely, during either the hearings or trial, Plaintiff could have inquired with his attorney on the status of the motions. He also could have petitioned the trial judge to direct the clerk of the court to

forward his motions. There is no evidence that he took any of these steps.

**\*7** Even accepting Plaintiff's argument that, somehow, the alleged misconduct hindered his ability to raise the ineffective assistance claims relating to search-and-seizure, *Brady,* and *Rosario* issues, Plaintiff does not claim that he was prevented from appealing his conviction on these grounds. In fact, the undisputed evidence shows that he did not appeal his conviction. His failure to take advantage of the numerous remedies available to him defeats his denial-of-access claim. *See Snyder,* 380 F.3d at 293 ("Access neither implies nor ensures an error-free process.... Electing to let the blunder stand without protest does not bootstrap a mistake into a constitutional violation."). FN2

> FN2. Plaintiff's *pro se* status does not excuse him from failing to use the available corrective measures. As the *Snyder* court emphasized, a plaintiff's lack of counsel and "status as a legal amateur does not, however, excuse his failure to take the steps provided or required by the judicial system. His ignorance of the right way to proceed certainly does not support an award of damages against the clerk of the court." 380 F.3d at 292.

**c. Involvement of Sunshine**

Defendants urge the court to dismiss the action against Nancy T. Sunshine, the Kings County Clerk of the Court, because Plaintiff's "motion for summary judgment as well as his amended complaint fail to set forth any facts which, even if read by the court in the most liberal manner, would establish that Nancy T. Sunshine was personally involved in the alleged violation of plaintiff's constitutional rights." The court agrees. In order to sustain a Section 1983 claim against individual defendants, the plaintiff must establish their personal involvement in the alleged misconduct. *See Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994). With respect to a supervisory defendant,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2009 WL 750217 (E.D.N.Y.)
**(Cite as: 2009 WL 750217 (E.D.N.Y.))**

the Second Circuit has ruled that:

> The personal involvement of a supervisory defendant may be shown by evidence that: (1) the defendant participated directly in the alleged constitutional violation, (2) the defendant, after being informed of the violation through a report or appeal, failed to remedy the wrong, (3) the defendant created a policy or custom under which unconstitutional practices occurred, or allowed the continuance of such a policy or custom, (4) the defendant was grossly negligent in supervising subordinates who committed the wrongful acts, or (5) the defendant exhibited deliberate indifference to the rights of inmates by failing to act on information indicating that unconstitutional acts were occurring.

*Colon v. Coughlin,* 58 F.3d 865, 873 (2d Cir.1995) (citations omitted). This test was applied in closely analogous circumstances where a *pro se* inmate brought a Section 1983 suit against the Chief Clerk of the Supreme Court of Kings County for failing to file his petition for a writ of habeas corpus. *See Woodard v. Mennella,* 861 F.Supp. 192, 198 (E.D.N.Y.1994). The court dismissed the denial of access claim against the Chief Clerk, in his individual capacity, because "a supervisory official cannot be held liable under § 1983 on a theory of respondent superior." *Id.* (citations omitted).

Here, Plaintiff's suit against Sunshine is based entirely upon her alleged "fail[ure] to implement safeguards to insure" that *pro se* motions are properly processed. (Pl.'s Compl. at ¶¶ 29–31.) Even if construed liberally, Plaintiff's submissions include no facts to indicate that Sunshine engaged in any affirmative acts, gross negligence, or was informed of anything pertaining to the filings in his criminal case. To the contrary, Sunshine's affidavit explains that prior to this suit, she had no involvement with Plaintiff's criminal proceedings. (Nancy T. Sunshine Aff. at ¶¶ 9–10.) Plaintiff does not dispute this. His suit against Sunshine appears to rest solely upon her supervisory role within the Clerk's Office. This is not enough to sustain a Section 1983 action. *See Colon,* 58 F.3d at 874 ("The bare fact that Coughlin occupies a high position in the New York prison hierarchy is insufficient to sustain Colon's claim.") (citations omitted); *see also id.* at 198.

**d. Declaratory Relief**

**\*8** Even if Plaintiff was able to establish a violation of his right to access the courts, the court must still grant summary judgment for Defendants on his requests for declaratory relief. With the sole exception of his request for punitive damages, all of Plaintiff's "prayer[s] for relief" seek declaratory relief. (Pl.'s Compl. at ¶¶ 46–51, Pl.'s Am. Compl. at ¶ 2.) Specifically, Plaintiff asks the court to declare that Defendants' conduct and the practices of the Kings County Supreme Court violate the Constitution as well as federal and state law. Additionally, Plaintiff wants the court to declare that he is in custody in violation of the Constitution. The court lacks the authority to grant such relief for at least three reasons. First, it appears that, in asking the court to declare Defendants' conduct unconstitutional, Plaintiff is in essence urging the court to order the Kings County courts to institute "procedural safeguards ... to protect the rights of the petitioner." (Pl.'s Compl. at ¶ 49.) To the extent that he seeks such relief, the principles of federalism and comity prohibit the court from doing so. *See Wallace v. Kern,* 481 F.2d 621, 622 (2d Cir.1973), *cert. denied,* 414 U.S. 1135, 94 S.Ct. 879, 38 L.Ed.2d 761 (1974) ("[U]nder the principles known as comity a federal district court has no power to intervene in the internal procedures of the state courts.") (citations omitted); *Woodard,* 861 F.Supp. at 199. In *Woodard,* the plaintiff also requested the court to declare that the failure of the state court clerks to file his *pro se* habeas petition violated his constitutional rights. The court held that "[w]ith respect to plaintiff's claim for declaratory relief, the court finds that defendants are entitled to summary judgment on this claim under principles of comity and federalism." 861 F.Supp. at 199. The declaratory relief that Plain-

Not Reported in F.Supp.2d, 2009 WL 750217 (E.D.N.Y.)
**(Cite as: 2009 WL 750217 (E.D.N.Y.))**

tiff seeks is indistinguishable.

Second, the Eleventh Amendment bars a declaratory judgment that Defendants' conduct and policies violate state law. *See Pennhurst State Sch. & Hosp. v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 79 L.Ed.2d 67 (1984). In *Pennhurst,* the Supreme Court found that under the Eleventh Amendment, federal courts do not have jurisdiction over suits against state officials that allege violations of state law because "[a] federal court's grant of relief against state officials on the basis of state law, whether prospective or retroactive, does not vindicate the supreme authority of federal law." *Id.* In *Woodard,* the court applied *Pennhurst* to the failure of the state court clerks to file motions and held that "the Eleventh Amendment bars plaintiff's action to the extent that he seeks a declaratory judgment that defendants' acts and policies violated *state* law." 861 F.Supp. at 196 (emphasis in original). Furthermore, Section 1983 is not the proper vehicle to seek such relief because it only provides relief for violations of the rights secured through the Constitution or federal law. 42 U.S.C. § 1983.

**\*9** Finally, in deference to Plaintiff's *pro se* status, the court liberally interprets his prayer for a declaration that he "is in custody in violation of the U.S. Constitution" as a habeas petition under 28 U.S.C. § 2254(b). Such a petition must fail because none of his custodians are defendants and thus, the Court does not have jurisdiction over the petition. *See Billiteri v. United States Bd. of Parole,* 541 F.2d 938, 948 (2d Cir.1976). Furthermore, it does not appear that Plaintiff has exhausted the available remedies in state court. *See Preiser v. Rodriquez,* 411 U.S. 475, 489–90, 93 S.Ct. 1827, 36 L.Ed.2d 439 (1973) (explaining that a state prisoner may not circumvent the exhaustion requirements for habeas corpus relief by requesting such relief under Section 1983).

**III. Conclusion**

Plaintiff does not have a viable denial of access claim. Defendants did not act with malicious and deliberate intent nor did Plaintiff suffer actual injury. Moreover, he had other available avenues to raise his concerns with the court. Plaintiff cannot sustain his claim against Sunshine since she was not personally involved with the alleged misconduct. Under the Eleventh Amendment, principles of federalism and comity, and Section 1983, the court lacks the authority to grant the declaratory relief that he seeks. In light of these conclusions, it is unnecessary for the court to decide whether Defendants are protected by qualified and quasi-judicial immunity. In accordance with the foregoing, Plaintiff's summary judgment motion is denied in its entirety. Defendants' cross-motion for summary judgment is granted in its entirety, and this action is dismissed.

SO ORDERED.

E.D.N.Y.,2009.
Waters v. Sunshine
Not Reported in F.Supp.2d, 2009 WL 750217 (E.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**



Only the Westlaw citation is currently available.

United States District Court,
N.D. New York.
Jason R. WHITE, Plaintiff,
v.
Brian FISCHER, Commissioner, Dept. of Correc-
tional Services; Theresa A. Knapp–David, Director,
Classification and Movement; and R. Woods, Super-
intendent, Upstate Correctional Facility, Defendants.

No. 9:09–CV–240.
Feb. 18, 2010.

Jason R. White, Elmira, NY, pro se.

Hon. Andrew M. Cuomo, Attorney General of the
State of New York, Brian J. O'Donnell, Esq., Asst.
Attorney General, of Counsel, Albany, NY, for De-
fendants.

### DECISION and ORDER

DAVID N. HURD, District Judge.
   **\*1** Plaintiff, Jason R. White, commenced this
civil rights action in February 2009, pursuant to 42
U.S.C. § 1983. By Report–Recommendation dated
January 25, 2009, the Honorable David E. Peebles,
United States Magistrate Judge, recommended that
defendant's motion to dismiss (Dkt. No. 10) be
granted, and that plaintiff's complaint in this action be
dismissed without leave to replead. No objections to
the Report–Recommendation have been filed.

   Based upon a careful review of the entire file and
the recommendations of Magistrate Judge Peebles, the
Report–Recommendation is accepted and adopted in
all respects. *See* 28 U.S.C. 636(b)(1).

Accordingly, it is

ORDERED that

   1. Defendant's motion to dismiss (Dkt. No. 10) is
GRANTED;

   2. Plaintiff's complaint in this action is DIS-
MISSED without leave to replead; and

   3. The Clerk is directed to file judgment accord-
ingly and close the file.

   IT IS SO ORDERED.

   JASON R. WHITE,

   Plaintiff,

   -v.-

   BRIAN     FISCHER,     THERESA     A.
KNAPP–DAVID, and R. WOODS,

   Defendants.

### REPORT AND RECOMMENDATION

DAVID E. PEEBLES, United States Magistrate
Judge.
   Plaintiff Jason R. White, a New York State prison
inmate who is proceeding *pro se* and *in forma pau-
peris,* has commenced this action pursuant to 42
U.S.C. § 1983, alleging deprivation of his civil rights.
In his complaint, plaintiff asserts that his transfer into
special housing unit ("SHU") disciplinary confine-
ment at the Upstate Correctional Facility, to serve
what was originally intended to be a three-month

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

disciplinary sentence of less restrictive keeplock confinement imposed while at another facility, represented a deprivation of a liberty interest without the requisite procedural due process. As relief for the violation, plaintiff's complaint seeks an award of compensatory damages in the amount of $25,000.

In response to plaintiff's complaint, defendants have moved seeking its dismissal for failure to state a cause of action upon which relief may be granted. In their motion, defendants argue that plaintiff's allegations do not demonstrate the existence of a meritorious due process claim since, at best, it implicates a failure of prison officials to comply with governing regulations regarding transfers into an SHU unit, a matter not of constitutional concern, noting further that plaintiff has no constitutional right to be designated to a particular correctional facility or to a desired security classification. Defendants also seek dismissal of plaintiff's claims against them based upon lack of personal involvement, and additionally assert their entitlement to qualified immunity from suit as a basis for their dismissal motion.

For the reasons set forth below, I find that White's complaint fails to set forth a plausible due process violation and that defendant Fischer is also entitled to dismissal of the claims against him based upon the lack of allegations showing of his personal involvement in the conduct allegedly giving rise to plaintiff's claims. I further recommend a finding that, even if plaintiff were able to plead a cognizable due process cause of action, defendants Knapp–David and Woods nonetheless should be granted qualified immunity from suit in this instance.

I. *BACKGROUND*[FN1]

> FN1. In light of the procedural posture of this case, the following recitation is drawn principally from plaintiff's complaint, the contents of which have been accepted as true for

purposes of the pending motion. *See Erickson v. Pardus,* 551 U.S. 89, 127 S.Ct. 2197, 2200 (2007) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955, 1965 (2007)); *see also Cooper v. Pate,* 378 U.S. 546, 546, 84 S.Ct. 1733, 1734 (1964). I have also considered the exhibits attached to plaintiff's memorandum, which accompanied his complaint, to the extent that they are consistent with the allegations of his complaint. *See Donhauser v. Goord,* 314 F.Supp.2d 119, 121 (N.D.N.Y.2004) (Hurd, J.).

**\*2** Plaintiff is a prison inmate entrusted to the care and custody of the New York State Department of Correctional Services ("DOCS"). *See generally* Complaint (Dkt. No. 1). At the times relevant to his claims plaintiff was designated first to the Auburn Correctional Facility ("Auburn"), located in Auburn, New York, and later to the Upstate Correctional Facility ("Upstate"), located in Malone, New York. *Id.,* § 6.

On March 28, 2007, while confined at Auburn, plaintiff was found guilty following a Tier I II disciplinary hearing of engaging in violent conduct and refusing a direct order, in violation of disciplinary rules 104.11 and 106.10, respectively.[FN2] *See* Plaintiff's Memorandum (Dkt. No. 1–1) Exh. A. [FN3] As a result of that determination plaintiff was sentenced to serve three months of keeplock confinement, with a corresponding loss of package, commissary, and telephone privileges. *See id.*

> FN2. The DOCS conducts three types of inmate disciplinary hearings. Tier I hearings address the least serious infractions, and can result in minor punishments such as the loss of recreation privileges. Tier II hearings involve more serious infractions, and can result in penalties which include confinement for a period of time in the SHU. Tier III hearings

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

concern the most serious violations, and could result in unlimited SHU confinement and the loss of "good time" credits. *See Hynes v. Squillace,* 143 F.3d 653, 655 (2d Cir.), *cert. denied,* 525 U.S. 907, 119 S.Ct. 246 (1998).

FN3. Plaintiff filed what he labeled as a "memorandum of law", with exhibits attached, in conjunction with his complaint. "Generally, a court may not look outside the pleadings when reviewing a Rule 12(b)(6) motion to dismiss. However, the mandate to read the papers of *pro se* litigants generously makes it appropriate to consider plaintiff's additional materials, such as his ... memorandum." *Rivera v. Selsky,* No. 9:05–CV–0967, 2007 WL 956998, at *1 n. 2 (N.D.N.Y. Jan. 5, 2007) (quoting *Gadson v. Goord,* 96 Civ. 7544, 1997 WL 714878, at *1 n. 2 (S.D.N.Y. Nov. 17, 1997)).

On April 11, 2007, while serving his keeplock sentence at Auburn, White was processed out of that facility and, following completion of an inter-prison transfer process which included a stop at another facility, was transferred into Upstate on or about April 13, 2007. Complaint (Dkt. No. 1) § 6. At Upstate, plaintiff was assigned to a two-person cell in the facility's SHU to serve the balance of his disciplinary confinement sentence.[FN4] *Id.*

FN4. Upstate is a maximum security prison comprised exclusively of SHU cells in which inmates are confined, generally though not always for disciplinary reasons, for twenty-three hours each day. *See Samuels v. Selsky,* No. 01 CIV. 8235, 2002 WL 31040370, at *4 n. 11 (S.D.N.Y. Sept. 12, 2002).

On April 23, 2007 plaintiff filed a grievance with prison authorities, arguing that his transfer into the SHU at Upstate was not authorized by DOCS directives. Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1–1) Exh. C. The grievance was denied by the facility's Inmate Grievance Review Committee ("IGRC"). Complaint (Dkt. No. 1) § 6 at p. 4B; Plaintiff's Memorandum (Dkt. No. 1–1) Exh. D. Plaintiff appealed the denial to defendant Woods, the Superintendent at Upstate, who upheld the IGRC's unfavorable determination by decision dated May 15, 2007. Complaint (Dkt. No. 1) § 6 at p. 4B. Plaintiff's Memorandum (Dkt. No. 1–1) Exh. D. Plaintiff's further appeal of the matter to the DOCS Central Office Review Committee ("CORC") was likewise unsuccessful. *Id.* Exh. E.

Also on April 23, 2007, plaintiff sent a letter to the DOCS Commissioner Brian Fischer, complaining of the SHU designation. Plaintiff's Memorandum (Dkt. No. 1–1) Exh. F. That letter was referred by Commissioner Fischer to defendant Theresa A. Knapp–David, the DOCS Director of Classification and Movement. Complaint (Dkt. No. 1) § 6 at pp. 4B–4C. In response, defendant Knapp–David wrote to the plaintiff on May 7, 2007, advising that his SHU assignment was in accordance with established DOCS procedures. Plaintiff's Memorandum at (Dkt. No. 1.1) Exh. G.

II. *PROCEDURAL HISTORY*

Plaintiff commenced this action on February 27, 2009, and was thereafter granted leave to proceed *in forma pauperis.* Dkt. Nos. 1, 4. Named as defendants in plaintiff's complaint are Commissioner Fischer; Director Knapp–David; and Upstate Superintendent R. Woods. Complaint (Dkt. No. 1) § 3. Plaintiff's complaint asserts a single cause of action for deprivation of procedural due process. *Id.,* § 7.

**\*3** Following service, in lieu of answering plaintiff's complaint, defendants filed a motion to dismiss asserting a variety of grounds for the relief sought. Dkt. No. 10. In their motion defendants argue, *inter*

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

*alia,* that plaintiff's complaint 1) does not implicate a cognizable due process violation, 2) plaintiff's complaint fails to establish their personal involvement in the deprivation alleged; and 3) in any event they are entitled to qualified immunity.[FN5] Plaintiff has since responded in opposition to defendants' motion, Dkt. No. 13, which is now fully briefed and ripe for determination, and has been referred to me for the issuance of a report and recommendation pursuant to 28 U.S.C. § 636(b)(1)(B) and Northern District of New York Local Rule 72.3(c). *See also* Fed.R.Civ.P. 72(b).

> FN5. Defendant's also seek a protective order pursuant to Rule 26(c) of the Federal Rules of Civil Procedure staying discovery in this matter pending final determination of their dismissal motion. Discerning no basis to conclude that plaintiff would be unduly prejudiced by such a stay, that application will be granted.

### III. *DISCUSSION*

#### A. *Dismissal Motion Standard*

A motion to dismiss a complaint, brought pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure, calls upon a court to gauge the facial sufficiency of that pleading, utilizing as a backdrop a pleading standard which, though unexacting in its requirements, "demands more than an unadorned, the-defendant-unlawfully-harmed me accusation" in order to withstand scrutiny. *Ashcroft v. Iqbal,* ——U.S. ——, ——, 129 S.Ct. 1937, 1949 (2009) (citing *Bell Atlantic Corp. v. Twombly,* 550 U.S. 554, 555, 127 S.Ct. 1955, (2007)). Rule 8(a)(2) of the Federal Rules of Civil Procedure requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). *Id.* While modest in its requirement, that rule commands that a complaint contain more than mere legal conclusions; "[w]hile legal

conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft,* ——U.S. ——, 129 S.Ct. at 1950.

To withstand a motion to dismiss, a complaint must plead sufficient facts which, when accepted as true, state a claim which is plausible on its face. *Ruotolo v. City of New York,* 514 F.3d 184, 188 (2d Cir.2008) (citing *Twombly,* 550 U.S. at 570, 127 S.Ct. at 1974). As the Second Circuit has observed, "[w]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to 'nudge [plaintiffs'] claims across the line from conceivable to plausible.' " *In re Elevator Antitrust Litig.,* 502 F.3d 47, 50 (2d Cir.2007) (quoting *Twombly,* 550 U.S. at 570 127 S.Ct. at 1974). When assessing the sufficiency of a complaint against this backdrop, particular deference should be afforded to a *pro se* litigant whose complaint merits a generous construction by the court when determining whether it states a cognizable cause of action. *Erickson v. Pardus,* 551 U.S. 89, 94, 127 S.Ct. 2197, 2200 (2007) (" '[A] *pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers' ") (quoting *Estelle v. Gamble,* 429 U.S. 97, 106, 97 S.Ct. 285, 292 (1976) (internal quotations omitted)).

#### B. *Procedural Due Process*
**\*4** In their motion, defendants assert that because plaintiff's due process claim rests on alleged violations of DOCS regulations, his complaint in fact fails to assert a cognizable due process claim.

To successfully state a claim under 42 U.S.C. § 1983 for the denial of procedural due process arising out of a disciplinary hearing, a plaintiff must show that he or she 1) possessed an actual liberty interest, and 2) was deprived of that interest without being afforded sufficient procedural safeguards. *See Tellier v. Fields,* 260 F.3d 69, 79–80 (2d Cir.2000) (citations omitted); *Hynes,* 143 F.3d at 658; *Bedoya v. Coughlin,* 91 F.3d 349, 351–52 (2d Cir.1996). Inmates' liberty interests

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

may arise out of the Due Process Clause of the Fourteenth Amendment, or state statute or regulation. *Arce v. Walker,* 139 F.3d 329, 333 (2d Cir.1998) (citing *Kentucky Dep't of Corr. v. Thompson,* 490 U.S. 454, 460, 109 S.Ct. 1904, 1908 (1989)).

Recognizing that lawful imprisonment necessarily restricts the rights and privileges of inmates, the Supreme Court has narrowly circumscribed the scope of liberty interests arising out of the Due Process clause to protect only the most basic liberty interests of prisoners. *Hewitt v. Helms,* 459 U.S. 460, 467, 103 S.Ct. 864, 869 (1983). Accordingly, the Due Process Clause does not guard against every change in the conditions of confinement having a substantial adverse impact on inmates, but only those conditions or restraints that "exceed[ ] the sentence in ... an unexpected manner." *Arce,* 139 F.3d at 333 (quoting *Sandin v. Conner,* 515 U.S. 472, 484, 115 S.Ct. 2293, 2300 (1995)).

In this instance plaintiff does not claim that he was denied procedural due process in connection with the disciplinary hearing that led to the imposition of a three-month period of keeplock confinement as a sanction. Instead, he argues that his due process rights were abridged after the sanction was imposed when, in violation of DOCS Directive No. 4933,[FN6] he was transferred from keeplock confinement at Auburn to an SHU cell at Upstate, and as a result required to endure a more restrictive confinement. Unfortunately for plaintiff, neither the Due Process Clause nor state statute or regulation give rise to a liberty interest in these circumstances.

> FN6. Section 301.6(a) of DOCS Directive No. 4933 permits an inmate confined in a medium or minimum security facility, or at Upstate, to be admitted into an SHU for various reasons, which can include confinement pursuant to a Tier II or III hearing disposition. Plaintiff asserts that because he was transferred from Auburn, a maximum

security facility, into an SHU unit, that section does not apply. Interestingly, a prior version of DOCS Directive No. 4933 provided, in relevant part, that

> [a]n inmate who is assigned to keeplock status and who is transferred to a maximum security facility shall not be assigned to the special housing unit at the receiving facility. Such inmate shall be assigned to keeplock within general population and shall have the same rights and responsibilities as other keeplock inmate in that facility.

> *Lee v. Coughlin,* 26 F.Supp.2d 615, 628 (S.D.N.Y.1998) (quoting prior version of 7 NYCRR § 301.6(h)).

Preliminarily, it is well recognized that an inmate has no constitutional right to be incarcerated at a particular correctional facility, "and transfers among facilities do not need to be proceeded by any particular due process procedure." *Halloway v. Goord,* No. 9:03–CV01524, 2007 WL 2789499, at * 5 (N.D.N.Y. Sept. 24, 2007) (Kahn, J. and Treece, J.) [FN7] (citing *Wilkinson v. Austin,* 545 U.S. 209, 221–22 (2005)) (other citation omitted); *see also, Johnson v. Rowley,* 569 F.3d 40, 43 (2d Cir.2009) (per curiam); *Davis v. Kelly,* 160 F.3d 917, 920 (2d Cir.1998). As a result, the constitution did not present any impediment to plaintiff's transfer to Upstate.

> FN7. Copies of all unreported decisions cited in this document have been appended for the convenience of the *pro se* plaintiff. [Editor's Note: Appended decisions deleted for Westlaw purposes.]

**\*5** Additionally, it is equally well established, as defendants now argue, that state regulations, including DOCS Directives, do not ordinarily confer constitu-

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

tional rights sufficient to give rise to a due process claim. *Snider v. Dylag,* 188 F.3d 51, 53 (2d Cir.1999) (citing *Dwares v. City of New York,* 985 F.2d 94, 98 (2d Cir.1993)); *Cusamano v. Sobek,* 604 F.Supp.2d 416, 482 (N.D.N.Y.2009). A state can, however, by statute or regulation confer a liberty interest which cannot be abridged without due process. *Black v. Lansberg,* No. 9:06–CV–1243, 2009 WL 3181111, at *3 (Sept. 29, 2009) (Suddaby, J., adopting Report and Recommendation of Lowe, M.J.). Nonetheless, contrary to plaintiff's contention, DOCS Directive No. 4933 does not give rise to a cognizable liberty interest.

It should be noted that on at least four separate occasions, addressing the same issues raised by the plaintiff in this case, this court has held that an inmate's transfer from keeplock to SHU after being sentenced to serve time in keeplock does not implicate a cognizable liberty interest. *McEachin v. Goord,* No. 9:06–CV–1192, 2008 WL 1788440 (N.D.N.Y. Apr. 17, 2008) (Hurd, J. and Treece, M.J.) (dismissing complaint alleging that plaintiff was unlawfully transferred from keeplock to SHU while serving disciplinary sentence); *Halloway,* 2007 WL 2789499 (granting summary judgment dismissing claim that plaintiff should have received hearing before transfer to Upstate after sentenced to keeplock at Elmira Correctional Facility); *Carlisle v. Goord,* No. 9:03–CV–296, 2007 WL 2769566, at *2 n. 1 (N.D.N.Y. Sept. 21, 2007) (Scullin, S.J., adopting Report and Recommendation of Lowe, M.J.) (granting summary judgment finding that "an inmate has no liberty interest in not having his sentence of keeplock confinement at one prison converted to a sentence of SHU confinement at another facility without receiving a hearing regarding the conversion."); and, *Chavis v. Kienert,* 9:03–CV–0039, 2005 WL 2452150, at *9–10 (N.D.N.Y. Sept. 30, 2005) (Scullin, C.J.) (finding that transfer from keeplock at Coxsackie Correctional Facility to SHU at Upstate did not implicate a liberty interest). *See also, Holmes v. Grant,* No. 03–Civ. 3426, 2006 WL 851753, at *18–19 (S.D.N.Y. mar. 31, 2006 (dismissing claim plaintiff's claim that discipli-

nary sentence was improperly converted from keeplock sentence to SHU). These decisions are premised upon the court's conclusion that a transfer from keeplock in one facility to SHU in another does not implicate a constitutionally protected liberty interest and that "New York has not created, by regulation or statute, any liberty interest in remaining in one particular prison[,]" noting that "the DOCS ... possesses sole discretion to determine 'where a [state] inmate will be housed.' " *Halloway,* 2007 WL 2789499, at *5 (quoting *Grullon v. Reid,* No. 97 CIV. 7616, 1999 WL 436457, at *10 (S.D.N.Y. Jun. 24, 1999)) (other citations omitted). These cases are indistinguishable from the case presently before the court.

***6** Moreover, contrary to the interpretation offered by the plaintiff, the court has read section 301.6 of DOCS Directive No. 4933 as "explicitly permitt[ing] keeplock sentences to be served in SHU and subject to the same restrictions and amenities ...." *McEachin,* 2008 WL 1788440, at *4; *see also, Halloway,* 2007 WL 278499, at * 5 ("[N]ot only do New York State Regulations permit keeplock sentences to be served in SHU, but further contemplate that assignments to SHU will be subject to the same ... limitations.") and *Holmes,* 2006 WL 851753, at * 19 ("Section 301.6 ... relat[es] to keeplock admissions and authorizes placement of inmates in SHU 'at a medium or minimum security correctional facility or *Upstate Correctional Facility* ... for confinement pursuant to disposition of a disciplinary (Tier II) or superintendent's (Tier II hearing.' ") (emphasis in original).

In view of the foregoing, it is clear that plaintiff's transfer from Auburn, where he was keeplocked, to SHU confinement at Upstate does not implicate a liberty interest arising out of either Due Process Clause, or state statute or regulation. According to plaintiff's complaint, he was sentenced to keeplock after a Tier III disciplinary hearing; he does not allege that he was denied due process in connection with that

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
(Cite as: 2010 WL 624081 (N.D.N.Y.))

hearing. The Tier II I hearing that he was provided was all that was required by the constitution before he was sentenced to disciplinary confinement. *Holmes,* 2006 WL 851753, at \*19. Plaintiff was entitled to no further procedure at the time of transfer to Upstate, and therefore cannot show that he was deprived of a protected liberty interest without due process of law.[FN8] *Id.* Accordingly, I recommend that plaintiff's complaint be dismissed for failure to state a cause of action.

> [FN8]. Plaintiff alleges a litany of differences between the conditions experienced while in keeplock at Auburn and those in SHU at Upstate asserting, for example, that with regard to visits, he was required to travel to and from them in handcuffs, had to remain in handcuffs if he needed to use the restroom, and was not permitted to take photographs, and also that he did not have the same opportunities for social interaction with other prisoners and had to sleep with a light on. Plaintiff's Memorandum (Dkt.1–1) at pp. 11–12. As a matter of law, these alleged conditions can hardly be characterized as "exceed[ing] his sentence in an unexpected manner" or as imposing an "atypical and substantial hardship upon the [plaintiff] in relation to the ordinary incidents of prison life". *Sandin,* 515 U.S. at 484, 115 S.Ct. at 2300. "[T] fact that 'life in one prison is much more disagreeable than another does not itself signify that a Fourteenth Amendment liberty interest is implicated....'" *Halloway,* 2007 WL 2789499, at \* 7 (quoting *Meachum v. Fano,* 427 U.S. 215, 225 (1976). Moreover, even if a liberty interest were alleged, plaintiff was afforded all the process he was due, by way of a disciplinary proceeding, before the alleged deprivation. *Carlisle,* 2007 WL 2769566, at \* 3.

*C. Personal Involvement*

In their motion, defendants also challenge the sufficiency of plaintiff's allegations regarding their personal involvement in the constitutional deprivations alleged. Personal involvement of defendants in alleged constitutional deprivations is a prerequisite to an award of damages under section 1983. *Wright v. Smith,* 21 F.3d 496, 501 (2d Cir.1994) (citing *Moffitt v. Town of Brookfield,* 950 F.2d 880, 885 (2d Cir.1991) and *McKinnon v. Patterson,* 568 F.2d 930, 934 (2d Cir.1977), *cert. denied,* 434 U.S. 1087, 98 S.Ct. 1282 (1978)). In order to prevail on a section 1983 cause of action against an individual, a plaintiff must show some tangible connection between the constitutional violation alleged and that particular defendant. *See Bass v. Jackson,* 790 F.2d 260, 263 (2d Cir.1986).

Two of the three defendants, Brian Fischer and Robert Woods, appear to be named as defendants in their supervisory capacities, based solely upon their positions as the DOCS Commissioner and the Superintendent at Upstate, respectively. As supervisors, neither of those individuals can be liable for damages under section 1983 solely by virtue of their respective positions as supervisor; there is no *respondeat superior* liability under section 1983. *Richardson v. Goord,* 347 F.3d 431, 435 (2d Cir.2003); *Wright,* 21 F.3d at 501. Vague and conclusory allegations that a supervisor has failed to train or properly monitor the actions of subordinate employees will not suffice to establish the requisite personal involvement and support a finding of liability. *Pettus v.. Morgenthau,* 554 F.3d 293, 300 (2d Cir.2009) ("To the extent that [a] complaint attempts to assert a failure-to-supervise claim ... [that claim is insufficient where] it lacks any hint that [the supervisor] acted with deliberate indifference to the possibility that his subordinates would violate [plaintiff's] constitutional rights."). Culpability on the part of a supervisory official for a civil rights violation can, however, be established in one of several ways, including when that individual 1) has directly participated in the challenged conduct; 2) after learning of the violation through a report or appeal,

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 8

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
(Cite as: 2010 WL 624081 (N.D.N.Y.))

has failed to remedy the wrong; 3) created or allowed
to continue a policy or custom under which uncon-
stitutional practices occurred; 4) was grossly negli-
gent in managing the subordinates who caused the unlaw-
ful event; or 5) failed to act on information indicating
that unconstitutional acts were occurring. *Iqbal v.
Hasty,* 490 F.3d 143, 152–53 (2d Cir.2007), *rev'd on
other grounds, sub nom., Ashcroft v. Iqbal,* ──U.S.
──, 129 S.Ct. 1937.; *see also Richardson,* 347 F.3d
at 435; *Wright,* 21 F.3d at 501; *Williams v. Smith,* 781
F.2d 319, 323–24 (2d Cir.1986).

### 1. *Commissioner Fischer*

**\*7** Aside from allegations centering upon his role
as the DOCS Commissioner, which are clearly insuf-
ficient in and of themselves to establish his liability,
plaintiff's claims against defendant Fischer appear to
revolve around the letter written by him to the Com-
missioner on or about April 23, 2007, complaining of
his SHU confinement at Upstate. That letter, it appears
from the limited materials now before the court, was
referred to defendant Knapp–David for response. It is
well established that when the Commissioner receives
a letter and forwards it on to another individual for
investigation and a response, his or her involvement in
the constitutional violation cannot be predicated solely
upon those circumstances. *Sealey v. Giltner,* 116 F.3d
47, 51 (2d Cir.1997); *Rivera v. Fischer,* No.
08–CV–6505L, 2009 WL 2981876, at \*2 (W.D.N.Y.
Sept. 18, 2009). I therefore recommend dismissal of
plaintiff's claims against Commissioner Fischer on the
basis of lack of his personal involvement.

### 2. *Superintendent Woods*

Plaintiff's claims against Superintendent Woods
stand on slightly different footing. It is alleged that
Superintendent Woods processed and affirmed the
determination of the Upstate IGRC denying plaintiff's
grievance regarding the relevant occurrences. His
review of plaintiff's grievance arguably placed Su-
perintendent Woods on notice of a constitutional vi-
olation, which was ongoing, at a time when he was
potentially positioned to end the violation. On that

basis I conclude that plaintiff has sufficiently alleged
Superintendent Woods' personal involvement in the
violation alleged to withstand defendants' dismissal
motion. *See Charles v. New York State Dept. of Corr.
Services,* No. 9:07–CV–1274, 2009 WL 890548, at
\*5–9 (N.D.N.Y. Mar. 21, 2009) (Hurd, J. and DiBi-
anco, M.J .).

### 3. *Director Knapp–David*

Plaintiff's complaint alleges that in her position as
the DOCS Director of Classification and Movement,
defendant Knapp–David would have reviewed and
approved his transfer from Auburn into Upstate. That
allegation is buttressed by both her position with the
DOCS and the fact that plaintiff's letter regarding the
matter was referred to defendant Knapp–David for
response explaining why the transfer was proper under
DOCS regulations. On this basis, I conclude that
plaintiff has stated a plausible claim against defendant
Knapp–David and her personal involvement in the
constitutional deprivations alleged.

### D. *Qualified Immunity*

In their motion, defendants also assert entitlement
to qualified immunity from suit. Qualified immunity
shields government officials performing discretionary
functions from liability for damages "insofar as their
conduct does not violate clearly established statutory
or constitutional rights of which a reasonable person
would have known." *Harlow v. Fitzgerald,* 457 U.S.
800, 818, 102 S.Ct. 2727, 2738 (1982) (citations
omitted). "In assessing an officer's eligibility for the
shield, 'the appropriate question is the objective in-
quiry whether a reasonable officer could have be-
lieved that [his actions were] lawful, in light of clearly
established law and the information the officer[ ]
possessed." *Kelsey v. County of Schoharie,* 567 F.3d
54, 61 (2d Cir.2009) (quoting *Wilson v. Layne,* 526
U.S. 603, 615, 119 S.Ct. 1692 (1999)). The law of
qualified immunity seeks to strike a balance between
the need to hold government officials accountable for
irresponsible conduct and the need to protect them
from "harassment, distraction, and liability when they

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

perform their duties reasonably." *Pearson v. Callahan,* 555 U.S. ——, 129 S.Ct. 808, 815 (2009).

**\*8** In *Saucier v. Katz,* 533 U.S. 194, 121 S.Ct. 2151 (2001), the Supreme Court "mandated a two-step sequence for resolving government official's qualified immunity claims." *Pearson,* 555 U.S. ——, 129 S.Ct. at 816. The first step required the court to consider whether, taken in the light most favorable to the party asserting immunity, the facts alleged show that the conduct at issue violated a constitutional right,[FN9] *Kelsey,* 567 F.3d at 61, "the second step being whether the right is clearly established", *Okin v. Village of Cornwall–On–Hudson Police Dept.,* 577 F.3d 415, 430 n. 9 (citing *Saucier* ).[FN10] Expressly recognizing that the purpose of the qualified immunity doctrine is to ensure that insubstantial claims are resolved prior to discovery, the Supreme Court recently concluded in *Pearson* that because "[t]he judges of the district courts and courts of appeals are in the best position to determine the order of decisionmaking [that] will best facilitate the fair and efficient disposition of each case", those decision makers "should be permitted to exercise their sound discretion in deciding which of the ... prongs of the qualified immunity analysis should be addressed first in light of the circumstances of the particular case at hand." [FN11] *Pearson,* 555 U.S. ——, 129 S.Ct. at 818, 821. In other words, as recently emphasized by the Second Circuit, the courts "are no longer *required* to make a 'threshold inquiry' as to the violation of a constitutional right in a qualified immunity context, but we are free to do so." *Kelsey,* 567 F.3d at 61 (citing *Pearson,* 129 S.Ct. at 821) (emphasis in original).

> FN9. If no constitutional right would have been violated were the allegations established, no further inquiry regarding qualified immunity is necessary. *Kelsey,* 567 F.3d at 61 (quoting *Saucier* ).

> FN10. In *Okin,* the Second Circuit clarified that the " 'objectively reasonable' inquiry is

part of the 'clearly established' inquiry", also noting that "once a court has found that the law was clearly established at the time of the challenged conduct and for the particular context in which it occurred, it is no defense for the [government] officer who violated the clearly established law to respond that he held an objectively reasonable belief that his conduct was lawful." *Okin,* 577 F.3d at 433 n. 11 (citation omitted).

> FN11. Indeed, because qualified immunity is "an immunity from suit rather than a mere defense to liability ...", *Mitchell v. Forsyth,* 472 U.S. 511, 526, 105 S.Ct. 2806 (1985), the Court has "repeatedly ... stressed the importance of resolving immunity questions at the earliest possible stage in the litigation." *Pearson,* —— U.S. ——, 129 S.Ct. at 815 (quoting *Hunter v. Bryant,* 502 U.S. 224, 227, 112 S.Ct. 524 (1991) (per curiam)).

For courts engaging in a qualified immunity analysis, "the question after *Pearson* is 'which of the two prongs ... should be addressed in light of the circumstances in the particular case at hand.' " *Okin,* 577 F.3d 430 n. 9 (quoting *Pearson* ). "The [*Saucier* two-step] inquiry is said to be appropriate in those cases where 'discussion of why the relevant facts do not violate clearly established law may make it apparent that in fact the relevant facts do not make out a constitutional violation at all .' " *Kelsey,* 567 F.3d at 61 (quoting *Pearson,* 129 S.Ct. at 818).

"The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier,* 533 U.S. at 202, 121 S.Ct. at 2156 (citation omitted). When deciding whether a right was clearly established at the relevant time, a court should consider

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

(1) whether the right in question was defined with "reasonable specificity"; (2) whether the decisional law of the Supreme Court and the [Second Circuit] support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

**\*9** *Wright v. Smith,* 21 F.3d 496, 500 (2d Cir.1994) (quoting *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993)). The objective reasonableness test will be met, and qualified immunity enjoyed, where government officers of reasonable competence could disagree as to whether by his or her alleged conduct the defendant would be violating the plaintiff's rights. *Okin,* 577 F.3d at 433 (quoting *Malley v. Briggs,* 475 U.S. 335, 341, 106 S.Ct. 1092 (1986)). "If, on the other hand, no officer of reasonable competence would conclude that the conduct in question is lawful, there is no immunity." *Okin,* 577 F.3d at 433 (citing *Lennon v.. Miller,* 66 F.3d 416, 420–21 (2d Cir.1995)).

Applying the *Saucier* two-step inquiry here, I have already determined that plaintiff has failed to state a plausible constitutional violation. Moreover, even if plaintiff were able to distinguish the existing precedent in this district and allege a protected liberty interest that required that plaintiff be provided with additional due process before his transfer to Upstate, I conclude that any such right was far from a clearly established and that a reasonable person in the circumstances of defendant Woods and defendant Knapp–David would not have appreciated that the transfer of plaintiff into SHU confinement at Upstate represented a potential deprivation of plaintiff's procedural due process rights beyond those addressed by the hearing officer. Accordingly, as an additional basis for dismissal, I recommend that both defendants Woods and Knapp–David be granted qualified immunity from suit.

### IV. *SUMMARY AND RECOMMENDATION*

At the heart of plaintiff's complaint in this action is his contention that his due process rights and DOCS regulations were violated when he was transferred from keeplock confinement at Auburn into an SHU cell at Upstate. Since such a claim, it is well established in this district, is not constitutionally cognizable, White has therefore failed to state a claim upon which relief may be granted. While plaintiff has failed to establish personal involvement on the part of Commissioner Fischer in an alleged deprivation and the claims against him should be dismissed on this additional basis, plaintiff has sufficiently alleged personal involvement on the part of defendant Knapp–David and R. Woods. Nonetheless, I find that those two defendants are entitled to qualified immunity from suit, providing an additional basis for dismissal of plaintiff's claims against them. Accordingly, it is hereby respectfully

RECOMMENDED that defendants' motion to dismiss (Dkt. No. 10) be GRANTED, and that plaintiff's complaint in this action be DISMISSED, without leave to replead; and it is further

ORDERED that pending a final determination on defendants' dismissal motion, discovery in this action be and hereby is STAYED.

NOTICE: Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court within FOURTEEN days of service of this report. FAILURE TO SO OBJECT TO THIS REPORT WILL PRECLUDE APPELLATE REVIEW. 28 U.S.C. § 636(b)(1); Fed.R.Civ.P. 6(a), 6(d), 72; *Roldan v. Racette,* 984 F.2d 85 (2d Cir.1993).

**\*10** It is hereby ORDERED that the clerk of the court serve a copy of this Report and Recommendation upon the parties in accordance with this court's local rules.

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.

Not Reported in F.Supp.2d, 2010 WL 624081 (N.D.N.Y.)
**(Cite as: 2010 WL 624081 (N.D.N.Y.))**

N.D.N.Y.,2010.
White v. Fischer
Not Reported in F.Supp.2d, 2010 WL 624081
(N.D.N.Y.)

END OF DOCUMENT

© 2014 Thomson Reuters. No Claim to Orig. US Gov. Works.